UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE KOELTL**

---

SECURITIES AND EXCHANGE COMMISSION,

                            Plaintiff,

                               v.

JON-PAUL RORECH and
RENATO NEGRIN,

                            Defendants.

: **09 CIV 4329**
:
:
: Civil Action No. 09-CV-____
:
:
:
:
:
:
:



**COMPLAINT**

        Plaintiff Securities and Exchange Commission (the "Commission") for its Complaint against Defendants Jon-Paul Rorech ("Rorech") and Renato Negrin ("Negrin") (collectively, the "Defendants"), alleges as follows:

        1.     This case involves unlawful insider trading conducted in credit default swaps ("CDSs") by Rorech, a bond and CDS salesman employed by Deutsche Bank Securities Inc. ("DBSI"), and Negrin, a portfolio manager employed by Millennium Partners, L.P. ("Millennium").

        2.     In July 2006, by virtue of his employment at DBSI, Rorech became privy to confidential information concerning restructuring of an upcoming bond issuance by VNU N.V. ("VNU"), a Dutch media conglomerate. This information was material to the market price of the separately-traded CDSs that referenced VNU bonds. Notwithstanding his duty to maintain the confidentiality of this material information, Rorech provided it to Negrin, who, on behalf of a hedge fund advised by Millennium, then purchased CDSs covering the VNU bonds based on that inside information. After the announcement that the bond issue would be restructured, the price

of the CDSs Negrin had purchased rose significantly. Negrin closed Millennium's CDS position in VNU for a profit of approximately $1.2 million.

3.    By the conduct alleged herein, the Defendants, directly or indirectly, have engaged, and, unless enjoined and restrained, will again engage, in transactions, acts, practices or courses of business that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, C.F.R. § 240.10b-5, thereunder.

## JURISDICTION AND VENUE

4.    The Commission brings this action pursuant to its authority under Section 21(d) of the Exchange Act, 15 U.S.C. §78u(d), to enjoin the Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, for disgorgement of profits and prejudgment interest thereon, and for civil penalties pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(3). The Commission also brings this action pursuant to Section 21A of the Exchange Act, 15 U.S.C. § 78u-1, for civil penalties against the Defendants under the Insider Trading and Securities Fraud Enforcement Act of 1988 ("ITSFEA"). The Commission also seeks such other relief as the Court may deem appropriate.

5.    This Court has jurisdiction over this action pursuant to Sections 21( 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u-1, and 78aa.

6.    Certain of the alleged transactions, acts, practices, and courses of business occurred in the Southern District of New York, including, but not limited to, Rorech's tipping of material non-public information to Negrin. Accordingly, venue in this district is proper under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

7.    By the conduct alleged in this Complaint, the Defendants, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication

in, or the means or instrumentalities of, interstate commerce, or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

## DEFENDANTS

8.      Jon-Paul Rorech, age 36, lives in Brooklyn, New York. Rorech is employed as a bond and CDS salesman at DBSI. Rorech has been in the securities industry for 14 years and has Series 7 and 63 licenses.

9.      Renato Negrin, age 45, resides in New York, New York. Negrin is employed as a portfolio manager at Millennium Partners, L.P., an unregistered hedge fund investment adviser located in New York, New York. Negrin is the head of a credit trading group of about seven individuals. Negrin has been employed in the securities industry for over 22 years and holds a Series 7 license.

## OTHER RELEVANT ENTITIES

10.     VNU is a Dutch media conglomerate that was taken private in May 2006 by a consortium of private equity companies. In order to finance the acquisition, VNU and its private equity owners ("financial sponsors") announced a proposed financial restructuring on July 10, 2006, which included a bond offering ultimately completed in August 2006. In January 2007, VNU changed its name to the Nielsen Company, but will be referred to herein as VNU.

11.     DBSI is a registered broker dealer and registered investment adviser located in New York, New York that served as lead underwriter for VNU's bond offering during July and August 2006. DBSI is a subsidiary of Deutsche Bank AG.

