## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____
                               :

SECURITIES AND EXCHANGE COMMISSION,   :
                               :   Civil Case No. 09-CV-4329 (JGK)
                    Plaintiff,   :
                               :   ECF CASE
                               :
                vs.   :
                               :
JON-PAUL RORECH and   :
RENATO NEGRIN,   :
                               :
                   Defendants.   :
_____  :

## <u>MEMORANDUM IN SUPPORT OF DEFENDANT JON-PAUL RORECH'S<br>MOTION FOR JUDGMENT ON THE PLEADINGS</u>

Richard M. Strassberg, Esq. (RS-5141)
Maryana Zubok, Esq. (MZ-0625)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

and

Roberto M. Braceras, Esq. (RB-2470)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109
(617) 570-1000

*Attorneys for Jon-Paul Rorech*

# TABLE OF CONTENTS

Page

INTRODUCTION ..............................................................................................................1

BACKGROUND ...............................................................................................................3

    A.    Overview Of The VNU Bond Deal And CDS Fundamentals. ................................3

    B.    Buyers Of CDS Were Potential Buyers Of The Bond Deal. ..................................7

    C.    Mr. Rorech's Discussions With Mr. Negrin Were Typical Sales Calls..................8

ARGUMENT .....................................................................................................................9

I.    The Complaint Must Be Dismissed Because The CDS Contracts At Issue Are Not "Security-Based Swap Agreements" And Are, Therefore, Not Within The SEC's Jurisdiction...............................................................................................................9

    A.    The SEC Can Only Bring An Enforcement Action Involving CDS If The Material Terms Of The CDS Are "Security-Based."................................................9

    B.    Because The Material Terms Of The CDS Contracts At Issue Are Not "Security-Based," The SEC Has No Authority Over This Case. .........................11

II.    The Complaint Must Be Dismissed Because The SEC Lacks Jurisdiction Over The VNU Reference Bonds. ...............................................................................15

    A.    The SEC Cannot Bring An Enforcement Action Involving CDS Where It Lacks Jurisdiction Over The Underlying Securities. ............................................16

    B.    Because The SEC Lacks Jurisdiction Over The VNU Reference Bonds, It Has No Authority To Bring This Case. .............................................................18

III.    The Complaint Fails To Allege Any Actionable "Duty" On The Part Of Mr. Rorech To Protect The Alleged "Confidentiality" Of The Information. ...................19

    A.    The SEC's Case Rests On The Breach Of An Alleged Duty To Deutsche Bank. ...................................................................................................................20

    B.    Deutsche Bank's Internal "Confidentiality Policy" Did Not Create A Duty For Mr. Rorech To Preserve The Alleged Confidentiality Of VNU's Information. ..........................................................................................................21

    C.    Deutsche Bank Did Not Consider Information Regarding The VNU Bond Deal "Confidential." ..........................................................................................23

CONCLUSION................................................................................................................25

## INTRODUCTION

The SEC, in its haste to bring the first insider trading case involving credit default swaps ("CDS"), has brought a case against Jon-Paul Rorech that is without merit. Indeed, this case should be dismissed for three separate and independent reasons: (1) the SEC simply does not have jurisdiction over this matter, as the CDS in question are not "security-based swap agreements" and thus are not covered by § 10(b) of the Securities Exchange Act of 1934; (2) even if the CDS did qualify as "security-based," which they do not, they are nonetheless beyond the SEC's authority, as the CDS referenced securities issued by a foreign company and traded on a foreign exchange; and (3) Mr. Rorech had no legal duty to keep the alleged "insider" information confidential.

The SEC is improperly attempting to stretch the limits of the U.S. securities laws by bringing a case involving CDS agreements that were not "security-based." The Commodity Futures Modernization Act of 2000 ("CFMA") granted the SEC _limited_ authority to prosecute insider trading cases related to CDS in _only_ those cases where the material terms of the CDS agreements are "security-based," meaning that they are based on the price, yield, value, or volatility of a security. Here, the material terms of the CDS contracts were unrelated to any of these specified characteristics. Thus, by definition, the CDS agreements are not "security-based," and, as a result, the SEC has no authority to bring this case.

Moreover, even if the CDS were "security-based," and they were not, the SEC still would lack jurisdiction. The SEC _only_ has jurisdiction over CDS if it has jurisdiction over the referenced security. Here, however the alleged reference bonds for the CDS agreements were issued by VNU — a privately-held, foreign company headquartered in the Netherlands — and those bonds were traded only on a foreign exchange. Because the SEC did not have jurisdiction

over VNU's issuance of bonds abroad, it cannot bring charges in this case based on the VNU CDS that allegedly referenced those foreign bonds.

Finally, the SEC's claim fails, because Mr. Rorech had no duty to keep the information at issue confidential. According to the SEC, Mr. Rorech unlawfully shared information about a potential restructuring of a bond deal with a customer, Renato Negrin, who then allegedly traded CDS based on such information. But the SEC is wrong. Mr. Rorech had no legal duty to protect the alleged "confidentiality" of the information in question. Even a cursory reading of the Engagement Letter that the SEC relies on in its Complaint reveals that, like other Deutsche Bank employees, Mr. Rorech — a Bank salesman who was required to be in regular communication with potential investors — was fully authorized to discuss the bond offering, including potential changes to its structure, with prospective customers, such as Mr. Negrin. Indeed, the SEC does not, and cannot, allege that Mr. Rorech was ever told to refrain from sharing information regarding the potential restructuring with any of his clients, nor was he cautioned as to its allegedly "confidential" nature or "wall crossed."[1]

Further, the information in question could not, as a matter of law, constitute "inside" information. As described by the SEC itself in a public report, discussing potential structural changes with customers is a well-accepted practice in the high yield bond market. The SEC is likewise aware that other Deutsche Bank employees routinely provided the same information as Mr. Rorech to other Deutsche Bank clients, many of whom similarly traded CDS. Notably, Mr. Rorech used CDS trading strategies to *generate interest in the bond deal*. Far from breaching

---

[1]    As described in documents relied upon and referenced by the SEC in its Complaint, "wall crossing" is an internal procedure used by the Bank to ensure that "confidential" information is not shared across an ethical wall with salespeople, such as Mr. Rorech, who are in regular communication with the public. The ethical wall at Deutsche Bank is specifically labeled a "Chinese Wall" by the Bank's internal policies. To be consistent, we will adopt and use the Bank's nomenclature in this brief.

any duty, Mr. Rorech was simply doing his job. The SEC cannot allege that information was "confidential" when it was openly shared both internally and externally by Deutsche Bank supervisors and employees.

In sum, if the SEC is concerned with the way information is shared in high yield bond offerings that involve trading in CDS, it should address such industry-wide concerns prospectively through regulation. It has failed, however, to allege an actionable violation of the existing insider trading laws against Mr. Rorech.

