UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION, :
: **No. 09-CV-4329 (JGK)**
               Plaintiff, :
:
  -against- :
:
JON-PAUL RORECH and :
RENATO NEGRIN, :
             Defendants. :
-----------------------------------------------------------------x

# DEFENDANT RENATO NEGRIN'S MEMORANDUM OF LAW IN SUPPORT OF HIS RULE 12(c) MOTION FOR JUDGMENT ON THE PLEADINGS

MORVILLO, ABRAMOWITZ, GRAND,
  IASON, ANELLO & BOHRER, P.C.
565 Fifth Avenue
New York, New York 10017
Tel: 212-856-9600
Fax: 212-856-9494
*Attorneys for Defendant Renato Negrin*

# TABLE OF CONTENTS

Page

**INTRODUCTION** ........................................................................................................................... 1

**LEGAL STANDARDS** ................................................................................................................. 2

**FACTUAL BACKGROUND** ....................................................................................................... 3

    I.    Credit Default Swaps. ............................................................................................ 3

    II.    Terms of the Credit Default Swaps at Issue. ......................................................... 4

**LEGAL ARGUMENT** .................................................................................................................. 8

    I.    Statutory Framework. ............................................................................................ 8

    II.    No "Material Term" in These Credit Default Swaps Is "Based On" the "Price, Yield, Value or Volatility of Any Security." ............................................. 9

    III.    The Conclusion That the Credit Default Swaps Purchased by Millennium Are Not "Securities-Based" Is Consistent with Existing Case Law. .................... 12

**CONCLUSION** ........................................................................................................................... 13

Defendant Renato Negrin respectfully submits this memorandum in support of his motion for a judgment on the pleadings on the complaint filed by plaintiff, the Securities and Exchange Commission (the "SEC" or "Commission") for lack of subject matter jurisdiction and for failure to state a claim.

## INTRODUCTION

The Commission alleges that defendant Renato Negrin, while working as a portfolio manager for Millennium Partners L.P. ("Millennium"), engaged in insider trading in July 2006 when he purchased credit default swaps ("CDS") referencing bonds issued by VNU N.V. ("VNU"). The SEC contends that Negrin received from co-defendant Jon-Paul Rorech, a salesperson at Deutsche Bank Securities Inc. ("Deutsche Bank"), material non-public information pertaining to VNU's plans to change the structure of its July 2006 bond issuance. Compl. ¶¶ 1, 2. The Commission claims Rorech provided this information to Negrin in breach of a duty to Deutsche Bank, and that after Negrin obtained this information, he, on behalf of Millennium, purchased two €10 million VNU credit default swaps. Compl. ¶¶ 38, 42. After VNU publicly announced the change to its bond issue, the VNU credit default swaps rose in price, and Negrin closed out Millennium's CDS positions at a profit.

The Commission brings this action pursuant to section 10(b) of the Securities Exchange Act of 1934, which prohibits the use of deceptive devices in connection with the purchase or sale of any "security-based swap agreement." In order to be a "security-based swap agreement," a "material term" in the agreement must be "based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein." None of the material terms of the swap agreements that are the subject of the SEC's complaint is based on the price, yield, value or volatility of any securities or group or index of securities. Because the credit default

swap agreements here are not "securities-based" as that term is defined in the statute, they are not covered by section 10(b). As a result, the SEC can state no viable cause of action, and this Court lacks subject matter jurisdiction over the case.

## **LEGAL STANDARDS**

As federal courts are courts of limited jurisdiction, they must always, as a threshold matter, ensure themselves that subject matter jurisdiction exists. Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008). The proponent of jurisdiction bears the burden of establishing jurisdiction by a preponderance of the evidence. Id.

When considering a dismissal motion for lack of subject matter jurisdiction and for failure to state a claim, a court must generally accept all well-pleaded factual allegations contained in the complaint as true. Shipping Fin. Svcs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998). "But, when the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." Id.; see also Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000) (upon a challenge to subject matter jurisdiction "the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing").

