**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

SECURITIES AND EXCHANGE COMMISSION,          :
                                             :
                            Plaintiff,       :
                                             :
            v.                               :          09 CV 4329 (JGK)
                                             :
JON-PAUL RORECH and                          :
RENATO NEGRIN,                               :          ECF CASE
                                             :
                            Defendants.      :
_____:


**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**


SECURITIES AND EXCHANGE
COMMISSION

Richard G. Primoff
Nancy A. Brown
Panayiota K. Bougiamas
Attorneys for Plaintiff
New York Regional Office
3 World Financial Center, Room 4300
New York, New York 10281
(212) 336-0148 (Primoff)

**Table of Contents**

**Page**

Introduction.....................................................................................................................1

Facts……......................................................................................................................4

    1.  CDS Price Is Based on the Price, Yield, Value and/or
       Volatility of the Reference Obligation......................................................4

    2.  Other Material, and Documented Terms of the VNU CDS Are
       Also Based on Price, Yield, Value or Volatility of Securities...............7

       a.  Partial Cash Settlement Provisions ...............................................8

       b.  Credit Support Annex .....................................................................9

    3.  The Only Deliverable Obligations Into
       the VNU CDS Known to the Market Were Bonds ...............................11

ARGUMENT ................................................................................................................11

I.  THE COURT HAS SUBJECT MATTER JURISDICTION OVER
    THIS COMPLAINT ...............................................................................................11

    A.  The VNU CDS Is a Security-Based Swap Agreement
        Under Section 206B of the GLBA......................................................11

    B.  It Is Immaterial that VNU Is Dutch ...................................................18

II.  THE COMPLAINT ADEQUATELY ALLEGES THAT RORECH
    BREACHED HIS DUTY OF CONFIDENTIALITY ...............................................21

CONCLUSION.............................................................................................................26

**Introduction**

In <u>United States v. O'Hagan</u>, 521 U.S. 642, 658 (1997), the Supreme Court adopted the misappropriation theory of insider trading under Section 10(b) of the Exchange Act, holding that the theory is "well-tuned to an animating purpose of the Exchange Act: to insure honest securities markets and thereby promote investor confidence."

Several years later, Congress amended Section 10(b) of the Securities Exchange Act of 1934 (among other provisions) through the Commodity Futures Modernization Act ("CFMA"), and clarified that Section 10(b)'s "animating purpose" – indeed, the Supreme Court's holding in <u>O'Hagan</u> as well – applies with equal force to the fast-growing market for security-based swap agreements as it does to securities themselves. Section 10(b) now explicitly provides that all rules previously promulgated by the Commission prohibiting fraud, manipulation or insider trading, *and all judicial precedents previously decided* under Section 10(b), "shall apply to security-based swap agreements (as defined in section 206B of the Gramm-Leach Bliley Act) *to the same extent as they apply to securities*." 15 U.S.C. § 78j, <u>as amended</u>, Pub.L. 106-554, § 1(a)(5), 3 U.S.C. § 303(d)(2) (emphasis added).

One of the prime and well-understood purposes of this legislative amendment was to close the door on a potential loophole in insider trading law that might have allowed wrongdoers to engage in the same conduct in derivative instruments that were economic substitutes for the securities themselves.

The Complaint alleges that in July 2006, Defendant Rorech, a bond salesman at Deutsche Bank Securities, Inc. ("DBSI"), tipped Defendant Negrin, a trader at the hedge

fund Millennium Partners, to material, non-public information about a bond issuance by

VNU N.V. ("VNU") that he had misappropriated in breach of his duty to DBSI.

Defendants expected that Rorech's inside information would drive an increase in the

price of a credit default swap agreement ("CDS") referencing a specific bond issued by

VNU.[1]  As they had expected, once the bond issuance became public, the VNU CDS

price increased dramatically.  Negrin's trades based on this inside information ultimately

earned trading profits of $1.2 million.  According to published news accounts, the price

movement on the VNU CDS led to widespread concerns later that summer among

investors that insider trading had occurred.  See Primoff Dec. Exh. B.

Defendants have moved for judgment on the pleadings pursuant to Fed. R. Civ. P.

12(c), arguing that the Court may now determine from the face of the pleadings (and

various extraneous materials) that the VNU CDS at issue is not a "security-based swap

agreement" as defined by Section 206B of the Gramm-Leach-Bliley Act, 15 U.S.C. § 78c

Note ("GLBA").  Accordingly, they argue that the Commission lacks authority to bring

this action and the Court lacks subject matter jurisdiction.

As detailed below, a "security-based swap agreement" is broadly defined to

include any swap agreement "of which a material term is based on the price, yield, value

or volatility of any security, or any group or index of securities, or any interest therein."

In both theory and practice, the CDS price – indisputably a "material" term of any

contract – is based on the price, yield, value and/or volatility (or an interest therein) of the

CDS reference obligation, here, a bond.  Indeed, CDS referencing corporate bonds –

which comprise a major sector of the securities industry – are classic examples of

---

[1]A copy of the Complaint is annexed as Exhibit A to the September 25, 2009
Declaration of Richard G. Primoff ("Primoff Dec.") submitted herewith.

security-based swap agreements.  Thus, the Court has subject matter jurisdiction over this proceeding.  The Court will find virtually no mention of CDS pricing in Defendants' motion papers.  Instead, Defendants cherry pick certain terms of the standard-form transaction documents relating to the VNU CDS, and claim there is no term derived by reference to the price, yield, value or volatility of the VNU bond that is the reference obligation.

Even if it were appropriate to ignore how CDS are priced (and of course it cannot be), and adopt Defendants' approach of examining ISDA contract documents, their argument fails.  Their formalistic analysis of the CDS contract language ignores several material provisions of the standard terms of the VNU CDS that are *expressly* based on the price, yield, volatility or value of VNU's bonds.   For this reason alone, Defendants' argument should be rejected.

