UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION, :
                                                              :         No. 09-CV-4329 (JGK)
                Plaintiff,               :
                                                              :
   -against-                                       :
                                                              :
JON-PAUL RORECH and                              :
RENATO NEGRIN,                                      :
              Defendants.                :
---------------------------------------------------------------x


# DEFENDANT RENATO NEGRIN'S REPLY MEMORANDUM OF LAW
# IN SUPPORT OF HIS MOTION FOR JUDGMENT ON THE PLEADINGS


MORVILLO, ABRAMOWITZ, GRAND,
  IASON, ANELLO & BOHRER, P.C.
565 Fifth Avenue
New York, New York 10017
Tel: 212-856-9600
Fax: 212-856-9494
*Attorneys for Defendant Renato Negrin*

**TABLE OF CONTENTS**

**ARGUMENT** .................................................................................................................................. 1

    I.    The Spread Or "Price" for the VNU Credit Default Swaps Was Not "Based On" the Value Or Yield of Securities. ........................................................................... 1

    II.    The Settlement Mechanics Did Not Make the VNU CDS "Security-Based." ....... 4

    III.    The Collateral Requirements Are Not "Based On" the Price Or Value of Securities. ................................................................................................................ 8

    IV.    Neither *Stechler* Nor the "Economic Reality" Approach Has Any Relevance. ..... 8

    V.    No Factual Issues Exist on the Question of Subject Matter Jurisdiction. ................ 9

**CONCLUSION** ........................................................................................................................ 10

In its Complaint, the Securities and Exchange Commission ("Commission") has alleged that Renato Negrin, on behalf of Millennium Partners, purchased two VNU credit default swaps while in possession of material nonpublic information provided by Jon-Paul Rorech, a salesman at Deutsche Bank. The two VNU credit default swaps provided that Millennium was to pay Deutsche Bank and Royal Bank of Scotland (the protection sellers) €383,000 (383 basis points, or 3.83%, multiplied by €10 million) for five years, in exchange for the promise by the protection sellers that they would each pay Millennium €10 million if a credit event occurred to VNU before the contracts expired. Although the credit default swaps did make reference to a 5 5/8% VNU N.V. bond maturing in May 2010, the reference only served to set the seniority level of the VNU credit obligation that Millennium could deliver in order to receive the €10 million notional payments in the case of a credit event.

The Exchange Act authorizes the Commission to enforce the fraud provisions of the securities laws with respect to credit derivatives, but only where the derivative contracts are "security-based swap agreements." As defined by statute, a "security-based swap agreement" is one in which "a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein." None of the material terms of the VNU credit default swaps satisfies this statutory definition. Therefore, we ask the Court to enter judgment in favor of Negrin because the credit default swaps he purchased were not "security-based," and thus were not within the scope of section 10(b) of the Exchange Act.

## ARGUMENT

I.  The Spread Or "Price" for the VNU Credit Default Swaps Was Not "Based On" the Value Or Yield of Securities.

The Commission claims that the spread or price term for credit default swaps is determined by various pricing models, and that the pricing models in turn use the "predicted

1

value" or the yield of the reference obligation as inputs. From this, the Commission argues that the spread of the VNU credit default swaps was "based on" the yield or value of the VNU bond that was the reference obligation for the swaps.

In its response, the Commission introduces at least three distinct pricing models and approaches supposedly available to the market ("Hull-White," J.P. Morgan's "market approach," and "no-arbitrage"). Opp. Brief at 4-6 & 5 n.3. But nowhere in its submissions is there any allegation that any particular model was used by Deutsche Bank, Royal Bank of Scotland, or Millennium (or by Negrin or Rorech) to determine the spread for the VNU credit default swaps.

