UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>  Plaintiff,<br><br>vs.<br><br>JON-PAUL RORECH and RENATO NEGRIN,<br><br>  Defendants. | Civil Case No. 09-CV-4329 (JGK)<br><br>ECF CASE |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT
JON-PAUL RORECH'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Richard M. Strassberg, Esq. (RS-5141)
Maryana Zubok, Esq. (MZ-0625)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

and

Roberto M. Braceras, Esq. (RB-2470)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109
(617) 570-1000

*Attorneys for Jon-Paul Rorech*

## TABLE OF CONTENTS

                                                                                            Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

I.     The Complaint Must Be Dismissed, As The CDS Contracts At Issue Are Not Security-Based. ........................................................................................................ 2

         A.    Whether CDS Agreements Are "Security-Based" Rests On The Material Terms of The CDS Agreements Themselves. .......................................... 2

         B.    Theoretical Pricing Models Are Neither Material To The CDS Agreements Nor Otherwise Relevant To The Analysis. .......................... 4

         C.    The Asset-Swap Spread Of The VNU Reference Bonds Is Likewise Irrelevant To The Issue Of Jurisdiction. ................................................... 6

         D.    The Credit Support Annex And Select Provisions In The ISDA Definitions Are Similarly Irrelevant To The Analysis, As They Are Neither Material Terms Nor "Security-Based." ................................................................ 7

         E.    Under Current Law, § 10(b) Simply Does Not Cover The CDS At Issue. ............. 9

II.    The SEC Fails To Establish That It Has Jurisdiction Over CDS Where, As Here, The CDS References Foreign Bonds. .............................................................. 11

III.   The Complaint Should Be Dismissed As A Matter Of Law, Because The SEC Does Not, And Cannot, Allege That Mr. Rorech Had A Duty To Keep Information Regarding The VNU Bond Deal Confidential. ............................................... 13

CONCLUSION ................................................................................................................... 16

## INTRODUCTION

In a disingenuous effort to stave off dismissal, the SEC misconstrues the law, overstates its position, and attempts to distract this Court with wholly irrelevant "pricing models." But despite its efforts, the SEC has failed to establish: (1) that the credit default swap ("CDS") agreements at issue are "security-based"; (2) that the SEC has jurisdiction over the CDS given the SEC's lack of authority over the referenced foreign bonds; and (3) that Jon-Paul Rorech had a duty to keep the information at issue confidential.

First, and most important, the SEC *concedes* that it has jurisdiction over CDS *only if* the *material terms* of the CDS agreements are "based on the price, yield, value, or volatility of any security." (See Pl. Mem. at 2.)[1] But the SEC cannot prove that the CDS in this case meets this threshold requirement to be "security-based." The SEC rests its argument almost exclusively on pricing, arguing that the CDS was "security-based," because its price was "related to" the price or value of a security — the VNU reference bond. (Id. at 4-6.) Instead of focusing on the actual CDS contracts at issue here, the SEC embarks on an overly complicated, irrelevant discussion of theoretical pricing models and asset swaps. The actual CDS prices, however, are based on the *CDS market*, not any security. The SEC's economic models (which may be used to help determine if CDS *market prices* appear over- or undervalued) and asset swaps (which may be used to mitigate against interest-rate risk) are wholly beside the point.[2]

Second, the SEC employs strong rhetoric, insisting that it has jurisdiction over CDS that references foreign bonds, (Pl. Mem. at 18-21), yet fails to cite to a single case for support. Not

---

[1]  Citations and references to "Opposition Brief" and "Pl. Mem." refer to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings (filed Sept. 25, 2009).

[2]  The SEC also argues — almost as an afterthought — that certain terms of the CDS agreements were based on the price of the VNU reference bonds. (See Pl. Mem. at 17.) Such arguments likewise fail, as the terms are neither material nor "based on" the price of any security.

1

only is there a clear presumption against the extraterritorial application of securities laws, but the SEC's limited authority over swaps simply does not include CDS that references foreign bonds.

Finally, the SEC asserts that Mr. Rorech had a duty to keep confidential *all* information that he received about the VNU bond deal. (Pl. Mem. at 21-22.) The SEC, however, ignores the plain language of the VNU Engagement Letter, which clearly authorized Mr. Rorech (a high-yield bond salesman) and other Deutsche Bank employees to share information regarding the bond deal with prospective bond purchasers, such as Renato Negrin. Moreover, the SEC does not dispute that Mr. Rorech was *never* "wall-crossed" with regard to information pertaining to the VNU deal — confirming that Deutsche Bank did not view this information to be confidential.

Absent jurisdiction, and failing to identify a duty on the part of Mr. Rorech to keep the information at issue confidential, the SEC's insider trading claim must be dismissed.

