UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,             09 Civ. 4329 (JGK)

      - against -

                                    OPINION AND ORDER

RORECH, ET AL.,

                  Defendants.
————————————————————————————

JOHN G. KOELTL, District Judge:

     The Securities and Exchange Commission ("SEC") brought this case against defendants Jon-Paul Rorech and Renato Negrin for alleged insider trading in credit default swaps ("CDSs") in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 48 Stat. 891, codified as amended at 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  The defendants both move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) and ask that the Court dismiss the SEC's Complaint.  Both defendants argue that § 10(b) does not provide the SEC with the authority to regulate the CDSs at issue in this case because they are not "securities-based swap agreement[s]."  See 15 U.S.C. § 78j(b).  The defendants therefore argue that the Court lacks subject matter jurisdiction over this case and that the Complaint fails to state a claim upon which relief can be granted.  Mr. Rorech also argues that even if the CDSs are based

on the securities at issue here, bonds issued by VNU N.V. ("VNU"), the SEC has no jurisdiction over the CDSs because they are based on foreign bonds.  Finally, Mr. Rorech argues that, in any case, he did not violate § 10(b) and Rule 10b-5's proscription of insider trading because he had no duty to keep information about the VNU bonds confidential.

I

The standards to be applied to a motion for judgment on the pleadings pursuant to Rule 12(c) are the same as those applied to a motion to dismiss pursuant to Rule 12(b).  See Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006); Katz v. Image Innovations Holdings, Inc., 542 F. Supp. 2d 269, 271-72 (S.D.N.Y. 2008); United States ex rel. Phipps v. Comprehensive Cmty. Dev. Corp., 152 F. Supp. 2d 443, 448-49 (S.D.N.Y. 2001); Peters v. Timespan Commc'ns, Inc., No. 97 Civ. 8750, 1999 WL 135231, at *3 (S.D.N.Y. 1999).  When presented with motions under both Federal Rule of Civil Procedure 12(b)(1) to dismiss for lack of subject matter jurisdiction and Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, the Court must first analyze the Rule 12(b)(1) motion to determine whether the Court has the subject matter jurisdiction necessary to consider the merits of the action. See Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n, 896 F.2d

674, 678 (2d Cir. 2000); Abrahams v. App. Div. of the Sup. Ct.,
473 F. Supp. 2d 550 (S.D.N.Y. 2007).

    In defending a motion to dismiss for lack of subject matter
jurisdiction, the plaintiff bears the burden of proving the
Court's jurisdiction by a preponderance of the evidence.
Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  In
considering such a motion, the Court generally must accept the
material factual allegations in the complaint as true.  See J.S.
ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir.
2004).  The Court does not, however, draw all reasonable
inferences in the plaintiff's favor.  Id.; Graubart v. Jazz
Images, Inc., No. 02 Civ. 4645, 2006 WL 1140724, at *2 (S.D.N.Y.
Apr. 27, 2006).  Indeed, where jurisdictional facts are
disputed, the court has the power and the obligation to consider
matters outside the pleadings, such as affidavits, documents,
and testimony, to determine whether jurisdiction exists.  See
APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003); Filetech S.A.
v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998); Kamen
v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986).  In
so doing, the Court is guided by that body of decisional law
that has developed under Federal Rule of Civil Procedure 56.
Kamen, 791 F.2d at 1011; see also HSBC Bank USA, 2007 WL
1159639, at *5.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor.  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Arista Records LLC v. Lime Group LLC, No. 06 Civ. 5936, 2007 WL 4267190, at **4-5 (S.D.N.Y. Dec. 3, 2007).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).  While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  Id. at 1949; see also Donelli v. County of Sullivan, No. 07 Civ. 2157, 2009 WL 2365551, at *1 (S.D.N.Y. July 31, 2009).

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also Kavowras v. New York Times Co., 328 F.3d 50, 57 (2d Cir. 2003); Taylor v. Vermont Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002); Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d. Cir. 1991); Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d. Cir. 1991).


II

The following facts are undisputed, unless otherwise noted.