3

## Background

12.     CDSs are a type of credit derivative, economically similar to default insurance for a referenced debt obligation, such as a bond. The seller of a CDS agrees to pay to the buyer of the CDS a specified (or "notional") amount of money if the issuer of the bond referenced by the CDS defaults on its obligations. The CDS buyer, in return for that protection, pays a specified amount, or premium, to the CDS seller each quarter, during the term of the CDS contract. In the event of a default, the CDS buyer tenders defaulted bonds (or their cash equivalent) to the CDS seller in exchange for the full notional amount of the CDS.

13.     CDSs are bilateral contracts traded over the counter, not on registered exchanges. CDSs are priced and traded based on their market value at the time of the trade, and are quoted in basis points. CDSs may be and are separately traded from the debt obligations that they reference, without any purchase or sale of the referenced debt obligation required.

14.     One factor affecting the price of CDSs referencing the VNU bonds in July 2006 was the limited supply of bonds covered by (or, "deliverable into") those CDSs. An increase in the supply of VNU bonds deliverable into CDSs would result in an increase in exposure and demand for CDSs covering the default of such bonds and, therefore, an increase in the market price for CDSs referencing those bonds.

15.     On July 10, 2006, VNU announced a new financing structure to fund the recent takeover of VNU. The announced structure was to include $1.67 billion of debt issued by VNU's subsidiaries, Nielsen Finance LLC and Nielsen Finance Co. ("Nielsen").

16.     At the time of the July 10 announcement, the only VNU-related CDSs available in the market referenced bonds issued, not from Nielsen, but from the holding company, VNU.

4

These existing CDSs did not appear to the market to provide coverage for a default of the newly-announced Nielsen bonds.

17.    In response to perceived market demand for VNU debt obligations that would be covered by, or "deliverable into" VNU CDSs, DBSI, as the lead underwriters for the bond offering, began to explore, at least as early as July 12, 2006, different ways of responding to the market's concerns about the lack of bonds covered by existing VNU CDSs.

18.    These discussions included the possibility of adding a new layer (or "tranche") of bonds issued from the VNU holding company that would be covered by the existing CDSs.

19.    DBSI bankers in New York led the effort to create a tranche of holding company bonds.

20.    DBSI bankers continuously communicated with the financial sponsors about issuing holding company bonds from July 12 until July 24, 2006, when it was publicly announced that VNU would be issuing a tranche of bonds out of the holding company.

21.    During the period before the July 24 announcement, DBSI employees were aware that information concerning the restructuring of the Nielsen bond offering to address deliverability of the new bonds into the CDSs would impact the market price for VNU CDSs.

22.    These discussions, and the financial restructuring ultimately decided upon by DBSI and the VNU financial sponsors, materially affected the pricing for the CDSs referencing VNU bonds. After the announcement, the CDS prices substantially increased, accounting for the cost of the protection that the CDSs would be providing for the VNU bonds. A trader who had purchased a CDS referencing VNU bonds before the announcement would have seen an increase in the market value of those CDS holdings, as the pricing for such CDSs rose after the July 24 announcement.

**From July 14 to July 21, Rorech Obtained Confidential
and Material Information Concerning VNU's Financial Restructuring**

23.     Information concerning the VNU restructuring was confidential.  DBSI's policies,

in place as of July 2006, prohibited Rorech from disclosing confidential information concerning

the bond offering restructuring.  Accordingly, Rorech had a duty to keep information he learned

about the bond restructuring confidential.

24.     For example, DBSI's written Confidential and Inside Information Policy (the

"Policy"), in effect at the relevant time, provided as follows:

> Confidential information is proprietary information, customer
> information, or any other type of information provided by or
> obtained from a third party with the expectation or contractual
> agreement that it will remain confidential.  Employees should
> presume that all business information acquired in connection with
> their day-to-day responsibilities at DBUS (including its affiliates
> and subsidiaries), from its clients and in connection with business
> transactions is confidential unless the information is already in the
> public domain.

25.     Examples of confidential information under the Policy include "pending or

contemplated customer orders" and "[c]ompany information which includes information

concerning Deutsche Bank's business and operations, [and] its clients (including any information

given the Company by its clients) . . . ."

26.     The Policy prohibited the communication of confidential information to anyone

without a legitimate need to know.  The Policy further precluded its employees from disclosing

or tipping inside information, such as information about plans to issue securities or derivatives

thereof, to someone else who trades on it.