## BACKGROUND[2]

### A.    Overview Of The VNU Bond Deal And CDS Fundamentals.

VNU is a Dutch media holding company ("holdco") that is incorporated in and has its primary corporate headquarters in Haarlem, the Netherlands.[3] (See Compl. ¶¶ 2, 10, 16.) Long before VNU announced the debt offering relevant to this case in July 2006, it issued a number of

---

[2]    The inclusion of certain "facts" alleged by the SEC in its Complaint in no way concedes the accuracy of such allegations. For the purposes of this motion, the Court must accept only well-pleaded factual allegations as true and "need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations." In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001) (citation omitted).

[3]    See SEC.gov, Netratings, Inc.'s SEC Filing of Schedule 13D, at 6 (Oct. 6, 2006), available at http://www.sec.gov/Archives/edgar/data/1093410/000095012306012447/y25792sc13dza.htm (hereinafter "Netratings Schedule 13D") (listing VNU's principal business and office address in the Netherlands).

In a motion for judgment on the pleadings, the Court may consider documents relied upon or incorporated by reference in the Complaint. See U.S. ex rel. Phipps v. Comprehensive Cmty. Dev. Corp., 152 F. Supp. 2d 443, 448 (S.D.N.Y. 2001) (Koeltl, J.) ("The same standards apply to a Rule 12(c) motion for judgment on the pleadings and to a Rule 12(b)(6) motion to dismiss for failure to state a claim."); Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (stating that a court may consider documents relied on or incorporated by reference in the complaint on a motion to dismiss). The Court may also take judicial notice of certain other evidence, such as publicly filed documents and analyst reports. See, e.g., In re Avon Prods., Inc. Sec. Litig., No. 05-6803, 2009 U.S. Dist. LEXIS 34564, at *73 n.10 (S.D.N.Y. Feb. 23, 2009) (judicial notice of published analyst reports and articles that show information known by market permitted); Garb v. Republic of Poland, 440 F.3d 579, 594 n.18 (2d Cir. 2006) (judicial notice of books and other "authoritative texts" permitted); Calcutti v. SBU, Inc., 224 F. Supp. 2d 691, 696 (S.D.N.Y. 2002) (judicial notice of "records and reports of administrative bodies" permitted (quotation omitted)). Moreover, because this motion challenges subject matter jurisdiction, the Court may consider extrinsic evidence and resolve factual disputes. See State Employees Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 77 n.4 (2d Cir. 2007); see also Phipps, 152 F. Supp. 2d at 448-49 (stating that a Rule (c) motion based upon a lack of subject matter jurisdiction is treated as a Rule 12(b)(1) motion to dismiss).

bonds directly from the VNU entity ("holdco bonds") that were traded exclusively on the

Luxembourg exchange.[4]  (See id. ¶ 16.)  As the CDS market emerged, investors entered into

CDS contracts that allegedly referenced the VNU holdco bonds.  (See id.)  Notably, those CDS

contracts were trading when VNU announced its new bond issuance in July 2006.  (See id.)

       In layman's terms, CDS can be thought of as a type of insurance or "protection" against

credit risk for highly sophisticated institutional investors.[5]  (See id. ¶ 12.)  As with any bilateral

contract between sophisticated market participants, the terms of the CDS contracts are privately

negotiated between the parties.  Pursuant to the CDS contract, the protection buyer makes regular

payments (akin to premium payments) to the protection seller.[6]  (See id. ¶¶ 12-13.)  The CDS

buyer will continue to pay a premium to the CDS seller until either the CDS contract expires or a

"credit event," such as a bankruptcy, occurs.  (See id. ¶ 12.)  If a credit event occurs, the

protection buyer has to "deliver" a qualifying credit obligation to the protection seller; the

protection seller must then pay the notional amount of the CDS contract.  (See id.)  The

protection buyer can "deliver" the debt instrument "referenced," or listed, in the CDS contract,

_or_ a loan or bond of the same or greater level of seniority.  The reference security of CDS is used

simply to help determine the qualifying credit obligations that are needed for payment under the

contract.  According to the Complaint, the CDS contracts at issue in this case referenced bonds

---

[4]   See Marco Gironi, VNU — Credit Investors Feel Leverage Pain, Merrill Lynch (July 20, 2006), Ex. A at 11 (hereinafter "Gironi") (listing VNU holdco bonds that had been issued prior to July 2006); VNU, Annual Report 2004: Public Debentures, available at http://vnu.2004.annualreport.nl/public_debentures.html, at 1 (hereinafter "VNU Annual Report 2004") (stating that the bonds were listed on the Luxembourg Exchange).

    All exhibits cited in this motion are attached to the Declaration of Richard M. Strassberg, filed herewith.

[5]   However, investors use CDS in various other ways.  For example, an investor also can take a positive or "bullish" view of a company's credit and choose to sell CDS.

[6]   The annual premium (or "spread") is expressed in basis points.  For example, if the CDS spread is 50 basis points, or 0.5%, then an investor buying €10 million of protection must pay the CDS seller €50,000 per year.

that were issued from VNU (the "reference bonds").  (Id. ¶ 16.)  If a VNU credit event occurred (e.g., if VNU went into bankruptcy), a CDS buyer would have needed to deliver a qualifying credit obligation to the CDS seller to receive the "insurance" proceeds.

On May 24, 2006, VNU was acquired through a tender offer by Valcon Acquisition bv, an entity formed by various private equity firms (collectively, "the sponsors") and based in Luxembourg.[7]  Shortly after the acquisition, VNU's common and preferred stocks were delisted from the Amsterdam Euronext, and VNU was converted from a public company (a Dutch "nv") to a private company (a Dutch "bv").  (See Compl. ¶ 10.)[8]

On July 10, 2006, VNU issued a press release announcing a new debt offering.  (See id. ¶ 15.)  The proposed structure was to include a $1.67 billion issuance of debt through VNU's subsidiaries, Nielsen Finance LLC and Nielsen Finance Co. (the "Nielsen bonds").  (Id.)  The bond offering was brought as a private placement pursuant to Rule 144a, which meant that only qualified institutional buyers could participate in the deal.[9]

Deutsche Bank Securities Inc. ("Deutsche Bank") was one of the underwriters for VNU's new bond offering.  (Id. ¶ 11.)  Mr. Rorech and other bond salespeople at Deutsche Bank marketed the bond deal to their customers.  To enable Deutsche Bank to market the debt offering, the sponsors explicitly authorized the Bank and its employees to share information

---

[7]  (See Compl. ¶ 10 ("VNU . . . was taken private in May 2006 by a consortium of private equity companies"));  Netratings Schedule 13D, at 6 (listing Valcon's principal address in Luxembourg).

[8]  See NYTimes.com DealBook, "VNU's Shares Delisted" (July 11, 2006), http://dealbook.blogs.nytimes.com/ 2006/07/11/vnus-shares-delisted/ (hereinafter "NYTimes DealBook").

[9]  (See Compl. ¶ 28 (citing Second Amended and Restated Project Valentine Engagement Letter (July 2006) (DBSI 76641-76654) (hereinafter "VNU Engagement Letter"), Ex. B ¶ 1 (indicating that the bond offering would be brought pursuant to Rule 144a)).)  Rule 144a private placements are limited to institutional buyers that own and invest at least $100 million in securities of unaffiliated issuers.  17 C.F.R. § 230.144A.

regarding VNU's bond offering with prospective investors.[10]  VNU also organized a "road show" to promote the bond deal on its own.