In the context of a challenge to the complaint's legal sufficiency, the defendant may submit, and the Court may properly consider, "documents plaintiff[] had either in its possession or had knowledge of and upon which they relied in bringing suit," even where plaintiff failed to attach those "integral" documents to its pleadings or to incorporate them by reference. Cortec Ind., Inc. v. Sum Holding LP, 949 F.2d 42, 48 (2d Cir. 1991).

Whether section 10(b) of the Exchange Act and Rule 10b-5 govern the alleged conduct in the complaint so as to provide the Commission with a cause of action for the alleged securities fraud implicates both questions of this Court's subject matter jurisdiction and whether the SEC has stated a cognizable claim for relief. Morrison, 547 F.3d at 177 (affirming district court's dismissal for lack of subject matter jurisdiction after concluding that section 10(b) did not apply to defendant's allegedly fraudulent conduct).

## FACTUAL BACKGROUND

I.  Credit Default Swaps.

A credit default swap is a fixed-duration financial contract in which a protection buyer agrees to make periodic payments (the "spread") to a protection seller in exchange for a promise by the protection seller to make a fixed payment ("notional" amount) if a specified credit event occurs in a referenced entity prior to the expiration of the contract. Aon Fin. Products, Inc. v. Societe Generale, 476 F.3d 90, 92 n.1 (2d Cir. 2007) ("A credit default swap is the most common form of credit derivative, i.e., a contract which transfers credit risk from a protection buyer to a credit protection seller") (quoting Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 171-72 (2d Cir. 2004)). The reference entity is the company upon which the contract is written. In order to receive the notional payment upon the occurrence of a credit event as set forth in the swap agreement, the protection buyer must settle the contract by physically delivering to the protection seller a qualifying credit obligation that is guaranteed, assumed or issued by the reference entity.

The parties agree upon the notional amount (the amount paid by the protection seller in case of a credit event) and the periodic payment or spread (the amount paid by the protection buyer for the protection). The periodic payment is determined by the parties based on their

respective views of the reference entity's creditworthiness, and is quoted in basis points and calculated by multiplying the spread by the notional amount.[1]

In many credit default swap agreements, the referenced entity's default of a specifically referenced credit obligation – a bond, for example – may trigger the protection seller's obligation to pay, upon the buyer's physical delivery of that particular referenced credit obligation. But this is only one way – of many – in which a credit default swap can work. See BNP Paribas, Understanding Credit Derivatives: CDS Basics, at 10 (2004) ("CDS counterparties can designate a Reference Obligation, which is typically a large bond issue of, or guaranteed by, the Reference Entity … [But] the protection buyer *does not necessarily deliver the Reference Obligation*") (emphasis added), available at http://www.globalriskguard.com/resources/crderiv/bnp_ Understanding%20Credit%20Derivatives%20volume%202.pdf (last visited August 17, 2009). In other cases, the referenced entity's commencement of a bankruptcy proceeding, separate and apart from any specific default on the referenced bonds, may require the seller to pay; and the protection buyer may in many instances deliver a loan, instead of the referenced bond, in order to settle the contract and to receive his payment. The specific credit events and deliverable obligations governing each swap agreement are determined and agreed upon by the parties to the contract.

II.     Terms of the Credit Default Swaps at Issue.

As alleged in the Commission's complaint, in this case, Millennium purchased a €10 million credit default swap from Deutsche Bank AG on July 17, 2006, and a €10 million credit

---

[1] For example, where parties A and B enter into a 5-year credit default swap in which A agrees to pay $10 million (notional amount) to B in exchange for a spread of 383 basis points (or 3.83%), B has agreed to pay $383,000 per year (or $97,750 per quarter) to A until a credit event occurs or the swap agreement expires.

4

default swap from "another dealer" on July 18, 2006. Compl. ¶ 42. These are the particular credit default swap agreements before the Court.[2]

Most credit default swaps bought and sold in the marketplace today – like those in our case – are governed by a standardized set of contract terms found in the 2003 International Swaps and Derivatives Association ("ISDA") Credit Derivatives Definitions and in the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions (collectively, the "2003 ISDA Definitions") (attached as Exhibit A to the Declaration of Linda Fang in Support of Defendant Renato Negrin's Motion for Judgment on the Pleadings, dated August 19, 2009 (hereinafter "Fang Declaration")). See 2003 Master Credit Derivatives Confirmation Agreement Between Deutsche Bank AG, London Branch, and Millennium Partners, L.P., June 11, 2004 (hereinafter "DB-Millennium Master Agreement"), ¶ 1 (providing that the 2003 ISDA Definitions will govern the transactions) (attached as Exhibit B to the Fang Declaration).