Defendant Rorech (but not Negrin) makes two additional arguments in support of his Rule 12(c) motion.  First, Rorech argues that even if the VNU CDS is a security-based swap agreement, the Commission cannot exercise jurisdiction here simply because the bonds' issuer was Dutch.  This argument is specious.  The plain language of Section 10(b) of the Exchange Act (which Rorech ignores in his motion papers) makes it clear that the Commission's authority over security-based swap agreements is independent from its authority over the reference securities.  All of the material, fraudulent conduct in this case occurred in New York City.  Thus, there can be no question under settled case law that the Commission has jurisdiction over this unlawful behavior.

Second, Rorech asks the Court to determine on this motion whether Rorech breached a duty to DBSI or VNU when he tipped Negrin to the likelihood that VNU

3

would issue bonds deliverable against the CDS.  Rorech claims he did not breach any

duty to his investment bank employer.  Rorech's argument, however, fails under settled

precedent.   At best for Rorech, the question of his duty (and his breach of it) depends on

a resolution of disputed issues of fact, and is not properly before the Court on this Rule

12(c) motion.

Indeed, under the most charitable view of Defendants' position, genuine issues of

material fact present themselves on every argument here.   Their motions must be denied

for this reason alone. See First Capital Asset Mgmt v. Brickellbush, Inc., 218 F. Supp. 2d

369, 378, 383 (S.D.N.Y. 2002) (where subject matter jurisdiction arises from the same

statute as governs the underlying claim, such that resolution of jurisdiction and the merits

are intertwined, courts must deny a motion to dismiss based on subject matter jurisdiction

where the evidence presented creates issues of fact).

## Facts

### 1.     CDS Price is Based on the Price, Yield, Value and/or Volatility of the Reference Obligation

A single-name CDS is an agreement between a protection buyer and a protection

seller whereby the buyer pays a periodic fee in return for a payment by the seller upon the

occurrence of a credit event involving the issuer in question.[2]  The amount the buyer pays

for protection is expressed in basis points on a notional amount specified in the swap

agreement.  This is the "CDS spread."

The market's standard models for pricing the CDS spread are explicitly based on

the "recovery rate" of the reference obligation specified in the CDS.  See, e.g., JP

---

[2]Credit events typically include one or more of the following: (1) bankruptcy, (2) obligation acceleration, (3) obligation default, (4) a failure to pay, (5) repudiation or moratorium, or (6) restructuring.

Morgan, Par Credit Default Swap Spread Approximation from Default Probabilities (2001) (Primoff Dec. Exh. C); Merrill Lynch, Credit Derivatives Handbook 2006-Vol. 1 14 (2006) (Primoff Dec. Exh. D) ("Any pricing model of credit default swaps would need to take into account several factors. The key inputs would include . . . expected recovery value of the reference asset.").  The recovery rate is the expected value of the reference obligation at the time of default.  Moorad Choudhry, The Credit Default Swap Basis (New York 2006) (Primoff Dec. Exh. E) 183.[3]

Thus, the market directly models CDS prices on the value of the CDS reference obligations.  Where the reference obligation is a bond (such as in the VNU CDS), the CDS price is thus "based on" the price, yield, value, volatility of a security – or an interest in the price, yield, value or volatility of a security.

CDS pricing models depend on the reference obligation of the CDS, because CDS prices are derived from and closely related to the equivalent spread of the bond's yield in the cash market – the asset swap spread.[4]  See JP Morgan, Credit Derivatives Handbook

---

[3]Indeed, two basic approaches to modeling CDS prices are the Hull-White model, and the market approach developed by JP Morgan (see above), both of which explicitly depend on the value "R" –  the recovery rate on the reference obligation.  See Choudhry, supra, at 25-35.  These models were available on Bloomberg.  Id. at 55; see also Harry Lipman, Valuing Credit Default Swaps (Bloomberg Markets October 2002) (Primoff Dec. Exh. F) (noting availability of Hull-White CDS pricing model on Bloomberg); see also Bjorn Flesaker, The Bloomberg Model in CDSW (February 2009) (Primoff Dec. Exh. G) (noting Bloomberg's own CDS pricing model on Bloomberg system, which also uses recovery rate of reference obligation as input).

[4]The asset swap spread is determined by means of an asset swap calculation.  In a typical asset swap transaction, the purchaser of a bond with a fixed interest payment exchanges that stream of payments with a counterparty for a floating rate, expressed as a spread (in basis points) above a risk-free benchmark such as LIBOR (with the benchmark rate frequently referred to as the "swap rate," or "swap curve.")  The asset swap thereby eliminates "interest rate" risk, since LIBOR is a floating rate.  Thus, the asset swap spread the investor receives over Libor is a measure of the credit risk of the specific bond.  Choudhry, supra at 13-15.

(JP Morgan 2006) (Primoff Dec. Exh. H) 44-49; Merrill Lynch, supra; Choudhry, supra at 61, 86 (CDS spread will equal the asset swap spread on the bond under "no-arbitrage model that assumes absence of technical factors causing the spreads to differ; and empirical data demonstrate that the "CDS market is …. very closely correlated to the movements of the cash bond market"); Satyajit Das, Credit Derivatives, CDOs  and Structured Credit Products  490-91 (3d ed. 2005) (Primoff Dec. Exh. I)  ("In practice, credit default swaps are priced relative to the cash market (asset swaps)"); David Mengle, Federal Reserve Bank of Atlanta, Credit Derivatives: An Overview, Economic Review (Fourth Quarter 2007) (Primoff Dec. Exh. J) 13-14 ("The asset swap spread performs essentially the same function as a CDS spread, so the two should be related by arbitrage.… The result of the above factors is that, even if asset swap spreads will not in most cases converge to CDS spreads, they are a reasonable starting point for calculating the spread.").[5]

Rorech and Negrin knew and understood that the price of the VNU CDS was based on the bond's yield.  Here is Rorech in testimony, referencing a conversation with Negrin, and explaining his understanding of the relationship between CDS price and the asset swap portion of the bond yield:

---

[5]There are of course technical and market factors (such as the relative liquidity of the CDS market to the bond market) that can cause the CDS spread and the asset swap spread in the cash market to diverge at times.  These differences (or "basis") provide arbitrage opportunities for investors, and is *based on* the relationship between the two spreads, and the expectation that the two spreads will reach equilibrium.  See Choudhry, supra at 113 ("We observed that the basis is driven by coupon and convexity issues, which we formalized in a relationship among the spread of the bond, its coupon, and the respective durations of the bond and CDS"); Jan De Wit, National Bank of Belgium, Exploring the CDS-Bond Basis 23 (2006) (Primoff Dec. Exh. K) ("We have shown that CDS and bond markets are closely related and bound by a long-run equilibrium relationship, as CDS premia and par asset swap spreads are mostly cointegrated").