The Commission cannot do so because the pricing models it discusses are theoretical constructs developed by academics to estimate what the spreads for credit default swaps should be, based on various assumptions about future events. E.g., Moorad Choudhry, The Credit Default Swap Basis 26 (2006) (portions excerpted in Primoff Decl. Ex. E) (noting "[t]he *theoretical* pricing of credit derivatives has attracted attention in the academic literature" and discussing the various models and approaches) (emphasis added). The models can be used to make predictions about credit default swap spreads, taking into account a number of factors which may include the reference bond's yield or its expected recovery value. But these models' results are no different from the estimated stock price target that a research analyst might set for a company after considering its financial performance along with other quantitative and qualitative factors; just as the analyst's price target does not establish the market price for the stock, pricing models do not set the actual spreads for credit default swaps.

The reality that actual credit default swap spreads are not set by pricing models is amply demonstrated by the credit derivatives literature submitted by the Commission. That body of

2

literature observes that theoretical predictions generally diverge from empirical market spreads.[1] If it were the case that pricing models actually set market spreads, one would expect that the two – market prices and model-predicted spreads – would be one and the same.

The Commission's argument further fails to account for the fact that both the notional amount and the spread of the VNU credit default swaps were expressed in absolute terms, independent of any reference to the price, value, or yield of the VNU bonds. This is in stark contrast to the equity swaps that were deemed "security-based" in Caiola v. Citibank, 295 F.3d 312, 327 (2d Cir. 2002), in which the price that Caiola paid for his swap was a rate of interest paid on the notional value of the contract, and the notional value was determined by multiplying the stock price at the time of the synthetic purchase by the total number of shares purchased.

Here, the parties to the VNU credit default swaps agreed on a price of 3.83% (383 basis points) multiplied by the notional amount (€10 million) per year, to be paid by Millennium on a quarterly basis until the expiration of the swaps or until a credit event occurred. This fixed price was set by the parties based on what the sellers were willing to accept and what the buyer was willing to pay at the time of the transactions. The price was not based on the results of any theoretical pricing models, nor was it based on the price, value, or yield of the VNU bonds.

---

[1] As the Commission's authorities explain, actual spreads diverge from the spreads generated by pricing models because actual spreads for credit default swaps are impacted by a host of "technical and market factors" not quantified by or accounted for in the theoretical pricing models. See Opp. Brief at 6 n.5; e.g., Jan De Wit, National Bank of Belgium, Exploring the CDS-Bond Basis 7, 7-13 (Nov. 2006) (Primoff Decl. Ex. K) (noting that although bond yields and CDS spreads should theoretically be equal under the "no-arbitrage" approach, "this relation does not always hold in practice"; reviewing the various drivers for the observed differences). And the fact that the models tend to rely on a host of simplifying but unrealistic assumptions further contributes to the divergence between the actual and the theoretical. E.g., Choudhry, The Credit Default Swap Basis 26 ("Like most other approaches, [the Hull-White CDS] model assumes that there is no counterparty default risk"); Frank J. Fabozzi, THE HANDBOOK OF FIXED INCOME SECURITIES 1347 (7th ed. 2005) ("Using [] a no-arbitrage strategy to price CDS is … not totally realistic because … effects such as … supply and demand, and counterparty risk also play a role in the determination of the default swap spread").

II.     The Settlement Mechanics Did Not Make the VNU CDS "Security-Based."

The VNU credit default swap agreements provided for physical settlement, meaning that upon the occurrence of a triggering credit event, Millennium would have to tender a qualifying credit obligation to Deutsche Bank and Royal Bank of Scotland in order to obtain the €10 million payments. The Commission notes that the governing ISDA definitions also contain contingent provisions which permitted the swaps to be settled partially in cash under limited circumstances.[2] The Commission argues that if the VNU swaps were cash settled, the amount that the protection seller would pay to the protection buyer would be reduced by the market value of a deliverable credit obligation at the time of settlement, thereby making the swaps "security-based."

The credit default swaps in this case provided that Deutsche Bank and Royal Bank of Scotland would each pay Millennium €10 million upon the occurrence of a VNU credit event. Unlike the "security-based" equity swaps in Caiola, these promises to pay the €10 million notional amounts were not based on the price or value of any security.