## ARGUMENT

**I. The Complaint Must Be Dismissed, As The CDS Contracts At Issue Are Not Security-Based.**

As the SEC itself concedes, if the material terms of a CDS agreement are not "based on the price, yield, value, or volatility of any security," then the agreement is *not* "security-based" and not within the SEC's jurisdiction. (See Pl. Mem. at 2); see also Gramm-Leach-Bliley Act ("GLBA") § 206B, 15 U.S.C. § 78c note. Based on the plain language of the CDS contracts at issue, the CDS do *not* qualify as "security-based swap agreements." (Rorech Mem. at 11-15.)[3]

**A. Whether CDS Agreements Are "Security-Based" Rests On The Material Terms Of The CDS Agreements Themselves.**

The SEC wastes page after page arguing that CDS prices are determined by certain economic models that supposedly rely on the price or value of the VNU reference bond, a

---

[3] Citations and references to "Rorech Mem." and to Mr. Rorech's "Opening Brief" refer to the Memorandum in Support of Defendant Jon-Paul Rorech's Motion For Judgment on the Pleadings (filed Aug. 13, 2009).

2

security. The SEC is wrong: even its theoretical models are not "based on" the price of securities.[4] But this is entirely beside the point. Whether CDS are "security-based" rests on the material terms of the CDS agreements themselves, not the variables of any economic model.

CDS agreements are governed by contract law. See, e.g., Aon Fin. Prods., Inc. v. Societe Generale ("Aon"), 476 F.3d 90, 96 (2d Cir. 2007) (applying contract law to analyze CDS). As with any other contract, a court looks to the language of the contract to determine the parties' obligations. If the terms of a CDS contract are unambiguous, the court must give effect to that unambiguous language. Id. Thus, as long as the material terms of the CDS agreements are unambiguous (a point that the SEC does not dispute), the Court's analysis must be limited *solely* to those material terms. See Sch. Dist. of Erie v. J.P. Morgan Chase Bank ("Erie"), No. 08-7688, 2009 WL 234128, at *1 (S.D.N.Y. Jan. 30, 2009) (considering *solely* the material term in the interest rate swap and dismissing the complaint upon finding that the term was not "security-based"); St. Matthew's Baptist Church v. Wachovia Bank Nat'l Ass'n ("St. Matthew's"), No. 04-4540, 2005 WL 1199045, at *12-13 (D.N.J. May 18, 2005) (same).[5]

Here, the material terms of the CDS agreements — including periodic payments (or "price"), credit events, and maturity — are all included in the Master Confirmation Agreement. See Robert F. Schwartz, Risk Distribution in the Capital Markets: Credit Default Swaps, Insurance and a Theory of Demarcation, 12 Fordham J. Corp. & Fin. L. 167, 178-79 (2007) ("A typical confirmation in a CDS trade sets forth *all* material terms." (emphasis added)). The SEC

---

[4] See infra n.10 at 5-6.

[5] The SEC somehow ignores these cases, which narrowly interpreted the definition of a "security-based swap agreement," and, instead, relies on a case that has nothing to do with security-based swap agreements. (See Pl. Mem. at 14-16 (citing Stechler v. Sidley Austin Brown & Wood, L.L.P., 382 F. Supp. 2d 580 (S.D.N.Y. 2005).) The Stechler court merely looked at whether digital options, a unique type of synthetic option, qualified as "*securities*" — *not* "*security-based swap agreements*" — in adjudicating defendants' motion to dismiss. See 382 F. Supp. 2d at 594-97. The SEC also mischaracterizes dicta from the decision. (See Pl. Mem. at 14-15.) For what it is worth, the court in Stechler actually agreed with plaintiff's argument that the digital options were likely not securities. See 382 F. Supp. 2d at 596.

3

does not contest the materiality of any of the terms in the Master Confirmation Agreement. The SEC likewise concedes that none of the material CDS terms are "security-based," with the exception of the CDS price. Thus, the only question before the Court is whether the CDS *price* is "security-based." As with other contracts, the price of the CDS was negotiated by the parties to the CDS agreement and, as a matter of law, was *not* based on the price or value of any security.

### B. Theoretical Pricing Models Are Neither Material To The CDS Agreements Nor Otherwise Relevant To The Analysis.

Unable to challenge the CDS based on the terms of the CDS agreements themselves, the SEC attempts to manufacture an issue by introducing theoretical[6] pricing models to argue that the "price" calculated by such *models* is "related to" the price of the underlying CDS reference bonds, which are securities. According to the SEC, because such pricing *models* supposedly rely on the projected price of a security, then the actual CDS price itself should be deemed "security-based." (See Pl. Mem. at 4-6.) The SEC is wrong. Such models are irrelevant both to the actual *market* price of CDS and to the question as to whether the CDS contracts are "security-based swap agreements." Indeed, the SEC readily admits in its Opposition Brief that these models are not listed or discussed anywhere in the Master Confirmation Agreements or in any other documentation.[7] (Pl. Mem. at 16-17 (stating that, while Defendants insist that the Court rely on the *terms* of the agreements, the SEC asks the Court to consider theoretical pricing models not discussed in the agreements).) Such theoretical pricing models may be useful for accounting purposes, or for an academic determination as to whether a CDS is under- or overvalued in

---

[6] See Moorad Choudhry, The Credit Default Swap Basis (New York 2006) (hereinafter "Choudhry"), Primoff Decl., Ex. E at 26 (stating that models used to price credit derivatives are "theoretical").