A credit default swap is a type of credit derivative contract that provides protection against credit risk for investors.  See Aon Fin. Prods., Inc. v. Société Générale, 476 F.3d 90, 92 n.1 (2d Cir. 2007).  The seller of a CDS agrees to pay the buyer a specific sum of money, called the notional amount, if a credit event occurs to either the company or the financial instrument referenced by the CDS.  Credit events can include the default of the underlying instrument or the

referenced company's bankruptcy or restructuring.  If a credit event occurs, the buyer must return to the seller the defaulted debt instrument referenced by the CDS, or a loan or bond of the same or greater level of seniority.  In exchange for this default protection from the seller, the buyer agrees to make periodic premium payments to the CDS seller during the course of the contract.  The premium is expressed in basis points, which indicate a percentage of the notional amount to be paid annually.

VNU is a Dutch media holding company that consists of various subsidiaries.  Before July 2006, the only VNU CDSs available on the market referenced bonds issued by VNU itself. (Compl. ¶ 16.)  On July 10, 2006, VNU announced that its subsidiaries, Nielsen Finance LLC and Nielsen Finance Co. ("Nielsen"), would issue bonds directly to help fund the takeover of VNU.  (Compl. ¶ 15.)  Deutsche Bank Securities Inc. ("DBSI") was one of the underwriters of this new bond offering. (Compl. ¶ 17.)  The SEC alleges that because these Nielsen bonds would not be covered by the available VNU CDSs, and because VNU would soon have no remaining debt to serve as a reference entity for those CDSs, there was a market demand for bonds that could be covered by the available VNU CDSs.  (Compl. ¶¶ 16-17.)  From July 12, 2006 to July 24, 2006, DBSI allegedly led an effort to encourage the VNU holding company to issue additional bonds.

(Compl. ¶ 20.)  On July 24, 2006, VNU announced publicly a restructuring of the bond issuance that included bonds issued directly by VNU.  (Compl. ¶ 20.)

The SEC alleges that the issuance of these new bonds materially affected the price of CDSs that referenced VNU bonds. (Compl. ¶ 22.)  The SEC alleges that a trader who purchased VNU CDSs before the July 24, 2006 public announcement would have seen the price and value of the CDSs increase with the increase in VNU bonds that would be covered by the CDSs.  (Compl. ¶ 22.) In fact, the price of VNU CDSs did increase after the public announcement.  (Compl. ¶ 22.)

In July 2006, Mr. Rorech was a bond and CDS salesperson at DBSI.  (Compl. ¶ 1.)  The SEC alleges that between July 14, 2006 and July 17, 2006, Mr. Rorech passed information on the new VNU bond issuance to Mr. Negrin, a portfolio manager for Millennium Partners, L.P. ("Millennium"), a hedge fund investment advisor. (Compl. ¶¶ 2, 10, 32.)  On July 17 and July 18, 2006, allegedly based on Mr. Rorech's tip, Mr. Negrin purchased two VNU CDSs, each with notional amounts of €10 million.  (Compl. ¶ 42.)  One was purchased from DBSI and one was purchased from another dealer.  (Compl. ¶ 42.)  Sometime after the July 24, 2006 public announcement of the bond issuance, Mr. Negrin sold the CDSs for a profit of almost €950,000, approximately $1.2 million at the then-existing exchange rates.  (Compl. ¶ 44.)

The CDSs purchased were governed by a set of standard contract terms set out in a Master Agreement.  (Fang Decl. Ex. A.)  Mr. Rorech and Mr. Negrin also exchanged electronic trade confirmations that set specific terms.  The CDSs in this case have a €10 million notional amount, referenced a 5 5/8% VNU bond that matured in May 2010, and set a premium price of 383 basis points per year (or 3.83% multiplied by the €10 million notional amount).  (Fang Decl. Ex. D.)  The credit events included bankruptcy, failure to pay, and restructuring.  (Fang Decl. Ex. D.)  The CDSs terminated on September 20, 2011.  (Fang Decl. Ex. D.)