27.     By July 2006, Rorech had received training on confidential and inside information

from DBSI, and from two employers previous to DBSI.

6

28.     The engagement letter between DBSI and VNU included a confidentiality provision to protect against disclosure of confidential information.  The confidentiality provision required DBSI to use all non-public information shared with it solely for providing underwriting services.

29.     Between July 10 and the morning of July 17, 2006, Rorech was in daily communications with a DBSI fixed income banker and others.  In these communications, Rorech was provided with confidential information about the proposed restructuring.  This included, among other things, information concerning (i) the financial sponsors' communications with DBSI, (ii) orders and indications of interest by DBSI's customers for a new holding company tranche of bonds deliverable into CDSs, and (iii) DBSI's advice and recommendations to the financial sponsors concerning the issuance of bonds deliverable into CDSs.

30.     The confidential information Rorech obtained in these communications confirmed to him that DBSI would be recommending to VNU that it issue a holding company tranche of bonds deliverable into CDSs, and that VNU would likely adopt that recommendation.  During the week of July 17, Rorech continued to receive information consistent with the foregoing.

31.     This non-public information was material to the market pricing for CDSs that referenced VNU's bonds.

### Rorech Breached His Duty to DBSI By Tipping Negrin Confidential Information Regarding the Restructuring

32.     From July 14 through July 17, 2006, Rorech had a series of communications with Negrin, in which he tipped Negrin to the confidential information that DBSI would be recommending to the financial sponsors that VNU issue a tranche of bonds out of the VNU holding company that would be deliverable into CDSs, that it was likely the sponsors would do so, and that DBSI had $200 million worth of customer orders for and interest in that tranche.

7

33.     This non-public information assured Negrin that he would profit by buying CDSs that referenced VNU bonds before the public announcement of that tranche, and then selling those CDSs after VNU announced the restructuring, and the demand (and price) for those CDSs increased.

34.     On the morning of July 14, Rorech, after inquiring as to Negrin's interest in trading CDSs that reference VNU bonds, told Negrin on a recorded telephone line that the odds were "very good" that VNU would be issuing bonds at the holding company level.  When Negrin asked Rorech for some way to assess and "handicap" that probability, Rorech paused, and responded, "you're listening to my silence, right?"  Negrin then replied, "OK, I'll call you back," and Rorech and Negrin ended the recorded telephone call.  Immediately thereafter, Negrin and Rorech conducted an unrecorded three-minute phone conversation on their cell phones.

35.     Rorech and Negrin spoke again at approximately 10:50 am on Monday, July 17. Negrin called Rorech on a recorded line, and said he "want[ed] to talk about that other situation." After confirming that Negrin was referring to VNU, Rorech responded "call my cell." Immediately thereafter, Negrin placed an unrecorded 4-minute call from his cell to Rorech's cell.

36.     During these and other conversations during this time period, Rorech solicited and encouraged Negrin to purchase VNU CDSs based on this nonpublic information, with the understanding that the price of CDSs would increase substantially once the new tranche was announced.

37.     On July 20, Negrin and Rorech spoke on a recorded line and Rorech told Negrin that the price of VNU CDSs was "15 wider in London" that morning, and that "things seem to be, uh, you know, going okay with the structure . . . so I think we'll, uh, uh, I'm hoping next

8

week we'll have a definitive answer." Negrin said "Okay. So they're going okay?" Rorech replied, "Uh-hum" and Negrin said "Okay, excellent."

38.     The foregoing communications constituted a breach by Rorech of the duty he owed to DBSI not to disclose the confidential information described above.

39.     Rorech and Negrin both understood that information concerning the restructuring of the Nielsen offering that resulted in bonds deliverable into VNU CDSs would, when it became public, increase CDS prices.

40.     The information Rorech and Negrin were discussing the week of July 17 concerning the restructuring was non-public because the information had not been broadly disseminated to the investing public generally and was not reflected in the price of the VNU CDSs.

41.     Rorech received a benefit from tipping Negrin because the tip solidified his client relationship with Negrin.  Rorech also received credit from DBSI toward his compensation for trades placed by his clients, including Negrin's CDS trades with DBSI.