As a result of the July 10 press release and the ensuing road show, the bond deal was widely discussed in the market.  Among other things, investors questioned whether the Nielsen bonds would be "deliverable" into (or covered by) existing VNU-related CDS contracts.  (See id. ¶¶ 16, 17.)  It quickly became clear that there was investor demand for a restructuring of the bond deal to clarify and confirm that the new bonds would be deliverable into the pre-existing CDS contracts.  (See id. ¶ 17.)  As with all high yield deals, bankers at Deutsche Bank — including those in capital markets — were interested in finding ways to restructure the bond deal to match the perceived demand from investors.  (See id.)

During this time, Mr. Rorech's clients approached him with a "reverse inquiry" — an idea for a potential restructuring of the bond deal, suggesting that some of the bonds issue directly from the VNU holding company (a "holdco issue"), which would allow them to be deliverable into existing CDS contracts.  Reverse inquiries consist of client requests and suggestions regarding changes to a proposed bond offering.  Reverse inquiries routinely influence the final terms of a bond offering, as such deals are an iterative process between the issuer and the institutional buyers.  The final structure of this particular offering, however, remained uncertain until Monday, July 24, 2006, when prospective buyers received notice that the sponsors had decided to restructure the deal.

---

[10]    See VNU Engagement Letter, Ex. B ¶ 7(a)(ii).

## B. Buyers Of CDS Were Potential Buyers Of The Bond Deal.

At the time of the VNU bond deal, CDS — which was trading at levels that were lower than the newly proposed VNU bonds — was considered to be underpriced. Based on VNU's leverage alone, the price of CDS was predicted to increase, regardless of whether additional deliverable bonds would become available to the market.[11] As a result, market analysts and many others, including Mr. Rorech, recommended that investors purchase CDS.[12] Not surprisingly, CDS was actively traded throughout the time period at issue in this case.

In addition to offering some protection against the potential default of the underlying bonds (Compl. ¶ 12), CDS also offered investors the opportunity to enter into what is called a "basis trade." When the CDS spread (or price) is lower than the bond spread[13] — as it was at the time of the VNU deal — the basis trade strategy is to buy *both* the bonds and the CDS.[14] In 2006, basis trades were considered to be lucrative opportunities that were rapidly finding favor with hedge funds and other investors.[15] Basis trades were attractive because, inter alia, they allowed investors to "capture the pricing discrepancy between the bonds and the CDS" while, as the SEC itself noted, minimizing, or hedging, credit risk by using bonds and CDS positions to offset one another in the case of default.[16] (See id. ¶ 12.) Mr. Rorech used the basis trade idea to

---

[11]   See Gironi, Ex. A at 1.

[12]   See id.

[13]   The bond spread, in layman's terms, incorporates the price of the bonds and other factors, including borrowing costs. Bond spreads allow investors to compare the cost of a bond purchase with the cost of CDS.

[14]   See Moorad Choudhry, The Credit Default Swap Basis 139 (Bloomberg Press 2006) (hereinafter "Choudhry").

[15]   See Eric Beinstein & Andrew Scott, Credit Derivatives Handbook 57 (JPMorgan 2006) (hereinafter "JPMorgan") (noting that basis trades were attractive opportunities that investors frequently engaged in); Nicoletta Kotsianas, CDS Negative-Basis Trading Jitters Hit Market, Credit Investment News, vol. 4, no. 7 (Feb. 18, 2008), at 1 (calling basis trades a "lucrative strategy").

generate interest in the bond deal and, accordingly, encouraged his clients to buy CDS and either the proposed holdco bonds or the Nielsen bonds.  (See id. ¶ 36 (stating that Mr. Rorech encouraged Mr. Negrin to purchase VNU-related CDS).)

### C. Mr. Rorech's Discussions With Mr. Negrin Were Typical Sales Calls.

Mr. Rorech's discussions with Mr. Negrin and other prospective purchasers of the bonds regarding the potential restructuring were routine sales calls, typical in the industry.  As the SEC has recognized, information about the ongoing status of high yield bond deals, including information about possible changes in deal structure, is openly shared with customers in the high yield bond market.[17]  In fact, as the SEC has reported, firms in the high yield market are "organized to facilitate the free flow of market information among the High Yield personnel that have day-to-day contact with customers."[18]  The SEC also has noted that the free flow of information among capital markets, salespeople, and customers is unique to high yield bond deals and differs greatly from the process involved in creating and marketing deals in other financial markets, including equities.[19]

---

[16]  JPMorgan at 55, 57 (stating that a basis trade allows an investor to "take a view on the relative pricing of bonds and CDS" while minimizing credit risk.  If the CDS spread (or price) is lower than the bond spread and the price of CDS increases, an investor can also make a profit when he or she unwinds the trade as a package (i.e., sells the CDS and the bonds together).  See Choudhry at 132-35.

[17]  See SEC, Division of Market Regulation, Broker-Dealer Internal Control Procedures for High Yield Securities (October 1993) (hereinafter "1993 SEC Report"), Ex. C at 4-5.

[18]  Id., Ex. C at 5.

[19]  See id., Ex. C at 1 (noting that "[t]he unique characteristics of the [high yield] market" set it apart from operations involving equity securities).  In contrast to other markets, high yield bond deals are riskier and typically harder to sell; it is, therefore, critical for there to be open communication with customers so that the terms of the deal can be adequately adjusted to meet customer demand.  Moreover, prospective investors are particularly encouraged to maintain open discussions with underwriters where, as here, a bond offering is brought pursuant to Rule 144a.  See Frank J. Fabozzi & Frank J. Jones, The Handbook of Fixed Income Securities 38-39 (Frank J. Fabozzi & Steven V. Mann eds., McGraw-Hill Prof'l 2005) (hereinafter "Fabozzi") (noting that "[i]nvestment banking firms assist in the private placement of securities in several ways," including by "work[ing] with the issuer and potential investors on the design and pricing of the security").

According to the Complaint, Mr. Rorech shared nothing more with Mr. Negrin, a prospective investor in the bond deal, than the type of information that is commonly shared in the high yield bond market. Indeed, the Complaint alleges that Mr. Rorech simply provided his personal opinion that he thought the chances for a change in the structure of the bond offering were good, given the underlying fundamentals associated with the deal.[20] (See Compl. ¶ 34.)

## ARGUMENT

## I. The Complaint Must Be Dismissed Because The CDS Contracts At Issue Are Not "Security-Based Swap Agreements" And Are, Therefore, Not Within The SEC's Jurisdiction.

The SEC filed its Complaint against Mr. Rorech with great fanfare, celebrating the first-ever insider trading case involving CDS.[21] But there was no insider trading of CDS by Mr. Rorech. And, in any event, the SEC does not have jurisdiction over the CDS traded in this case. As a result, the Complaint must be dismissed.