The parties to a credit default swap agreement also set a number of transaction-specific terms, generally memorialized in the "Master Agreement" and the "Trade Confirmation." The Trade Confirmation identifies the reference entity or obligation, the notional amount, the expiration date of the contract, the spread, and the frequency of spread payments. The parties' Master Agreement specifies the qualifying credit events, such as "bankruptcy" or "failure to pay," the "deliverable obligation categories" and "deliverable obligation characteristics," and the method of settlement. These terms are defined in the 2003 ISDA Definitions.

The two credit default swaps purchased by Millennium were set to expire on September 10, 2011, had notional amounts of €10 million, referenced a 5 5/8% VNU N.V. bond issue

---

[2] Because both of the credit default swap agreements at issue in this case are identical in all material respects, for the purposes of simplifying the discussion, we cite to and discuss only the Deutsche Bank AG credit default swap agreement.

5

maturing May 2010, and provided for a spread of 383 basis points per annum, to be paid every 3 months. See Electronic Trade Confirmations for the July 17, 2006 VNU CDS Transaction Between Deutsche Bank AG and Millennium Partners L.P. (hereinafter "DB-Millennium Trade Confirm") (attached as Exhibit D to the Fang Declaration). The triggering credit events for these credit default swaps were "bankruptcy", "failure to pay," and "restructuring." DB-Millennium Master Agreement, General Terms Confirmation, ¶ 3; DB-Millennium Trade Confirm ("CREDIT EVENTS: Bankruptcy, Failure to Pay, Mod Mod R"[3]).

Under the relevant 2003 ISDA Definitions, "bankruptcy" occurs when "a Reference Entity [] is dissolved (other than pursuant to a consolidation, amalgamation or merger)[,] becomes insolvent or is unable to pay its debts or fails or admits in writing in a judicial, regulatory or administrative proceeding or filing its inability generally to pay its debts as they become due[,] … [or] seeks or becomes subject to the appointment of an administrator,

---

[3] "Mod Mod R" refers to "modified modified restructuring" (or "Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation"), a variation on the basic "restructuring" credit event. Frank J. Fabozzi, THE HANDBOOK OF FIXED INCOME SECURITIES, at 711 (7th ed. 2005); 2003 ISDA Definitions § 2.33; see also Mark Adelson et al., Credit Default Swap (CDS) Primer, at 5-6 (May 12, 2004) (summarizing various "restructuring" credit event variations), available at http://www.securitization.net/pdf/content/Nomura_CDS_Primer_12May04.pdf (last visited August 15, 2009).

"Modified modified restructuring" is a common feature of European credit default swap contracts. E.g., Fabozzi, THE HANDBOOK OF FIXED INCOME SECURITIES, at 711. The only relevant difference between a "modified modified restructuring" credit event and a basic "restructuring" credit event is that in the former, the protection buyer is limited to delivering a qualifying credit obligation maturing no later than 60 months following the restructuring for settlement purposes, whereas in the latter, the protection buyer is not so limited and may settle by delivering any qualifying credit obligation, regardless of the obligation's maturity date. See 2003 ISDA Definitions § 2.33(c) (setting forth maturity limitations of deliverable obligations).

For the purposes of this motion – that is, in determining whether the credit default swaps purchased by Millennium are "securities-based," there is no relevant difference between a "modified modified restructuring" and a plain "restructuring" credit event. We thus refer exclusively to "restructuring" so as to simplify the discussion.

provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets …" 2003 ISDA Definitions § 4.2.

"Failure to pay" is defined as "after the expiration of any applicable Grace Period … the failure by a Reference Entity to make, when and where due, any [material] payments … under one or more Obligations, in accordance with the terms of such Obligations at the time of such failure." Id. § 4.5.