> If you add the CDS rate to the LIBOR swap, that would give you kind of
> what your bond equivalent yield is, right.  So, let's just say LIBOR is at
> five percent and CDS is at 425 [basis points, or 4.25%], you add the two
> that's nine and a quarter.  We were marketing the Nielson bonds, the
> OptCo bonds at nine and a half percent, ten percent, so that risk premium
> is still tighter than where the OptCo bonds are trading, sorry, potentially
> are coming out.  So, I was just giving him my view based on swap rates
> where I think CDS should be.[6]

And here is Negrin in testimony, also describing a conversation with Rorech, and also

expressing the same understanding:

> And then [Rorech] tells me that the tone of the market is weaker, which is
> saying to me that they're going to need a higher coupon for the VNU debt
> we priced.  Q.  And is that significant information to you with regards to
> VNU CDS pricing? A. It's a piece for the puzzle.[7]

**2.      Other Material, and Documented Terms of the VNU CDS Are
Also Based on Price, Yield, Value or Volatility of Securities**

Defendants claim that no material term of the CDS is based on VNU's securities.

In addition to ignoring the all-important price term, Defendants ignore several other

material provisions of the VNU CDS contract documentation that are explicitly based on

the price, yield, value or volatility of VNU's securities.  The VNU CDS contract

documentation (for, e.g., the Deutsche Bank-Millennium relationship) includes:

(1) The 2003 ISDA Credit Derivatives Definitions (Primoff Dec. Exh. N);

(2) The September 15, 1997 Master Agreement and Schedule ("Master
Agreement") executed by Millennium and Deutsche Bank (Primoff Dec.
Exh. O); and

---

[6]February 12, 2009 Investigative Testimony of Jon-Paul Rorech ("Rorech Test.")
(Primoff Dec. Exh. L) at 123.

[7]November 5, 2008 Investigative Testimony of Renato Negrin ("Negrin Test.") at
80-81 (Primoff Dec. Exh. M).  See also Negrin Test. at 19 ("So when you look at [the
bond's spread] and then you compare it to the CDS spread and there is a positive
difference, if you can fund that – get good funding on it, then it's almost like it's an
arbitrage where if you can hold it to maturity you're going to make that spread if you
have locked up your funding").

(3) The September 15, 1997 Credit Support Annex executed by
Millennium and Deutsche Bank (Primoff Dec. Exh. P).[8]

The Master Agreement and Credit Support Annex were global agreements that covered

multiple swap transactions between Millennium and Deutsche Bank.

### a.      **Partial Cash Settlement Provisions**

First, settlement terms of the CDS are based on the value of VNU's securities.

Defendants rely on the fact that the VNU CDS calls for "physical settlement," apparently

conceding that a CDS requiring *cash* settlement – in which the default value of the

reference obligation is explicitly deducted from the notional amount owed to the

protection buyer – is necessarily based on the value of a security, where the reference

obligation is a security.  See Article VII of ISDA Credit Derivatives Definitions (Primoff

Dec. Exh. N).   Defendants fail to mention that the 2003 ISDA Credit Derivatives

Definitions (also incorporated as part of the VNU CDS at issue), contain cash settlement

terms that explicitly require the counterparties to value the reference entity's securities.

Section 9.9 of the ISDA Credit Derivatives Definitions, "Buy-In of Bonds Not

Delivered," provides a mechanism under which, if the protection buyer has not delivered

the bonds specified in the Notice of Physical Settlement within five business days after

the Physical Settlement Date, the protection seller has the right to close out some or all of

the transaction through a buy-in of the bonds.   In such a "buy-in," a cash settlement

---

[8]The Master Agreement is based on the standard-form 1992 ISDA Master
Agreement, and the Credit Support Annex is based on the 1994 ISDA Credit Support
Annex.  It was market convention for parties to execute and exchange only the
individually negotiated pages of these forms.  For ease of reference for the Court and
counsel, the Commission has combined the individual and standard-form pages of each
document, and created one Master Agreement exhibit, and one Credit Support Annex
exhibit. Primoff Dec. Exh. O and P.

procedure is followed, and the protection buyer is given a payment in settlement that nets from the full notional amount the value of the bonds that the protection seller has committed to purchase.  If the protection seller fails to obtain a buy-in price from a dealer within a specified number of days, the protection buyer's right to deliver bonds recommences, with the protection seller again obtaining a buy-in right if the protection buyer fails to deliver within a certain number of days – and this process can repeat until the final settlement of the transaction.[9]

This is clearly a material term, a point Defendants can hardly dispute since they have conceded that the settlement terms of the CDS are material.  Where the protection seller, for example, believes there will be a post-default increase in the price of the bonds, it may seek to take advantage of this situation.  One example where this is predictable is if the amount of notional coverage written in CDS exceeds the amount of issued bonds (i.e., the situation the market was concerned about with respect to VNU in early July 2006, see Complaint ¶¶ 16-17).  In such a case, protection buyers may be unable to deliver bonds to physically settle their CDS contracts, and a protection seller may rationally conclude that the price of those bonds will increase as CDS protection buyers attempt to obtain them for settlement purposes, and will thus seek to avail itself of the buy-in provisions.