In Caiola, the "based on" element was satisfied because the material terms pertaining to the parties' payment obligations were explicitly based on the price of the reference securities. The price Caiola paid for the swap was calculated from the price of the reference stock. And at the termination of the contract, the amount Caiola was obligated to pay (or entitled to receive) was determined based on the appreciation or depreciation of the stock price. Caiola, 295 F.3d at 316. As a result, the parties' payment obligations were expressly dependent on the price of the reference securities; it was impossible to determine the material terms relating to payment (both

---

[2] In cash settlement, the protection buyer agrees, upon a triggering credit event, to receive from the protection seller a payment for the notional amount less the then-market value of a deliverable obligation. Cash settlement is the economic equivalent of allowing the protection buyer to tender the cash equivalent of the credit obligation instead of the physical instrument. Fabozzi, THE HANDBOOK OF FIXED INCOME SECURITIES, at 699-700.

in terms of what the buyer had to pay for the swap and what the parties had to pay when the swap terminated) without looking to the price of the reference stock. Therefore, the price and payout terms were directly and necessarily derived from, and thus were "based on" the price of those securities, making the swaps "security-based."[3]

Here, the material terms in the VNU credit default swaps pertaining to how the parties' payment obligations were calculated were not indeterminate but were *fixed*. Millennium agreed to pay Deutsche Bank and the Royal Bank of Scotland €383,000 per year. Deutsche Bank and the Royal Bank of Scotland agreed to pay Millennium €10 million – exactly the notional amount – if there was a qualifying credit event. These promises to pay were the material terms, and they were set entirely independent of the price, value, yield, or volatility of the VNU bonds.

The Commission's argument is premised on the flawed assumption that the provisions pertaining to settlement were "material terms." They were not; the settlement terms were merely "conditions."[4] Deutsche Bank AG v. AMBAC Credit Products, LLC, No. 04-CV-5594 (DLC),

---

[3] In addition to the Caiola swaps, another example of a "security-based swap agreement" is the total return swap ("TRS"). See David Mengle, Credit Derivatives: An Overview 5-6 (2007) (Primoff Decl. Ex. J). The TRS works in virtually the same way as the Caiola equity swaps, except that the reference security in a TRS is a bond, not a stock. In a TRS, the total return payer agrees to pay to his counterparty the total appreciation or depreciation in the bond's price, along with interest on the total notional amount of bonds "purchased," in exchange for a payment of LIBOR plus some negotiated spread. Id. at 5. The "price" of a TRS is necessarily derived from the price of the reference bonds (since interest is paid on the total value of the "purchased" bonds).

Asset swaps are similarly "security-based." Under an asset swap, a party holding a fixed coupon bond transfers his fixed coupon payments to his counterparty in exchange for a payment of LIBOR plus a spread equal to the difference between the bond's fixed coupon and LIBOR at the time the swap is executed. Id. at 6; see Opp. Brief at 5 n.4 (discussing asset swaps). Similar to the Caiola equity swaps and to the total return swaps, the price of the asset swap is contractually *and necessarily* based on the yield of the reference security, thereby rendering it "security-based" under the statutory definition.

[4] Nowhere in our opening brief did we, as the Commission insists, "concede" the settlement terms were material, or that a credit default swap providing for cash settlement would

5

2006 WL 1867497, *9-*10 (S.D.N.Y. July 6, 2006) (in a credit default swap dispute, plaintiff's failure to deliver bonds within the allotted time under ISDA meant it had failed to satisfy a "condition precedent" to the protection seller's duty to pay, thereby excusing the seller's nonpayment).  Under settled contract jurisprudence, "material terms" are those so essential to the agreement that a lack of definiteness as to their contours will render the agreement unenforceable, see Richard A. Lord, WILLISTON ON CONTRACTS § 4:21 (4th ed.) (updated May 2009) (collecting cases), whereas a "condition is an event, not certain to occur, which must occur … before performance under a contract becomes due," RESTATEMENT (SECOND) OF CONTRACTS § 224 (1981).  See WILLISTON ON CONTRACTS § 38:5 ("The distinction between a promise or covenant on the one hand, and a condition on the other, both in their legal effect and in their wording, is obvious and familiar").