[7] Remarkably, the SEC did not even have the CDS agreements at issue when it chose to bring this case and only obtained them after Mr. Rorech filed his Motion on August 13, 2009. See, e.g., Email from Primoff to Strassberg (Sept. 15, 2009) (enclosing CDS agreements the SEC had recently received from Deutsche Bank).

4

deciding whether to trade it, but such models do not — and *cannot* — set the actual price of the CDS, as the price is negotiated between the buyer and seller of the contract. All of the material terms of a CDS contract, including its "price," can be agreed to by the CDS buyer and seller without ever consulting a theoretical model.[8]

As with any market price, CDS prices are negotiated between the parties — the protection buyer and seller. The market price of CDS is influenced by any number of factors, including overall economic climate, interest rates, default rates, credit ratings, corporate leverage, and the supply and demand for the CDS. See Jan De Wit, Exploring the CDS-Bond Basis (2006), Primoff Decl., Ex. K at 2, 13. As the SEC itself alleges, the CDS price is based on the CDS market and nothing else — not the price or yield of the underlying reference bonds, not an economic model. (See Compl. ¶ 13 ("CDSs are priced and traded based on their market value at the time of the trade . . . .").)[9] In short, the SEC's argument regarding theoretical pricing models fails. Such models are wholly irrelevant to this motion and do not establish that the CDS prices were at all "based on" the price or yield of the VNU reference bonds.[10]

---

[8] Indeed, the VNU CDS contracts at issue were set to expire in 2011, notwithstanding the fact that the VNU reference bond (5.625% VNU bond) was scheduled to mature in 2010. (Rorech Mem. at 12.) More to the point, the reference bond was tendered by May 2009, but *CDS contracts referencing the bond continue to exist and be traded at prices set by the market*. See The Nielsen Co. B.V., Quarterly Report For the Period Ended March 31, 2009, at 13-14 (stating that the VNU bonds were tendered). Given that the CDS continues to exist and be priced *after* the expiration of the VNU bonds, by definition the CDS price could *not* be based on the price of such bonds, and, accordingly, the CDS *cannot* be "security-based."

[9] The literature confirms that CDS prices are negotiated and based on market prices. See "A Debate on Exchange Traded Credit Default Swaps" (Aug. 15, 2006), http://www.gtnews.com/article/6439.cfm ("CDS prices are negotiated between the protection buyer and protection seller."); "Credit Default Swaps In The Headlines…" (Feb. 1, 2009), http://www.metrocorpcounsel.com/current.php?artType=view&artMonth=February&artYear =2009&EntryNo=9353 ("The fixed payment that the Buyer pays for a CDS is based on the market's perceived likelihood, at the time the CDS is purchased, that a Credit Event will occur.").

[10] The Court need not consider the mechanics of theoretical pricing models, but if it did, it would learn that the SEC's assertion that theoretical models are "based on" the projected *future* price of a defaulted VNU reference bond, (Pl. Mem. at 4-5), is flat-out wrong. The models may be used to determine mark-to-market CDS spreads by calculating the present value of expected CDS cash flows using a complex mathematical equation that involves numerous variables. See Choudhry, Primoff Decl., Ex. E at 26-34. The variable that the SEC singles out is the "R" value (or "Recovery Rate"). "R" is defined as the "expected recovery rate on the reference obligation in a risk-neutral world (independent of the time of default)." Id. at 27. The SEC, however, fails to

### C. The Asset-Swap Spread Of The VNU Reference Bonds Is Likewise Irrelevant To The Issue Of Jurisdiction.

The SEC similarly misses the point by alleging that CDS prices are "security-based," because they are somehow "related to" the asset-swap spread of the reference obligation. (Pl. Mem. at 5-6, 16.) An "asset swap" is a type of swap agreement that bond buyers may enter into to mitigate against interest-rate risk. See David Mengle, "Credit Derivatives: An Overview," Economic Review (Fourth Quarter 2007) (hereinafter "Mengle"), Primoff Decl., Ex. J at 6. As with theoretical pricing models, asset-swap spreads are completely irrelevant both to the price of CDS in this case and the question as to whether the CDS was "security-based." Specifically:

1) The asset-swap spreads are not referenced anywhere in the CDS contracts. Thus, they cannot possibly be considered *material terms* of such agreements.

2) Asset swaps are *swap agreements*, not *securities*.[11] The SEC can only have jurisdiction over the CDS agreements if the material terms are based on *securities*. GLBA § 206B. Swap agreements, however, are expressly excluded from the definition of a security. 15 U.S.C. §§ 78c-1(a)-(b).