                              III

                               A

    Section 10(b) of the Exchange Act gives the SEC authority to prohibit the use of any "manipulative or deceptive device" in connection with the purchase or sale of securities.  15 U.S.C. § 78j(b).  Pursuant to its § 10(b) authority, the SEC promulgated Rule 10b-5, which makes it unlawful for any person to commit, among other things, fraud against another person "in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.  Courts have identified two theories under which § 10(b) and Rule 10b-5 are violated by insider trading.  First, under the traditional theory of insider trading, § 10(b) and

Rule 10b-5 are violated when a corporate insider trades securities in the insider's own company on the basis of material, nonpublic information.  See Chiarella v. United States, 445 U.S. 222, 228-29 (1980).  Second, under the misappropriation theory, insider trading occurs when a person "misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information."  United States v. O'Hagan, 521 U.S. 642, 652 (1997).  This theory bases liability on the fiduciary's "deception of those who entrusted him with access to confidential information."  Id.

In 2000, Congress passed the Commodity Futures Modernization Act ("CFMA"), which amended § 10(b) to extend the rules promulgated by the SEC under § 10(b) to prohibit fraud, manipulation, and insider trading (but not the SEC's prophylactic reporting requirements), and judicial precedents decided under § 10(b), to "security-based swap agreement[s] (as defined in section 206B of the Gramm-Leach-Bliley Act)." Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, § 1(a)(5), 114 Stat. 2763 (Dec. 21, 2000) (codified at 15 U.S.C. § 78j(b)).  Section 206B of the Gramm-Leach-Bliley Act defines a "security-based swap agreement" as a "swap agreement . . . of which a material term is based on the price, yield, value, or volatility of any security or any group or index of

securities, or any interest therein." Gramm-Leach-Bliley Act, Pub. L. No. 106-102, § 206B, 113 Stat. 1138 (Nov. 12, 1999) (set out as a note under 15 U.S.C. § 78c).

The SEC argues that § 10(b) and Rule 10b-5's proscription of insider trading applies to the CDSs sold in this case because, among other reasons, the CDSs' price term was "based on" the price, yield, value, or volatility of the referenced VNU bonds. The defendants respond that while the premium set in the CDS contracts may have been somewhat related to those characteristics of the underlying bonds, it was not "based on" those characteristics of the bonds. The defendants contend that the Court's analysis must be limited solely to the text of the CDS contracts. The defendants argue that because the CDSs' price term of the CDSs was specified by the parties as a particular number (383 basis points), and did not instead refer to the price, yield, value, or volatility of the underlying bonds, the price of the CDSs could not have been "based on" those characteristics of the bonds.

The defendants rely on Chief Judge Preska's decision in School District of Erie v. J.P. Morgan Chase Bank, No. 08 Civ. 7688, 2009 WL 234128, at *1 (S.D.N.Y. Jan. 30, 2009), for the proposition that the Court may only look at the face of the CDS contracts to determine if a material term is based on the price, yield, value, or volatility of any security. In School District

of Erie, Chief Judge Preska decided that "the only material
term" of the interest rate swap agreement at issue was the
floating interest rate, which was based on the London Interbank
Offered Rate ("LIBOR"), which is not a security.  Id.  As a
result, Chief Judge Preska found that the swap was not "security
based" for purposes of § 10(b) and Rule 10b-5.  Id. (citing St.
Matthew's Baptist Church v. Wachovia Bank Nat'l Ass'n, No. 04
Civ. 4540, 2005 WL 1199045, at **12-13 (D.N.J. May 18, 2005)
(finding swap based on LIBOR was not security-based)).  The
defendants similarly point to Caiola v. Citibank, 295 F.3d 312,
327 (2d Cir. 2002), where the Court of Appeals for the Second
Circuit noted that the synthetic stock transactions at issue
would have been covered by Rule 10b-5 if entered into before the
CFMA was enacted.  In that case, the transactions explicitly
stated that material terms would rise and fall based on the
value of Philip Morris stock.  Id. at 316.