### Negrin Traded on the Confidential and Material Information Rorech Had Provided to Him

42.     After the call between Rorech and Negrin on July 17, Negrin, between 12:30 and 1:00 p.m. that same day, placed an order with DBSI for €10 million worth of VNU CDS at 383 basis points, on behalf of a hedge fund advised by Millennium.  On July 18, Negrin bought €10 million more VNU CDS from another dealer at 383 basis points, on behalf of a hedge fund advised by Millennium.

43.     After the July 24, 2006 public announcement that VNU would be issuing bonds at the holding company level, and which would be deliverable into CDSs, the price of CDSs referencing the VNU bonds rose substantially.

44.     Following the July 24, 2006 announcement, Negrin sold the VNU CDS for a profit of almost €950,000, approximately $1.2 million at the exchange rate at the time. In a conversation with Rorech on July 24, Negrin expressed his gratitude to him.

45.     Rorech and Negrin, when discussing information about the VNU financial restructuring, repeatedly switched from recorded telephone lines to unrecorded cell phone communications. Rorech knew that the information he was providing to Negrin concerning the restructuring was material, nonpublic and provided in breach of Rorech's duties to his employer. Rorech was aware of DBSI's policies concerning the treatment of confidential information, and knew that the information he had imparted to Negrin was confidential. Indeed, Rorech knew that as of July 12, he was specifically restricted by DBSI from soliciting trades in, for example, VNU CDSs.

46.     Negrin also knew or should have known that Rorech provided him with information concerning the restructuring in breach of duties owed to DBSI.

47.     Negrin has been working in the securities industry in various capacities since 1986. From his long experience in the securities industry, Negrin was familiar with standard controls concerning confidentiality obligations with regard to material nonpublic information. In addition, Negrin received compliance training during the course of his employment with Millennium, and affirmed each year that he read Millennium's compliance policy.

48.     Negrin knew that Rorech was employed by the lead underwriter on the bond offering, and privy to nonpublic information concerning the restructuring. For this reason, Negrin sought from Rorech, and Rorech provided, concrete facts concerning the restructuring so that Negrin could profit from CDS trading.

### Rorech's Breach Was In Connection With the
### Purchase or Sale of Security-Based Swap Agreements

49.     The CDSs at issue in this matter qualify as security-based swap agreements under the Gramm-Leach-Bliley Act of 2002 and are therefore subject to the antifraud provisions set forth in Section 10(b) of the Exchange Act and the rules promulgated thereunder.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

50.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 49, inclusive, as if they were fully set forth herein.

51.     Defendants Rorech and Negrin, by engaging in the conduct described above, knowingly or recklessly, in connection with the purchase or sale of securities-based swap agreements, directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or the mails:

        a.     employed devices, schemes or artifices to defraud;

        b.     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

        c.     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

11

52.     By engaging in the foregoing conduct, Defendants Rorech and Negrin violated

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5,

thereunder.

## PRAYER FOR RELIEF

53.     **WHEREFORE**, the Commission respectfully requests that this Court enter a

Final Judgment:

### I.

Permanently restraining and enjoining Defendants Rorech and Negrin from violating

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5,

thereunder;

### II.

Ordering Defendants Rorech and Negrin to disgorge all unlawful trading profits that were

derived from the activities set forth in this Complaint, together with prejudgment interest

thereon;

### III.

Ordering that Defendants Rorech and Negrin be held jointly and severally liable for

disgorgement plus prejudgment interest;

### IV.

Ordering Defendants Rorech and Negrin to pay civil penalties pursuant to Section 21A of

the Exchange Act, 15 U.S.C. § 78u-1, or in the alternative, Section 21(d)(3) of the Exchange Act,

15 U.S.C. § 78u; and

**V.**

Granting such other and further relief as the Court may deem just and appropriate.

Dated: New York, New York
       May 5, 2009

                                        **SECURITIES AND EXCHANGE**
                                        **COMMISSION**

                                        BY: _____
                                              Bruce Karpati (BK-4671)
                                        Assistant Regional Director
                                        Attorney for Plaintiff
                                        New York Regional Office
                                        3 World Financial Center, Room 400
                                        New York, New York 10281
                                        (212) 336-1100

Of Counsel:
Richard G. Primoff
Kay Lackey (not admitted in NY)
Stephanie Shuler
Israel Friedman
Panayiota K. Bougiamas