### A. The SEC Can Only Bring An Enforcement Action Involving CDS If The Material Terms Of The CDS Are "Security-Based."

While the SEC's authority to bring an enforcement action for trading in CDS is largely an issue of first impression for the judiciary, the core principles at issue are well-settled. As with any federal agency, the authority of the SEC is limited to that which is expressly granted by Congress. See Etuk v. Slattery, 936 F.2d 1433, 1443 (2d Cir. 1991) ("In short, executive

---

[20] Notably, the SEC has not alleged — nor could it — that the sponsors had approved the potential restructuring of the bond deal at the time of Mr. Rorech's calls with Mr. Negrin. To the contrary, despite market demand for deliverable bonds, there were never any guarantees — internally at Deutsche Bank or otherwise — that the holdco issue would be approved by the sponsors. As with any reverse inquiry, it was always possible that the proposed structural changes ultimately would be refused.

[21] See SEC Litigation Release No. 21023, "SEC Files First Credit Default Swap Insider Trading Case" (May 5, 2009), http://www.sec.gov/litigation/litreleases/2009/lr21023.htm.

agencies cannot exceed the limits of their congressionally delegated authority."). Here, the SEC has overstepped its authority.

With the passage of the CFMA in 2000, Congress made clear that the SEC has *very limited* authority over swap agreements, including CDS. Indeed, as originally introduced, Congress did not intend for the SEC to have *any* jurisdiction over swap agreements. S. 2697, 106th Cong. § 22 (2000) ("Nothing in this Act or any amendment made by this Act grants the . . . [SEC] any jurisdiction over any swap agreement . . . ."). Congress reluctantly granted the SEC enforcement power, but, in doing so, limited the SEC's authority to *only* those antifraud actions where the swap agreement is "security-based." As a result of the CFMA, § 10(b) was amended to prohibit fraudulent conduct with regard to "securities-based swap agreement[s]," "as defined in section 206B of the Gramm-Leach-Bliley Act." 15 U.S.C. § 78j(b) (emphasis added). The SEC, however, has no jurisdiction under § 10(b) or any other statutory provision to bring an action relating to a swap agreement that is <u>not</u> "security-based."[22]

The CFMA amended the Gramm-Leach-Bliley Act of 1999 ("GLBA") to include, <u>inter alia</u>, definitions for a "swap agreement" and, separately, a "security-based swap agreement." <u>See</u> CFMA, Pub. L. No. 106-554, § 301, 114 Stat. 2763 (Dec. 21, 2000); GLBA, Pub. L. No. 106-102, §§ 206A, 206B, 113 Stat. 1338 (Nov. 12, 1999). Credit default swaps are listed as an example of the types of derivatives that qualify as "swap agreements," <u>see</u> GLBA § 206A, but <u>not</u> as an example of the type of derivative that would be considered "security-based." <u>See</u> <u>id.</u> § 206B. Instead, the statute explicitly defines a "security-based swap agreement" as "a swap

---

[22] <u>See</u> 15 U.S.C. § 78j(b) (stating that § 10(b) *only* covers conduct related to the purchase or sale of a "security" or a "securities-based swap agreement"); 15 U.S.C. § 78c-1(a) (stating that "[t]he definition of 'security' . . . does not include any non-security-based swap agreement"); GLBA § 206C ("[T]he term 'non-security-based swap agreement' means any swap agreement . . . that is not a security-based swap agreement . . . .").

agreement . . . of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein." Id. A careful review of the statutory definition of a "security-based swap agreement," along with the underlying documentation for the CDS trades at issue in this case, confirms that VNU-related CDS are not "security-based" and, thus, are beyond the reach of the SEC's authority. Absent jurisdiction, the SEC's Complaint must be dismissed.[23]

**B.** **Because The Material Terms Of The CDS Contracts At Issue Are Not "Security-Based," The SEC Has No Authority Over This Case.**

The material terms of a CDS contract — including the VNU-related CDS agreements at issue in this case — are: (1) the notional amount of the contract; (2) the length of the contract; (3) the amount of the periodic payments made to the CDS seller or the "price" of the contract; (4) the triggering credit events; and (5) the settlement terms following a credit event, including the form of delivery by the CDS buyer and the deliverable obligation. Here, Mr. Negrin purchased €10 million of CDS on behalf of Millennium Partners L.P. ("Millennium") on July 17 and July 18, 2006. (See Compl. ¶ 42.) Each contract was set to expire after five years, and Millennium agreed to pay 3.83% (or 383 basis points) on an annual basis to the protection seller.[24] Pursuant to the agreements, Millennium would be able to "cash in" on its CDS contracts if a bankruptcy occurred, if VNU failed to pay its credit obligations, *or* if VNU underwent a

---

[23] "[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." Arar v. Ashcroft, 532 F.3d 157, 168 (2d Cir. 2008) (quotation omitted). Rather, the "party invoking federal jurisdiction must allege in its pleading the facts essential to show jurisdiction, and must support those facts by competent proof." Phipps, 152 F. Supp. 2d at 449 (quotation omitted). "The plaintiff has the ultimate burden of proving the Court's jurisdiction." Id. (citations omitted).

[24] Bloomberg e-mail from Mr. Rorech to Mr. Huynh et al. (July 17, 2006) (DB001055) (hereinafter "Millennium-DB Trade Confirmation"), Ex. D-1 at 1 (listing the terms of the CDS contract for Millennium's July 17, 2006 CDS trade); Bloomberg e-mail from Mr. Garcia (July 18, 2006) (MLP010406) (hereinafter "Millennium-RBS Trade Confirmation"), Ex. D-2 at 1 (listing the terms of the CDS contract for Millennium's July 18, 2006 CDS trade). The material terms of Millennium's CDS trades from July 17 and July 18 are essentially identical.

certain type of restructuring.[25]  To receive the notional amount of the CDS contract, Millennium

would have had to deliver a qualified deliverable obligation to the CDS seller.  None of these

material terms of the CDS contracts were "based on the price, yield, value, or volatility of any

security," as required by the statute to be "security-based."[26]

## 1. __Notional Amount__

The notional amount of a CDS contract is "[t]he amount of credit risk being transferred"

from the seller to the buyer.[27]  This amount is "[a]greed between the buyer and seller of CDS

protection" and does not depend on the price, yield, value, or volatility of any security.[28]

## 2. __Length Of The Contract__

"The maturity of the credit default swap does not have to match the maturity of the

reference asset, and often does not."[29]  Here, the CDS was a five-year contract, terminating on

September 20, 2011, but the reference obligation — the 5.625% VNU bonds — was scheduled to

mature in 2010.  Moreover, even if the maturity of the CDS agreement mirrored the maturity of a

security, it would not be enough to make the CDS "security-based," as the duration or maturity

---

[25]   Millennium-DB Trade Confirmation, Ex. D-1 at 1; Millennium-RBS Trade Confirmation, Ex. D-2 at 1.

[26]   Not surprisingly, while the SEC alleges in conclusory fashion that VNU-related CDS _qualifies_ as a "security-based swap agreement" (Compl. ¶ 49), it has failed to allege any facts sufficient to establish jurisdiction. Compare Compl. ¶ 49, with SEC v. Langford, No. 08-0761, Compl. ¶¶ 15-16 (N.D. Ala. Apr. 30, 2008) (alleging why the swap agreements at issue were "security-based").