"Restructuring" occurs when "with respect to one or more Obligations" the Reference Entity effectuates an adverse financial restructuring of an Obligation. Specifically, a "restructuring" may consist of "a reduction in the rate or amount of interest payable … [or] in the amount of principal [] payable," "a postponement or other deferral of a date or dates for [interest or principal payments]," or "a change in the ranking in priority of payment of any Obligation, causing the Subordination of such Obligation to any other Obligation." Id. § 4.7(a).

For purposes of both the "restructuring" and "failure to pay" provisions, the 2003 ISDA Definitions provide that "Obligations" may include *any* loans or bonds of the reference entity. Id. § 2.19 ("Obligation may be defined as each obligation of each Reference Entity described by the Obligation Category specified in the related Confirmation … as of the date of the event which constitutes the Credit Event"), § 2.14.

Finally, the credit default swaps purchased by Millennium provided for physical settlement, and specified that Millennium could deliver either bonds or loans not subordinated to the referenced VNU bonds – that is, any VNU bond or loan of equal or greater seniority to the referenced bonds – to settle the contracts and to obtain the full notional payments. DB-Millennium Master Agreement, General Terms Confirmation, ¶ 4 ("Settlement Method: Physical Settlement … Deliverable Obligation Categories: Yes – Bond or Loan … Deliverable Obligation

Characteristics: Yes – Not Subordinated"); 2003 ISDA Definitions § 2.19(b)(1)(A) ("'Not Subordinated' means an obligation that is not Subordinated to [] the most senior Reference Obligation in priority of payment").

## LEGAL ARGUMENT

I. Statutory Framework.

Section 10(b) of the Securities Exchange Act of 1934 provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails … [t]o use or employ, in connection with the purchase or sale of … any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Section 10(b) further states that the Commission's rules relating to insider trading and securities fraud and the judicial precedents interpreting such rules apply to securities-based swaps. 15 U.S.C. § 78j.

Under the Commodity Futures Modernization Act ("CFMA"), a "security-based swap agreement" is "any swap agreement (as defined in section 206A [of the Gramm-Leach-Bliley Act]) … of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein." CFMA § 301(a) (as amending the Gramm-Leach-Bliley Act § 206B, set forth in 15 U.S.C. § 78c, Note). While the SEC may not regulate securities-based swap agreements, 15 U.S.C. §§ 77b-1(b)(2)-(3), 78c-1(b)(2)-(3), the Commission is authorized to enforce the fraud provisions of the securities laws with respect to securities-based swap agreements.

8

II. No "Material Term" in These Credit Default Swaps Is "Based On" the "Price, Yield, Value or Volatility of Any Security."

There are very few cases that address what swap agreements are "security-based" under section 10(b), and we have not found any involving credit default swaps. However, a plain reading of the statutory language at issue compels the conclusion that the VNU credit default swaps purchased by Millennium are not "securities-based."

In order to qualify as a "security-based swap agreement," a "material term" of the agreement must do more than simply reference a security – it must be "based on" certain enumerated characteristics of a security or a group or index of securities. The credit default swaps here do not satisfy this requirement.

Courts generally hold that the "material" or essential terms of a contract include "subject matter, price, payment terms, quantity, quality and duration." Rosenthal v. Nat'l Produce Co., 573 A.2d 365, 370 (D.C. 1990) (citing J.D. Calamari & J.M. Perillo, THE LAW OF CONTRACTS, § 2-13 at 43-44 & n.17 (2d ed. 1977)); e.g., Sevel Argentina, S.A. v. General Motors Corp., 46 F. Supp. 2d 261, 269 (S.D.N.Y. 1999).

In order to be a "security-based swap agreement," it is not enough that a material term of the agreement relates in some way to the price, yield, value or volatility of a security or group of securities; the term must itself be "based on" these specifically enumerated characteristics of some security. Courts have routinely interpreted the phrase "based on" in a variety of different statutory contexts consistent with its dictionary definition – that is, to mean "derived from" or "arising from." Environmental Defense v. EPA, 369 F.3d 193, 203 (2d Cir. 2004) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, at 180, 182 (1986)) ("The phrase 'based on' means to be 'used as a base or basis for.' The relevant definition of 'basis' in turn is 'principal component' or 'fundamental ingredient.'"); United States v. Becton Dickinson & Co.,

9

21 F.3d 1339, 1348 (4th Cir. 1994) (interpreting term "based upon" to mean "actually derived from"). Thus, a term is "based on" the price, yield, value or volatility of a security under the CFMA only where the term is somehow "derived from" or dependent upon a security's price, yield, value or volatility. See Community for Creative Non-Violence v. Reid, 490 U.S. 730, 739 (1989) ("where Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms").