### b.    Credit Support Annex

Second, the Credit Support Annex provides for calculation of the CDS price (which, as noted above, is based on, among other things, the bond's expected recovery

---

[9]In addition to the foregoing provision, Section 9.8 of the ISDA Definitions provides for partial cash settlement where a buyer fails to deliver Deliverable Obligations under the CDS due to reasons of impossibility or illegality.   ISDA Credit Derivatives Definitions Section 9.8.

value) on a daily basis. The Credit Support Annex is designed to protect the CDS counterparties from the credit risk each poses to the other, and it operates analogously to a margin account. Each party may be required to post initial collateral, and during the term of the CDS, may be obligated to post additional collateral, or may be entitled to a return of collateral, sufficient to essentially make the parties whole as if all the transactions between the parties were terminated on the valuation date. The amount of collateral required is referred to as the Credit Support Amount.[10] Under the method of calculating the Credit Support Amount applicable here (the Market Quotation method, see Master Agreement Schedule Part 1(g)), the valuation agent uses estimates at mid-market (i.e., the average of the bid and offer quotations) of amounts that would have to be paid to enter into equivalent transactions with a market maker.[11]

Thus, to calculate the Credit Support Amount between Deutsche Bank and Millennium, both parties would assess the value of each trade on a mark-to-market basis. The daily calculation of the current market value of the CDS in this case would necessarily depend on the value of the reference obligation since, as demonstrated above,

---

[10]Paragraphs 13(b)(C) and 3(b)(ii) of the Credit Support Annex provide that the Credit Support Amount here is based on the Secured Party's "Exposure." Exposure is defined in ¶ 12 of the Credit Support Annex as the amount that would be payable to a Secured Party by the other party pursuant to Section 6(e)(ii)(2)(A) of the Master Agreement if all transactions were to be terminated as of a certain date.

[11]Were the parties actually terminating the transaction, and not using Section 6(e)(ii)(2)(A) simply to mark it to market on a daily basis, the Market Quotation method would entail obtaining quotations from leading market makers for an amount that would be paid by a party to a market maker to enter into a transaction (the "Replacement Transaction") that would effectively preserve for the party the obligation due to it under the agreement with its counterparty. Master Agreement ¶ 14, Definitions, Market Quotation (Primoff Dec. Exh. O).

CDS prices are modeled – dependent on – the price, yield, or value of the reference bond.[12]

### 3.      The Only Deliverable Obligations Into the VNU CDS Known to the Market Were Bonds

Quite apart from the economic theory, practice, pricing and contract language of single-name CDS, the Court should take note of one further, salient fact regarding the VNU CDS at issue in this case: At all times relevant to this Complaint, the *only* debt issued by VNU known to the market were its bonds, and thus the only Deliverable Obligations against the VNU CDS were bonds.  Indeed, a prime purpose of the new VNU bond issuance in 2006 was to create more securities that could be delivered into VNU CDS.   See, e.g., Marco Gironi, VNU: Credit Investors Feel Leverage Pain 11 (August 13 )  (Merrill Lynch July 20, 2006) (Strassberg Dec. Exh. A). Thus, as a simple matter of fact, the very existence of the VNU CDS depended on the existence of the VNU bonds.

## ARGUMENT

## I.     THE COURT HAS SUBJECT MATTER JURISDICTION OVER THIS COMPLAINT

### A.      The VNU CDS Is a Security-Based Swap Agreement Under Section 206B of the GLBA

When Congress passed the CFMA in late 2000, it amended Section 10(b) of the Exchange Act to clarify that the Commission's traditional anti-fraud and insider trading enforcement authority applies to security-based swap agreements to the same extent as to securities.  Thus, the CFMA not only inserted the term "security-based swap agreement" into the operative provisions of Section 10(b), but also emphasized that with respect to

---

[12]The JP Morgan model (discussed above) is the industry standard modeling tool for counterparties to mark their CDS transactions to market.  See JP Morgan, supra (Primoff Dec. Exh. H) at 11-14.

such swap agreements, the Commission's anti-fraud authority, *and judicial precedents decided under Section 10(b) and rules promulgated under it,* applied equally and independently as to securities:

> Rules promulgated under subsection (b) that prohibit fraud, manipulation, or insider trading *(*but not rules imposing or specifying reporting or recordkeeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading), *and* judicial precedents decided under subsection (b) and rules promulgated thereunder that prohibit fraud, manipulation, or insider trading, shall apply to security-based swap agreements (as defined in section 206B of the Gramm-Leach-Bliley Act) to the same extent as they apply to securities. Judicial precedents decided under section 17(a) of the Securities Act of 1933 and sections 9, 15, 16, 20, and 21A of this title, and judicial precedents decided under applicable rules promulgated under such sections, shall apply to security-based swap agreements (as defined in section 206B of the Gramm-Leach-Bliley Act) to the same extent as they apply to securities.

15 U.S.C. § 78j, as amended by Pub.L. 106-554, § 1(a)(5), 3 U.S.C. § 303(d)(2).

At the time of passage, it was noted that this amendment to Section 10(b) would "enhance protection for investors and for the financial markets, and will permit the SEC to respond as necessary to developments in these markets." 146 Cong. Rec. S 27310 (Jan. 2, 2001) (Statement of Sen. Sarbanes) (Primoff Dec. Exh. Q). The relevant legislative history prior to its passage is consistent. Administration officials and Congressional members expressed support for making it explicitly clear that the Commission's traditional anti-fraud and insider trading enforcement authority applied to security-based swap agreements. See The Commodity Futures Modernization Act of 2000: Hearing on S. 2697 Before the Senate Committee on Agriculture, Nutrition, and Forestry and the Senate Committee on Banking, Housing and Urban Affairs, 106th Cong. (2000) 4 (Statement of Senator Gramm) (Primoff Dec. Exh. R) ("We need the SEC in all areas to exercise its authority on anti-fraud and insider trading"); Id. at 20 (Statements of

Senator Sarbanes and Federal Reserve Chairman Greenspan, expressing agreement that "we should focus on insider trading, fraud, manipulation, and make sure that any possibility for those practices to take place is precluded under the regulatory scheme.").[13]

The reasons for this amendment are readily apparent. The prohibitions against insider trading have been recognized for decades as a fundamental element of the investor protections supplied by the federal securities laws, serving the critical function of promoting market integrity and investor confidence in the markets. As the Supreme Court recognized in endorsing the misappropriation theory of insider trading in O'Hagan, 521 U.S. at 658, that theory is "well-tuned to an animating purpose of the Exchange Act: to insure honest securities markets and thereby promote investor confidence. . . . [I]nvestors likely would hesitate to venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law."