Not every provision in the VNU credit default swaps is "a material term."  The "material terms" of the VNU credit default swaps, as set forth in the trade confirmations were: notional amount; duration; spread (and frequency of spread payments); reference obligation; and terms dictating how the notional payment would be calculated[5].  See DB-Millennium Trade Confirm (Fang Decl. Ex. D).  The omission of any of these terms would have rendered the swaps unenforceable.  See Ansorge v. Kane, 155 N.E. 683, 685 (N.Y. 1927) (failure to specify how much buyer was to pay upon signing invalidated the contract since the court could not fill in that missing term by looking to default rules in contract law); cf. Mereminsky v. Mereminsky, 188 N.Y.S. 2d 771, 778 (App. Div. 2d Dep't 1959) (vagueness as to meaning of contractual condition did not impact validity of contract as long as contract's essential terms were defined).

---

be "security-based."  See Negrin Opening Brief, at 9-11 (defining "material" terms and enumerating the material terms of the VNU credit default swaps).

[5] In the case of the VNU credit default swaps, the payment was simply equal to the notional amount.

6

On the other hand, the method of settlement for the VNU credit default swaps upon the occurrence of a VNU credit event was merely a "condition." See AMBAC Credit Products, 2006 WL 1867497 at *9. The settlement terms dictated what Millennium had to do in order to trigger the protection sellers' fixed promises to pay €10 million on each swap. If Millennium did not comply with the settlement provisions and failed to tender a qualifying credit obligation, the protection sellers would not have been obligated to pay anything. The promises to pay €10 million were the material terms; the settlement provisions were just conditions.

In addition, the VNU swaps provided for physical settlement. DB-Millennium Master Agreement, General Terms Confirmation, ¶ 4 (Fang Decl. Ex. B). The partial cash settlement of these swaps was allowed only in very limited circumstances: *only if* it became illegal or impossible (excluding market conditions) to deliver a VNU credit obligation, ISDA Definitions § 9.3; or *if* the buyer failed to tender a deliverable obligation after the delivery period had run, and then *only if* the seller gave notice and successfully purchased bonds in the market, id. § 9.9. The contingent nature of these provisions further demonstrates that they cannot be material terms.

Congress provided that only those swaps in which a "material" term – not *any* term – was based on the price, yield, value or volatility of a security qualify as "security-based swap agreements." "Material term" is a phrase "the meaning of which had been crystallized by … judicial interpretation" prior to the Congressional action at issue. SEC v. W.J. Howey Co., 328 U.S. 293, 298 (1946). Congress's choice of language must be given effect; the word "material" should not be read out of the statute, and the phrase "material term" should be construed consistent with its settled common law meaning. Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 112 (1991) (statutes are to be interpreted "so as to avoid rendering superfluous" any statutory language); see W.J. Howey Co., 328 U.S. at 298 (where "investment contract" had

7

been uniformly interpreted by courts, it was "therefore reasonable to attach that meaning to the term as used by Congress").

III.    The Collateral Requirements Are Not "Based On" the Price Or Value of Securities.

The Commission also argues that the Credit Support Annex for the VNU credit default swaps supports the contention that these swap agreements were "security-based." The Credit Support Annex provides that the parties to a credit default swap may be required to post additional collateral in certain contingent circumstances based on the mark-to-market value of the credit default swaps. Credit Support Annex ¶¶ 3, 4 (Primoff Decl. Ex. P). But as the Commission acknowledges, the collateral requirements, if applicable, were to be determined based on the daily "market value *of the CDS*," Opp. Brief at 10 (emphasis added), and not on the price or value of any securities. Therefore, it is plain that the Credit Support provisions do not make the VNU credit default swaps "security-based."

IV.     Neither *Stechler* Nor the "Economic Reality" Approach Has Any Relevance.

The Commission claims that Stechler v. Sidley Austin Brown & Wood, LLP, 382 F. Supp. 2d 580 (S.D.N.Y. 2005) supports its argument that even if the VNU credit default swaps do not otherwise fit the statutory definition, this Court should nevertheless utilize a flexible "economic reality" approach to find that the VNU swaps are "security-based."