3) Contrary to the SEC's contentions, CDS spreads are simply *not* "closely related to" asset-swap spreads. While in *theory* there may be some correlation between CDS spreads and asset-swap spreads, the scholarship that the SEC relies on makes clear that, in *practice*, CDS spreads typically *diverge* from asset-swap spreads.[12]

---

acknowledge that the Recovery Rate used in the model for senior unsecured reference obligations, such as the VNU reference bond, is not "based on" the "price, yield, value, or volatility of any security," because a default value of 40% is used for the CDS being priced mark-to-market. See id. at 29 (showing the CDSW Bloomberg screen reflecting a 40% Recovery Rate); Merrill Lynch, Credit Derivatives Handbook 2006-Vol. 1 26 (2006) ("The market assumes a recovery of about 40% in the unwind market for senior unsecured CDS contracts."). Indeed, a default value must be used, because the actual recovery rate of the bonds is unknown until the issuer, inter alia, goes bankrupt or otherwise defaults.

[11] The SEC tries to confuse the issues by using "asset-swap spreads" interchangeably with "bond's yield." (See, e.g., Pl. Mem. at 5-6.) The bond's yield, however, is merely one component of a potential asset-swap spread. See Mengle, Primoff Decl., Ex. J at 6; (see also Pl. Mem. at 5 n.4).

[12] See Mengle, Primoff Decl., Ex. J at 13-14 (stating that "*asset swap spreads will not in most cases converge to CDS spreads*" (emphasis added)); Choudhry, Primoff Decl., Ex. E at 61 ("[I]n practice, the CDS spread will differ from the asset-swap (ASW) spread.").

6

Because the SEC cannot prove that CDS prices are "based on" asset-swap spreads, its "asset swap" argument is irrelevant and cannot resurrect its failed argument that CDS are "security-based."[13]

### D. The Credit Support Annex And Select Provisions In The ISDA Definitions Are Similarly Irrelevant To The Analysis, As They Are Neither Material Terms Nor "Security-Based."

Almost as an afterthought, the SEC includes a short argument that (for the first time) actually focuses on the *terms* of the CDS agreements. (See Pl. Mem. at 17.) The SEC, however, fails to show that any of the terms are "material" or "based on the price, yield, value, or volatility of any security." See GLBA § 206B. First, the SEC cites to the Credit Support Annex ("the Annex"), which "may" require parties to the CDS agreements to post collateral. (Pl. Mem. at 10.) The Annex, however, is not a material term of the CDS agreements at issue.[14] Moreover, in citing to the Annex, the SEC merely rehashes its flawed argument regarding theoretical pricing models, mistakenly alleging that, because such models may play a role in helping to determine how much collateral to post or withdraw, the terms of the Annex are somehow "based on" the price of the reference bonds. (See Pl. Mem. at 9-11.) But, again, theoretical pricing models are

---

[13] The SEC makes two additional arguments asserting that CDS prices are somehow "security-based," but neither argument has any merit. First, the SEC improperly cites to statements by Mr. Rorech and Mr. Negrin regarding asset-swap spreads. (See Pl. Mem. at 6-7.) However, such statements provide *no* support for the SEC's argument and have no bearing on the material terms of the CDS agreements. See United States v. Wallace & Wallace Fuel Oil Co., 540 F. Supp. 419, 425 (S.D.N.Y. 1982) (stating that the parol evidence rule "preclude[s] the admission of extrinsic evidence outside the four corners of a contract").

The SEC further misses the point by asserting that the CDS contracts are "security-based" because VNU bonds were allegedly the only available deliverable obligation in July 2006. (See Pl. Mem. at 11, 16.) As the SEC readily admits, this argument is not based on "economic theory . . . [or CDS] *contract language*," (id. at 11 (emphasis added)), thereby rendering it wholly irrelevant. Moreover, the mere "existence" of deliverable bonds does not mean that any material term of the CDS contracts was based on the "price, yield, value, or volatility" of such bonds. Indeed, even though the VNU bonds ceased to exist (as they have because of the tender), the contracts still survive.

[14] Notably, the Annex agreement was entered into nearly *nine* years prior to the CDS trades at issue and did *not* contain any terms that were specific to these CDS trades. (See Pl. Mem. at 7-8 (stating that the Annex, dated Sept. 15, 1997, was a standardized, "global agreement[] that covered multiple swap transactions . . . .").)

7

not material terms of a CDS contract and are *wholly unrelated* to the actual market price of a security.  See supra § I(B) at 4-5.