    However, the fact the contracts at issue in those cases
referred explicitly to either an interest rate or a stock price,
items that could easily be adjudged either a security or not a
security, is not dispositive here.  In this case, the face of
the contracts does not reveal whether a material term of the
CDSs was based on a security.  It may be that the 3.83% premium
was based directly on the price of the underlying bonds, or that
premium may have been independently derived.  In any event, it

cannot be that traders can escape the ambit of § 10(b) and Rule 10b-5 by basing a CDS's material term on a security, but simply omitting reference to the security from the text of the CDS contract.

Moreover, the defendants have acknowledged that the CDSs in this case can be bought and sold on the secondary market. The amount at which the CDSs can be bought and sold would normally be described as the "price" of the instruments. There is at least an issue of fact whether that price would be based on the value of the underlying bond, for example, if the bond was about to go into default. Thus, inside information about the underlying bonds can be used as a means to reap an allegedly illegal profit from the purchase of the CDSs. This plainly could not be the case with the interest rate swaps at issue in School District of Erie and St. Matthew's Baptist Church.

The SEC also points to additional provisions of the CDS contracts that it alleges are material terms based on the price, yield, value, or volatility of a security. The SEC argues that the Credit Support Annex, an agreement that covered swap transactions between DBSI and Millennium, requires calculation of the CDSs' value on a daily basis. This valuation allows the amount of collateral each party owes to be adjusted. The SEC argues that the mathematical method of calculating the CDSs' value provided for in the Master Agreement between the parties

relies on the value of the underlying bonds.  The defendants respond that the Credit Support Annex is not a material term of the CDS agreements because it was entered into nine years prior to the CDS agreements and does not specifically reference them. The scope of the material terms of the CDS contracts and whether they were actually based on securities are questions of fact that cannot be resolved at this stage of the proceedings.

In passing the CFMA, Congress extended the SEC's security-related insider trading rules to apply to securities-based swap agreements.  Congress thus made it clear that what was prohibited in trading securities was also prohibited in trading securities-based swap agreements.  In this case, the defendants allegedly engaged in conduct that would constitute insider trading in violation of § 10(b) and Rule 10b-5 if the VNU bonds their information concerned were the subject of the transactions instead of the CDSs.  This appears, at the pleading stage, to bring the CDSs into the heartland of the instruments Congress intended to govern under § 10(b) and Rule 10b-5.

In determining whether other novel financial instruments were securities, courts have taken a flexible approach and looked to the "economic reality" of the instruments and the public's expectations of their nature.  See Stechler v. Sidley Austin Brown & Wood, L.L.P., 382 F. Supp. 2d 580, 596-597 & n.121 (S.D.N.Y. 2005) (determining whether options contract was

"security" for purposes of Exchange Act).  Factors like whether the theoretical value of the instrument is reflected in the actual market price and whether a secondary market for the instrument exists are issues of fact that affect whether the instruments are securities and are "not appropriately resolved on a motion to dismiss."  Id. at 597.

The defendants argue that CDS prices are not based on the price of underlying VNU bonds, but rather can be affected by many factors, including the strength of the overall economy and the market's assessment of the referenced company's credit risk. The defendants argue that in some cases CDS prices may change for no discernable reason.  The defendants, however, have not shown that the SEC's allegation that the CDSs were security-based swap agreements is implausible.  Whether the price, or any other material term, of the VNU CDSs were actually "based on" the VNU bonds raises questions of fact that are not amenable to a motion for judgment on the pleadings.  See Stechler, 382 F. Supp. 2d at 596-97.

The defendants request a preliminary evidentiary hearing on the Court's jurisdiction to hear this case based on their argument that § 10(b) and Rule 10b-5 do not govern the CDSs at issue.  The Court has ordered reasonably expedited discovery at the defendants' request, and set this case down for a non-jury trial on the merits.  Because the issues of jurisdiction are so

intertwined with the merits, it makes no sense to have a preliminary evidentiary hearing on jurisdiction. See United States v. Alfonso, 143 F.3d 772, 777 (2d Cir. 1998). Therefore, the request for an evidentiary hearing is **denied**.