[27]   JPMorgan at 9.

[28]   See id.

[29]   Choudhry at 10; see also 2003 ISDA Credit Derivatives Definitions at 1-2, §§ 1.6, 1.7 (hereinafter "2003 ISDA Definitions") (explaining the "termination date" of a credit derivative without reference to the maturity of the reference asset).  Millennium's CDS agreements incorporated the 2003 ISDA Definitions by reference.  See 2003 Master Credit Derivatives Confirmation Agreement between Deutsche Bank AG, London Branch and Millennium (June 11, 2004), Ex. D-3 ¶ 1; 2003 Master Credit Derivatives Confirmation Agreement between The Royal Bank of Scotland plc and Millennium (May 12, 2005), Ex. D-4 ¶ 1 (collectively, "2003 Master Confirmation Agreements").

of a security is not one of the four enumerated characteristics — i.e., price, yield, value, or volatility — listed in the statute.

### 3. Amount Of The Periodic Payments Made To The CDS Seller

The buyer of protection pays the seller a periodic fee for a specified time period, which can be thought of as the "price" of the CDS. "To calculate this fee on an annualized basis, the two parties multiply the notional amount of the swap . . . by the market price of the credit default swap."[30] CDS market prices are quoted in basis points and are based on a variety of factors, including the market's perceived credit risk of the referenced entity.[31] For example, if a company takes on a great deal of leverage or is downgraded by a ratings agency, the price of CDS may increase regardless of the "price, yield, value, or volatility of any security." Because the price for the CDS is set by the participants in the market who trade CDS, it is not based upon the "price, yield, value, or volatility of any security."

### 4. Triggering Credit Events

Similarly, the credit events that trigger a protection seller's obligation to pay the protection buyer are not equivalent to the "price, yield, value, or volatility of any security." The credit events listed in the underlying documents for Millennium's swap agreements include: (a) bankruptcy; (b) failure to pay outstanding debt obligations; and (c) either a "modified restructuring" or "modified modified restructuring."[32] A bankruptcy includes: "insolvency,

---

[30]    JPMorgan at 8.

[31]    (See Compl. ¶ 13 ("CDSs are priced and traded based on their market value at the time of the trade, and are quoted in basis points."); see also JPMorgan at 8, 13-23; Choudhry at 25-35.

[32]    Millennium-RBS Trade Confirmation, Ex. D-1 at 1 (listing bankruptcy, failure to pay, and modified restructuring); Millennium-DB Trade Confirmation, Ex. D-2 at 1 (listing bankruptcy, failure to pay, and modified modified restructuring).

appointment of administrators/liquidators, and creditor arrangements."[33]  "Failure to pay" is a "payment failure on one or more obligations after expiration of any applicable grace period; typically subject to a materiality threshold."[34]  "Restructuring" "refers to a change in the agreement between the reference entity and the holders of an obligation," which binds all the holders of such obligation.[35]  A "modified restructuring" and "modified modified restructuring" are two versions of the restructuring credit event; the latter version is typically used in European CDS contracts.[36]  While a triggering event, like a bankruptcy, may have an impact on the price and value of various securities of the underlying entity, it is the triggering event itself — not the effect on any security — that is the term of the CDS contract.

## 5. Settlement Following Credit Events: Form Of Delivery And Deliverable Obligation

The CDS agreements in this case required physical delivery of a qualifying debt obligation upon the occurrence of a credit event in order for the holder of the CDS to receive payment of the actual amount of the contract.[37]  As a result, for the CDS buyer to be paid in the event of a credit event, the CDS buyer must transfer to the protection seller a deliverable debt obligation with a face amount equal to the notional amount of the CDS contract.[38]

---

[33]  JPMorgan at 9; see also 2003 ISDA Definitions at 30, § 4.2.

[34]  JPMorgan at 9; see also 2003 ISDA Definitions at 31, § 4.5.

[35]  See JPMorgan at 9-10; 2003 ISDA Definitions at 32, § 4.7.

[36]  JPMorgan at 10; see also 2003 ISDA Definitions at 22-24, § 2.33; Jeffrey T. Prince et al., Fabozzi at 711 n.19 (explaining that § 2.33 of the 2003 ISDA Definitions is commonly referred to as "modified, modified restructuring").

[37]  2003 Master Confirmation Agreements, General Terms Confirmation, Exs. D-3, D-4 ¶ 4 (stating that "physical settlement" was required under the contract).

[38]  JPMorgan at 10; Choudhry at 22-23.

Qualifying deliverable obligations are listed in the CDS contract. Such obligations can be either loans or bonds that are the same level of seniority ("*pari passu*") or senior to the reference entity bond.[39] Here, the contract specified that *loans* or bonds that were *pari passu* with, or senior to, VNU's 5.625% bonds maturing in 2010 could be delivered by the CDS buyer.[40] The seniority of a loan or bond, however, is not equivalent to its "price, yield, value, or volatility."

Notably, the CDS is not converted into a "security-based" swap agreement just because the reference entity bonds may be one of several instruments physically delivered to settle the CDS contract, because physical delivery of a bond does not rest on the price, yield, value, or volatility of any security. Moreover, loans — which could have been delivered to the seller pursuant to the terms of Millennium's CDS contracts — *do not qualify as securities*[41] and provide no support for satisfying the statutory definition of a "security-based swap agreement." In sum, because the material terms of the VNU-related CDS contracts at issue are not "based on the price, yield, value, or volatility of any security," such CDS agreements cannot qualify as "security-based" swap agreements and are therefore outside the authority of the SEC.

## II.     The Complaint Must Be Dismissed Because The SEC Lacks Jurisdiction Over The VNU Reference Bonds.

Consistent with Congress's intent to grant the SEC *limited* jurisdiction over CDS, such jurisdiction applies *only* to those CDS agreements where the SEC has jurisdiction over the

---

[39]  See JPMorgan at 9.

[40]  2003 Master Confirmation Agreements, General Terms Confirmation, Exs. D-3, D-4 ¶ 4 (stating that a "Bond or Loan" qualified as a "deliverable obligation"); see also 2003 ISDA Definitions at 12, § 2.19 (stating that when the "Bond or Loan" option is selected in the confirmation, it refers to "*any* obligation that is either a Bond or a Loan" (emphasis added); id. at 14, § 2.20 (listing bonds or loans as possible "deliverable obligations").

[41]  See, e.g., Reves v. Ernst & Young, 494 U.S. 56, 65 (1990) (stating that notes given in connection with commercial loans are not securities under federal securities laws).

underlying debt instrument.  Here, the SEC — which has limited or no authority over foreign, private issuances — does not have jurisdiction over the VNU *reference bonds*, as VNU was a foreign company, and its bonds traded on a foreign exchange.  And because the SEC lacks jurisdiction over the VNU *bonds*, it likewise has no jurisdiction over the *CDS* that references the VNU bonds.