Here, the material terms of the credit default swaps purchased by Millennium include the notional amount, the duration of the contract, the spread or "price" and the frequency of the spread payments, and the terms dictating how the notional payment would be determined and calculated. None of these material terms derive or arise from the price, yield, value or volatility of a security.

The notional amount of the credit default swap – here, €10 million – was the amount Deutsche Bank agreed to pay to Millennium if a qualifying credit event occurred; the notional amount was not based on the price, yield, value or volatility of the referenced VNU bond issue. Parties may contract for CDS agreements of varying notional amounts (e.g., €2.5 million, or €5 million), irrespective of the price or value of any specific security of the reference entity.

Next, the credit default swaps at issue provided for a 5-year term and were set to expire in September 2011, even though the referenced VNU bond issue was set to mature ahead of the swaps, in May 2010. Thus, the contracts' durational terms were similarly unrelated to any security.

The spread or "price" of the credit default swap – here, 383 basis points – was also determined by the parties, based on what the protection buyer is willing to pay and the protection

seller is willing to accept, in light of the parties' respective perceptions of the reference entity's credit risk and its likelihood of bankruptcy or default. This term also was not derived from the price, yield, value or volatility of the referenced VNU bond or any other security. Nor was the frequency of the spread payments based on any of the characteristics of a security specified in the statute. Here, the spread payments were to be made by Millennium to Deutsche Bank on a quarterly basis; this frequency of payment did not correspond to anything related to any security.

The only material term that remains is how Deutsche Bank's notional payment obligation was determined and calculated. The mutually agreed upon terms of the credit default swap provided that Deutsche Bank's obligation to pay Millennium would be triggered by the "bankruptcy" of VNU, VNU's "failure to pay," or VNU's "restructuring" of the terms, the payment dates, or the seniorities of any of its credit obligations. Upon the occurrence of one of these credit events, Millennium must then deliver a loan or a bond that is not junior to the VNU bond referenced in the swap agreement in order to receive payment of the €10 million notional amount of the contract. Deutsche Bank's payment obligation depended solely on *the existence of some deliverable credit obligation* that was equal to or more senior in the capital structure than the referenced VNU bonds; this payment obligation did not depend in any way on the price, yield, value or volatility of any security, as the statute requires.[4]

In the credit default swaps purchased by Millennium, the reference to the VNU bond simply established the seniority level of the deliverable obligation for settlement purposes.

---

[4] There are some credit default swaps which premise the protection seller's payment obligations upon the occurrence of a qualifying credit event *along with* a significant price deterioration of the referenced security. J.P. Morgan & RiskMetrics Group, The J.P. Morgan Guide to Credit Derivatives, at 14 (December 2003), available at http://www.investinginbonds.com/assets/files/Intro_to_Credit_Derivatives.pdf (last visited August 9, 2009). But the credit default swaps at issue in this case do not contain such a price deterioration term; they only require the occurrence of the specified credit event.

11

Frank J. Fabozzi, THE HANDBOOK OF FIXED INCOME SECURITIES, at 700 n.13 (7th ed. 2005) ("[p]hysically settled CDS contracts may reference a specific obligation to clarify the reference entity or the seniority of the deliverable obligation, but any *pari passu* obligation may be delivered"). Deutsche Bank's payment obligation and the extent of that obligation were in no way dependent on or derived from the price, yield, value or volatility of the referenced VNU bonds, or of any security or group of securities.

III. The Conclusion That the Credit Default Swaps Purchased by Millennium Are Not "Securities-Based" Is Consistent with Existing Case Law.