Yet this fundamental protection would be gutted under Defendants' view of the law. If Defendants' argument were accepted, insiders and misappropriators, while prohibited from victimizing investors in the securities markets by trading on confidential information, would be free to reap enormous profits legally by trading in unregulated derivative instruments that operate as economic substitutes for their underlying securities. Congress recognized the absurdity of that outcome, and the economic devastation that

---

[13] See also Id. at 14 (Statement of Senator Gramm) (expressing agreement with Treasury Secretary Summer's statement that "Insider trading, fraud, manipulation… it seems to us need to continue to be subject to regulation, not so as to extend some net of regulation to OTC derivatives in a way that they are not now subject to regulation, but only to assure that the basic protections we provide in our cash markets do not become circumvented through this legislation."). Defendant Rorech's repeated suggestion that Congress acted only "reluctantly" in clarifying the Commission's anti-fraud and insider trading enforcement authority with respect to security-based swap agreements is inaccurate and finds no support in the legislative record.

would result if insider trading were unchecked in the securities derivatives markets.[14] Congress adopted the amendments to section 10(b) at issue here in order to plainly state that the law of insider trading, in its entirety, applies to transactions in security-based swap agreements.

While, as indicated above, there is little question that the VNU CDS at issue here were derivative instruments based on securities, Defendants try to avoid the obvious implications of the CFMA amendments by offering an extremely selective interpretation of the statutory term "security-based swap agreement." For numerous reasons, defendants' argument fails.

Although there is no case law directly addressing whether credit default swaps such as the one at issue here are "*based on*" the "price, yield, value or volatility" (or "any interest" in any of those aspects) of a security for purposes of determining the Commission's jurisdiction, there is instructive case law on the question of whether newly-created derivatives are "based on the value of" a security (or index of securities) for purposes of deciding whether the Commission has jurisdiction over them.

In Stechler v. Sidley Austin Brown & Wood, L.L.P., 382 F. Supp. 2d 580, 595 (S.D.N.Y. 2005), for example, the court considered whether "Digital Options" were "based on the value" of an index of securities. The Digital Options were synthetic options that provided for a fixed payout that was not tied proportionately to the value of the underlying index. In denying a defendant's motion to dismiss, the court noted its

---

[14]The market for CDS exploded after the passage of the CFMA. ISDA, for example, reported that CDS notional coverage grew from $632 billion in 2001 to over $45 trillion by mid-year 2007. As of 2006, single-name CDS accounted for one third of the total market for all credit derivatives, reaching a peak of $62 trillion by the second half of 2007. See Mengle, supra at 7-8; 2009 ISDA Market Survey (Primoff Dec. Exh. S).

14

agreement with plaintiff's argument that the Digital Options could be based on the value

of the underlying index, if the price of the Digital Options in the secondary market was

sufficiently related to the index, even if the relationship was not spelled out explicitly in

the derivatives' contract language.  <u>Stechler</u>, 382 F. Supp. 2d at 596-97.   However, the

court denied the defendant's motion to dismiss without deciding the question, holding

that factual issues on that point precluded that decision in the context of a motion to

dismiss.  <u>Id.</u> at 597.  <u>Accord</u> <u>Ling v. Deutsche Bank, AG</u>, No. 04 CV 4566 (HB), at *5

(S.D.N.Y. May 26, 2005) (declining to determine whether investors' interest in an LLC

constituted a security on motion to dismiss).

The definition of security-based swap agreement in Section 206B of the GLBA is

broader and more encompassing than the analogous portion of the "securities" definition

under Section 3(a)(10) of the Exchange Act at issue in <u>Stechler</u>.  While the securities

definition uses the phrase "including any interest therein or based on the value thereof" in

relation to groups or indices of securities, Section 206B uses the disjunctive phrase

"based on the price, yield, value or volatility of any security, or any group of securities,

or any interest therein." The Commission submits the use of a broader and more flexible

definition with respect to security-based swap agreements was no accident, and was used,

consistent with the legislative history discussed above, precisely to allow the Commission

flexibility with respect to its anti-fraud and insider trading enforcement authority as

would be made necessary by developments in the market – among which were the rapid

growth in the credit derivatives market – and, most prominently, the CDS market.[15]

_____

[15]<u>Stechler</u>'s focus on the economic reality of the derivative is consistent with a
long line of cases that, in interpreting the Commission's jurisdiction over financial
instruments, eschews "legal formalisms, [and] instead take[s] account of the economics

The realistic approach used in <u>Stechler</u> applies at least as forcefully, if not more so, to the case at hand.  Under that analysis, moreover, there can be little doubt that the material terms of the VNU CDS  are "based on" the price, yield, value or volatility (or interest therein) of a security.  As noted above in detail:

- As a matter of market practice, CDS prices were actually derived in the market based on pricing models that explicitly used the predicted value of the reference obligation as a "key input" (<u>see</u> <u>Facts</u>, Section 1, supra);

- The price of single-name CDS is, by definition, theoretically and empirically derived from the asset swap spread of the reference obligation (<u>see</u> <u>Facts</u>, Section 1, <u>supra</u>);

- Defendants Rorech and Negrin understood CDS prices were based on the bond market spreads (<u>see</u> <u>Facts</u>, Section 1, <u>supra</u>); and

- In the case of the VNU CDS at issue, the *only* "Deliverable Obligations" that existed during the entire time relevant to the Complaint were securities: bonds issued by VNU (<u>see</u> <u>Facts</u>, Section 3, <u>supra</u>).

The foregoing facts – which are either ignored or conceded by Defendants in their motion papers – demonstrate what is clear from the very nature and identity of single-name CDS:  That such CDS, like the VNU CDS here, which specifically references a security, is  "based on" on the price, yield, value or volatility (or an interest in the price, yield, value or volatility) of the bonds they reference, and thus a security-based swap agreement under GLBA Section 206B.