In Stechler, the court considered whether certain synthetic options (in which a party was obligated to make a fixed payment if the price of an equity index exceeded a set price on a particular date and time) were properly deemed "options" and thus "securities" under section 10(b). Id. at 594-97. The text of the statute does not provide the answer; although the Exchange Act defines a "security" to include an "option" on a security, it does not define the term "option." See 15 U.S.C. § 78c(a)(10). In that context, courts "searching for the meaning and scope of the

8

word 'security'" are entitled to look to "economic realities" to craft judicial definitions for terms (such as "options") left undefined by Congress. Caiola, 295 F.3d at 326 (concluding synthetic options were "options" and therefore "securities" by looking to the economic characteristics of the options); Reves v. Ernst & Young, 494 U.S. 56, 67 (1990) (applying "family resemblance" test to determine what constitutes a "note" and thus a "security").

In this case, however, the Court does not have to search for the meaning of the phrase "security-based swap agreement"; it has been defined by Congress. As defined, the term includes only those swaps in which "a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein." Neither Stechler nor any other case supports the Commission's apparent contention that courts may use a "flexible approach" to expand the coverage of this unambiguous statutory definition. As the Supreme Court has explained, "[t]here is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted"; courts may do the former, but certainly not the latter. Lamie v. United States Trustee, 540 U.S. 526, 537 (2004); see also McGaw v. Farrow, 472 F.2d 952, 955 (4th Cir. 1973) (if there exists "an unfortunate gap in the statutory jurisdiction of the federal courts … the gap … can only be filled by Congress and not by judicial legislation") (internal quotes omitted).

V.    No Factual Issues Exist on the Question of Subject Matter Jurisdiction.

Finally, there are no factual disputes that preclude resolution of the "security-based swap agreement" issue.[6] There is no dispute about the documents governing the swaps in question.

---

[6] Although we are confident that no factual issues exist here, if the Court disagrees, we would respectfully request a hearing on the discrete issue of subject matter jurisdiction. Zappia Middle East Constr. Co. Ltd. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000) (upon a challenge to subject matter jurisdiction "the court may resolve the disputed jurisdictional fact issues by … if necessary, hold[ing] an evidentiary hearing").

9

We have not introduced any materials extrinsic to the Complaint, but only those contracts upon which the Commission's claim is based.  Cortec Ind., Inc. v. Sum Holding LP, 949 F.2d 42, 48 (2d Cir. 1991) (defendant may submit "integral" "documents plaintiffs … had knowledge of and upon which they relied in bringing suit" even if plaintiffs failed to attach those documents to the complaint).  Courts routinely decide similar threshold legal questions in the context of preliminary dispositive motions.  See, e.g., Sch. Dist. of the City of Erie v. J.P. Morgan Chase Bank, 08-CV-7688, 2009 WL 234128, *1 (S.D.N.Y. Jan. 30, 2009) (granting motion to dismiss on section 10(b) claim where swaps in question were not "security-based"); see SEC v. Mutual Benefits Corp., 408 F.3d 737, 741-45 (5th Cir. 2005) (affirming dismissal for lack of subject matter jurisdiction on ground that contracts were not "securities").

## CONCLUSION

In sum, because none of the material terms of the VNU credit default swaps were based on the price, yield, value, or volatility of any security, group or index of securities, or any interest therein, the swaps were not "security-based swap agreements."  We therefore ask the Court to dismiss the Complaint with prejudice and enter judgment in favor of Negrin.

Dated: New York, New York
October 23, 2009

Respectfully submitted,

MORVILLO, ABRAMOWITZ, GRAND,
IASON, ANELLO & BOHRER, P.C.

By:  /s/
Lawrence Iason (LI 8996)
Linda Fang (LF 3461)
Claudio Ochoa (CR 7695)

*Attorneys for Defendant Renato Negrin*