Finally, in a last ditch effort to demonstrate that subject matter jurisdiction exists, the SEC asserts that two provisions of the 2003 ISDA Credit Derivatives Definitions ("ISDA Definitions") — sections 9.9 and 9.3[15] — somehow render the CDS agreements "security-based."  The SEC, however, misses the mark once again.  First and foremost, sections 9.3 and 9.9 are not material terms of the CDS agreements, because pursuant to the GLBA, the material terms of a swap agreement — including a security-based swap agreement — must be "subject to individual negotiation."  See GLBA §§ 206A, 206B.  A review of the ISDA Definitions and the Master Confirmation Agreements ("Master Confirmations") reveals that, while certain cash settlement provisions may be subject to individual negotiation, sections 9.3 and 9.9 are not.  Indeed, other partial cash settlement provisions listed in the ISDA Definitions only apply if such provisions are "specified in the related Confirmation."  See ISDA Definitions, Primoff Decl., Ex. N § 9.4 (partial cash settlement of consent required loans), § 9.5 (assignable loans), and § 9.6 (participations).  The Master Confirmations list these three provisions and permit the parties to mark them as either "Applicable" or "Not Applicable" (i.e., subject to individual negotiation).  See Master Confirmations, General Terms Confirmation, Strassberg Decl., Exs. D-3, D-4 ¶ 4 (listing all three partial cash settlement provisions as "Not Applicable").  By contrast, sections 9.3 and 9.9 are generic; the ISDA Definitions do not state that these provisions are subject to approval in the Master Confirmations.  And there is no mention of these terms in the Master Confirmations or any other individually negotiated document.  As such, sections 9.3 and 9.9 are

---

[15]  The SEC misquoted this provision, citing to § 9.8 instead.  (See Pl. Mem. at 17.)

not subject to individual negotiation and are, by statutory definition, not material terms of the CDS agreements.  See GLBA §§ 206A, 206B.

Moreover, while these generic provisions discuss a partial cash settlement option, the SEC fails to explain that this settlement option is the exception — only available in *narrow, exigent circumstances*.[16]  These ISDA provisions simply do not convert the CDS agreements to "cash settlement contracts," particularly where, as here, the agreements expressly *require physical settlement*.  See Master Confirmations, General Terms Confirmation, Strassberg Decl., Exs. D-3, D-4 ¶ 4 (stating, without qualification, that the "Settlement Method" was "Physical Settlement").  Notably, the SEC does not, and cannot, challenge Mr. Rorech's assertion that *physical* delivery was required under the CDS contracts and that this term was *not* based on the "price, yield, value, or volatility of any security."  (See Rorech Mem. at 14-15.)  Because the express terms of the CDS contracts required physical delivery, the peripheral, generic provisions relating to "partial cash settlement" are irrelevant, and the contracts are not "security-based."

### E. Under Current Law, § 10(b) Simply Does Not Cover The CDS At Issue.

The SEC appears to be trying to muddle the issues to avoid judgment by suggesting that the mere "relationship" between CDS price and the price of the reference VNU bond is sufficient to meet the statutory definition of "security-based."  (See Pl. Mem. at 5-6.)  The SEC's argument that CDS prices are "related to" or even "closely related to" the VNU reference bonds, proves

---

[16] Section 9.3 allows for partial cash settlement in the event that it is *impossible* or *illegal* for the CDS buyer to deliver or the CDS seller to accept the particular deliverable obligation specified in the Notice of Physical Settlement.  ISDA Definitions § 9.3.  The SEC also relies on § 9.9, which allows the CDS seller to elect for partial cash settlement, *but only if* the CDS buyer fails to deliver the obligation specified in the Notice of Physical Settlement in a timely manner *and only if* the CDS buyer listed *bonds* as the obligation that he planned to deliver.  If, as was permitted under the VNU CDS contracts, the CDS buyer listed *loans* in the Notice of Physical Delivery (or listed bonds and delivered them on time), § 9.9 would not be available to the CDS seller.  See id. § 9.9.  Indeed, the Master Confirmation Agreements expressly stated that partial cash settlement of loans was prohibited.  See Master Confirmations, General Terms Confirmation, Strassberg Decl., Exs. D-3, D-4 ¶ 4 (stating that partial cash settlement was not available for "Consent Required Loans" and "Assignable Loans," the only types of loans permitted under the contract).

nothing, as the SEC must show that the CDS is *based on* the price of a security.[17] GLBA § 206B. By suggesting that the marginal relationship between the CDS price and the price of the reference VNU bond is sufficient, the SEC does its best to minimize the statutory requirement that the CDS be "security-based." This requirement, however, is *not* a mere technicality. There are many derivatives that are security-based, just as there are many — including the CDS in this case — that are not. Indeed, the CDS agreements at issue here differ drastically from actual "security-based swap agreements," such as equity swaps and total return swaps, where a material term of the swap is *directly* based on the price movements of the underlying security.[18] In short, the requirement "security-based" means something, and when Congress included the requirement that the CDS be "security-based," it made a reasoned distinction.

Recent efforts by Congress and the SEC reveal the critical importance of the "security-based" limitation. Indeed, the SEC and Congress have publicly acknowledged the limited reach of § 10(b), and they are both currently in the process of trying to broaden the statutory definition of "security-based" swap agreements to include CDS agreements such as those at issue in this case. For example, SEC Chairperson Mary Schapiro testified before Congress that federal law should cover "securities-related" — rather than "security-based" — swap agreements and broadly defined such agreements to include CDS and other derivatives that *reference a security*, regardless of whether the material terms are "based on" the price, yield, value, or volatility of a

---

[17] Suffice to say, a mere "relationship" is irrelevant: correlation is *not* causation. The market price of CDS is "related to" countless factors, including indices such as the Dow Jones Industrial Index, and commodities such as oil and gold. Indeed, if such "relationships" were sufficient, the statutory requirement of "security-based" would be rendered meaningless, as anything could be deemed "related to" something else. See Doricent v. Am. Airlines, Inc., No. 91-12084Y, 1993 U.S. Dist. LEXIS 15143, at *21-22 (D. Mass. Oct. 19, 1993) (noting the futility of the term "related to" because "life, like law, is a seamless web" where everything is inter-related).