B

Defendant Rorech also argues that even if the CDSs were security-based swap agreements, the SEC lacks jurisdiction over the CDSs because the underlying VNU bonds were issued by a foreign company and traded on a foreign exchange, and therefore this Court has no jurisdiction under § 10(b) and Rule 10b-5. Mr. Rorech first argues that the SEC has the burden to prove its authority over the CDSs and this Court's subject matter jurisdiction, and notes that the SEC has cited no case supporting its position that the foreign nature of the bonds is irrelevant. However, Mr. Rorech argues that this is an issue of first impression in this Court. It is unsurprising, then, that there are no cases available for the SEC to cite. Mr. Rorech similarly cites no case to support his position.

Next, Mr. Rorech argues that § 20(d) of the Exchange Act supports his argument that the SEC has no power over the VNU CDSs. Section 20(d) provides that anyone who would violate SEC regulations by insider trading in securities would also be liable for conduct with respect to certain derivatives of those securities, including puts, calls, options, and security-based

15

swap agreements.  See 15 U.S.C. 78t(d).  It is unclear what jurisdictional limit this section places on the SEC's regulation of derivatives, if any.  In any event, this section is irrelevant to this case.  The fact that the defendants may be found liable under § 20(d) has no bearing on whether the SEC has authority over the CDSs in this case under § 10(b), which explicitly extends the SEC's insider trading rules to "security-based swap agreement[s]" with no mention of a jurisdictional limit.

Defendant Rorech is left with his argument that there is a presumption against the extraterritorial application of United States securities laws.  See Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 172-73 (2d Cir. 2008), cert. granted, 2009 WL 4111014, at *1 (Nov. 30, 2009).  Mr. Rorech argues that this is a case about foreign bonds, issued by a foreign company, in a foreign market, to foreign investors.  He urges that the SEC would not have jurisdiction over the underlying bonds, and, therefore, it should not have jurisdiction over the CDSs based on those bonds.  However, the CDSs, not the bonds, are the financial instruments at issue in this case and "at the heart of" the alleged fraud.  Id. at 174.  Unlike Morrison, this is not a "foreign cubed" case, where foreign plaintiffs are suing a foreign defendant for violations of United States securities laws in connection with transactions that occurred in a foreign

country.  See id. at 172.  Under the misappropriation theory of

insider trading, the alleged wrongful conduct at issue here

occurred in the United States when Mr. Rorech passed allegedly

confidential information to Mr. Negrin.  See United States v.

Falcone, 257 F.3d 226, 233 n.4 (2d Cir. 2001) (finding that

breach of tipper's duty occurs at time tip is made).

Additionally, neither the plaintiff nor the defendants are

foreign.  (Compl. ¶¶ 8, 9.)  Mr. Rorech has failed to make out a

claim that the SEC is enforcing United States securities laws

extraterritorially.  Therefore, the foreign nature of the VNU

bonds does not provide a basis to grant defendant Rorech's

motion for judgment on the pleadings.

C

To establish that the defendants are liable for insider

trading on a misappropriation theory, the SEC must prove that

the information was both material and nonpublic.  See SEC v.

Lyon, 605 F. Supp. 2d 531, 541 (S.D.N.Y. 2009).  The SEC must

also show that Mr. Rorech breached a duty of confidentiality in

sharing the information—"the cornerstone of a misappropriation

liability case."  Id. at 542.  A duty of confidentiality exists

"only where there is explicit acceptance of a duty of

confidentiality or where such acceptance may be implied from a

similar relationship of trust and confidence between the

parties."  Falcone, 257 F.3d at 234.  To prove misappropriation,

17

the SEC must show that the information misappropriated was acquired through this confidential relationship.  SEC v. Falbo, 14 F. Supp. 2d 508, 522 (S.D.N.Y. 1998).