A.    **The SEC Cannot Bring An Enforcement Action Involving CDS Where It Lacks Jurisdiction Over The Underlying Securities.**

In response to Congress's initial attempt to deny the SEC *any* jurisdiction over swap agreements in the CFMA,[42] SEC Chairman Arthur Levitt and Treasury Secretary Lawrence Summers testified against a blanket exclusion for swap agreements and requested that Congress provide the SEC with limited jurisdiction for antifraud enforcement purposes.  But, in doing so, they emphasized that the SEC was *not seeking to expand its current authority*; rather, the SEC only wanted to ensure that individuals were unable to evade existing regulations over securities that already had been within the SEC's purview by resorting to swap transactions.[43]  Notably, when asked by Senator Rod Grams, a member of the Senate committee reviewing the proposed bill, whether Secretary Summers was "suggesting that all swaps be given the same treatment, *regardless of the underlying financial instrument involved*," Secretary Summers answered in the

---

[42]    S. 2697, 106th Cong. § 22 (2000) (denying the SEC "any jurisdiction over any swap agreement").

[43]    For example, SEC Chairman Levitt explained that, although "the SEC does not have blanket authority over swaps or other derivatives," it needed limited jurisdiction over swap agreements solely as a precaution to prevent people from mischaracterizing an otherwise illegal transaction — where the SEC had jurisdiction — as a swap agreement.  <u>See</u> The CFMA: Hearing on S. 2697 Before the S. Comm. On Agriculture, Nutrition, and Forestry and the S. Comm. on Banking, Housing, and Urban Affairs, 106th Cong. 76 (2000).  Secretary Summers emphasized that *a limited grant of authority to the SEC would not "extend some net of regulation to [over-the-counter] derivatives in a way that they are not now subject to regulation*," but would rather "assure that the basic protections we provide in our cash markets do not become circumvented through this legislation." <u>Id.</u> at 14 (emphasis added).

negative and reiterated that he was advocating only for "*the minimal set of provisions* that *assures that there will not be circumvention of the existing regulatory protections*."[44]

In response to the SEC's concerns, Congress granted the SEC enforcement authority but only to undertake "*certain* enforcement actions in connection with security-based swap agreements" on a "case-by-case basis."[45]  This very limited grant of authority is evidenced by the language contained in § 20(d) of the Exchange Act, which was amended by the CFMA to read:

> Wherever communicating, or purchasing or selling a security while in possession of, material nonpublic information would violate, or result in liability to any purchaser or seller of the security under any provisions of this chapter, or any rule or regulation thereunder, such conduct in connection with a purchase or sale of a . . . security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) *with respect to such security* or with respect to a group or index of securities including such security, shall also violate and result in comparable liability to any purchaser or seller of that security under such provision, rule, or regulation.

15 U.S.C. § 78t(d) (emphasis added).[46]  The express text of the statute applies insider trading restrictions to CDS, but only "with respect to" the underlying securities.  Congress's grant of authority simply does not allow the SEC to bring an enforcement action involving CDS unless

---

44  Id. at 31 (emphasis added).

45  See 146 Cong. Rec. S11867 (2000) (statement of Senator Gramm) (emphasis added); see also 146 Cong. Rec. S11925 (2000) (statement of Senator Lugar) (stating that the revised bill would include "*limited authorities*" for the SEC over security-based swap agreements (emphasis added)); cf. SEC.gov, "Public Statement by SEC Chairman: Swapping Secrecy for Transparency" (Oct. 18, 2008), available at http://www.sec.gov/news/speech/2008/spch101808cc.htm (urging Congress to grant the SEC "explicit authority to issue rules against fraudulent, deceptive or manipulative acts and practices in credit default swaps," noting that such authority is lacking under current law).  Notably, in the CFMA, Congress gave the SEC no other jurisdiction over swap agreements.  See, e.g., 15 U.S.C. § 78c-1(b)(2) (prohibiting the SEC from "requiring . . . or suggesting, the registration . . . of any security-based swap agreement" and stating that any application filed with regard to a swap agreement "shall be void").

46  See also 15 U.S.C. § 78i(a)(2)-(5) (amending anti-fraud enforcement measures to prohibit certain conduct with regard to a "security" or a "security-based swap agreement . . . *with respect to such security*." (emphasis added)); 15 U.S.C. § 78p(a) (amending anti-insider trading measures relating to "any equity security" or "*a security-based swap agreement . . . involving such equity security*" (emphasis added)).

the SEC has jurisdiction over the underlying securities.  Here, the SEC is missing the critical link between the CDS at issue and the underlying VNU securities, over which it has no jurisdiction.

**B.**  **Because The SEC Lacks Jurisdiction Over The VNU Reference Bonds, It Has No Authority To Bring This Case.**

The U.S. Supreme Court recently reaffirmed the general presumption against the extraterritorial application of U.S. laws.  See Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 454 (2007).  This presumption applies with equal force against the extraterritorial application of U.S. _securities_ laws.  See Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 175 (2d Cir. 2008), petition for cert. filed, 77 U.S.L.W. 3562 (U.S. Mar. 23, 2009) (No. 08-1191) (emphasizing that the Second Circuit is "an American court, not the world's court").  Notably, here, neither the text nor the legislative history of the securities laws reflect any intent as to extraterritorial enforcement.  In re Parmalat Sec. Litig., 497 F. Supp. 2d 526, 531 (S.D.N.Y. 2007).  To the contrary, the Securities Exchange Act is concerned _only_ with protecting U.S. investors, U.S. companies, and U.S. financial markets.[47]

In this case, VNU shares have _never_ traded on a U.S. stock exchange.  It is a foreign company with headquarters in the Netherlands.[48]  VNU issued the reference bonds in 2001, long before the alleged misconduct in this case took place, and those bonds were only traded overseas

---

[47]  See Koal Indus. Corp. v. Asland, S.A., 808 F. Supp. 1143, 1155 (S.D.N.Y. 1992) ("Congress's intent regarding extraterritorial application of the Exchange Act was to protect _domestic investors_ who have purchased foreign securities on _American exchanges_ and to protect _the domestic securities market_ from the effects of improper foreign transactions in _American securities_." (emphasis added and quotation omitted)).  Similarly, the CFMA was concerned with "enhanc[ing] the competitive position of _United States financial institutions and financial markets_."  CFMA § 2 (emphasis added).  Indeed, the SEC has described its role as the "primary overseer and regulator of the _U.S. securities markets_" and has stated that its focus is on the protection of U.S. investors.  See SEC.gov, "The Investor's Advocate: How the SEC Protects Investors, Maintains Market Integrity, and Facilitates Capital Formation," http://www.sec.gov/about/whatwedo.shtml#laws (last visited Aug. 12, 2009).

[48]  (See Compl. ¶¶ 2, 10); Netratings Schedule 13D, at 6.

on the Luxembourg Stock Exchange.[49]  These were foreign bonds issued by a foreign company,

in a foreign market, to foreign investors.  There are no allegations of an intent to harm American

investors or markets in connection with these foreign issuances of VNU reference bonds.

Finally, on May 24, 2006, VNU was acquired, its shares were subsequently delisted, and it was

converted to a private company.[50]  The SEC has no authority whatsoever over bonds (or CDS

referencing bonds) issued by a private, foreign company.