The credit default swaps before the Court are materially and markedly different from those swap agreements that have been judicially determined to be "securities-based" under the CFMA and section 10(b). In Caiola v. Citibank, 295 F.3d 312 (2d Cir. 2002), the Second Circuit considered the status of certain equity swap agreements executed between Citibank and Caiola. These swaps allowed the parties to "synthetically trade" shares of Phillip Morris stock by replicating the economic benefits of stock trading without requiring the capital outlays that would otherwise have been necessary to purchase the securities. There, the contracts provided that Caiola was entitled to receive from Citibank the amount of any actual appreciation in the price of Phillip Morris stock following the date of "purchase," but was obligated to pay to Citibank the amount of any actual depreciation in the stock price, plus interest on the notional value of the contract (determined by multiplying the stock price at the time of the "purchase" by the total number of shares so "purchased"). Id. at 317. Under these circumstances, the Second Circuit had little trouble concluding that these equity swaps were "security-based swap agreements" for purposes of section 10(b). Id. at 327.

Unlike the equity swaps at issue in Caiola where the parties' respective payment obligations depended directly on the price and value of a security, here, neither the amount of the

12

obligated notional payment nor the obligation itself depended on the price, yield, value or volatility of a security or group or index of securities.[5] Although the swap agreements here do make reference to a security, none of their material terms is based on the price, yield, value or volatility of that or any other security. In cases where the parties' payment obligations under a swap agreement do not satisfy the statute's dictates, courts have reached the straightforward and uncontroversial conclusion that such agreements are not "securities-based." See Sch. Dist. of the City of Erie v. J.P. Morgan Chase Bank, 08-CV-7688 (LAP), 2009 WL 234128, *1 (S.D.N.Y. Jan. 30, 2009) (dismissing plaintiff's section 10(b) claim based on an interest rate swap agreement – which called for one party to pay another based on the difference between LIBOR and a fixed interest rate – because the swap's "material term" providing for payment was "not based on the price, yield, value, or volatility of any security, or any group, or index of securities"); St. Matthew's Baptist Church v. Wachovia Bank Nat'l Ass'n, 04-CV-4540 (FLW), 2005 WL 1199045, *13 (D.N.J. May 18, 2005) (same).

## **CONCLUSION**

The terms of the credit default swaps at issue, when read in light of the 2003 ISDA Definitions that govern the contracts, make clear that the protection sellers would have been obligated to pay Millennium €10 million on each contract if VNU went bankrupt, failed to pay, or restructured any of VNU's credit obligations, independent of what happened to the price, yield, value or volatility of the referenced VNU bonds or any other security. The protection

---

[5] Further, Millennium and Deutsche Bank AG could have carried out their respective contractual obligations under the credit default swaps at issue here without ever dealing in a security, since the parties agreed that VNU loans may have been delivered in order to settle the contracts. See, e.g., Reves v. Ernst & Young, 494 U.S. 56, 65 (1990) (certificates evidencing commercial loans are not "securities"); Banco Espanol de Credito v. Security Pacific Nat'l Bank, 973 F.2d 51, 54-56 (2d Cir. 1992) (sale of interests in portions of a series of commercial loans to institutional investors was not a sale of "securities").

13

sellers would have had to pay the full notional amounts as long as Millennium delivered a VNU bond or loan that was equal or more senior in the capital structure than the referenced VNU bonds, irrespective of the price, yield, value or volatility of any security.

In sum, none of the material terms of the present credit default swaps is "based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein" as required by statute. Since the credit default swaps here are not "security-based," they are outside the reach of section 10(b). Therefore, this Court has no subject matter jurisdiction over this case, and the Commission cannot state a claim for relief. Accordingly, we respectfully request that the Court dismiss the complaint with prejudice.

Dated: New York, New York
   August 19, 2009

                Respectfully submitted,

                MORVILLO, ABRAMOWITZ, GRAND,
                 IASON, ANELLO & BOHRER, P.C.

                By:  /s/_____
                  Lawrence Iason (LI 8996)
                  Linda Fang (LF 3461)
                  Claudio Ochoa (CR 7695)
                565 Fifth Avenue
                New York, New York 10017
                Tel: 212-856-9600
                Fax: 212-856-9494

                *Attorneys for Defendant Renato Negrin*