---

of the transaction under investigation."  <u>Reves v. Ernst & Young</u>, 494 U.S.56, 61 (1990). Such an "economic reality" test "permit[s] the SEC and the courts sufficient flexibility to ensure that those who market investments are not able to escape the coverage of the Securities Acts by creating new instruments that would not be covered by a more determinate definition." <u>Id.</u> at 63 n.2.  <u>See</u> <u>Caiola v. Citibank</u>, 295 F.3d 312, 325 (2d Cir. 2002), <u>quoting</u> <u>United Housing Foundation v. Foreman</u>, 421 U.S. 837, 848 (1975) ("In searching for the meaning and scope of the word 'security' . . . the emphasis should be on economic reality").

The Court could properly reach no other conclusion even if it were to determine this issue simply by using the definitions for "based on" proffered by Defendant Negrin: "derived from," "arising from," "fundamental ingredient," and "dependent on."  Negrin Mem. at 9-10.  As noted above, it was market practice to price the CDS transaction – initially, and then on a daily basis thereafter under the Credit Support Annex – using the recovery rate of the reference obligation as a "key input" (i.e., "fundamental ingredient," and "dependent on").  It was Rorech who acknowledged giving Negrin his view of where CDS spreads should be, "based on" swap rates, an entirely reasonable admission since it has been acknowledged that the asset swap rates are an important "starting point" for pricing CDS.  See Mengle, supra.   It was a feature of all the standard pricing models, after all, to *derive* the CDS price from the value of the reference obligation.

Defendants ignore all of this, and instead insist that the Court search the standard-form contract determination for some formula that relates explicitly to the price, yield, value or volatility of VNU's bonds.  Although this approach is deficient because it ignores one of the most material terms of CDS – its price – even this approach does not avail the Defendants.

As Defendants acknowledge, the 2003 ISDA Credit Derivatives Definitions form a material part of the VNU CDS.  As noted above in detail (Facts, Section 2(a), supra), Sections 9.9 and 9.8 contain settlement provisions applicable to "physical settlement" CDS such as the VNU CDS that call for partial or complete "cash settlement" procedures in certain circumstances.  These procedures explicitly require the parties to value VNU's bonds – and, in the case of the "buy-in" provisions in Section 9.9, *only* VNU bonds.

17

Similarly, as noted above, the Credit Support Annex to the Deutsche Bank and Millennium VNU CDS imposed collateral requirements on the parties that required the parties to model the CDS price on a daily basis, and directed them either to post additional collateral, or entitled them to a return of collateral, as a result.   The Credit Support Annex was expressly part of the VNU CDS.  It was material, since it was included to protect the counterparties from the credit risk each posed to the other – and it was indisputably "based on" the price, yield, value or volatility of VNU's bonds. (or an interest therein).  See Facts, Section 2(b), supra.

### B.        It Is Immaterial that VNU Is Dutch

Rorech (but not Negrin) argues that as a matter of law, the Court does not have subject matter jurisdiction, even if the VNU CDS is a security-based swap agreement, because the VNU bonds referenced by the CDS were issued by a foreign issuer and traded on a foreign exchange.  Rorech insists that for purposes of Section 10(b), the Commission must establish not only that the VNU CDS is a security-based swap agreement, but that it also has separate and independent jurisdiction over the underlying security.

This additional jurisdictional hurdle is one entirely of Rorech's own imagination, however, and is not to be found in Section 10(b), the legislative history of the CFMA, or the case law.   On the contrary, the statutory language and case law is quite clear that the Commission has jurisdiction over the VNU CDS without regard to VNU's location.

As noted previously, Congress made it clear in the CFMA that the Commission's authority to bring anti-fraud and insider trading enforcement cases under Section 10(b) with respect to security-based swap agreements is independent of its authority with

18

respect to securities themselves.  See p. 12, supra.  Section 10(b) explicitly prohibits

fraud with respect to any security-based swap agreement, and explicitly provides that the

Commission's anti-fraud rules, and all judicial precedent regarding the same, apply to

security-based swap agreements (as defined in section 206B of the Gramm-Leach-Bliley

Act)  "*to the same extent as they apply to securities*. . . ." (emphasis added).

      Rorech, curiously, ignores Section 10(b), which is the section at issue in this

proceeding, and cites instead Section 20(d) of the Exchange Act, which is not.  Rorech

apparently contends that the phrase "with respect to such security," in Section 20(d)

implies Congressional intent to limit the Commission's jurisdiction to those cases in

which it has established jurisdiction with respect both to a securities-based swap

agreement, and the security to which the swap agreement relates.

      Rorech's argument makes no sense, quite apart from the irrelevancy of Section

20(d) of the Exchange Act to this case.   Prior to the CFMA, Section 20(d) existed

(without the security-based swap agreement language) in the same form it does now, and

its purpose initially was simply to make clear that insider trading was unlawful with

respect to a list of derivatives, just as it was with respect to the securities themselves, and

to avoid uncertainty about the reach of the "fiduciary theory" of insider trading under

Section 10(b) to those derivatives.[16]  The CFMA merely added security-based swap

agreements to the list of covered derivatives.  There is no "jurisdictional" limitation to be

read or imputed from the presence of the phrase "with respect to such security" language

---

[16]See Ted Kamman and Rory T. Hood,  <u>With the Spotlight on the Financial Crisis, Regulatory Loopholes, and Hedge Funds, How Should Hedge Funds Comply with the Insider Trading Laws?</u>, 2009 Colum. Bus. L. Rev. 357, 377-78 (2009); Steve Thel, <u>Section 20(d) of the Securities Exchange Act: Congress, the Supreme Court, the SEC, and the  Process of Defining Insider Trading</u>, 69 N.C.L. Rev  1261, 1266, 1267 (1991).

on which Rorech relies, as its purpose is merely to point out that conduct that would have amounted to unlawful insider trading in a security, also applies to the listed types of derivatives of those securities.[17]  The location of a security's issuer or exchange is not part of the definition of "security" under the securities laws, moreover, so it is mystifying why Defendant Rorech insists that the phrase in question carries such a meaning.  Even if that phrase were included in Section 10(b) (and it is not), it would be immaterial to this proceeding.