[18] See Caiola v. Citibank, 295 F.3d 312, 324-27 (2d Cir. 2002) (noting that an equity swap that, inter alia, paid the plaintiff the equivalent of any appreciation in the referenced stock price would "clearly" qualify as a security-based swap agreement due to the *direct* connection between payout amount and amount of stock appreciation); see also Mengle, Primoff Decl., Ex. J at 5 (discussing total return swaps that, as with equity swaps, contain material pay-out terms that are *directly* based on changes in the value of the reference security).

10

security.[19]  Of course, the SEC and Congress would not be seeking to expand the definition of "security-based" if the _current_ definition was sufficiently broad to cover CDS.

Perhaps recognizing that the CDS contracts here are not "security-based" under current law, the SEC resorts to policy arguments at the outset of its memorandum.  (See Pl. Mem. at 12-13 (asserting that market protections would be "gutted" and insider trading would be rampant in CDS if the Court finds the SEC lacks jurisdiction).)  Such policy arguments, however, are for the legislature.  See Sal Tinnerello & Sons, Inc. v. Town of Stonington, 141 F.3d 46, 54-55 (2d Cir. 1998) (stating that it is not the province of the court to "substitute its judgment" for that of the legislature).  And under existing law, the SEC has utterly failed to demonstrate that any of the material terms of the CDS agreements are "security-based."  Because the SEC lacks authority over the CDS contracts in this case, the Complaint must be dismissed as a matter of law.  See Erie, 2009 WL 234128, at *1 (dismissing the complaint upon finding the swap was not "security-based"); St. Matthew's, 2005 WL 1199045, at *12-13 (same).[20]

## II. The SEC Fails To Establish That It Has Jurisdiction Over CDS Where, As Here, The CDS References Foreign Bonds.

The SEC asserts that "there can be no question under settled case law" that it has authority over the CDS, despite its lack of jurisdiction over the VNU bonds that the CDS references.  (See Pl. Mem. at 3.)  The SEC, however, does not cite _a single case_ that discusses jurisdiction, even though the SEC bears the burden to affirmatively establish this threshold issue,

---

[19] See SEC.gov, "Testimony of Chairman Schapiro Concerning Regulation of Over-The-Counter Derivatives" (June 22, 2009), available at http://www.sec.gov/news/testimony/ 2009/ts062209mls.htm; see also Comprehensive Derivatives Regulation Act of 2009, S. 1691, 111th Cong. § 101 (2009) (proposing to expand the definition of a "security-based" swap to include a swap that "allows for settlement of the swap by delivery of, or by reference to, any security," such as the CDS agreements at issue).

[20] The SEC surprisingly ignores Erie and St. Matthew's, which dismissed plaintiff's claims _as a matter of law_.  The Court should reject the SEC's plea to deny this motion based on "issues of material fact."  (Pl. Mem. at 4.)  This motion presents a legal question, and, just as in Erie and St. Matthew's, the Court should dismiss the Complaint, as a matter of law, because the CDS agreements at issue here are similarly not "security-based."

11

and there is a presumption against the extraterritorial application of securities laws.[21]  See Arar v. Ashcroft, 532 F.3d 157, 168 (2d Cir. 2008) (stating that plaintiff must prove jurisdiction).

The SEC erroneously dismisses Mr. Rorech's statutory argument as "fictitious," alleging that Congress granted the SEC broad authority over security-based swap agreements, even where the reference obligation is a foreign debt instrument over which the SEC has no jurisdiction. (See Pl. Mem. at 18-20, 20 n.17.)  The SEC should not be so cavalier, as this is an issue of first impression for the Court that requires careful analysis.  (See Rorech Mem. at 9 n.21.)  And the legislative history makes clear that Congress did *not* originally intend for the SEC to have *any* jurisdiction over swap agreements.  S. 2697, 106th Cong. § 22 (2000).  Indeed, the SEC was *prohibited* from requiring or even suggesting the registration of any swap agreement.  15 U.S.C. § 78c-1(b)(2).  Ultimately, the SEC was granted some authority over swap agreements, but its enforcement powers were extremely limited.  As Senator Gramm explained, the SEC was given authority to undertake "*certain* enforcement actions in connection with security-based swap agreements" on a "case-by-case basis."  146 Cong. Rec. S11867 (2000) (emphasis added).  This limited enforcement power does *not* extend to CDS that references a foreign bond.  Because the CDS agreements fall outside the scope of the SEC's authority, the Complaint must be dismissed.[22]

---

[21]  See Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 175 (2d Cir. 2008), petition for cert. filed, 77 U.S.L.W. 3562 (U.S. Mar. 23, 2009) (No. 08-1191) (noting that the Second Circuit is "an American court, not the world's court").  In fact, the only case the SEC cites is United States v. Falcone, 257 F.3d 226 (2d Cir. 2001), which has nothing to do with CDS, derivatives, or foreign securities.