Courts have found that the existence of a duty of confidentiality turns on the nature of the relationship between the tipper and the source and not formal agreements.  See, e.g., United States v. Chestman, 947 F.2d 551, 568 (2d Cir. 1991) (looking to nature of relationship to determine existence of duty); Falbo, 14 F. Supp. 2d at 523 (finding that both employee and contractor owed duty of confidentiality based on relationships to employer); see also SEC v. Talbot, 530 F.3d 1085, 1095-96 (9th Cir. 2008) (finding that relationship to employer imposed duty of confidentiality and that information was of confidential nature).  The breach of that duty also does not turn on whether the information was voluntarily given or wrongfully taken, but rather on the duty of trust the tipper owed the source.  See SEC v. Singer, 786 F. Supp. 1158, 1171 (S.D.N.Y. 1992) (finding that duty of confidentiality arose from relationship to client not from manner information was obtained).

In this case, the SEC alleges that Mr. Rorech acquired his information about the VNU bonds through his relationship of trust and confidence with DBSI.  The SEC alleges that between July 10 and July 17, 2006, Mr. Rorech received material,

nonpublic information about the proposed VNU bond restructuring from a DBSI fixed income banker and other DBSI employees, who presumably were working on the bond issuance. (Compl. ¶ 29.) The SEC contends that DBSI's own confidentiality policy and DBSI's engagement letter with VNU show that the information passed by Mr. Rorech to Mr. Negrin was confidential. (Compl. ¶¶ 23-26, 28.) DBSI's confidentiality policy stated that "[e]mployees should presume that all business information acquired . . . from . . . clients and in connection with business transactions is confidential unless the information is already in the public domain." (Compl. ¶ 24.) The SEC also points to the defendants' switching between recorded telephone lines and unrecorded cellular telephones when discussing the VNU bonds to indicate that they knew the information was not to be shared. (Compl. ¶¶ 34, 45.)

Mr. Rorech responds that he did not have a duty of confidentiality to DBSI with respect to this information because even though the information was nonpublic, DBSI did not view the information as confidential. First, he argues that the DBSI private-side bankers who shared information with him did not initiate an internal "wall crossing" procedure. While this may be somewhat probative of the nature of the information, DBSI's internal procedures do not control whether the information was

actually confidential or whether Mr. Rorech breached his duty to DBSI by sharing it.

Next, Mr. Rorech points to the engagement letter between DBSI and VNU, which stated that "nothing herein shall prevent any Underwriter from disclosing any such [confidential] information . . . (ii) to purchasers or prospective purchasers of Securities in connection with an Offering of such Securities, to the extent appropriate in the context of such Offering." (Strassberg Decl. Ex. B, ¶ 7(a).)  Mr. Rorech argues that as a result of this letter, DBSI allowed him to share the information about the bond offering with Mr. Negrin, a prospective purchaser of the bonds, so he could not have breached any duty.  However, while the engagement letter may have indicated that VNU or DBSI did not mean to place additional confidentiality restrictions on DBSI employees as a result of the letter, that does not mean Mr. Rorech owed no duty of confidentiality to DBSI as "appropriate in the context" of his work.  It is also unclear whether the information could be disclosed for the purposes of purchasing CDSs rather than the underlying bonds.

The issue of the existence of a duty of confidentiality is one that can be decided by a court as a matter of law.  See Lyon, 605 F. Supp. 2d at 542, 544-45 (examining existence of duty of confidentiality but finding evidence insufficient to grant summary judgment).  However, in this case, the question of

the scope of Mr. Rorech's duty to DBSI and whether the
information he shared was in fact confidential is a fact-based
inquiry that cannot be decided in the defendant's favor on a
motion for judgment on the pleadings.  The SEC alleges facts
that support a reasonable inference that Mr. Rorech breached a
duty of confidentiality.  Mr. Rorech's responses do not show
that the SEC's claim is implausible on its face.  Therefore, the
defendant's motion for judgment on the pleadings is denied.

### CONCLUSION

For the reasons stated above, the defendants' motions for
judgment on the pleadings are **denied** without prejudice.  The
Clerk is directed to close Docket Nos. 15 and 22.

**SO ORDERED.**

**Dated:    New York, New York**
          **December 9, 2009**

John G. Koeltl
United States District Judge