In sum, the SEC simply does *not* have jurisdiction over the VNU reference bonds and, as

such, does not have jurisdiction over the CDS that allegedly referenced those bonds and was

allegedly traded in violation of § 10(b) in this case.  See SEC v. Gonzalez de Castilla, 184 F.

Supp. 2d 365, 382 (S.D.N.Y. 2002) ("[I]n this case, where the securities in question are listed on

a foreign exchange, the shareholders are also foreign, and the transactions took place in a foreign

country, there is no basis for subject matter jurisdiction under the U.S. securities laws." (citation

omitted)).  Given the SEC's lack of authority to bring any claims based on the foreign, VNU-

referenced CDS, this action must be dismissed.

### III.     The Complaint Fails To Allege Any Actionable "Duty" On The Part Of Mr. Rorech To Protect The Alleged "Confidentiality" Of The Information.

To sustain an insider trading claim under the misappropriation theory of §10(b), as the

SEC attempts, the Complaint must identify a duty on the part of Mr. Rorech to maintain and to

protect the confidentiality of the information in question — i.e., information regarding the

---

[49]   VNU Annual Report 2004, at 1.

[50]   (See Compl. ¶ 10 (stating that VNU was "taken private" in May 2006)); NYTimes.com DealBook.

potential restructuring of the VNU bond deal.  Because the SEC does not, and _cannot_, allege that

Mr. Rorech ever had such a duty, its claim against him fails as a matter of law.[51]

**A.**   **The SEC's Case Rests On The Breach Of An Alleged Duty To Deutsche Bank.**

The SEC does not assert a so-called "traditional" insider trading claim against Mr.

Rorech, nor could it.[52]  Rather, the SEC alleges that Mr. Rorech violated § 10(b) and traded —

or, more precisely, assisted another person to trade — based on "misappropriated" information.

Under the misappropriation theory, a person violates § 10(b) "when he misappropriates

confidential information for securities trading purposes, in breach of a duty owed to the source of

the information."  United States v. O'Hagan, 521 U.S. 642, 652 (1997).  The underlying rationale

is that "a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell

securities, _in breach of a duty of loyalty and confidentiality_, defrauds the principal of the

exclusive use of that information."  Id. (emphasis added).  But for there to be a breach under the

---

[51]   "The same standards apply to a Rule 12(c) motion for judgment on the pleadings and to a Rule 12(b)(6) motion to dismiss for failure to state a claim."  Phipps, 152 F. Supp. 2d at 448.  A complaint is properly dismissed pursuant to Rule 12(b)(6) where it does not allege facts that "confer a judicially cognizable right of action."  York v. Ass'n of the Bar of the City of N.Y., 286 F.3d 122, 125 (2d Cir. 2002).  To survive such a motion, "a plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level."  SEC v. Espuelas, 579 F. Supp. 2d 461, 469 (S.D.N.Y. 2008) (quotation omitted).  In other words, the SEC must allege sufficient facts to "nudge[]" its claim that Mr. Rorech purportedly breached an alleged duty of confidentiality owed to Deutsche Bank "across the line from conceivable to plausible."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) (stating that a complaint must be dismissed if plaintiff has not alleged "enough facts to state a claim to relief that is plausible on its face").  Moreover, because a claim under § 10(b) sounds in fraud, it must also meet the heightened pleading requirements of Rule 9(b).  Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 220 (S.D.N.Y. 2008) (Koeltl, J.).

[52]   Liability under the traditional theory is based on a corporate insider's trading in violation of a fiduciary duty owed to the corporation's shareholders.  United States v. O'Hagan, 521 U.S. 642, 651-52 (1997).  There is no fiduciary duty owed to bond holders, because a bond is a "contractual entitlement."  Alexandra Global Master Fund Ltd. v. Ikon Office Solutions, No. 06-5383, 2007 U.S. Dist. LEXIS 52546, at *14, *16 (S.D.N.Y. July 20, 2007) (Koeltl, J.) (quotation omitted) (stating that the relationship between corporations and their unsecured creditors, including debt security holders, "is contractual rather than fiduciary" (citations omitted)).  Because CDS is similarly rooted in contract, there is likewise no fiduciary duty owed to CDS holders.  See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 171-72 (2d Cir. 2004) (discussing the contractual nature of CDS).

misappropriation theory, a duty of loyalty and confidentiality must first exist: there must be a clear expectation that the information at issue be kept confidential. <u>See, e.g.</u>, <u>SEC v. Falbo</u>, 14 F. Supp. 2d 508, 514-15 (S.D.N.Y. 1998) (discussing strict confidentiality measures in the context of a tender offer). In other words, there can be no breach where, as here, Mr. Rorech had <u>no</u> duty to maintain the purported "confidentiality" of the potential restructuring of the VNU bond deal. Indeed, the SEC effectively concedes that Mr. Rorech owed no such duty to VNU. [53] The SEC likewise does not — and cannot — sufficiently allege that Mr. Rorech breached any duty owed to the Bank. Absent any duty on the part of Mr. Rorech to keep the information concerning the VNU bond deal confidential, the Complaint must be dismissed. [54]

**B.** **Deutsche Bank's Internal "Confidentiality Policy" Did Not Create A Duty For Mr. Rorech To Preserve The Alleged Confidentiality Of VNU's Information.**

The SEC asserts that Mr. Rorech's alleged duty to keep information regarding the VNU bond deal confidential stemmed from Deutsche Bank's Confidential and Inside Information Policy ("the Bank's Policy"). (<u>See</u> Compl. ¶¶ 23-26.) The Complaint alleges that confidential information is defined by the Bank's Policy as "'information provided by or obtained from a third party with the expectation or contractual agreement that it will remain confidential.'" (<u>Id.</u> ¶ 24.) To show that the sponsors purportedly expected that information regarding the VNU bond deal would be kept confidential, the SEC asserts that the Engagement Letter between Deutsche Bank and the sponsors regarding the VNU financing ("VNU Engagement Letter") required the

---

[53] (<u>See</u> Compl. ¶¶ 32-41 (listing allegations under the heading "Rorech Breached His Duty To <u>DBSI</u> [Deutsche Bank] . . . .") (emphasis added).)

[54] The other elements of liability under the misappropriation theory — including the requisite scienter and the disclosure of material, nonpublic information — also cannot be met in this case. If necessary, these elements will be addressed at a later stage of the litigation.

Bank to "use all non-public information shared with it solely for providing underwriting services." (Id. ¶ 28.) But the SEC's theory is misplaced. In its effort to manufacture a duty where none exists, the SEC mischaracterizes and misrepresents the actual language of the Engagement letter, which made clear that there was _no_ expectation on the part of the sponsors that the information at issue in this case would be kept confidential.

The VNU Engagement Letter expressly provides:

> 7. Confidentiality. (a) Each Underwriter shall use all non-public information provided to it by [the sponsors] . . . or [on] their behalf hereunder solely for the purpose of providing the services that are the subject of this letter agreement and shall treat confidentially all such information; provided that _nothing herein shall prevent any Underwriter from disclosing any such information_
>
>           \* \* \*
>
> (ii) _to purchasers or prospective purchasers of Securities in connection with an Offering of such Securities, to the extent appropriate in the context of such Offering_.