Rorech's arguments concerning certain foreign attributes of the VNU bonds are thus wholly irrelevant to this case, which alleges unlawful insider trading in VNU CDS under Section 10(b) of the Exchange Act, because Section 10(b) clearly provides this court with jurisdiction over the wrongful conduct alleged in the Complaint.  In insider trading cases based on the misappropriation theory, where the tipper misappropriates information from the source and passes it onto the tippee who subsequently trades on the information, the wrongful conduct consists of the exchange of information.  United States v. Falcone, 257 F.3d 226, 233 n.4 (2d Cir. 2001) ("The breach of the tipper's duty to the information source occurs at the exchange of information to which the source has a right of exclusive use, not upon the use of the information by the tippee for a securities

---

[17]Rorech's fictitious casting of the legislative history (Rorech Mem. at 16-17) provides no support for his argument.  The Court will search through the cited statements of Senators Gramm and Lugar in vain for any suggestion that the Commission's anti-fraud and insider trading authority over security-based swap agreements should be limited only to cases where the Commission also has jurisdiction over the underlying security.  The concerns expressed by Senators Gramm and Lugar in the cited provisions went toward prohibiting the Commission from having forward-looking, prophylactic rule-making authority.  On the contrary, the legislative history shows nothing but support for the Commission's anti-fraud and insider trading authority over security-based swap agreements, to prevent a circumvention of the basic protections of the securities markets through the derivatives market.  See p. 13, supra.

transaction").  The wrongful conduct at issue in this case occurred in the United States:

Rorech and Negrin exchanged the material non-public information concerning the new

issue of VNU NV bonds in breach of his duty to DBSI while in New York, and Rorech

does not argue otherwise.  See Negrin Answer ¶ 6 (Docket Entry No. 10).  Since the

wrongful conduct at issue occurred in the United States, no issue of extraterritorial

application of the securities laws arises from the Complaint.[18]

## II.       THE COMPLAINT ADEQUATELY ALLEGES THAT RORECH BREACHED HIS DUTY OF CONFIDENTIALITY

Rorech indisputably owed a fiduciary duty to DBSI.  As an employee of the bank,

he owed it a duty not to misappropriate its or its clients' material, nonpublic information

for his own purposes.

The Complaint alleges that Rorech – an employee of DBSI –  told Negrin that

"DBSI would be recommending to the financial sponsors that VNU issue a tranche of

bonds out of the VNU holding company that would be deliverable into CDSs, that it was

_____

[18]Rorech's argument that the pre-existing VNU bonds were issued by a foreign issuer, and traded in a foreign market, is thus irrelevant.  Nonetheless, the Commission points out that the new VNU NV bonds that were the subject of the tipped information were being structured and sold by New York-based DBSI capital markets bankers and a consortium of private equity firms based in the United States that owned nearly all of VNU's outstanding stock.  February 3, 2009 Investigative Testimony of Mark Fedorcik (Primoff Dec. Exh. T at 32-52).  These United States-based private equity firms were the ones that hired DBSI bankers in New York, and with whom DBSI discussed the possibility of issuing the new VNU NV bonds.  February 4, 2009 Fedorcik Test. (Primoff Dec. Exh. T at 213-16).

   In addition, the new VNU NV bonds were marketed to United States investors.  The new bonds were sold by DBSI salespeople based in New York—including Rorech— to clients based in New York.  Rorech Test. at 127 (Primoff Dec. Exh. L)  Finally, the reference obligation of the VNU CDS – the existing issue of VNU bonds – were still being traded (Rorech Test. at 59-60), and, as the evidence in case will show, were referenced by millions of dollars worth of CDS traded by US-based hedge fund managers and dealers who managed funds for US investors.   All of this demonstrates without question that the VNU bonds were subject to United States securities laws.

likely the sponsors would do so, and that DBSI had $200 million worth of customer

orders for and interest in that tranche."  (Complaint ¶ 32.)  The Complaint alleges that

that information was "confidential."  (Complaint ¶ 23.)  Those allegations are sufficient

to state a claim that Rorech breached the fiduciary duties he owed to DBSI to keep

undisclosed confidential information he learned in the course of his employment.[19]

It has been settled law in the Second Circuit for almost thirty years that an

employee of an investment bank owes a duty to keep client information confidential.  In

United States v. Newman, 664 F.2d 12, 17 (2d Cir. 1981), the Second Circuit concluded

that employees of two investment banks who tipped their associates with information

about the banks' merger work for clients had breached their fiduciary duties.  "By

sullying the reputations of [their] employers as safe repositories of client confidences,

appellee and his cohorts defrauded those employers as surely as if they took their

money."  Id.  In disclosing to Negrin DBSI's  and VNU's plans to restructure the VNU

bond offering, Rorech is guilty of no lesser theft.

While the Complaint alleges that Rorech was bound by confidentiality policies

(Complaint ¶¶ 23-26), and that DBSI was itself bound by an explicit pledge to VNU to

keep its nonpublic information confidential (Complaint ¶ 28), no such explicit policy is

---

[19]Because Rorech passed information obtained from DBSI that Negrin used to buy CDSs and not securities directly issued by VNU, the Commission's claim against him proceeds on a misappropriation theory.  The Supreme Court has defined that theory of liability as requiring allegations that Defendant "misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information. . . .  In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's [or tipper's] deception of those who entrusted him with access to confidential information."  O'Hagan, 521 U.S. at 652.

required to establish an employee's fiduciary duty to his employer. [20]   The duty arises

from Rorech's employment relationship with DBSI, and does not depend on the existence

of any confidentiality agreement or policy.  United States v. Chestman, 947 F.2d 551,

566 (2d Cir. 1991) (holding that the duty arises from the relationship of the tipper to the

source and noting precedent finding the requisite duty in employer/employee contexts);

SEC v. Falbo, 14 F. Supp. 2d 508, 523 (S.D.N.Y. 1998) (contractor owed duty not to

reveal any information he obtained during his work for employer even where no

agreement to maintain confidentiality existed); SEC v. Musella, 578 F. Supp 425, 438-39

(S.D.N.Y. 1984) (law firm employee owed duty to firm not to disclose client's

confidential information); accord SEC v. Talbot, 530 F.3d 1085, 1095 (9th Cir. 2008)

(holding that relationship imposes duty, not specific agreement); SEC v. Cherif, 933 F.2d

403, 410-11 (7th Cir. 1991) (employees have duty to protect any information with which

they are entrusted during course of employment, even after employment is terminated);

see also Restatement (Second) of Agency § 395 ("Unless otherwise agreed, an agent is

subject to a duty to the principal not to use or to communicate information confidentially

given him by the principal or acquired by him during the course of or on account of his

agency").