[22]  The SEC further asserts that Mr. Rorech fails to address § 10(b) and relies on § 20(d) instead.  Contrary to the SEC's contentions, Mr. Rorech focused his argument on § 10(b) and made only one reference to other antifraud provisions of the Exchange Act as further evidence of Congress's intent to limit the SEC's authority to only those agreements where the SEC has jurisdiction over the reference securities.  (Rorech Mem. at 17.)  Pursuant to well-established canons of statutory construction, the Court may look to other provisions of the same statute for guidance.  See, e.g., First Multifund Advisory Corp. v. Williams, No. 80-2717, 1981 U.S. Dist. LEXIS 11927, at *13 (S.D.N.Y. Apr. 7, 1981) (stating that it is one of "the most elementary principles of statutory construction" that one section of a statute must be interpreted to be consistent with other provisions of the statute).

### III. The Complaint Should Be Dismissed As A Matter Of Law, Because The SEC Does Not, And Cannot, Allege That Mr. Rorech Had A Duty To Keep Information Regarding The VNU Bond Deal Confidential.

The SEC alleges that Mr. Rorech breached a fiduciary duty to Deutsche Bank, his employer, pursuant to which he was prohibited from disclosing *any* information he learned in the course of his employment, including information regarding the VNU bond deal. (Pl. Mem. at 22-23.) The SEC is wrong. Indeed, the documents relied upon by the SEC in its Complaint show the exact opposite: Mr. Rorech, a high-yield bond salesman, was not only *authorized* to share the alleged "confidential" information with customers (including Mr. Negrin), he was *required* to do so. (Rorech Mem. at 21-25 (citing documents incorporated in the Complaint).)

The SEC's assertion that an employee has an inherent duty to keep *all* client information confidential, irrespective of any agreements to the contrary, (Pl. Mem. at 22, 24), has no merit. The very case law cited by the SEC reveals that an employee's duty extends only to information that he was asked to keep confidential. See, e.g., United States v. O'Hagan, 521 U.S. 642, 652 (1997) ("[A person violates § 10(b)] when he misappropriates *confidential information* for securities trading purposes . . . ." (emphasis added)); United States v. Newman, 664 F.2d 12, 17 (2d Cir. 1981) (stating that the investment banker had a duty to not disclose client information "*entrusted to him in the utmost confidence*" (emphasis added)).[23]

Here, Mr. Rorech had *no* duty to keep the information at issue confidential. The VNU Engagement Letter — an agreement entered into between the issuer and Mr. Rorech's employer

---

[23] The SEC improperly conflates Mr. Rorech's "duty" argument with an entirely different element of insider trading — whether the information had been "publicly disclosed." (Pl. Mem. at 23.) There is no case law to support the SEC's implication that information is only deemed to be "not confidential" when it is announced to the general public. It is clear from the cases cited by the SEC that the nonpublic nature of information is an entirely separate consideration under the misappropriation theory from the defendant's duty to keep that information confidential. See, e.g., SEC v. Lyon, 605 F. Supp. 2d 531, 541-47 (S.D.N.Y. 2009) (analyzing nonpublic nature of the information separately from indicia of the information's confidentiality). Whether or not information regarding the potential restructuring was "nonpublic" is not relevant to Mr. Rorech's motion.

(and cited in the Complaint) — expressly authorized Mr. Rorech and other Deutsche Bank employees to disclose information about the VNU bond deal, including information regarding the potential bond restructuring, to prospective bond purchasers.[24]  (Rorech Mem. at 22.)  The SEC admits both that Deutsche Bank was bound by the Engagement Letter to act on VNU's behalf *and* that Mr. Negrin was a prospective bond purchaser.  (See Pl. Mem. at 22.)  Thus, by the strict terms of the Engagement Letter, Mr. Rorech was authorized to provide information to Mr. Negrin, meaning that there could be *no* insider trading.