Second Amended and Restated Project Valentine Engagement Letter (July 2006) (DBSI 76641-76654) (hereinafter "VNU Engagement Letter"), Ex. B ¶ 7(a) (emphasis added). As stated in plain language, the VNU Engagement Letter allows Deutsche Bank's employees, such as Mr. Rorech, to share VNU's purported "confidential" information with prospective buyers. And, as the Complaint itself makes clear, Mr. Negrin was a prospective purchaser of VNU bonds.[55]

Because Mr. Negrin was a prospective buyer of the VNU bonds, he was fully authorized under the VNU Engagement Letter — and therefore under the Bank's Policy — to receive information regarding the potential bond restructuring. Put another way, because Mr. Negrin

---

[55] (See, e.g., Compl. ¶ 9 (describing Mr. Negrin as a "portfolio manager" and "head of a credit trading group" at a "hedge fund"); id. ¶ 12 (indicating that CDS would be an attractive purchase for a prospective bond buyer since CDS can be used as "default insurance for a referenced debt obligation, such as a bond").)

was a prospective purchaser, the VNU Engagement Letter expressly authorized Mr. Rorech to share information about the VNU bond offering with him; as a result, there was no legal duty on the part of Mr. Rorech under the Bank's Policy to maintain the "confidentiality" of VNU's information. Absent such a duty, the SEC's claim against Mr. Rorech must be dismissed. See O'Hagan, 521 U.S. at 652.

C.   **Deutsche Bank Did Not Consider Information Regarding The VNU Bond Deal "Confidential."**

Notably, the SEC does not, and cannot, allege any facts suggesting that Deutsche Bank — the source of the supposedly "confidential" information regarding the potential restructuring — considered such information to be "confidential." In particular, there is no allegation that Mr. Rorech was "wall crossed" pursuant to Deutsche Bank's Chinese Wall policy.[56] Deutsche Bank has Chinese Walls to "control the flow of information" between employees who are on the "private side" of the Wall — such as capital markets and investment bankers — and those employees in sales or trading, like Mr. Rorech, who are on the "public side" of the Wall.[57] The purpose of the Chinese Wall is to permit public-side employees (such as Mr. Rorech) to continue unrestricted activities in the securities of an issuer, even though employees on the private side are aware of "inside" information relating to those same securities.[58] As such, the Bank's Chinese Wall policy requires the _private-side employee_ in possession of confidential information (the "holder" of inside information) to initiate "wall

---

[56]   Deutsche Bank's Chinese Wall policy is described in the Bank's Policy, which is quoted and discussed at length in the Complaint. (See Compl. ¶¶ 23-26.)

[57]   Deutsche Bank, Confidential and Inside Information Policy (Oct. 1, 1997) (DBSI SEC 76628-76635) (hereinafter "Confidentiality Policy"), Ex. E at 6.

[58]   Id., Ex. E at 5.

crossing" procedures before passing any such information to a public-side employee.[59] Here, the SEC does not allege that Mr. Rorech was ever "wall crossed," a necessary precursor before Mr. Rorech could ever receive confidential information. Because Mr. Rorech was never "wall crossed," it follows under the Bank's own policy that he never received information the Bank treated as "confidential." As a result, he never had a duty to protect such information.

In short, the Bank's internal Policy did not, and could not, create a legal duty on the part of Mr. Rorech to maintain any purported "confidential" information about the VNU bond deal. First, the VNU Engagement Letter made clear that there was no expectation or agreement that information regarding the VNU bond deal would be kept confidential. To the contrary, the Engagement Letter specifically authorized Mr. Rorech to share information about the restructuring with prospective purchasers, such as Mr. Negrin. Thus, the Bank's Policy did not even apply. Second, even if the Bank's internal Policy did apply, and it did not, the Policy was never invoked, as there is _no_ allegation that Mr. Rorech was ever "wall crossed" such that he could receive any purported "confidential" information.[60] Because Deutsche Bank's internal

---

[59] Id., Ex. E at 6-7 (stating that a private-side employee must contact the Control Room of the Compliance Department "**prior** to initiating contact to communicate [any material, nonpublic] information" to a public-side employee so that the "wall cross" can be properly approved, recorded, and monitored (emphasis in original)).

[60] The allegations at issue in this case are in stark contrast to the typical misappropriation case, where a defendant steals the information and uses it to the principal's detriment. See, e.g., O'Hagan, 521 U.S. at 653-55 (explaining that an insider breaches his duty by "feigning fidelity to the source of information" and "secretly converting" the information in a manner that is "akin to embezzlement"); United States v. Falcone, 257 F.3d 226, 235 (2d Cir. 2001) (finding liability where the defendant received "stolen" information). Mr. Rorech cannot be said to have "stolen" or "embezzled" the information at issue here, when he was merely doing his job trying to sell the bond deal for the benefit of the client. See Confidentiality Policy, Ex. E at 4 (stating that Deutsche Bank employees may use information obtained in the course of their employment, _even if it is deemed confidential_, "for the purpose of performing services as an employee of Deutsche Bank").

Moreover, unlike other insider trading cases, the SEC does not allege, nor could it, that Mr. Rorech shared the profits generated by Mr. Negrin from his CDS trades or that Mr. Rorech had close personal or family ties to Mr. Negrin. See, e.g., SEC v. Guttenberg, No. 07-1774, Complaint ¶¶ 1-2, 4, 36 (S.D.N.Y. Mar. 1, 2007) (alleging that numerous individuals tipped inside information "in exchange for kickbacks" and to "shar[e] in the illicit profits" of their tippees). Instead, the SEC concedes in its allegations that Mr. Rorech received nothing more

24

Policy did not give rise to a legal duty on the part of Mr. Rorech to preserve purported "insider" information, the SEC cannot state a viable "misappropriation" claim against Mr. Rorech, and the Complaint must be dismissed.  See O'Hagan, 521 U.S. at 652.

## CONCLUSION

For the foregoing reasons, Mr. Rorech respectfully submits that the Court grant Mr. Rorech's motion for judgment on the pleadings and enter an order dismissing the Complaint in full and with prejudice.

<u>Dated</u>:  August 13, 2009

<div style="margin-left:40%">

Respectfully Submitted,

  s/ Richard M. Strassberg      
Richard M. Strassberg (RS-5141)
Maryana Zubok (MZ-0625)
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
Tel:  212.813.8800
Fax:  212.355.3333
rstrassberg@goodwinprocter.com

and

Roberto M. Braceras (RB-2470)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
Tel:  617.570.1000
Fax:  617.523.1231
rbraceras@goodwinprocter.com

*Attorneys for Jon-Paul Rorech*

</div>

---

from his interaction with Mr. Negrin than what any Bank salesperson would have received by performing his or her job.  (See Compl. ¶ 41.)

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 13, 2009.

 s/ Richard M. Strassberg
Richard M. Strassberg (RS-5141)