Rorech raises a pure question of fact when he argues that the information he

shared was not considered by DBSI or VNU to be confidential or expected to be retained

in confidence.  The Complaint alleges that the information *was* confidential (Complaint

¶¶ 23, 25, 29, 30, 32, 33, 40), and that it was not publicly disclosed until July 24.

---

[20]Rorech makes much of the Engagement Letter's permission to use VNU's
nonpublic information "to the extent appropriate in the context of such Offering."  But
divulging material non-public for insider trading purposes is not lawful, much less
"appropriate." Rorech's reasoning is entirely circular here.

(Complaint ¶ 20.)  The Complaint further alleges that DBSI's policy decreed that "information concerning Deutsche Bank's  . . . clients (including any information given the Company by its clients)" was confidential without regard for what the client expected. (Complaint ¶ 25.)

Rorech's attempt to paint the high-yield market as free-wheeling, subject to few rules of confidentiality, and apparently exempt from insider trading proscriptions is ineffective and unsupported.  Without any evidence at this pre-discovery stage, Rorech merely offers a Report by the Commission's Staff of the Division of Market Regulation from 1993 that recognized the need of "traders, salespersons and analysts" in the high yield market to share information on a more immediate basis than exists in the equity markets. (SEC, Division of Market Regulation, Broker-Dealer Internal Control Procedures for High Yield Securities  4 (October 1993) (Strassberg Decl.Exh.C; Rorech Mem. at 8 nn. 17, 18 and 19.)  But that report cited no such need for the free flow of information between *investment banking* employees and the sales force – the two sides of the information flow at issue here.  Rather than provide support for Rorech's argument that the peculiarities of the high yield market create lower barriers against insider trading for its participants, the Report notes that sharing of information between Investment Banking employees and the sales force is typically constrained by strict policies prohibiting the sharing of information between those two areas of the firms it reviewed: "All of the firms have long-standing Chinese Wall procedures in place to prevent the misuse of material, nonpublic information that often is received by personnel in the firms' investment banking operations."  Id. at 6-7.  In those interactions, the Staff wrote, "[t]he standard procedures used by particular firms in underwritings, restructurings, or

other deals involving equities are applied by these firms to comparable activities involving High Yield securities." Id.

The information Rorech came to possess was confidential, and not publicly known.  In contrast to the information Rorech had, information is public and not confidential when it is "disclosed 'to achieve a broad dissemination to the investing public generally and without favoring any special person or group,' . . . or when, although known only by a few persons, their trading on it 'has caused the information to be fully impounded into the price of the particular stock.'" SEC v. Mayhew, 121 F.3d 44, 50 (2d Cir. 1997) (quotations omitted) (affirming bench trial verdict for plaintiff on evidence that information, once disclosed, moved market price, supporting inference that it was not publicly known prior to announcement); SEC v. Lyon, 605 F. Supp. 2d 531, 541 (S.D.N.Y. 2009) (granting plaintiff summary judgment on issue of nonpublic nature of planned PIPEs offering where deposition testimony supported allegation).

There is no evidence on this record that the investing public knew the information that Rorech – and then Negrin – knew:  that VNU would restructure the bond offering to issue a tranche out of the holding company.  Indeed the Complaint alleges that news of the restructuring affected the market price of the VNU-referenced CDS, indicating a market reaction to the news.  (Complaint ¶ 43.) [21]  With no evidence to contradict the Complaint's allegations of the non-public and confidential nature of the information, the

---

[21]Rorech's own evidence of what the public knew supports this allegation.  As of July 20, 2006, Merrill Lynch analyzed the publicly proposed VNU debt offering.  Gironi, supra (Strassberg Dec. Exh. A).  Throughout the report, the Merrill Lynch analyst cites VNU's plans to issue bonds only at the operating company level and discusses the discount – amounting to 100 basis points – that should be applied to existing CDS prices as a result of the "deliverability and liquidity impairment" caused by the proposal to issue non-deliverable bonds. Id. at 3.

Court should accept those allegations as true and deny Rorech's motion for judgment on the pleadings.[22]

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court deny Defendants' motions for judgment on the pleadings.

Dated: New York, New York
          September 25, 2009

                                    SECURITIES AND EXCHANGE COMMISSION


                                    By:____s/   Richard G. Primoff_____
                                            Richard G. Primoff
                                            Nancy A. Brown
                                            Panayiota K. Bougiamas
                                            Attorney for Plaintiff
                                            New York Regional Office
                                            3 World Financial Center, Room 4300
                                            New York, New York 10281
                                            (212) 336-0148 (Primoff)
                                            primoffr@sec.gov

---

[22]Rorech's arguments about his "wall-crossing" are beside the point.  (Rorech Mem. at 23-24.)  How he obtained the information has no effect on the confidential and non-public nature of it, or the duty he owed to keep it undisclosed.  If the information was not known to the public, Rorech owed a duty to DBSI not to disclose it because the duty arises from his employment, not the manner in which the information was conveyed. SEC v. Singer, 786 F. Supp. 1158, 1171 (S.D.N.Y. 1992) (rejecting defendant lawyer's argument that he owed no duty to keep confidential information that his client had volunteered and that he had done nothing wrong to obtain because his duty to retain the confidence arose from his relationship to the client, not the manner in which he had acquired the information).  In any event, Rorech's argument only goes so far; he supposes that if he was provided with the information without being subjected to formal wall-crossing, then he must have received it properly, and therefore, it must not have been confidential.  An equally likely scenario, however, is that despite the information's confidentiality – which the Complaint alleges – he received the information *improperly*. Either way, the information was still non-public, and therefore, confidential.