Moreover, there is *no* support for the SEC's suggestion that Deutsche Bank's internal Confidential and Inside Information Policy (the "Policy") somehow trumped the VNU Engagement Letter.  (See Pl. Mem. at 24 (stating that the Bank's Policy "decreed" that information about the VNU bond deal "was confidential without regard for what the client expected").)  To the contrary, the Policy states that Deutsche Bank employees may use information obtained in the course of their employment, *even if it is deemed confidential*, "for the purpose of performing services as an employee of Deutsche Bank."[25]

The undisputed fact that Mr. Rorech was never "wall crossed" pursuant to the Bank's Policy also confirms that the Bank itself did not view this information as confidential *and* that Mr. Rorech was under *no* obligation to keep it confidential.[26]  The SEC tries to minimize the importance of "wall crossing" procedures in it Opposition Brief, but, in the same breath,

---

[24] According to the SEC, Mr. Rorech's disclosure of information to Mr. Negrin, a prospective bond purchaser, cannot be authorized by the VNU Engagement Letter, because insider trading can never be sanctioned.  (See Pl. Mem. at 23 n.20.)  The SEC misses the mark.  The fact that Mr. Rorech's actions were authorized by the Engagement Letter does not sanction "insider trading"; it means that, as a matter of law, there was no "misappropriation" and, thus, no insider trading in the first instance.  See O'Hagan, 521 U.S. at 652.

[25] Deutsche Bank, Confidential and Inside Information Policy (Oct. 1, 1997), Strassberg Decl., Ex. E at 4.

[26] Notably, Mr. Rorech continues to be a Deutsche Bank employee despite the SEC's investigation and pending litigation.  (See Compl. ¶ 8 ("Rorech is employed as a bond and CDS salesman at DBSI.").)  Deutsche Bank itself conducted a comprehensive internal review under former General Counsel Robert Khuzami, now the SEC's Director of the Division of Enforcement.  Suffice to say, if Mr. Khuzami's internal review had concluded that Mr. Rorech breached a duty to the Bank, Mr. Rorech no longer would have his job.

14

acknowledges that such procedures are critical in preventing the disclosure of confidential information to public-side employees like Mr. Rorech. (Pl. Mem. at 24.) The Bank's "wall crossing" policy requires *private-side* employees — such as the "fixed income banker" who gave Mr. Rorech allegedly confidential information (Compl. ¶ 29) — to initiate "wall crossing" procedures *before* giving a *public-side* employee such as Mr. Rorech *any* confidential information. (Rorech Mem. at 23-24.) If such wall crossing procedures are not instituted, the public-side employee may share information given to him with customers outside of the Bank.[27]

Finally, the SEC mistakenly suggests that the question of whether Mr. Rorech owed a duty of confidentiality with regard to information about the VNU bond deal is a question of fact that cannot be decided on a motion to dismiss. (See Pl. Mem. at 23.) Courts have decided this issue as a matter of law. See, e.g., SEC v. Cuban, No. 08-2050, 2009 WL 2096166, at *10 (N.D. Tex. July 17, 2009) (granting defendant's motion to dismiss upon finding that he lacked the requisite duty). The SEC attempts to manufacture a factual dispute merely to ward off dismissal.

There can be no securities violation where, as here, the SEC does not, *and cannot*, allege that Mr. Rorech had a duty to keep information regarding the VNU bond deal confidential. Accordingly, the Complaint must be dismissed.

---

[27] The one case that the SEC cites in opposition to Mr. Rorech's wall crossing argument — SEC v. Singer — is inapposite. (See Pl. Mem. at 26 n.22.) Singer did not involve wall crossing procedures. Moreover, it involved the quintessentially confidential relationship between an attorney and his client, where the client fully expected his attorney to keep all information confidential. See 786 F. Supp. 1158, 1170 (S.D.N.Y. 1992). Mr. Rorech, by contrast, was a salesman whose job entailed sharing up-to-the minute market information with customers.

The SEC further asserts that "wall crossing" is irrelevant, because Mr. Rorech somehow "improperly" received the information from the investment banking side of the Bank. (Pl. Mem. at 26 n.22.) But *nothing* in the Complaint alleges that Mr. Rorech received the information in question improperly, and the SEC cannot avoid dismissal by making this statement in its Opposition Brief. See, e.g., Henry v. Jones, No. 08-5316, 2009 U.S. Dist. LEXIS 6508, at *13-14 n.5 (S.D.N.Y. Jan. 28, 2009) (stating that a complaint cannot be supplemented by way of plaintiff's opposition papers and dismissing claim).

15

## **CONCLUSION**

For the foregoing reasons, Mr. Rorech respectfully submits that the Court grant Mr. Rorech's motion for judgment on the pleadings and enter an order dismissing the Complaint in full and with prejudice.

Dated:  October 23, 2009

        Respectfully Submitted,

         s/ Richard M. Strassberg
        Richard M. Strassberg (RS-5141)
        Maryana Zubok (MZ-0625)
        GOODWIN PROCTER LLP
        620 Eighth Avenue
        New York, NY 10018
        Tel:  212.813.8800
        Fax:  212.355.3333
        rstrassberg@goodwinprocter.com

        and

        Roberto M. Braceras (RB-2470)
        GOODWIN PROCTER LLP
        Exchange Place
        Boston, MA 02109
        Tel:  617.570.1000
        Fax:  617.523.1231
        rbraceras@goodwinprocter.com

        *Attorneys for Jon-Paul Rorech*

**CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 23, 2009.

                                                    s/ Richard M. Strassberg
                                                  Richard M. Strassberg (RS-5141)