UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION, :
                                                        :          **No. 09-CV-4329 (JGK)**
                                   Plaintiff,           :
                                                        :
                    -against-                           :
                                                        :
JON-PAUL RORECH and                                     :
RENATO NEGRIN,                                          :
                              Defendants.
-----------------------------------------------------------------x


## <u>**DEFENDANTS' PROPOSED FINDINGS OF FACT**</u>

Richard M. Strassberg                     Lawrence Iason
Maryana Zubok                             Linda Fang
GOODWIN PROCTER LLP                       MORVILLO, ABRAMOWITZ, GRAND,
The New York Times Building               IASON, ANELLO & BOHRER, P.C.
620 Eighth Avenue                         565 Fifth Avenue
New York, New York 10018                  New York, New York  10017

                                          *Attorneys for Renato Negrin*

-and-

Roberto M. Braceras
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109


*Attorneys for Jon-Paul Rorech*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

PROPOSED FINDINGS OF FACT ......................................................................................4

I.      PARTIES ................................................................................................................4

II.     GENERAL OVERVIEW ......................................................................................4

III.    OVERVIEW OF THE VNU BOND OFFERING .............................................6

IV.    MARKETING OF THE VNU BOND OFFERING...........................................7

       A.   Deliverability Of The New Nielsen Bonds and the Possibility of Structural Changes Were Widely Discussed in the Market ........................9

       B.   Investors Submitted Reverse Inquiries for a Holding Company Issuance.................12

       C.   Deutsche Bank Salespeople And Capital Markets Professionals Worked To Explore Solutions To The Deliverability Problem ........................16

       D.   The Decision To Change The Structure Of The VNU Bond Offering Was Not Made By The Financial Sponsors Until July 21, 2006.................19

V.     THE CELL PHONE CALLS AND NEGRIN'S VNU CDS TRADES ...........................22

VI.    INFORMATION ABOUT POTENTIAL STRUCTURAL CHANGES TO, AND INDICATIONS OF INTEREST IN, THE VNU BOND OFFERING WERE NOT CONFIDENTIAL ................................................................................................24

       A.   Rorech And Other Deutsche Bank Employees Were Fully Authorized To Share Information Regarding Potential Structural Changes With Customers.................24

       B.   Deutsche Bank Employees Openly Discussed Potential Structural Changes — Including Deutsche Bank's Conversations With Sponsors — with Others Both Inside and Outside of Deutsche Bank ................................................27

       C.   Information About Customers' Indications of Interest And Orders Was Not Confidential ................................................................................................34

       D.   Customers Who Received Information About Potential Structural Changes And Indications Of Interest Did Not Have Any Indication That The Information Was Confidential ................................................36

VII.   RORECH'S CONDUCT WAS CONSISTENT WITH THAT OF A SALESPERSON ATTEMPTING TO SOLICIT INVESTOR INTEREST IN A BOND OFFERING................................................................................................41

       A.   It Was Widely Believed In The Market That VNU CDS Was Underpriced.................41

       B.   Rorech And Other Deutsche Bank Salespeople Pitched The Idea Of Doing Basis Trades With VNU Bonds And VNU CDS................................................43

  C. **Rorech Discussed The VNU Bond Offering With Negrin Because Millennium Was A Prospective Purchaser Of The Bonds** .................................................45

VIII. **RORECH BELIEVED THERE WAS NOTHING WRONG WITH DISCUSSING POTENTIAL STRUCTURAL CHANGES WITH HIS CUSTOMERS** ..........................48

IX. **THE ALLEGED "INSIDE" INFORMATION DID NOT EXIST AT THE TIME OF NEGRIN'S VNU CDS TRADES, AND, IF IT DID, RORECH WAS UNAWARE OF IT.** ..........................................................................................................................53

  A. **Information About Deutsche Bank's Recommendation Did Not Exist As Of The Cell Phone Calls** ..........................................................................................53

  B. **Even If Deutsche Bank Had Decided To Recommend A Holding Company Modification to the VNU Bond Offering, Rorech Did Not Know of This Information Until After The Cell Phone Calls** ......................................................54

  C. **Information About Customer Orders Did Not Exist At the Time Of The Cell Phone Calls** ......................................................................................................55

  D. **No Inside Information About the Sponsors' Likelihood Of Accepting Deutsche Bank's Recommendation Existed At The Time of the Cell Phone Calls** ....................56

  E. **Even If Rorech Had Confidential Or Material Nonpublic Information, Which He Did Not, Rorech Had Nothing To Gain From Sharing Such Information With Negrin** ..........................................................................................................58

X. **DEUTSCHE BANK DID NOT FIND THAT RORECH OR FEDORCIK BREACHED ANY DUTY TO DEUTSCHE BANK OR MISAPPROPRIATED ANY CONFIDENTIAL INFORMATION** ......................................................................58

XI. **NEGRIN'S TRADING IN VNU CDS DOES NOT SUPPORT AN INFERENCE THAT HE WAS TIPPED WITH MATERIAL NONPUBLIC INFORMATION** ...........61

  A. **Negrin's VNU CDS Trades Were Consistent with His Trading History** ...................61

  B. **Negrin Had Many Reasons To Buy VNU CDS on July 17 and July 18** .....................63

  C. **All of the VNU CDS Trades Involved Deutsche Bank** ..............................................65

XII. **THE COURT LACKS JURISDICTION OVER THE CREDIT DEFAULT SWAPS AT ISSUE** .........................................................................................................65

  A. **Overview Of Credit Default Swap Agreements** .......................................................65

  B. **None Of The Material Terms Of The VNU Credit Default Swap Agreements Contained An Express Reference To The Price, Yield, Value, Or Volatility Of Any Security Or Group Or Index Of Securities.** .....................................................68

  C. **No Other Aspect Of The VNU CDS Contracts Is Based On The Price, Yield, Value, Or Volatility Of Any Security Or Group Or Index Of Securities.** ..................71

Defendants Renato Negrin and Jon-Paul Rorech jointly submit the following proposed findings of fact pursuant to the Court's November 20, 2009 Scheduling Order and the Court's Individual Practices.  We note in bold the facts to which the Commission has stipulated.

## PRELIMINARY STATEMENT

Evidence developed through discovery confirms that the SEC's insider trading charges against Jon-Paul Rorech, a Deutsche Bank salesperson, and Renato Negrin, a former portfolio manager for Millennium Partners L.P., have no merit.  The SEC alleges that, while marketing a publicly-announced bond deal in July 2006, Rorech provided "inside" information about potential structural changes to Negrin, who, in turn, allegedly traded on this information by buying VNU credit default swap ("CDS") contracts.  However, in its haste to bring the first insider trading case involving CDS, the SEC has brought a case against Rorech and Negrin that is baseless and is outside the jurisdictional bounds of the federal securities laws.

Record evidence confirms that there is no support for any of the fundamental elements of insider trading under § 10(b) and Rule 10b–5.  Rorech never had inside information about the bond deal in question, nor did Rorech ever share any inside information with Negrin.  Moreover, both defendants lacked the requisite intent.

Pursuant to Deutsche Bank's Engagement Letter with its client, the consortium of financial sponsors who purchased VNU N.V., Rorech was fully authorized to provide Negrin – a potential purchaser of the bonds – with information regarding the potential restructuring of the bond offering.  Consistent with both Deutsche Bank's policies and the custom and practice of the industry, Rorech and his colleagues on the high yield desk and in capital markets openly discussed the potential restructuring with Deutsche Bank customers.  Rorech consistently acted in the interests of Deutsche Bank.  Notably, no one at Deutsche Bank, following the bank's own

1

internal review of this matter, ever advised Mr. Rorech that he had breached any duty to the bank.

Further, Rorech kept his direct supervisor and a managing director in Deutsche Bank's capital markets division apprised of his conversations concerning the VNU restructuring. Indeed, both his direct supervisor and the head of capital markets personally participated in calls with Rorech and customers where they shared information substantially identical to the information that the Commission alleges Mr. Rorech misappropriated in this case. At no point was Rorech told that he should refrain from sharing information regarding the restructuring with any of his customers, nor was he told the information that he received from capital markets was to remain confidential. To the contrary, he was *encouraged* by his supervisors at Deutsche Bank to discuss the potential restructuring with customers and to use CDS trading strategies to help sell the VNU bond deal. Information regarding the potential restructuring was presumed to be public, as it was freely shared with public-side employees such as Rorech. Moreover, neither Rorech nor any other sales employee was "wall crossed" prior to receiving the information, and no customers were asked to sign confidentiality agreements in the context of this deal.

Finally, insider trading under the misappropriation theory of liability depends on the sharing of material nonpublic information. But Rorech did not possess any such information during the relevant period and, therefore, could not have shared it with Negrin. At the time of Rorech's conversations with Negrin, no decision had been made by the issuer regarding any restructuring, nor had Deutsche Bank made any decision to make any recommendations to the financial sponsors. Rorech simply could not have shared inside information with Negrin, either on the recorded line or during their cell phone conversations, because no such information

existed at the time.  Moreover, the mere possibility of a restructuring was not material nonpublic information as it was already in the public domain and the subject of widespread market rumors.

The Commission's allegation that Negrin traded VNU CDS based on inside information also fails.  Negrin's purchases of VNU CDS in July 2006 were consistent with his trading history, and were supported by reasonable rationales.  In fact, Negrin had purchased VNU CDS on several occasions just months prior to the trades in question.  Thus, the fact that Negrin purchased VNU CDS is insufficient to give rise to an inference of insider trading.

In any event, the SEC simply does not have jurisdiction over this matter, as the CDS contracts in question are not "security-based swap agreements" and thus are not covered by § 10(b) of the Securities Exchange Act of 1934.  The SEC has limited authority to prosecute insider trading cases related to CDS in only those cases where the material terms of the CDS agreements are "security-based," meaning that they are based on the price, yield, value, or volatility of any security.  Here, the material terms of the CDS contracts – including price – were not based on any of these enumerated characteristics.  Thus, by definition, the CDS agreements are not "security-based," and, as a result, neither the SEC nor the Court has jurisdiction over this case.

Judgment should be entered in favor of Defendants.  Rorech neither possessed nor provided Negrin with any inside information.  And, accordingly, Negrin did not trade on any inside information.

## PROPOSED FINDINGS OF FACT

**I.     PARTIES**

1.     Jon-Paul Rorech was a salesperson working in the High Yield Sales group at Deutsche Bank Securities, Inc. ("Deutsche Bank") in New York in 2006.  **STIPULATED.**

2.     Rorech began working in the High Yield Sales group at Deutsche Bank in around January 2006.  **STIPULATED.**

3.     Prior to joining the High Yield Sales group, Rorech worked in the Hedge Fund Sales group at Deutsche Bank for approximately two years and was asked to join high yield sales to, in part, help others on the desk learn about derivatives trading strategies.

4.     Renato Negrin was one of Rorech's customers.

5.     In 2006, Negrin was a portfolio manager for Millennium Partners, L.P. ("Millennium"), a New York-based hedge fund.  **STIPULATED.**

**II.    GENERAL OVERVIEW**

6.     This action involves allegations of insider trading against Jon-Paul Rorech and Renato Negrin in connection with the trading of credit default swaps referencing VNU ("VNU CDS") in July and August 2006.

7.     In 2006, both Rorech and Negrin resided in Manhattan, in the Southern District of New York.

8.     All of the alleged acts, transactions, and courses of business by Rorech and Negrin relevant to this action occurred in Manhattan, in the Southern District of New York.

**STIPULATED.**

9.     The SEC charges that Rorech breached a duty of confidentiality to Deutsche Bank by illegally tipping Negrin and that Negrin illegally traded on that tip.  The Commission claims

that these acts violated Section 10(b)(5) and Rule 10b-5.  Both Rorech and Negrin deny any

wrongdoing.

10.     Rorech did not breach any duty to the bank, as the alleged information in his

possession was not confidential.

11.     Negrin did not trade VNU CDS while in possession of confidential information.

12.     In July 2006, Rorech was one of the high yield salespeople at Deutsche Bank in

New York responsible for marketing a proposed issuance of high yield bonds by subsidiaries of

VNU ("VNU Bond Offering").  **STIPULATED.**

13.     As part of the marketing of the VNU Bond Offering, Rorech reached out to many

potential bond purchasers, including Negrin, to ask whether they were interested in purchasing

bonds.

14.     On July 17 and July 18, 2006, Negrin purchased two €10 million VNU CDS

contracts.  He sold those credit default swaps to Deutsche Bank on July 24 and August 1, 2006,

earning Millennium a total profit of approximately €946,678.

15.     The Commission alleges that Rorech illegally tipped Negrin during two cell

phone calls by providing him with material nonpublic information about a proposed structural

change in the VNU Bond Offering.  The Commission claims that Rorech knowingly

misappropriated this confidential information from Deutsche Bank in breach of his fiduciary

duty to his employer.

16.     Rorech did not misappropriate any information from Deutsche Bank, as he was

authorized to disclose the information he possessed to potential purchasers of the VNU bonds.

17.     Rorech's supervisors — the head of the high yield sales desk and the head of

capital markets — _and_ the terms of Deutsche Bank's engagement letter with its client – the

consortium of financial sponsors who purchased VNU N.V.— all specifically authorized Rorech to share the alleged "inside" information with his customers.

18.     Rorech's conduct in allegedly providing information to Negrin regarding the restructuring of the VNU bond deal was fully consistent with custom and practice of high yield bond sales.

19.     Indeed, information about the potential structural changes was decidedly not treated as confidential by Deutsche Bank employees.  To the contrary, the same material nonpublic information that Rorech allegedly misappropriated by providing it to Negrin was discussed openly by Deutsche Bank supervisors, salespeople, senior capital markets professionals, and customers on recorded lines.

20.     Furthermore, the information that the Commission alleges Rorech provided to Negrin did not exist or was not known to Rorech prior to Rorech's and Negrin's communications.

21.     Accordingly, Rorech could not have provided Negrin with any material nonpublic information in breach of a duty to Deutsche Bank during the cell phone calls, because (a) Rorech was never in possession of any material nonpublic information involving the proposed VNU Bond Offering, and (b) Rorech was authorized to disclose to Negrin, a potential bond purchaser, whatever information he possessed about the proposed bond offering to facilitate the marketing of the VNU Bond Offering.

## III.    OVERVIEW OF THE VNU BOND OFFERING

22.     VNU was a public Dutch media and information company.  Its operating subsidiaries included Nielsen, a marketing and media information company best known in the U.S. for providing viewing and ratings statistics for television shows.  **STIPULATED.**

23.     On March 8, 2006, VNU announced that it had agreed to be purchased and taken private for €7.5 billion by a consortium of private equity firms consisting of AlpInvest Partners N.V., Blackstone Group L.P., Carlyle Group, Hellman & Friedman LLC, Kohlberg Kravis Roberts & Co. L.P., and Thomas H. Lee Partners, L.P ("sponsor consortium" or "financial sponsors").  **STIPULATED,**

24.     Deutsche Bank served as a financial advisor to the sponsor consortium in connection with its acquisition of VNU.  **STIPULATED.**

25.     Shortly after the acquisition, VNU's common and preferred stocks were delisted from the Amsterdam Euronext exchange, and VNU was converted from a public to a private company.  **STIPULATED.**

26.     On July 10, 2006, VNU announced that it would change its capital structure to include $1.67 billion of new bonds issued by VNU's subsidiaries ("VNU Bond Offering"), and €4.89 billion of new bank loans and credit facilities ("bank debt").  **STIPULATED.**

27.     The $1.67 billion of bonds was proposed to be issued in two tranches, by the Nielsen Finance LLC and Nielsen Finance Co. (the "new Nielsen bonds"), and consisted of senior notes and senior subordinated discount notes.  **STIPULATED.**

28.     Deutsche Bank was the lead underwriter for the VNU Bond Offering.  The other underwriters were Citigroup Global Markets Inc. ("Citigroup"), JP Morgan Securities Inc., ABN AMRO Bank N.V., and ING Bank N.V.  **STIPULATED.**

29.     The VNU Bond Offering was made pursuant Rule 144A, and thus could only be marketed to sophisticated institutional customers with over $100 million in investable assets, also known as Qualified Institutional Buyers.  **STIPULATED.**

**IV.     MARKETING OF THE VNU BOND OFFERING**

30.     As lead underwriter, Deutsche Bank had primary responsibility for marketing the VNU Bond Offering.  **STIPULATED.**

31.     Shortly after the bond deal was announced on July 10, Deutsche Bank sent the preliminary offering memorandum setting forth the proposed terms of the bond deal to prospective bond purchasers, including Millennium.

32.     The financial sponsors, VNU management, and Deutsche Bank investment bankers organized a lengthy three-week international roadshow process to market the VNU Bond Offering.  The European roadshow commenced on July 11, 2006 in London, and the U.S. roadshow ran from July 17 through July 28, 2006.  **STIPULATED.**

33.     Books closed for the VNU Bond Offering at approximately 5:00pm EDT on July 31, 2006, at which point no more orders could be placed.  The bonds for the VNU Bond Offering were officially priced and allocated to investors on August 1, 2006.  **STIPULATED.**

34.     From the time of the announcement of the VNU Bond Offering on July 11, 2006 through July 31, 2006 (the "marketing period"), Deutsche Bank salespeople in New York and London were responsible for soliciting investor indications of interest and orders for the proposed VNU Bond Offering.

35.     Jon-Paul Rorech, a salesperson in Deutsche Bank's High Yield Sales group in New York, was one of a number of salespeople responsible for marketing the VNU Bond Offering to his customers, including Renato Negrin at Millennium.

36.     The VNU Bond Offering was one of the largest and most leveraged high yield bond deals that had ever been brought to market at the time.

37.    In light of the challenging conditions in the high yield market in the summer of 2006, the size of the VNU Bond Offering, the deal was difficult to market successfully.

**STIPULATED.**

38.    Deutsche Bank and the sponsor consortium understood that the senior subordinated discount note tranche of the new Nielsen bonds would be especially difficult to sell.

**STIPULATED.**

39.    The senior subordinated discount Nielsen bonds were to account for $835 million, or 50% of the total of the VNU Bond Offering.

A.    **Deliverability Of The New Nielsen Bonds and the Possibility of Structural Changes Were Widely Discussed in the Market**

40.    Long before the VNU Bond Offering was announced, credit default swap contracts had been written to reference VNU N.V. ("VNU CDS").  **STIPULATED.**

41.    Before and during the marketing period for the VNU Bond Offering, VNU CDS were actively traded in London.

42.    As part of its proposed new financing, VNU indicated that it would tender for and retire most of its previously issued and then-outstanding bonds — about €1.095 billion in total.

**STIPULATED.**

43.    As a result of retiring these old bonds, if the new Nielsen bonds were not deliverable into VNU CDS contracts, market participants believed that there would have been very few potentially deliverable obligations for the existing VNU CDS.

44.    Accordingly, there was interest in whether the VNU Bond Offering would provide additional deliverable obligations.

45.    Even if there were perceived to be no deliverable obligations, VNU CDS could still trade, as (a) the Determinations Committee could determine that other obligations could be

9

sufficient to "deliver" at settlement, and (b) market participants could take the view that new deliverable obligations would be issued in the future.

46.     As soon as the marketing for the VNU Bond Offering began, the issue of whether the new Nielsen bonds would be deliverable into VNU CDS was widely debated among investors and other market participants.[1]

47.     Some market participants held the view that, in order for the new Nielsen bonds to be deliverable into the VNU CDS, they would have to be unconditionally and irrevocably guaranteed by the parent, VNU.[2]

48.     Because the language of the preliminary offering memorandum indicated that the guarantee from VNU was not irrevocable, some investors believed that the new Nielsen bonds would not be deliverable.[3]

49.     At one of the very first investor presentations in London on the morning of July 11 or 12, 2006 — attended by financial sponsors, VNU management, Deutsche Bank investment bankers and market participants — a number of investors raised the question whether the VNU Bond Offering would be deliverable into existing VNU CDS.  **STIPULATED.**

---

[1]     Defs' Ex. 40: 07/11/2006 Email from Ciorchina to Daly, et al, DBSI 73278; Deposition of Mark Fedorcik, dated January 20, 2010, at pp. 15:13-25, 57:19-58:11; Fedorcik SEC Investigative Testimony, 2/24/09, at pp. 126:05-127:03; Defs' Ex. 349: 07/14/2006 Call between Bertrand and Kotsen, 3:40pm EDT; Defs' Ex. 58: 07/11/2006 Bloomberg chat between Burch and Logue, BM0000045-46; Defs' Ex. 57: 07/11/2006 Bloomberg chat between Barnum and Cusworth, BM0000076-77; Def's Ex. 96: 07/12/2006 Bloomberg from Hu to Epstein and Hornblass, MLP 002281-82; Defs' Ex. 91: 07/12/2006 Bloomberg from Moses, MLP 0032351-53; Defs' Ex. 31: 07/11/2006 Bloomberg from McCandless to Epstein, MLP 002458; Defs' Ex. 62: 07/11/2006 Bloomberg from Melchionni to Sherry, CAX05806; Defs' Ex. 56: 07/11/2006 Bloomberg from Kemp to Sherry, CAX05830; Defs' Ex. 44: 07/11/2006 Bloomberg from Lima to Fedorcik, DBSI021705; Defs' Ex. 40: 07/11/2006 Email from Ciorchina to Daly, DBSI073278; Rorech Expert Ex. 3: 07/11/06 Market News International Article, Miller 3938; Defs' Ex. 69: 07/11/06 Reuters Article.

[2]     Defs' Ex. 62: 7/11/06 Bloomberg from Melchionni to Sherry, et al., CAX05806; Defs' Ex. 42: 07/11/2006 Email from Sherry to Cavanagh, CAX00093.

[3]     Defs' Ex. 131: 07/14/2006 Bloomberg from Smith to Mansfield,, MLP 24930-31; Defs' Ex. 97: 07/13/2006 Reuters Article; 07/11/2006 Bloomberg chat between Barnum and Cusworth, BM0000076-77; 07/11/2006 Bloomberg from Kemp to Sherry, CAX05830.

50.     At that investor presentation on July 12, investors made public demands that VNU and the financial sponsors alter the offering to provide new bonds that would be deliverable.[4]

51.     Plaintiffs' expert, David Barcus, agrees that, based on such investor feedback, it would be obvious and common knowledge to the market participants that Deutsche Bank investment bankers and the issuer, VNU, would consider the issue of whether to restructure the deal to offer deliverable bonds.[5]

52.     Indeed, on July 11, Geoffrey Sherry, a portfolio manager for a credit trading fund at Caxton Associates LLC ("Caxton"), a New York-based hedge fund, and one of Rorech's customers, received a Bloomberg from Citigroup saying that "one of the leads says the spirit of the prospectus is that [the new Nielsen] bonds should be deliverable."[6]

53.     Market participants suggested two options for changing the structure of the Bond Offering in an effort to solve the deliverability problem and make the offering more attractive: the Sponsors could (a) change the guarantee language in the offering memorandum for the new Nielsen bonds so that the bonds would be unconditionally guaranteed by VNU N.V.; or (b) issue a tranche of bonds from the holding company or some other legal entity that would be deliverable into VNU CDS.  **STIPULATED.**

54.     It was believed that such structural changes suggested by investors — both changing the guarantee language and issuing a new tranche of bonds from VNU — would have the same effect:  there would have been more bonds that were potentially deliverable into VNU CDS.

---

[4]    Defs' Ex. 97: 07/13/2006 Reuters Article; Defs' Ex. 79: 07/12/2006 Bloomberg from JP Morgan Euro to Hornblass, MLP 02172-73; Defs' Ex. 131: 07/14/2006 Bloomberg from Smith to Mansfield, MLP 24930-31.
[5]    Barcus Deposition, 3/4/10, 87:12-88:19.
[6]    Defs' Ex. 46: 07/11/2006 Bloomberg from Pierce to Sherry, CAX05776.

55.     The possibility of structural changes to the VNU Bond Offering — including changing the guarantee language and the potential for issuing a tranche of bonds directly from VNU — was openly discussed in the marketplace, and the subject of rumors and speculation.[7]

### B.     Investors Submitted Reverse Inquiries for a Holding Company Issuance

56.     During the marketing period for the VNU Bond Offering, investors and market professionals at Deutsche Bank perceived an opportunity for VNU and the financial sponsors to issue a tranche of bonds directly out of the holding company — VNU — in an attempt to satisfy the market's demand for what they perceived to be qualifying deliverable bonds.

**STIPULATED.**

a.     On the morning of July 11, 2006, at 9:52am EDT, Sherry suggested that Deutsche Bank ask the sponsors to issue bonds out of the holding company.  Sherry suggested that if VNU issued bonds out of the holding company, investors could potentially lock up a couple hundred basis points of profit by buying the holding company bonds and the VNU CDS because the CDS was underpriced – in effect, executing what is known in the industry to be a "basis trade." [8]  Rorech conveyed Sherry's suggestions to Mark Fedorcik, the head of Deutsche Bank's High Yield Capital Markets group in New York.[9]

---

[7]     Defs' Ex. 97: 07/13/2006 Reuters Article; Defs' Ex. 166: 07/18/2006 Bloomberg exchange between Masel and Oppedisano, MLP 35700; Deposition of Randy Masel, 129:13-130:03; Defs' Ex. 131: 07/14/2006 Bloomberg from Smith to Mansfield, MLP 24930-31; Defs' Ex. 245: 07/21/2006 Email from Barclays Capital, MLP 005159-63; Defs' Ex. 202: 07/20/2006 Bloomberg chat between Hadley and McGinty, BM0000096; Defs' Ex. 110: 07/13/2006 Bloomberg from Scheuler to Tournier, DBL 5547; Defs' Ex. 120: 07/13/2006 Bloomberg from Kemp to Sherry, CAX05515; Defs' Ex. 112: 07/13/2006 Bloomberg from Pierce to Sherry, CAX05522; Defs' Ex. 121: 07/13/2006 Bloomberg from Joyce to Sherry, CAX05477; Defs' Ex. 111: Bloomberg message from Patel to Lantz, et al., CAX05527; Defs' Ex. 89: 07/12/2006 Bloomberg message from Hunt to Hornblass, et al., MLP002159; Defs' Ex. 90: 07/12/2006 Bloomberg message from JP Morgan Euro HY Sales to Hornblass, MLP002154; Defs' Ex. 87: 07/12/2006 Bloomberg message from Cowan to Negrin, MLP006990; Defs' Ex. 244: 07/21/2006 Bloomberg chat between Barnum and Egan, BM0000071; Defs' Ex. 83: 07/12/2006 Email from Mansfield to London Credit, MLP 035298; Defs' Ex. 340: 07/20/2006, Call between Wagner and Morris, 11:26am EDT.

[8]     Defs' Ex. 361: 07/11/2006 Call between Rorech and Sherry at 9:52am EDT.

[9]     Defs' Ex. 368: 07/11/2006 Call between Fedorcik, Rorech and Kushner at 10:23 am EDT call.

b.      Also on July 11, 2006, at around the same time (4:45pm GMT / 11:45am EDT), two Deutsche Bank credit derivatives traders in London — Eve Tournier and Grigore Ciorchina — called David Ross, the senior Deutsche Bank capital markets professional in London responsible for the VNU Bond Offering.  Ciorchina and Tournier urged Ross to suggest to the financial sponsors that they change the structure of the proposed VNU Bond Offering to add a tranche of bonds issued out of VNU in order to satisfy the investor demand for deliverable bonds.[10]

57.     Additionally, during the first week of the marketing period, a number of investors asked salespeople and capital market professionals at Deutsche Bank whether the financial sponsors would consider issuing bonds out of the holding company.  **STIPULATED.**

a.      On July 12 at 10:42am GMT, Dennis Akoo from Cairn Capital told Sean Hunt, a salesperson in Deutsche Bank's London office, that "the CDS market is important to us," and said "if you can issue a tranche out of the reference entity, that would be really appreciated."[11]  Dennis Akoo reiterated this sentiment to David Ross later that day and asked if Deutsche Bank could "issue some of the senior notes from VNU N.V." [12]

b.      During the week of July 10, 2006, Kerin Goodwin, a portfolio manager at King Street Capital Management, L.P. ("King Street"), a New York-based hedge fund, spoke with Fedorcik to express interest in deliverable bonds.[13]

c.      One of Rorech's customers — Jeremy Barnum — also submitted a request for additional qualifying deliverable bonds during the first week of the VNU Bond Offering

---

[10]   Tournier deposition, 12/22/09, 52:16-53:4, 56:21-58:12; Defs' Ex. 428: 07/11/2006 Call Between Ciorchina, Tournier and Ross at 4:45pm GMT.

[11]   Defs' Ex. 433: 07/12/2006 Call between Akoo and Hunt at 10:42.

[12]   Defs' Ex. 449: 07/12/2006 Call between Ross, Akoo and Cahalan at 2:36pm GMT; see also Defs' Ex. 450: 07/12/2006 Call between Ross, Akoo and Cahalan at 2:45pm GMT.

[13]   Defs' Ex. 7: 02/13/2007 Letter from Gambino to Martin, DBL 1822- 28 at 1826; Fedorcik SEC Investigative Testimony, 2/24/09, 05:19-07:04.

marketing period.  At the time, in July 2006, Barnum was the head of the London office and a portfolio manager for Blue Mountain Capital Management LLC ("Blue Mountain"), a hedge fund.[14]

58.    When potential investors suggest that an issuer offer particular securities for sale or suggest that an issuer make changes to an announced securities offering, the suggestion is called a "reverse inquiry."  Reverse inquiries can include suggested modifications to covenants, pricing, maturity, or other structural features of a proposed securities offering.  **STIPULATED.**

59.    Reverse inquiries may be submitted by investors to salespeople, who may then pass the reverse inquiries on to the investment bank's capital markets professionals.  Occasionally, investors address these reverse inquiries directly to the capital markets professionals.  The capital markets professionals may relay the suggestion to the other investment bankers at the bank responsible for managing the relationship with the issuers who then may discuss the reverse inquiry with the issuer.  **STIPULATED.**

60.    A reverse inquiry will often result in a dialogue between capital markets — as the representative of the issuer — and the potential investor.  These discussions may take place directly with capital markets or through a salesperson.[15]

61.    Capital markets and salespeople may also reach out to other investors to discuss the reverse inquiry in order to generate additional interest and gauge market demand for the suggested change.[16]  Capital markets and salespeople will generally provide investors with

---

[14]   Defs' Ex. 496: 07/14/2006 Call between Rorech and Fedorcik at 9:42am EDT; Defs' Ex. 498: 07/14/2006 Call between Rorech, Barnum and Fedorcik at 10:03am EDT.
[15]   Olvany Report ¶¶ 23-24.
[16]   Olvany Report ¶ 22.

updates on the progress of a reverse inquiry, including updates on the investment bankers'
discussions with the issuers.[17]

62.   The ultimate decision whether to agree to any investor-proposed structural change
is made by the issuer.  **STIPULATED.**

63.   In the case of the VNU Bond Offering, the ultimate decision whether to agree to
the investor-proposed structural changes was made by the financial sponsors.  **STIPULATED.**

64.   In the VNU bond deal itself, the sponsor rejected certain recommendations by the
Deutsche Bank bankers for structural changes.

65.   It is well understood that issuers and their investment banking advisors will make
some effort to accommodate reverse inquiries, particularly if a deal is struggling.[18]  However, in
practice, many reverse inquiries — even those that seem like they are clearly to the benefit of the
issuers — are ultimately rejected.[19]

66.   During the reverse inquiry negotiations, information regarding the potential
structural changes is not broadcast or announced by Bloomberg or other means to all potential
bond purchasers until and unless the requested change is approved by the issuer.[20]  Nevertheless,
information regarding potential structural changes is considered "public" and not confidential —
such information is openly discussed with salespeople and potential investors, and is generally
available to the public.[21]

67.   In the case of the VNU Bond Offering, satisfying the apparent market demand for
deliverable VNU bonds would be greatly beneficial to the offering and to the issuer, as it not

---

[17]   Olvany Report ¶ 23.
[18]   Barcus Deposition, 66:4-68:11, 72:20-73:25; see also Olvany Report ¶ 22 .
[19]   Olvany Report ¶ 25; Ross Deposition, 1/06/2010,184:10-184:19.
[20]   See Olvany Report ¶ 25.
[21]   See Cartaina Deposition, 1/14/10, at 110:06-21; Fedorcik Deposition 1/20/10, at 98:06-99:22.

only would help sell "deliverable" bonds, but would also reduce the size of the subordinated debt offering, which was the most challenging aspect of the deal.

      **C.**      **Deutsche Bank Salespeople And Capital Markets Professionals Worked To Explore Solutions To The Deliverability Problem**

      68.     It was clear from the persistent and public investor inquiries about deliverability that there was a demand for bonds that would be deliverable into VNU CDS.[22]

      69.     The financial sponsors heard about the deliverability issue and investor demands for potential structural changes first-hand during the roadshow presentations.[23]

      70.     Deutsche Bank capital markets professionals and others in investment banking, namely, Mark Fedorcik, Vikrant Sawhney, and John Eydenberg, were responsible for keeping the financial sponsors abreast of all market developments and investor feedback.

      71.     Mark Fedorcik was an investment banker in and head of the High Yield Capital Markets group at Deutsche Bank in New York in 2006. He was the most senior capital markets professional responsible for marketing the VNU Bond Offering in the U.S. **STIPULATED.**

      72.     Vikrant Sawhney and John Eydenberg were investment bankers in the Financial Sponsors and the Leveraged Finance groups, respectively, at Deutsche Bank in New York. Both Sawhney and Eydenberg worked closely with Fedorcik and the financial sponsors during the marketing period.

      73.     The role of capital markets professionals during a new bond offering is to work with salespeople and with investors to provide the issuer with accurate information about market demand and with advice about whether to change the pricing, covenants, and the other structural

---

[22]   Fedorcik SEC Investigative Testimony, 2/4/09, 26:15-19, 27:11-28:02; Rorech SEC Investigative Testimony, 1/22/09, 159:01-06.

[23]   Ross deposition, 1/6/10 113:25-114:17, 218:06-23; Fedorcik SEC Investigative Testimony 2/ 24/09, 126:05-127:10.

components of the bond offering so as to achieve the best execution of the deal in light of market conditions.  **STIPULATED.**

74.     Capital markets professionals also provide guidance to the sales force when salespeople or customers have questions about the bond offering.

75.     Deutsche Bank's New York office took the lead in exploring ways to restructure the VNU Bond Offering to address investor concerns about deliverability so as to improve the prospects for selling the entire deal.  Fedorcik, Sawhney, and Eydenberg were the senior investment bankers working on the deal and the primary points of contact for the financial sponsors throughout this process.

76.     No capital markets or investment banking professionals from Deutsche Bank's London office had communications with the financial sponsors about the potential structural issues in connection with the VNU Bond Offering.

77.     Of the Deutsche Bank investment bankers who interacted with the financial sponsors, only those in capital markets, and primarily Fedorcik, interacted with the sales team in New York.

78.     Potential investors in the VNU Bond Offering suggested two options for changing the structure of the Offering in an effort to solve the deliverability problem and make the Offering more attractive: (a) change the guarantee language in the offering memorandum for the new Nielsen bonds so that the bonds would be unconditionally guaranteed by VNU; or (b) issue a tranche of bonds from the holding company or some other legal entity that would be deliverable into VNU CDS.  **STIPULATED.**

79.     Fedorcik, Eydenberg, and Sawhney preliminarily discussed both options with the financial sponsors early in the marketing period.[24]

80.     The fact that the financial sponsors and Deutsche Bank were working to address the investors' concerns about deliverability was widely known in the market.[25]

81.     Sometime late on July 13 or early on July 14, after consulting with Deutsche Bank's legal department, Fedorcik discovered that changing the guarantee language for the new Nielsen bonds would not solve the deliverability problem.  **STIPULATED.**

82.     As a result, as of July 14, 2006, Fedorcik began to explore the possibility of issuing bonds out of the holding company or another entity, and he sought to assess the market's demand for such an issuance.[26]

83.     Because Fedorcik was surprised that changing the guarantee language would not solve the deliverability problem, he did not want to have additional discussions with the financial sponsors about deliverability issues until he knew whether there was a sufficient demand for a bond issue by the holding company.[27]

84.     On July 18, 2006 at 6:50pm EDT, Sawhney emailed a number of the financial sponsor representatives to propose a conference call on July 19 to discuss a "holdco tranche that would be sold into CDS market for purpose of short covering." [28]

---

[24]   Defs' Ex. 81: 07/12/06 Email between Eydenberg and Fedorcik, DBSI 021746-47; Defs' Ex. 73: 07/12/2006 Email between Sawhney and Taylor, THL-VNU-SEC 04595-04599.

[25]   Ross Deposition, 1/6/10, 75:04-76:06; see also Barcus Deposition, 3/4/10, 87:12-88:19.

[26]   Defs' Ex. 462: 07/14/2006 call between Fedorcik and Rorech at 9:39am EDT; Defs' Ex. 524: 07/14/06 Call between Wagner, Martindale and Fedorcik at 9:31am EDT.

[27]   Fedorcik SEC Investigative Testimony, 2/4/09, 219:01-220:19; 221:06-222:12; Defs' Ex. 126: 07/14/2006 Email from Fedorcik to Sawhney, DBSI 22109; Defs' Ex. 124: 07/14/2006 Email between Sawhney and Fedorcik, DBSI 22058.

[28]   Defs' Ex. 170: 07/18/2006 Email from Sawhney to Reid, Taylor, Brown, Merrill and Eydenberg, DBSI 90747.

85.     On July 19, 2006 at 3pm EDT, Deutsche Bank investment bankers conducted a conference call with several (but not all) of the financial sponsors to discuss the possibility of changing the VNU Bond Offering to include a tranche issued out of VNU.[29]

86.     The financial sponsors had a mix of reactions to the discussions about the potential holding company issuance.  Some were amenable to the idea, but others, namely Alex Navab and Simon Brown, two managing directors at Kohlberg Kravis Roberts & Co. L.P., were initially opposed to the proposal.[30]

87.     Even after this call, there was uncertainty as to whether the VNU bond issuance that Fedorcik and the other investment bankers had discussed with the sponsors would be feasible, because there were legal issues that might present problems, and because of concerns about the impact of a holding company issuance on the credit ratings for the VNU Bond Offering.[31]

88.     In particular, there was serious concern on July 19 and 20 that it might not be feasible to issue bonds out of the holding company, because hedge funds domiciled in either the Cayman Islands or Bermuda — like those that were considering purchasing potential holding company bonds — might not be permitted to purchase bonds issued by VNU, a Dutch issuer.[32]

**D.     The Decision To Change The Structure Of The VNU Bond Offering Was Not Made By The Financial Sponsors Until July 21, 2006**

89.     The sponsor consortium approved the issuance of bonds out of VNU N.V. on the afternoon of Friday, July 21, 2006.  **STIPULATED.**

---

[29]   Defs' Ex. 186: 07/19/2006 Email exchange from Eydenberg to Sawhney and Fedorcik, DBSI 90821-90823.
[30]   Sawhney Deposition, 1/14/10, 134:17-136:22.
[31]   Defs' Ex. 205: 07/20/2006 Email between Eydenberg, Sawhney, Holden and Fedorcik, DBSI 78121- 23.
[32]    Defs' Ex. 395: 07/19/2006, Call between Rorech and Fedorcik at 10:13am EDT; Defs' Ex. 400: 07/20/2006 Call between Rorech and Sherry at 7:12am EDT; Defs' Ex. 401: 07/20/2006 Call between Rorech and Barnum at 7:09 am EDT.

90.     Even then, that approval the sponsors gave to Deutsche Bank late on July 21, 2006 was only preliminary.

91.     This decision preliminarily approving an issuance of bonds out of VNU was first communicated to Deutsche Bank by George Taylor, a managing director at Thomas H. Lee Partners L.P., one of the private equity firms in the sponsor consortium, at 6:48pm EDT on Friday, July 21, 2006 to John Eydenberg, and at 6:54pm EDT on Friday, July 21, 2006 to Vikrant Sawhney.[33]  Sawhney then communicated the financial sponsors' preliminary approval of the holding company issuance to Mark Fedorcik at 6:59pm EDT by email.[34]

92.     The financial sponsors, Deutsche Bank's investment bankers, VNU, and their lawyers all continued to work on finalizing the holding company issuance over the weekend of July 22 and 23, 2006.  Discussions as to the ultimate structure of the holding company bonds continued until the afternoon of Sunday, July 23, when the financial sponsors gave their final approval for the structural change to the VNU Bond Offering.[35]

93.     On the morning of July 24, Deutsche Bank announced via Bloomberg that the VNU Bond Offering would be modified to include a €200 million tranche of bonds issued directly out of VNU, the holding company, and that the size of the Nielsen subordinated tranche would be correspondingly decreased.  **STIPULATED.**

94.      The holding company issuance did not increase the total debt that was issued by VNU and its subsidiaries; The revised structure of the VNU Bond Offering was not a significant

---

[33]   Defs' Ex. 228: 07/21/2006 Email between Eydenberg and Taylor, DBSI 78277; Defs' Ex. 220: 07/21/2006 Email between Sawhney and Taylor, THL VNU SEC  04020.

[34]   Defs' Ex. 230: 07/21/2006 Email from Eydenberg to Sawhney, Fedorcik, Holden, Pai and White, DBSI 78281; Defs' Ex. 7: 02/13/2007 Letter from Gambino to Martin, DBL 1822- 28  at 1824.

[35]   Defs' Ex. 7: 02/13/2007 Letter from Gambino to Martin, DBL 1822- 28  at 1824); Defs' Ex. 246: 07/22/2006 Email between  Sawhney and Brown, et al, DBSI 22876; Defs' Ex. 247: 07/23/2006 Email exchange between Fedorcik, Eydenberg, Sawhney, Holden and Pai, DBSI 22915; Sawhney Deposition, 1/14/10, 101:15-102:4.

corporate event for the issuer.[36]  Notably, it increased overall investor demand for the VNU

Bond Offering, reduced the size of the tranche that was the most difficult to sell, and enhanced

deal execution, merely by solving the deliverability issue.[37]

      95.    The revised structure of the VNU Bond Offering had no detrimental impact on the

interests of VNU or the financial sponsors.  [DB letter to I. Friedman dated September 28, 2007,

at p.2]  To the contrary, the structural change was beneficial to Deutsche Bank's issuing clients

— the financial sponsors and the issuer.

      96.    The holding company bonds priced at a lower coupon than the senior

subordinated discount Nielsen bonds and, thereby, lowered the issuer's overall cost of

financing.[38]

      97.    The holding company issuance also made it easier for Deutsche Bank to sell the

subordinated notes by reducing the number of subordinated notes that needed to be sold, and

reducing the amount of leverage attributed to the subordinated notes tranche.[39]

      98.    The VNU Bond Offering was viewed by both VNU and Deutsche Bank as a

major success.[40]

      99.    Rorech's customers' orders accounted for the majority of the €200 million tranche

of VNU holding company bonds.[41]

      100.    Rorech was praised for his work on the holding company issuance and the VNU

Bond Offering in general. [42]

---

[36]   Defs' Ex. 220: 07/21/2006 Email between Sawhney and Taylor, THL VNU SEC  04020.
[37]   Ross Deposition, 1/6/10, 162:06-163:11.
[38]   Defs' Ex. 325: Updated Nielsen Finance Summary, DBSI 0001- 0003.
[39]   Sawhney Deposition, 1/14/10,  56:25-58:3; Defs' Ex. 522:  07/13/2006 Call between Martindale and Johnson at
     11:44 EDT; Defs' Ex. 428: 07/11/2006 Call between Ciorchina, Tournier and Ross at 1:08pm GMT.
[40]   Defs' Ex. 278: 08/10/2006 Email from Fedorcik to Mahoney, et al., DBSI 83529; Defs' Ex. 260: 07/24/2006
     Bloomberg message between Martindale and Johnson, DBSI 065998.
[41]   Defs' Ex. 314: Summary chart of Orders and Allocations for VNU Offering, DBSI 0002-0003.

## V.    THE CELL PHONE CALLS AND NEGRIN'S VNU CDS TRADES

101.    Deutsche Bank records most, but not all, telephone lines to aid in the resolution of trade disputes.  Some clients, such as Fidelity, refused to do business on recorded lines.[43]

102.    During the marketing period of the VNU Bond Offering, Rorech and Negrin had a number of conversations on recorded telephone lines regarding VNU.  **STIPULATED.**

103.    Rorech and Negrin also had two cell phone-to-cell phone conversations during this period, one on July 14 at approximately 8:58am EDT and the other on July 17 at approximately 9:49am EDT.  **STIPULATED.**

104.    The cell phone call on July 14 occurred shortly after two recorded phone calls on July 14, 2006 at approximately 8:37am EDT and approximately 8:55am EDT.  **STIPULATED.**

105.    On their recorded calls on July 14, 2006, Rorech spoke to Negrin about the VNU Bond Offering.  They discussed the proposed terms and structure of the offering, and the idea of doing a basis trade with VNU CDS and the new Nielsen bonds.  In the recorded call at 8:55am on July 14, Rorech also mentioned the possibilities that (a) VNU would make the new Nielsen bonds irrevocably guaranteed, and (b) there could be a dividend deal issued out of VNU in the future, both of which would make VNU CDS a good buy.  Negrin then asked Rorech to handicap the likelihood that those possibilities may occur, and Rorech responded that he thought the likelihood was good.  When Negrin repeatedly asked Rorech to explain his opinion, Rorech responded "are you listening to my silence?" and then asked Negrin to hold.  After a pause of approximately 6 seconds, Negrin said that he would call Rorech back, and the call was disconnected.

---

[42]    Defs' Ex. 311: Performance Review of Jon-Paul Rorech, DBSI 97439- 63; Defs' Ex. 386: 07/18/2006 Call between Rorech, Martindale and Hudoff at 8:40am EDT.

[43]    Defs' Exhibit 16: 05/08/2006 Deutsche Bank Voice Recording Policy, DBSI 76636-640;  Martindale Deposition, 1/12/10, 129:09-129:23.

106.    Negrin called Rorech's cell phone from his cell phone at 8:57am EDT on July 14, 2006, but did not reach him.  Rorech then called Negrin's cell phone back from his cell phone at 8:58am.  **STIPULATED.**

107.    This cell phone conversation lasted no more than three minutes.

108.    At approximately 9:49am on July 17, Negrin called Rorech, and said that he wanted to talk about "the other situation," referring to VNU.

109.    Following this call, Rorech and Negrin had a cell phone-to-cell phone conversation at approximately 9:49am EDT on July 17.  **STIPULATED.**

110.    This cell phone conversation lasted no more than four minutes.[44]

111.    Neither Negrin nor Rorech recall the substance of their cell phone conversation, and there is no other direct evidence as to what they discussed.

112.    Approximately three hours after the cell phone conversation on July 17, Negrin placed an order to buy €10 million of VNU CDS from Deutsche Bank for Millennium.  The trade was executed by John Aylward, a Deutsche Bank credit derivatives trader in London, at approximately 12:40pm EDT on July 17 at a spread of 383 basis points.  **STIPULATED.**

113.    Negrin purchased another €10 million of VNU CDS from Royal Bank of Scotland on July 18, 2006, also at a spread of 383 basis points.  **STIPULATED.**

114.    Rorech and Negrin did not speak again about the VNU Bond Offering between the time of their second cell phone call on July 17 and Negrin's VNU CDS trade on July 18.  The next time they spoke about the VNU Bond Offering was on July 20 at 7:07am.

115.    On July 24, 2006 at 8:29am EDT, Deutsche Bank announced that the VNU Bond Offering was to be modified to include a €200 million tranche of bonds issued by VNU, the holding company.

---

[44]    Defs' Ex. 378: 07/17/2006 Call between Rorech and Negrin at 9:49am EDT.

116.    On the morning of July 24, 2006, after the announcement of the holding company issuance, Negrin sold the €10 million VNU CDS he purchased from Deutsche Bank on July 17 back to Deutsche Bank at a spread of 481 basis points.  This sale resulted in approximately €391,678 of profits for Millennium.  **STIPULATED.**

117.    Negrin did not sell the other half of his VNU CDS position until one week after the July 24 announcement.

118.    On the morning of August 1, 2006, Negrin placed an order to sell to Deutsche Bank the €10 million VNU CDS that Millennium had purchased from the Royal Bank of Scotland.  The trade resulted in a novation in which Millennium assigned its interest as the protection buyer in that VNU CDS to Deutsche Bank, at a spread of 525 basis points.  This transaction yielded approximately €555,000 of profits for Millennium.  **STIPULATED.**

119.    Rorech did not receive any direct financial benefit as a result of Negrin's VNU CDS trades.

120.    Rorech simply could <u>not</u> have provided Negrin with any confidential information about the possible holding company issuance on the cell phone calls, because he was not in possession of any confidential information at the time of either cell phone call.

## VI.    INFORMATION ABOUT POTENTIAL STRUCTURAL CHANGES TO, AND INDICATIONS OF INTEREST IN, THE VNU BOND OFFERING WERE NOT CONFIDENTIAL

### A.    <u>Rorech And Other Deutsche Bank Employees Were Fully Authorized To Share Information Regarding Potential Structural Changes With Customers</u>

121.    Deutsche Bank capital markets and salespeople, including Rorech, were authorized to discuss potential structural changes and other customers' indications of interest with prospective investors in connection with the marketing of the VNU Bond Offering.

122.    Deutsche Bank, like many multi-service financial institutions, has both a public

24

side and a private side.  The public side includes the bank's sales, trading, and research employees, whereas the private side includes the bank's investment banking employees, including capital markets.  The public side primarily interacts with other public market participants including investors, while the private side primarily interacts with issuers and financial sponsors.  **STIPULATED.**

123.    Deutsche Bank, like many multi-service financial institutions, has a "Chinese Wall" in place to prevent non-public information possessed by private-side employees from reaching employees on the public side.

124.    Deutsche Bank also has a policy of physically segregating public- and private-side employees.  In New York, they sit on different floors.

125.    Members of Deutsche Bank's sales force, including salespeople on the high yield desk, are on the public side of the Chinese Wall.

126.    Deutsche Bank's capital markets professionals, such as Fedorcik, work within investment banking and are on the private side of the Chinese Wall, but they routinely interact with both public- and private-side Deutsche Bank employees, as well as with investors.

127.    Pursuant to Deutsche Bank's Chinese Wall policy, Fedorcik and other private-side employees are required to initiate wall crossing procedures before providing any material, nonpublic information to public-side employees such as Rorech.

a.    Deutsche Bank's policy provided:  "Any communication of material, nonpublic information from the 'Private' side of the Chinese Wall to the 'Public' side of the Chinese Wall must be handled through the [compliance] Control Room prior to initiating contact to communicate the information" in accordance with formal wall-crossing procedures. [45]

---

[45]    Defs' Ex. 285: Deutsche Bank's Updated Confidential and Inside Information Policy, DBSI 98821-DBSI 98829, at DBSI 98826-27.

128.     Non-public information is information that is confidential and not "public." Consistent with the custom and practice of the high yield bond industry, Deutsche Bank deems information to be "public" when it is generally available to investors in the marketplace.[46]

129.     Salespeople are not provided with or exposed to material nonpublic information about the bank's investment banking issuer clients in the ordinary course of business.[47]

130.     When salespeople are wall-crossed and are provided with material nonpublic information, they will generally become restricted in their activities and may be prevented from speaking to their customers.[48]

131.     Among the purposes of the Chinese Wall and physical segregation policies is to ensure that the bank's public side employees — including salespeople — do not get exposed to material nonpublic information that would prevent them from being able to perform their duties in speaking to investors and soliciting business.[49]

132.     In practice, salespeople are rarely ever wall-crossed or provided with material nonpublic information, because doing so would prevent them from being able to do their jobs.[50]

133.     Capital markets professionals control the flow of information from the investment banking (or "private") side of Deutsche Bank to their sales and trading colleagues ("public" side) and to potential investors.[51]  Because of this control function, capital markets professionals are

---

[46]   Cartaina deposition, 1/14/10, 110:13-110:23; Barcus deposition, 3/4/10, 60:13-62:6.

[47]   Olvany deposition, 3/16/10, 137:06-138:04; Barcus deposition, 3/4/10, 99:13-101:5; Martindale deposition, 1/12/10, 144:22-144:25.

[48]   Defs' Ex. 285: Deutsche Bank's Updated Confidential and Inside Information Policy, DBSI 98821-DBSI 98829, at DBSI 98826-27.

[49]   . Olvany deposition, 3/16/10, 137:06-138:04; Barcus deposition, 3/4/10, 99:13-101:5; Martindale deposition, 1/12/10, 144:22-144:25; Defs' Ex. 285: Deutsche Bank's Updated Confidential and Inside Information Policy, DBSI 98821-DBSI 98829, at DBSI 98826-27.

[50]   Olvany deposition, 3/16/10, 127:10-127:21; Barcus deposition, 3/4/10, 104:11-18; Martindale deposition, 1/12/10. 150:25-151:20.

[51]   Barcus deposition, 3/4/10, 103:19-104:10; Fedorcik deposition,1/20/10, 128:18-128:22; Ross deposition, 1/6/10, 24:15-24:19; Olvany ¶33.

held responsible for protecting information and for determining whether and when it is appropriate or necessary to share certain information in the course of doing their jobs.

134.    Public-side employees generally understand that the information that they receive in the ordinary course of business is *public*, unless they are wall-crossed.

135.    Neither Rorech nor any other Deutsche Bank sales or trading employees were wall-crossed pursuant to Deutsche Bank's policies in connection with the VNU Bond Offering.[52]

136.    Moreover, the Engagement Letter between Deutsche Bank and the financial sponsors expressly authorized Deutsche Bank employees, including Rorech, to discuss information provided to Deutsche Bank by VNU or the financial sponsors regarding the VNU Bond Offering with prospective bond purchasers in order to market the bond deal. In particular, the Engagement Letter stated that "*nothing herein shall prevent any Underwriter from disclosing any such information … to purchasers or prospective purchasers of Securities in connection with an Offering of such Securities, to the extent appropriate in the context of such Offering.*"[53]

### B.      Deutsche Bank Employees Openly Discussed Potential Structural Changes — Including Deutsche Bank's Conversations With Sponsors — with Others Both Inside and Outside of Deutsche Bank

137.    Neither Fedorcik nor Ross, the two senior capital market professionals at Deutsche Bank primarily responsible for marketing the VNU Bond Offering understood that information about capital markets' discussions with the financial sponsors about a potential structural change in the VNU Bond Offering was confidential, material nonpublic information that was not to be told to Deutsche Bank's public-side employees or to potential investors.[54]

---

[52]    Deposition of John Cartaina, 1/14/10, 85:10-86:04.
[53]    Defs' Ex: 301: Second Amended and Restated Project Valentine Engagement Letter, DBSI 76641-DBSI 76654, at DBSI 76647(emphasis added).
[54]    Fedorcik deposition, 1/20/10, 97:16-24; 129:07-17129:07-129:17; Ross deposition, 1/6/10, 75:04-76:06.

138.    To the contrary, both Fedorcik and Ross expressly asked various salespeople to discuss the possibility of a potential holding company issuance with customers to obtain market feedback and investor interest for such a structural change.

a.    On the morning of July 14, Fedorcik asked Rorech to get "color," *i.e.*, to assess investor demand, for a potential holding company issuance, and later requested Rorech to "firm up" any indications of interest Rorech had received for the potential holding company bonds.[55]

b.    Also on July 14, Fedorcik asked Wight Martindale, the head of the High Yield Sales group in Deutsche Bank in New York and Rorech's direct supervisor, to reach out to one of Martindale's customers to discuss whether the customer had any possible interest in a potential holding company issuance.[56]

c.    Ross told Sean Hunt, the head of the High Yield Sales group at Deutsche Bank AG, in London, about the possibility of issuing bonds out of the holding company on the evening of July 11, 2006.  The next morning, on July 12, 2006 at 9:32am GMT, Ross asked Hunt to speak to customers about the possibility of a holding company issuance, and to see if customers would have any interest in buying such an issuance of bonds.  He asked Hunt to "try to [get a] reverse inquiry" from a customer and further asked "can you feel him out and say 'Is there something you'd like to do' and try to create something you guys want to own upstairs or something like that?" [57]

d.    On July 20, 2006 at 4:55pm GMT, Ross told Rachel Bobillier, the head of the Hedge Fund Sales group at Deutsche Bank AG in London, to raise the potential of a holding

---

[55]    Defs' Ex. 496: 7/14/06 Call between Fedorcik and Rorech 9:39am EDT; Defs' Ex. 418: 7/24/06 Call, 8:27am EDT.
[56]    Defs' Ex. 524: 7/14/06 Call, 9:31am EDT.
[57]    Defs' Ex. 441: 7/11/06 Call, 5:47pm BST; Defs' Ex. 445: 7/12/06 Call, 9:34am BST.

company tranche issuance with CQS, a hedge fund that Ross thought likely traded in VNU CDS, to see if CQS might be interested. Specifically, Ross told her "what we would like to do is if there's like reverse inquiry from guys at CQS and they're trying to look for someone to put something together then they should be talking to us about that," and he continued that Bobillier should "try to engineer something."[58]

139.    Ross also spoke to investors directly about the possibility of a holding company tranche.[59]

140.    Mark Fedorcik, the lead capital markets professional in New York, openly discussed potential structural changes — including his discussions with the financial sponsors — with customers and salespeople, including Rorech.

     a.    On July 11, Fedorcik had multiple conversations with Rorech in which he told Rorech that he planned to try to find a way to allow for some of the bonds in the VNU Bond Offering to be potentially deliverable into VNU CDS contracts.[60]

     b.    On July 14, at 9:42am EDT, Fedorcik spoke to Jeremy Barnum at Blue Mountain with Rorech on the line. Barnum and Fedorcik talked about the potential structure of a holding company issuance, and Fedorcik solicited Barnum's opinions on the potential terms of such an issuance, *e.g.,* pricing, call structure, maturity, and the level of likely demand in the marketplace for such an issuance. At the end of their conversation, Fedorcik told Barnum that he was planning to speak to the sponsors about their options.[61]

     c.    On the afternoon of July 17, Fedorcik told Rorech that he had spoken to other investors and received feedback similar to the feedback they received from Barnum. Fedorcik

---

[58]    Defs' Ex. 460: 7/20/06 Call, 4:55pm BST.
[59]    Defs' Ex. 456: 7/18/06 Call, 3:01pm BST; Defs' Ex. 453: 7/14/06 Call, 10:24am BST.
[60]    Defs' Ex. 367: 7/11/06 Call, 10:52am EDT; Defs' Ex. 368: 7/11/06 Call, 10:23am EDT.
[61]    Defs' Ex. 497: 7/14/06 Call, 9:44am EDT; Defs' Ex. 498: 7/14/06 Call, 10:03am EDT.

said that his plan was to propose that the sponsors create a 200-250 million tranche of bonds at the holding company, but that he wanted to confirm Barnum's interest before doing so.[62]

       d.      A few minutes later, Fedorcik told Barnum, with Rorech on the telephone, that he wanted to confirm Barnum's interest in purchasing bonds from the potential holding company issuance ahead of speaking to the financial sponsors more concretely about the proposed structural change.[63]

       e.      Shortly thereafter, also on July 17, Fedorcik spoke with Sherry, with Rorech on the line, and informed Sherry that he was trying to gauge investor demand for a holding company tranche before going to the financial sponsors with a proposal.[64]

       f.      On the morning of July 18, Fedorcik spoke with Andrew Kellerman, a salesperson in the Investment Grade Sales group at Deutsche Bank in New York, and individuals from Merrill Lynch Principal Finance, one of Kellerman's customers, about reverse inquiries that Deutsche Bank received from other investors, and about the fact that he had introduced the possibility of a holding company issuance to the financial sponsors.[65]

       g.      On July 19, on a call with Jeff Kushner at Blue Mountain with Rorech also on the line, Fedorcik told Kushner that the sponsors were amenable to the holding company issuance.[66]

       h.      On July 20, Gerald Walker, another Deutsche Bank salesperson in the High Yield Sales group in New York, asked Fedorcik if there was going to be "some movement on issues" regarding the restructuring of a potential holdco tranche."  Fedorcik replied that he was

---

[62]    Defs' Ex. 380: 7/17/06 Call, 1:28pm EDT.
[63]    Defs' Ex. 379: 7/17/06 Call, 1:31pm EDT.
[64]    Defs' Ex. 381: 7/17/06 Call, 1:39pm EDT .
[65]    Defs' Ex. 481: 7/18/06 Call, 10:30am EDT; Defs' Ex. 482: 7/18/06 Call, 10:58am EDT.
[66]    Defs' Ex. 397: 7/19/06 Call, 12:51pm EDT.

"getting all this feedback from investors" and said that he was "going to go back to sponsors and do what we can do."[67]

      i.    Fedorcik also spoke to Martindale about both potential structural changes to the VNU Bond Offering and his conversations with the sponsors regarding such changes.[68]

141.    At *no* point in any of these conversations did Fedorcik say to Rorech, any other Deutsche Bank salesperson, or to investors that the information about the potential structural changes and his discussions with the sponsors was confidential and was not intended to be disseminated to the market.

142.    Chris White, another capital markets professional in Deutsche Bank's New York office working under Fedorcik also discussed potential structural changes — including the likelihood that a holding company tranche would be issued — with salespeople without indicating that such information was confidential and should not be discussed with investors.[69]

143.    Further, Eve Tournier and Grigore Ciorchina, two credit default swap traders for Deutsche Bank in London, spoke to Jeff Burch, a portfolio manager at Blue Mountain, about potential structural changes to the VNU Bond Offering.  Tournier told Burch that she and Ciorchina had raised the possibility of changing the VNU Bond Offering to include a tranche of bonds issued by VNU with capital markets, but that the sponsors and capital markets professionals were not receptive to the idea.[70]

144.    Taking the lead from capital markets, salespeople in both New York and London spoke to their customers about the potential structural changes prior to the July 24 announcement.

---

[67]   Defs' Ex. 503: 7/20/06 Call, 6:11pm EDT.
[68]   Defs' Ex. 522 7/13/06 Call, 11:46a, EDT; Defs' Ex. 336: 7/17/06 Call, 10:29am; Defs' Ex. 341 7/20/06 Call, 12:57pm; Martindale Deposition, 1/12/10, 209:03-12; 234:04-234:09; 249:11-249:19.
[69]   Defs' Ex. 352: 7/20/06 Call, 3:48pm EDT.
[70]   Defs' Ex. 426: 7/12/06 Call, 7:52am BST.

a.      On July 11, Martindale, the head of the High Yield Sales group in New York and Rorech's direct supervisor, told an individual at GSO, a hedge fund and one of its customers, that Fedorcik said that a guarantee language change was doable, and that Fedorcik is "wheels are spinning on how to take advantage" of the deliverability issue, including considering potentially issuing additional bonds in the VNU Bond Offering. [71]

b.      On July 13 and July 14, Martindale told individuals at Dillon Reade-UBS that, based on his conversation with Fedorcik, a holding company issuance "is perfect for the sponsor," and that the financial sponsors were amenable to doing the holding company issuance.[72]

c.      On July 14 during a call with Graham Cohen at Dillon Reade-UBS, Cohen asked Martindale whether he thought that the sponsors would be "attuned to doing this holdco," and Martindale replied "Yep." [73]

d.      On July 18, Martindale told Mark Hudoff at PIMCO that they were "possibly" "going to be able to do a tranche at the holdco . . . to satisfy CDS . . . ." [74]

e.      On July 12, Sean Hunt, the head of the High Yield Sales group in London, told a client that CDS investors were trying to have the guarantee structure amended so as to create deliverable bonds, and *said that capital markets told him that the company was interested in this possibility*. [75]  On the same day, Hunt also discussed the possibility of changing the guarantee language or issuing a holding company tranche of bonds with other customers.[76]

---

[71]   Defs' Ex. 506: 7/11/06 Call, 11:50am EDT.
[72]   Defs' Ex. 522: 7/13/06 Call, 11:44am EDT; Defs' Ex. 525: 7/14/06 Call, 9:58am EDT.
[73]   Defs' Ex. 525: 7/14/06 Call, 9:58am EDT.
[74]   Defs' Ex. 386: 7/18/06 Call, 8:40am EDT.
[75]   Defs' Ex. 434: 7/12/06 Call, 10:53am BST.
[76]   Defs' Ex. 431: 7/12/06 Call, 9:52am BST; Defs' Ex. 433: 7/12/06 Call, 10:42am BST; Defs' Ex. 435: 7/12/06 Call, 12:03pm BST.

f.        On July 19, Sean Hunt told Elyssa Johnson at Citadel, a hedge fund, that Deutsche Bank had received reverse inquiries from customers who wanted to change the structure of the VNU Bond Offering to include a tranche of bonds issued by the holding company.[77]

g.        Throughout the marketing period of the VNU Bond Offering, a number of the other high yield salespeople for Deutsche Bank in New York, including Christopher Wagner, Mark Colm, John Bertrand, Michael Glick, and Sean Finnerty, all discussed the possibility of structural changes in the VNU Bond Offering with their customers on recorded lines

h.        From July 11 through July 14, Christopher Wagner, a Deutsche Bank salesperson in the High Yield Sales group in New York, discussed the possibility of a restructuring of the VNU Bond Offering — including both a possible holding company issuance and a potential change to the guarantee language — in multiple conversations with individuals at Blackrock, one of his clients.[78]

i.        On July 19 and July 20, Wagner likewise discussed possible structural changes with a number of his other customers.[79]

j.        On July 20 and July 21, Mark Colm, another high yield salesperson in New York, discussed the possibility of a holding company issuance with several of his clients, including James Fitzpatrick at Seix Advisors.[80]

---

[77]    Defs' Ex. 502: 7/19/06 Call, 4:24pm BST.
[78]    Defs' Ex. 509: 7/11/06 Call, 11:56am EDT; Defs' Ex. 517: 7/12/06 Call, 10:20am EDT; Defs' Ex. 518: 7/12/06 Call, 10:40am EDT; Defs' Ex. 526: 7/14/06 Call at 12:05pm EDT.
[79]    Defs' Ex. 337: 7/19/06 Call, 11:54am EDT; Defs' Ex. 338: 7/19/06 Call, 1:56pm EDT; Defs' Ex. 339: 7/19/06 Call, 3:07pm EDT; Defs' Ex. 340: 7/20/06 Call, 11:26am EDT.
[80]    Defs' Ex. 467: 7/20/06 Call, 10:22am EDT; Defs' Ex. 468: 7/21/06 Call, 7:19am EDT; Defs' Ex. 469: 7/21/06 Call, 9:25 EDT; Defs' Ex. 470: 7/21/06 Call, 10:03am EDT; Defs' Ex. 471: 7/21/06 Call, 2:04pm EDT) ; Colm 922 1:35:07-1:38:34 (7/21/06 Call, 2:07pm EST.

k.      From July 19 through July 21, John Bertrand, another high yield salesperson in Deutsche Bank's New York office, told a number of his customers about the possibility of structural changes, including a potential holding company issuance.[81]

l.      From July 17 through July 21, Andrew Kellerman, a Deutsche Bank salesperson in the Investment Grade Sales group in New York had a number of conversations with individuals at Merrill Lynch Principal Finance about potential structural changes in the VNU Bond Offering and about Deutsche Bank's discussions with the sponsors about potential changes.[82]

m.      On July 13, Michael Glick, also a Deutsche Bank high yield salesperson in New York, discussed the likelihood of potential structural changes to the VNU Bond Offering with a customer.[83]

n.      On July 21, Kevin "Sean" Finnerty, another Deutsche Bank high yield salesperson in New York, told a client that Deutsche Bank was debating issuing a holding company tranche in order to satisfy CDS demand.[84]

### C.      Information About Customers' Indications of Interest And Orders Was Not Confidential

145.    Indications of interest constitute a non-binding expression of interest in a bond offering.

146.    Indications of interest are different from customer orders or "firm" orders for any particular securities.

147.    Firm orders are generally not accepted until price talk is announced (in this case

---

[81]  Defs' Ex. 184: 7/19/06 Email from Bertrand to Ford, DBSI 012099; Defs' Ex. 183: 7/19/06 Email from Bertrand to Moss, DBSI 012076; Defs' Ex. 198: 7/20/06 Email from Bertrand to Rich at Glenview Capital, DBSI 012423; Defs' Ex. 353: 7/21/06 Call, 10:03am EDT; Defs' Ex. 354: 7/21/06 Call, 10:12am EDT.

[82]  Defs' Ex. 477: 7/17/06 Call, 3:03pm EDT; Defs' Ex. 478: 7/17/06 Call, 4:13pm EDT; Defs' Ex. 390: 7/19/06 Call, 8:55am EDT; Defs' Ex. 484: 7/18/06 Call, 2:16pm EDT; Defs' Ex. 489: 7/21/06 Call, 3:38pm EDT.

[83]  Defs' Ex. 461: 7/13/06 Call, 2:36pm EDT.

[84]  Defs' Ex. 372: 7/21/06 Call, 11:40am EDT.

on July 27, 2006).

148.     The information that Rorech possessed about other customers' indications of interest was not confidential information, as his customers did not expect that the information about their indications of interest would be kept confidential.[85]

149.     To the contrary, it is customary, entirely appropriate, and, indeed, necessary for salespeople to share information regarding customers' indications of interest with other potential investors during the process of marketing a new issue.[86]

150.     It is custom and practice in the marketplace for salespeople to share trading ideas and market color information — including trading flows, indications of interest, customer or bank orders, or trading positions — with their clients.  Clients expect to receive such information, and keeping clients abreast of such information is consistent with furthering the bank's business interests because it generates additional trading revenue.[87]

151.     Plaintiff's expert agrees that salespeople routinely share this type of information with customers in an effort to generate and maintain demand.[88]

152.     Deutsche Bank capital markets and salespeople openly discussed other customers' indications of interest on recorded lines.

        a.        On the afternoon of July 17, Fedorcik told Barnum and Sherry that he had indications of interest amounting to a couple of hundred million dollars from other customers for the possible bond issuance out of the holding company.

---

[85]    Sherry Deposition, 1/21/10, 148:01- 148:19.

[86]    Olvany deposition, 3/16/10, 317:19-318:18; Martindale  deposition, 1/12/10, 166:11-25; 171:04-172:02; Defs' Ex. 199: 7/20/06 Email chain between Ross and Fedorcik, DBSI 022757; Defs' Ex. 459: 7/20/06 Call, 3:04pm BST.

[87]    Olvany Deposition, 3/16/10, 315:16-316:20; Martindale Deposition, 1/12/10, 121:11-121:15.

[88]    Barcus deposition, 3/4/10, 106:21-107:23.

b.      On July 20, Martindale discussed with his customers, Chris Pucillo at Stanfield Capital, the potential new holding company deal and said that a number of "CDS guys" were going to buy those bonds.[89]

c.      On July 14 and July 19, Chris Wagner, a Deutsche Bank salesperson on the high yield desk in New York, told customers that others on the desk had received orders for VNU bonds "contingent on" and "subject to" a change in the guarantee language to make the bonds potentially deliverable.[90]

d.      On July 20, Marc Lavine, another high yield salesperson in New York, told his customer that another customer had put in an order for 20 million of the senior notes at 9.5% and 20 million of the subordinated discount notes at 12%.[91]

e.      Deutsche Bank salespeople, including Wagner and Colm, likewise discussed other customers' CDS orders with their clients.[92]

**D.      Customers Who Received Information About Potential Structural Changes And Indications Of Interest Did Not Have Any Indication That The Information Was Confidential**

153.    Capital markets and salespeople at Deutsche Bank openly shared information regarding potential structural changes for the VNU Bond Offering with investors who they knew traded VNU CDS.

a.      On July 14, Fedorcik discussed potential structural changes with Barnum, one of Rorech's customers, to find out how Deutsche Bank should structure a potential holding

---

[89]    Defs' Ex. 341: 7/20/06 Call, 12:54pm EDT.

[90]    Defs' Ex. 526: 7/14/06 Call at 12:05pm EDT; Defs' Ex. 526: 7/14/06 Call at 12:06pm EDT Defs' Ex. 337: 7/19/06 Call, 11:54am EDT.

[91]    Defs' Ex. 357: 7/20/06 Call, 9:14am EDT.

[92]    Defs' Ex. 518: 7/12/06 Call, 10:40am EDT; Defs' Ex. 465: 7/14/06 Call, 10:43am EDT.

company issuance so that it would appeal to "the CDS guys," such as Barnum, who were "playing the bond deal" and wanted additional potentially deliverable bonds.[93]

　　　　b.　　On July 18, David Ross discussed the VNU Bond Offering with individuals at Deephaven, a hedge fund.  The Deephaven investors told Ross that they had just traded VNU CDS that day.  Ross then told them that he was "continuing to work . . . with the guys in New York and the colleagues in New York on the legal side" on getting bonds issued "upstairs" at the VNU entity.[94]

　　　　c.　　On July 11, Martindale discussed the potential holding company issuance with James Didden at GSO, one of Martindale's customers.  Martindale relayed that Fedorcik had said that he may issue some of the deal at the holding company because of the guarantee language issue, and agreed that Didden should buy CDS because it was a no brainer.[95]

　　　　d.　　On July 11, Wagner discussed the possibility of a holding company issuance of bonds with his clients in the context of explaining that the clients should purchase VNU CDS.[96]

　　154.　　No investor was asked to sign a confidentiality agreement as a condition of receiving information about the possibility of structural changes.  Nor was any investor who received information about potential structural changes asked to keep the information confidential and not trade on the information.

　　155.　　Information about potential structural changes was discussed with customers by senior capital markets professionals and senior salespeople at Deutsche Bank, even though there

---

[93]　Defs' Ex. 497: 7/14/06 Call, 9:44am EDT; Defs' Ex. 498: 7/14/06 Call, 10:03am EDT.

[94]　Defs' Ex. 456: 7/18/06 Call, 3:01pm BST.

[95]　Defs' Ex. 506: 7/11/06 Call, 11:50am EDT.

[96]　Defs' Ex. 508: 7/11/06 Call, 12:33pm EDT; Defs' Ex. 509: 7/11/06 Call, 11:56am EDT; Defs' Ex. 512: 7/11/06 Call, 3:51pm EDT; Defs' Ex. 513: 7/11/06 Call, 3:58pm EDT.

was the possibility that market participants might trade on that information.  The public sharing

of such information was necessary to gauge investor demand for the potential structural change

and to market the VNU Bond Offering.

156.    Indeed, some investors gave indications of interest for a potential holding

company issuance *only after* being provided information about the potential structural change by

capital markets professionals and salespeople.

a.    On July 17, Fedorcik told Sherry that he was trying to gauge investor demand

for a holding company tranche before going to the sponsors with a proposal.  After being told

this, Sherry said that he was interested and gave an indication of interest of 50 million.[97]

b.    On July 18, 2006, Rorech discussed with Sean Fahey, a portfolio manager at

Claren Road Asset Management LLC ("Claren Road"), a New York-based hedge fund and one

of Rorech's customers the possibility that bonds would be issued out of the VNU holding

company entity.  After receiving this information, Fahey and Bill Green, an analyst at Claren

Road, indicated that they may be interested in such a potential issuance as well, but did not give

any quantitative indication of their level of interest.  Later that day, Rorech called John Eckerson,

a portfolio manager at Claren Road about the potential holding company tranche, and Eckerson

gave Rorech an indication of interest for €20-30 million of bonds.[98]

c.    Ross did not receive an indication of interest for €50 million of potential

holding company bonds from his customer, Deephaven, until after he discussed potential

structural changes with them.[99]

---

[97]    Defs' Ex. 381: 7/17/06 Call, 1:39pm EDT.

[98]    Defs' Ex. 384: 7/18/06 Call, 8:27am EDT; Defs' Ex. 385: 7/18/06 Call, 8:37am EDT; Defs' Ex. 387: 7/18/06 Call 9:09am EDT; Defs' Ex. 388: 7/18/06 Call, 9:51am EDT.

[99]    Defs' Ex. 456: 7/18/06 Call, 3:01pm BST; Defs' Ex. 459: 7/20/06 Call, 3:04pm BST.

157.    No investor who received information about the potential structural changes —
including information about other customers' indications of interest and about Deutsche Bank's
discussions with the financial sponsors — was told not to trade VNU CDS or securities.

158.    The potential investors who received such information from Deutsche Bank did
not view the information as confidential or material nonpublic information.  Indeed, they
continued to trade VNU CDS after their conversations with Deutsche Bank capital markets
professionals and salespeople in which they discussed (a) Deutsche Bank's ongoing dialogues
with the financial sponsors regarding the potential holding company issuance, and/or (b) other
customers' indications of interest in such a possible issuance.

a.    During the week of July 10, 2006, Kerin Goodwin, a portfolio manager at
King Street, expressed an interest in deliverable VNU bonds to Fedorcik.  On July 13, 2006,
King Street purchased €30 million of VNU CDS from UBS AG and the Royal Bank of Scotland.
Then, on July 17 and July 18, the week after discussing the possibility of VNU issuing a
deliverable bond, King Street purchased another €30 million of VNU CDS through a series of
transactions with UBS AG, Morgan Stanley, J.P. Morgan and Citigroup.[100]

b.    On July 12, the day after Martindale told James Didden from GSO that
Fedorcik said he was exploring ways to issue additional deliverable debt and that, at the very
least, a dividend deal at the holding company was certainly "doable," GSO purchased $10
million of VNU CDS from Deutsche Bank.[101]

c.    After their conversations with Kellerman and Fedorcik on July 17 and 18
about Deutsche Bank's investment bankers' plan to speak to the sponsors about potential

---

[100]   Defs' Ex. 306: King Street VNU Trade Charts, KS-SEC000001 – KS-SEC000007.

[101]   Defs' Ex. 506: 7/11/06 Call, 11:50am EDT; Defs' Ex. 74: 7/12/06 email from Pecorella to Martindale, DBSI 41472.

structural changes with the VNU Bond Offering, individuals at Merrill Lynch Principal Finance traded VNU CDS with Deutsche Bank on July 18 and July 21, 2006.[102]

     d.     On July 18, 2006, the day after Sherry's conversation with Fedorcik — in which Sherry learned both (i) that Fedorcik was planning to propose the holding company issuance to the financial sponsors, and (ii) that Fedorcik had a couple hundred million of indications of interest from other customers for such an issuance — Sherry bought €10 million of VNU CDS from Deutsche Bank.[103]

     e.     On July 18, the day after Barnum's conversation with Fedorcik about both Fedorcik's plan to propose the potential holding company tranche to the financial sponsors and the indications of interest of other customers, Blue Mountain traded VNU CDS and accumulated at least €10 million worth of VNU CDS protection.[104]  Blue Mountain bought an additional €28 million in VNU CDS on July 21.[105]

---

[102]   Defs' Ex. 164: 7/18/06 Bloomberg from Paviolitis to Kellerman, DBSI 031666; Defs' Ex. 236: 7/21/06 Bloomberg from Paviolitis to Kellerman, DBSI 031765.

[103]   Defs' Ex. 165: 7/18/06 Bloomberg from Rorech to Labisi et al., CAX 05238.

[104]   Defs' Ex. 167: 7/18/06 Bloomberg chat between Hadley and Macmillan, BM0000117-BM0000118; Defs' Ex. 168: 7/18/06 Bloomberg chat between Hadley and Cowan, BM0000114.

[105]   Defs' Ex. 177: 7/18/06 Bloomberg chat between Barnum and Massolo, BM0000069-BM0000070; Defs' Ex. 244: 7/21/06 Bloomberg chat between Barnum and Egan, BM0000071-BM0000073.

## VII.   RORECH'S CONDUCT WAS CONSISTENT WITH THAT OF A SALESPERSON ATTEMPTING TO SOLICIT INVESTOR INTEREST IN A BOND OFFERING

159.    During the marketing period, Rorech and other salespeople tried to generate interest among investors in the VNU Bond Offering by encouraging them to buy both VNU CDS and the bonds that VNU was about to issue.

160.    Consistent with his responsibilities as a high yield salesperson, Rorech attempted to persuade all of his customers to purchase bonds in the VNU Bond Offering.

### A.    It Was Widely Believed In The Market That VNU CDS Was Underpriced

161.    Apart from the uncertainties surrounding deliverability, the market consensus during the time of the marketing of the VNU Bond Offering was that the VNU CDS was underpriced and was expected to widen.

162.    Some analysts and other market participants believed that VNU CDS should widen based on the amount of leverage that VNU was going to assume, the downgrade of the VNU bonds, or other fundamentals of the deal, and recommended buying VNU CDS *regardless of whether any additional deliverable bonds were issued by VNU.*[106]

163.    Some market participants also believed that VNU CDS might be an attractive purchase, because a holding company dividend deal could be issued sometime in the future, even after the VNU Bond Offering was completed.[107]

---

[106]   Defs' Ex. 197: 7/20/06 Merrill Lynch Report by Marco Gironi, CRD 0114-CRD 0127; Defs' Ex. 46: 7/11/06 Bloomberg from Pierce (Citigroup) to Sherry et al., CAX05776; Defs' Ex. 113: 7/13/06 Bloomberg from Sawjani (JP Morgan) to Sherry et al., CAX05530; Defs' Ex. 194: 7/20/06 Email from Fahey to Pierce (Citigroup), CRD005584; Defs' Ex. 41: 7/11/06 Email from Barnum to Feldstein et al., BM0000390-BM0000398; Defs' Ex. 114: 7/13/06 Bloomberg from JP Morgan Euro HY Sales to Sherry et al., CAX05394; Defs' Ex. 90: 7/12/06 Bloomberg from JP Morgan Euro HY Sales to Hornblass et al., MLP002154;  Defs' Ex. 346: 7/11/06 Call between Bertrand and Ragsdale at 2:00pm EDT; Defs' Ex. 348: 7/13/06 Call between Bertrand and Phillips at 12:24pm EDT.

[107]   Defs' Ex. 109: 7/13/06 Bloomberg from Pierce (Citigroup) to Sherry et al., CAX 05459; Defs' Ex. 98: 7/13/06 Email from Czarnota (Citigroup) to Riano, CRD 004824; Defs' Ex. 42: 7/11/06 Email from Sherry to Cavanagh et al., CAX00093; Defs' Ex. 116: 7/13/06 Bloomberg from Brennan to Dafforn et al., MLP 002051.

164.     Others believed that Deutsche Bank would likely restructure the VNU Bond Offering by modifying the guarantee language or separately issuing deliverable bonds at the holding company level.[108]

165.     At the outset of the marketing period, a number of the Deutsche Bank high yield salespeople in New York, including Martindale, Rorech's direct supervisor, urged their clients to buy VNU CDS, because it was trading cheaply.[109]

166.     Deutsche Bank traders, including Tournier, sent trader runs to Rorech and other high yield salespeople soliciting VNU CDS trades during the marketing period of the VNU Bond Offering.[110]

167.     Several banks besides Deutsche Bank also sent Bloombergs and trader runs soliciting customers to purchase VNU CDS during the marketing period of the VNU Bond Offering.[111]

168.     VNU CDS was actively traded throughout the two weeks leading up to July 24, 2006, when the holding company issue was announced.

---

[108]   Defs' Ex. 166: 7/18/06 Bloomberg between Oppedisano and Masel, MLP 35700; Defs' Ex. 245: 7/21/06 Barclays Capital- Europe Credit Derivatives- Daily CDS Update, MLP 005159 – MLP 005163; Defs' Ex. 202: 7/20/06 Bloomberg chat between Hadley and McGinty, BM0000096; Defs' Ex. 427: 7/24/06 Call between Tournier, Pehar, Ross, and Unidentifieds at 1:08pm BST; Defs' Ex. 452: 7/24/06 Call between Ross and Dawson at 3:00pm BST.

[109]   Defs' Ex. 506: 7/11/06 Call between Martindale and Didden at 11:50am EDT; Defs' Ex. 512: 7/11/06 Call, 3:51pm EDT; Defs' Ex. 516: 7/12/06 Call between Wagner and Baumgarten at 7:17am EDT; Defs' Ex. 518: 7/12/06 Call between Wagner and Baumgarten at 10:40am EDT;  Defs' Ex. 84: 7/12/06 Email from Bertrand to Ford, DBSI 011780;  Martindale Deposition, 1/12/10, 205:06-11, 221:24-223:14; Rorech SEC Investigative Testimony, 1/21/09, 135:17-139:04.

[110]   Defs' Ex. 106: 7/13/06 Bloomberg from Aylward to Wiss et al., DBSI073539;  Defs' Ex. 173: 7/18/06 Bloomberg from Tournier to Gould, DBL 5742.

[111]   Defs' Ex. 51: 7/11/06 Bloomberg from JP Morgan Sales to Negrin et al., MLP 000023; Defs' Ex. 119: 7/13/06 Bloomberg from Abernathy to Sotnick, MLP005446; Defs' Ex. 132: 7/14/06 Email from Goldman Trading Desk to Negrin et al., MLP 007115;  Defs' Ex. 140: 7/17/06 Bloomberg from Abernethy to Sotnick, MLP 005443; Defs' Ex. 175: 7/18/06 Bloomberg from Jasdanwala to Sherry et al., CAX05268; Defs' Ex. 162: 7/18/06 Bloomberg from Lewis to Epstein, MLP001793; Defs' Ex. 154: 7/18/06 Email from Czarnota to Fahey et al., CRD005439; Defs' Ex. 193: 7/20/06 Email from Clary to Green and Fahey, CRD005540.

169.     The market price for VNU CDS in the period of July 10, 2006 through August 1, 2006 ranged from approximately 268 basis points to 524 basis points.

**B.**     **Rorech And Other Deutsche Bank Salespeople Pitched The Idea Of Doing Basis Trades With VNU Bonds And VNU CDS**

170.     Because VNU CDS was trading cheaply, Rorech tried to generate additional interest in the VNU Bond Offering by recommending basis trades.[112]

171.     A basis trade is an investment strategy in which an investor buys a credit default swap and bond issued by the reference entity or a related entity.  One instance when a basis trade may yield a profit is when the spread of the CDS is trading at a low level relative to the spread of the related bond.

172.     This trading strategy is sometimes also referred to as a "basis package" or "relative value trade."

173.     Basis trades were popular with hedge funds and other investors in 2006.[113]

174.     A number of Rorech's customers, including Blue Mountain and Renato Negrin at Millennium, executed basis trades.[114]

175.     The fundamental premise of such a trade is that, by owning both the bond and the CDS, the investor will be effectively hedged against the credit risk associated with owning the bonds, — i.e., the investor will be protected against the risk of a default of the bonds, because he is assured of receiving the full notional value in the case of a credit event by holding the CDS, while receiving a coupon payment that exceeds the spread payments he owes for the CDS protection.  For example, if the investor buys a 5-year VNU CDS at a spread of 383 basis points,

---

[112]   Rorech SEC Investigative Testimony, 1/21/09, 121:05-122:01.

[113]   Olvany Report ¶ 40.

[114]   Rorech SEC Investigative Testimony, 1/21/09, 120:20-121:08; Barnum Deposition, 12/9/09, 21:13-22:13; Negrin Deposition, 12/17/09, 65:21-66:02; Fahey Deposition, 12/7/09, 20:10-15.

but the related bonds pay a coupon of 550 basis points (above LIBOR), he will be paying only

383 basis points per year for the credit protection but will be receiving 550 basis points per year

from the bonds.

176.    The maturity of the bond that is paired with a CDS for the purposes of a basis

trade does not have to match the CDS in terms of duration, nor does the bond even have to be

deliverable into the CDS.

177.    The basis trade strategy does not require that the investor purchase the bond and

the CDS at the same time.  Investors can buy CDS at a low price with the expectation of buying

the bond if and when it is issued.

178.    Rorech pitched the basis trade idea — which involves purchasing both VNU

bonds and VNU CDS — to a number of his clients, including Millennium.[115]

179.    Rorech also discussed with a number of his clients the idea that the VNU CDS

was a good buy, because there was always the possibility of a dividend deal being issued out of

VNU by the financial sponsors in the future.[116]

180.    Rorech developed these marketing ideas in order to generate interest in the VNU

Bond Offering and to keep interested customers engaged through the bond deal's marketing

process.  Rorech believed that the basis trade idea was likely to convince his customers to

purchase bonds in the VNU Bond Offering.

181.    A number of the other salespeople for Deutsche Bank in New York, including

Wagner, Mark Colm, and John Bertrand, pitched basis trades to their customers as well.[117]

---

[115]   Defs' Ex. 363: 7/11/06 Call between Rorech and Masel at 10:07am EDT; Defs' Ex. 366: 7/11/06 Call between Rorech and Fahey at 11:08am EDT; Defs' Ex. 68: 7/11/06 Bloomberg from Rorech to Sharman et al., CAX05719; Defs' Ex. 67: 7/11/06 Bloomberg from Rorech to Weston et al., MLP009216.

[116]   Defs' Ex. 360: 7/11/06 Call between Rorech and Hudoff at 9:01am; Defs' Ex. 362: 7/11/06 Call between Rorech and Burch at 10:00am EDT; Defs' Ex. 369: 7/11/06 Call between Rorech and Koundourakis at 10:58am EDT.

182.    Several of Rorech's customers ultimately executed basis trades, and bought both the VNU CDS and portions of the VNU Bond Offering.

### C.    Rorech Discussed The VNU Bond Offering With Negrin Because Millennium Was A Prospective Purchaser Of The Bonds

183.    Millennium was a Qualified Institutional Buyer in 2006 and was a potential investor in the VNU Bond Offering.  **STIPULATED.**

184.    Negrin, on behalf of Millennium, had purchased bonds from Rorech at Deutsche Bank prior to July 2006.  **STIPULATED.**

185.    Negrin was a frequent purchaser of bonds generally, and conducted some 180 bond transactions in June and July 2006 alone, buying and selling over $973 million worth of bonds.  In the year preceding the VNU Bond Offering, Negrin traded over one thousand bond transactions worth more than $6.3 billion.

186.    Rorech spoke to Negrin about the upcoming VNU Bond Offering for the first time on July 13, 2006, at 8:35am EDT.  Negrin said that he was interested in the deal.[118]

187.    From July 13 through July 24, Rorech spoke to Negrin and others at Millennium in an effort to persuade them to participate in the VNU Bond Offering.[119]

a.    On July 14, 2006, at 8:34am EDT, Rorech spoke to Randy Masel, an analyst for Negrin's trading group at Millennium.  Masel was responsible for performing various financial analyses in helping Negrin evaluate trading strategies and investment ideas; Masel

---

[117]    Defs' Ex. 508: 7/11/06 Call between Wagner and Palmer at 12:32pm EDT; Defs' Ex. 513: 7/11/06 Call between Wagner and Portes at 3:58pm EDT; Defs' Ex. 463: 7/11/06 Call between Colm and Fitzpatrick at 12:45pm EDT; Defs' Ex. 464: 7/11/06 Call between Colm and Fitzpatrick at 12:41pm EDT; Defs' Ex. 466: 7/14/06 Call between Colm and Sipprelle at 4:26pm EDT; Defs' Ex. 346: 7/11/06 Call between Bertrand and Ragsdale at 2:00pm EDT;  Defs' Ex. 347: 7/12/06 Call between Bertrand and Ford at 1:55pm EDT; Defs' Ex. 350: 7/17/06 Call between Bertrand and Serhart at 4:20pm EDT; Defs' Ex. 351: 7/20/06 Call between Bertrand and Ford at 3:01pm EDT; Defs' Ex. 84: 7/12/06 Email from Bertrand to Ford, DBSI 011780.

[118]    Defs' Ex. 374: 07/13/2006 Call between Rorech and Negrin, at 8:35am, EDT.

[119]    Defs' Ex. 493: 07/14/2006 Call between Rorech and Masel at 8:34am EDT; Defs' Ex. 494: 07/14/2006 Call between Rorech and Negrin at 8:37am EDT.

would analyze trade ideas and then provide Negrin with his trading recommendations.  Rorech pitched the basis trade idea to Masel, encouraging him to buy the Nielsen bonds and CDS for "like 100 basis points pick up on the pro forma rate of the new bonds."  Masel said he agreed with Rorech and had spoken to Negrin about the idea, but told Rorech to talk to Negrin some more about the trade, because Negrin was not yet convinced.[120]

       b.      On July 14, 2006 at 8:37am EDT, Rorech spoke to Negrin about the VNU Bond Offering.  They discussed the proposed terms and structure of the offering, and the idea of a basis trade with VNU CDS and the new Nielsen bonds.  Rorech also mentioned his opinion with regard to the possibility that (i) VNU could make the new Nielsen bonds irrevocably guaranteed, and (ii) there could be a dividend deal issued out of a VNU entity in the future, both of which could suggest that VNU CDS prices might rise in the future, thereby making the basis trade idea even more attractive.[121]

188.    Rorech also spoke to Negrin about potential structural changes, because he believed Negrin, like Rorech's other customers Blue Mountain, Caxton, and Claren Road, might be interested in participating in a potential holding company issuance.

189.    On the morning of July 24, after the holding company issue was announced, Rorech continued to encourage Negrin to buy the holding company bonds.

       a.      At 8:36am on July 24, Rorech said to Negrin "I wanted to firm you up if you cared, on the [VNU holding company] bonds, because … this note is probably going to be sold off to my guys."  Negrin responded "I understand.  Okay, I'll let you know soon."[122]

---

[120]   Defs' Ex. 493: 07/14/2006 Call between Rorech and Masel at 8:34am EDT.

[121]   Defs' Ex. 494: 07/14/2006 Call between Rorech and Negrin at 8:37am EDT.

[122]   Defs' Ex. 421: 7/24/06 Call between Rorech and Negrin at 8:36am EDT.

b.      Shortly thereafter, at 8:56am, Rorech called again and said to Negrin: "You let me know if you want in this [holding company] deal as well. I hadn't put you in the original orders, but I'm firming up my other guys right now … You think about it and let me call you back."[123]

190.    As of the morning of July 24, Rorech believed that Negrin might place an order for the holding company bonds. Indeed, at 9:02am, when Rorech was giving Fedorcik the rundown of the orders from Claren Road, Blue Mountain, and Caxton for the holding company bonds, Negrin called, at which point Rorech said to Fedorcik "I may have something from Millennium. Hang on a second, okay?"[124]

191.    Negrin did not ultimately purchase the holding company bonds.

192.    Although Negrin did not place an order for any holding company bonds on July 24, Rorech continued to pitch the VNU Bond Offering, including the basis trade idea, to Negrin and others at Millennium up until the afternoon of July 31, when the books closed.[125]

a.      From July 24, 2006 through July 31, 2006, Rorech had a number of conversations with Negrin and Masel about the VNU Bond Offering; they discussed the proposed structure, covenants, pricing, and other terms of the bond issue. Rorech provided Negrin and Masel with information on the progress of the book of interest for the VNU Bond Offering, and updated them about the changes in the covenants for the new bonds.[126]

---

[123]   Defs' Ex. 422: 7/24/06 Call between Rorech and Negrin at 8:56am EDT.

[124]   Defs' Ex. 415: 7/24/06 Call between Rorech and Negrin at 9:02am EDT.

[125]   Defs' Ex. 267: 7/26/06 Email from Rorech to Weston, MLP 011651.

[126]   Defs' Ex. 473: 7/26/06 Call between Rorech and Masel at 9:15am EDT; Defs' Ex. 487: 7/27/06 Call between Rorech and Negrin at 12:42pm EDT; Defs' Ex. 490: 7/31/06 Call between Rorech and Negrin at 8:51am EDT; Defs' Ex. 492: 7/31/06 Call between Rorech and Masel at 1:48pm EDT;  Defs' Ex. 499: 7/31/06 Call between Rorech and Masel and Negrin at 3:55pm EDT.

b.      On July 27, Rorech pitched a basis trade with the senior sub notes to Negrin, and, on July 31, Rorech told Negrin to "forget about deliverability" and recommended a basis trade with the senior subordinated bonds, noting that CDS is still mispriced relative to the bonds.[127]

193.    Negrin reiterated in *several* calls that he was considering buying the bonds.[128]  In fact, on July 27, 2006, Negrin said to Rorech that he would "sit down with [Masel] to look at the whole structure and figure out which [Nielsen notes] to get in on."[129]

194.    It was not until July 31, 2006, approximately one hour before the books closed, that Millennium decided not to place an order for the bonds.  At that time, Negrin explained that they had "done a lot of work" on VNU but thought the company was too leveraged and thus decided to pass on the deal.[130]

## VIII.   RORECH BELIEVED THERE WAS NOTHING WRONG WITH DISCUSSING POTENTIAL STRUCTURAL CHANGES WITH HIS CUSTOMERS

195.    Rorech did not, at any point, believe that he was prohibited from sharing information regarding potential structural changes or customers' indications of interest with his customers.

196.    At the time of the VNU deal, Rorech was relatively new to the High Yield Sales group, having just transferred to the desk from the Hedge Fund Sales group around January 2006.[131]

---

[127]   Defs' Ex. 485: 07/27/06, 9:27am EDT; Defs' Ex. 490: 07/31/06, 8:51am EDT.

[128]   Defs' Ex. 491: 7/31/06 Call between Rorech and Negrin at 9:02am EDT;  Defs' Ex. 419: 7/24/06 Call between Rorech and Negrin at 8:22am EDT; Defs' Ex. 487: 7/27/06 Call between Rorech and Negrin at 12:42pm EDT.

[129]   Defs' Ex. 487: 7/27/06 Call between Rorech and Negrin at 12:42pm EDT.

[130]   Defs' Ex. 499: 7/31/06 Call between Rorech and Masel and Negrin at 3:55pm EDT.

[131]   Defs' Ex. 311: Performance Review of Jon-Paul Rorech, DBSI 97439- 63 at DBSI 97456.

197.     Deutsche Bank transferred Rorech to the High Yield Sales group in part to provide the High Yield group with someone experienced in derivatives so the High Yield group could incorporate derivative trading strategies into their marketing practices.

198.     Rorech was not provided with formal training on how to market high yield bond deals.  Rather, he learned directly from his supervisor, other senior high yield salespeople, and capital markets.

199.     Rorech was encouraged to use derivative trading strategies to try to generate bond sales with his customers.

200.     Rorech was encouraged by Fedorcik, the head of capital markets, and Martindale, his direct supervisor, to discuss potential structural changes with his customers.

201.     Rorech participated in a number of calls during which senior Deutsche Bank employees and supervisors, namely, Fedorcik and Martindale, provided potential investors with information about possible structural changes in the VNU Bond Offering.

202.     Rorech also was aware that other salespeople in the High Yield Sales group were discussing potential structural changes with their customers.

203.     Rorech also heard about similar conversations among others in the marketplace.

204.     No customers or clients ever expressed concern about receiving such information from Rorech, nor did any client suggest that such information could restrict his activities because all of the information was hypothetical and speculative.

205.     Rorech also knew that Martindale and other Deutsche Bank high yield salespeople who discussed potential structural changes with their customers were also pitching VNU CDS and basis trades to their customers.

206.    Rorech kept Fedorcik and Martindale apprised of his conversations with customers regarding potential structural changes to the VNU Bond Offering, including the potential holding company issuance.[132]

207.    Martindale and Fedorcik never told Rorech that he could not share information about potential structural changes or indications of interest with customers.  Indeed, no one at Deutsche Bank ever told Rorech not to share this information with customers.

208.    Rorech believed that he was permitted and *encouraged* to discuss potential structural changes with potential investors, including any information that Fedorcik may have provided to him about capital markets' discussions with the sponsors and about other customers' indications of interest.

209.    Rorech did not have any reason to believe that any of the information that Fedorcik provided to him was confidential or otherwise provided in breach of Fedorcik's duty to Deutsche Bank.

210.    Rorech was never wall crossed with respect to the VNU Bond Offering.

211.    Rorech believed that his discussions with Negrin about potential structural changes were consistent with his responsibilities as a high yield salesperson in marketing the VNU Bond Offering.

212.    Notably, the precise information that Rorech was alleged to have divulged to Negrin on the cell phone calls in violation of law, Rorech freely and knowingly told to his other customers on recorded lines, as did Martindale and Fedorcik, and almost every other member of Deutsche Bank's credit sales force.

---

[132]    Defs' Ex. 462: 07/14/2006 call between Fedorcik and Rorech at 9:39am EDT; Defs' Ex. 380: 07/17/2006 Call between Rorech and Fedorcik at 1:28pm EDT; Rorech SEC Investigative Testimony, 1/22/09, 313:02-313:15, Fedorcik Deposition, 1/20/10, 19:13-20:22; 39:02-40:05; Martindale Deposition, 1/12/10, 228:15-229:23; 270:18-271:06

a.      On July 11, 2006, Rorech told Sherry that, based on his discussions with Fedorcik, Rorech believed that Fedorcik would try to make the Nielsen bonds deliverable.[133]

b.      That same day, during a call with Sean Fahey at Claren Road, Rorech told Fahey that Fedorcik was looking into the deliverability issue, including the guarantee language for the Nielsen bonds.  Rorech told Fahey that he believed that a dividend deal was likely.[134]

c.      On July 13, 2006, Rorech told Sherry that he believed that the sponsors could always issue out of the holdco, including for a dividend deal, and stated that Fedorcik had confirmed as much during a recent conversation.[135]

d.      On July 17, 2006, at 9:45am EDT, Rorech responded to Sherry's question as to whether the holding company issuance was likely to happen by saying, "we don't have anything yet, but that's the tone."  Rorech also told Sherry that one of his accounts put in an indication of interest for 100 million of a potential holding company issuance.[136]

e.      On July 19, 2006, at 8:55am EDT, Rorech assured Fahey that VNU was likely to issue bonds at the holding company level because of the strong interest from other investors for holding company bonds.  In particular, Rorech told Fahey that he had indications of interest from other investors for a couple hundred millions worth of holding company bonds.[137]

f.      On July 19, 2006, at 10:24am EDT, Rorech told Barnum that he thought capital markets had spoken with the sponsors but he did not have any more color.  However, Rorech said that he thought "it was moving in the right direction."[138]

---

[133]   Defs' Ex. 365: 07/11/2006 Call between Rorech and Sherry at 10:42am EDT.

[134]   Defs' Ex. 366: 07/11/2006 Call between Fahey and Rorech at 11:08am EDT.

[135]   Defs' Ex. 375: 07/13/2006 Call between Rorech and Sherry at 9:12am EDT.

[136]   Defs' Ex. 377; 07/13/2006 Call between Rorech and Sherry at 9:45am EDT.

[137]   Defs' Ex. 390, 7/19/06 Call between Rorech and Fahey at 8:55am EDT

[138]   Defs' Ex. 394; 7/19/06 Call between Rorech and Barnum at 10:24am EDT.

213.    Rorech believed that his discussions with customers in trying to generate additional interest in the VNU Bond Offering and in the potential holding company tranche of bonds were in the best interests of Deutsche Bank and were consistent with his responsibilities as a high yield salesperson.[139]

214.    Other Deutsche Bank salespeople believed they were authorized to discuss potential structural changes in the VNU Bond Offering with investors, regardless whether they traded VNU CDS.[140]

215.    The *only* conduct that separates Rorech from the many Deutsche Bank capital markets professionals and salespeople who shared the precise information with the public was the cell phone calls.

216.    But Deutsche Bank did not prohibit salespeople from speaking to customers on their cell phones.[141]

217.    The phone lines for salespeople were recorded mostly for the purpose of resolving potential trade disputes.  Notably, Deutsche Bank agreed to stop recording Martindale's phone line to accommodate a request from one of Martindale's customers.[142]

---

[139]   Rorech SEC Investigative Testimony, 1/22/09, 192:05-22, 316:12-22.

[140]   Wagner Deposition, 1/15/10, 131:10-132:13; Kellerman Deposition, 12/23/09, 112:12-21; Hunt Deposition, 1/7/10, 96:09-22, 99:05-100:02, 101:05-16; Martindale Deposition, 1/12/10, 262:05-20, 267:02-268:06.

[141]   Defs' Exhbit 16: 05/08/2006 Deutsche Bank Voice Recording Policy, DBSI 76636-76640, at 76636; Martindale Deposition, 1/12/10, 127:24-25; 129:09-23.

[142]   Defs' Exhbit 16: 05/08/2006 Deutsche Bank Voice Recording Policy, DBSI 76636-76640, at 76636; Martindale Deposition, 1/12/10, 127:24-25; 129:09-23.

IX.    **THE ALLEGED "INSIDE" INFORMATION DID NOT EXIST AT THE TIME OF NEGRIN'S VNU CDS TRADES, AND, IF IT DID, RORECH WAS UNAWARE OF IT.**

A.    **Information About Deutsche Bank's Recommendation Did Not Exist As Of The Cell Phone Calls**

218.    Rorech did not have any information as of July 14 at 8:58am EDT or July 17 at 9:49am EDT that Deutsche Bank's investment bankers had decided to recommend to the financial sponsors that they alter the VNU Bond Offering to include an issuance of bonds out of the holding company, *because that decision had not yet been made*.[143]

219.    In fact, as of the morning of July 14, Fedorcik had decided not to have any substantive discussions about potential structural changes with the financial sponsors until he had a better understanding of the CDS deliverability issue.  On the morning of July 14, Fedorcik's thinking around a potential holding company issuance was still in the formative stages, and he was in no position to make any recommendation to the financial sponsors about a structural change.[144]

a.    At 9:39am EDT on July 14, *approximately 30 minutes after Rorech's and Negrin's first cell phone call*, Fedorcik told Rorech that he discovered that changing the guarantee language would not solve the deliverability problem.  Fedorcik then told Rorech that his "game plan" was to discuss the potential holding company issuance with the sponsors, and asked Rorech to get "color," *i.e.*, assess investor demand, for such a potential issuance.[145]

b.    At 9:42am EDT on July 14, Fedorcik spoke to Jeremy Barnum at Blue Mountain with Rorech on the line.  Barnum and Fedorcik discussed the potential structure of a

---

[143]    Fedorcik SEC Investigative Testimony, 2/4/09, 284:04-285:14

[144]    Defs' Ex. 126: 07/14/2006 Email from Fedorcik to Sawhney, DBSI 22109; Fedorcik Deposition, 1/20/10, 38:04-38:25

[145]    Defs' Ex. 496: 7/14/06 Call between Fedorcik and Rorech at 9:39am EDT.

holding company issuance, and Fedorcik asked Barnum's opinions on the potential terms of such an issuance, and the likely demand in the market for that possible deal.  At the end of this call, Fedorcik told Barnum that their discussions had given him a better understanding of the possibilities to enable him to speak to the sponsors about their various options.[146]

220.     Thus, as of the morning of Friday, July 14, *after* Rorech's first cell phone call with Negrin, Fedorcik himself had not yet decided on his position vis-à-vis the restructuring, much less conveyed his plans on the subject to Rorech.

221.     On the morning of Monday, July 17, when Rorech had his cell phone call with Negrin, Fedorcik still had not decided to make any particular recommendation to the financial sponsors.  Indeed, on the afternoon of July 17, he was still in the process of speaking to investors to obtain feedback and to gauge demand.

222.     Suffice it to say, Rorech could not convey any alleged "inside" information concerning Deutsche Bank's "recommendation" to the sponsors if that recommendation did not yet exist.

**B.    Even If Deutsche Bank Had Decided To Recommend A Holding Company Modification to the VNU Bond Offering, Rorech Did Not Know of This Information Until After The Cell Phone Calls**

223.     Regardless of what Fedorcik and the other investment bankers' recommendation plans may have been, Fedorcik did not communicate this information to Rorech until *after* Rorech's and Negrin's second cell phone call.

224.     It was not until approximately four hours *after* Negrin's and Rorech's second cell phone call on July 17, 2006, and about an hour after Negrin placed his first VNU CDS trade, that Fedorcik first told Rorech that his plan was to propose to the sponsors that they create a new

---

[146]   Defs' Exhibit 497: 07/14/2006 Call between Rorech, Barnum and Fedorcik at 9:42am EDT; Defs' Ex. 498: 07/14/2006 Call between Rorech, Barnum and Fedorcik at 10:03am EDT.

€200-250 million tranche of bonds at the holding company.  And when Fedorcik did tell Rorech about his planned proposal to the sponsors, he specifically explained that the holding company option was contingent on his being able to confirm Barnum's interest in a holding company issuance.[147]

225.    Indeed, four hours after the July 17 cell phone call, Fedorcik told Sherry, with Rorech on the line, that he was trying to gauge investor demand for a holding company tranche *before* going to the sponsors with a proposal.[148]

226.    There is no evidence that aside from Fedorcik's own stated plans, the other investment bankers at Deutsche Bank had agreed to Fedorcik's views on the holding company proposal.

### C.    Information About Customer Orders Did Not Exist At the Time Of The Cell Phone Calls

227.    Rorech could not have provided Negrin with any information about customer orders on either of their cell phone calls.

228.    No customer had placed any orders for holding company bonds as of July 14, 2006 at 8:57am EDT or as of July 17, 2006 at 9:49am EDT.

229.    As of the time of Rorech's and Negrin's second cell phone call on July 17, 2006 at 9:49am EDT, the only information Rorech possessed was that Blue Mountain and some other unnamed customers had given *indications of interest* for approximately a couple hundred million worth of bonds if the holding company issued bonds.

230.    But this information was not confidential.

---

[147]    Defs' Ex. 380: 07/17/2006 Call between Rorech and Fedorcik at 1:28pm EDT.

[148]    Defs' Ex. 381: 07/17/2006 Call between Rorech, Sherry and Fedorcik at 1:39pm EDT.

D.     **No Inside Information About the Sponsors' Likelihood Of Accepting Deutsche Bank's Recommendation Existed At The Time of the Cell Phone Calls**

231.     Neither Mark Fedorcik nor any other investment banker at Deutsche Bank knew whether the financial sponsors were likely to accept any recommendation about changing the structure of the VNU Bond Offering.

232.     Even if a recommendation had been made by July 17, market participants were well aware that there were no guarantees that the sponsors would accept such a recommendation.

233.     Indeed, the financial sponsors did *not* always accept the Deutsche Bank investment bankers' recommendations.[149]

a.     Because of the deteriorating conditions in the high yield bond market in the first week of the marketing period of the VNU Bond Offering, Sawhney and Fedorcik recommended to the financial sponsors during the week of July 10, 2006, that they not launch the subordinated discount note tranche of the VNU Bond Offering in the U.S.[150]

b.     The sponsors rejected Deutsche Bank's recommended structural change and opted to launch the VNU Bond Offering in the U.S. with the senior subordinated discount note tranche as originally announced.[151]

234.     Rorech did not know whether the financial sponsors were likely to accept any recommendations from Deutsche Bank investment bankers about changing the structure of the VNU Bond Offering.   Neither did the investors who had previously expressed interest in the potential holding company issue.

---

[149]   Olvany ¶ 25; Sawhney Deposition, 1/14/10, 61:11-61:21.

[150]   Sawhney deposition, 1/14/10, 62:19-64:17; Defs' Ex. 124: 07/14/2006 Email between Sawhney and Fedorcik, DBSI 22058.

[151]   Sawhney deposition, 1/14/10, 70:12-72:18; Defs' Ex. 134: 07/15/2006 Email between Fedorcik and Sawhney, DBSI 22164-65.

a.      On July 17, 2006 at 9:45am EDT, just minutes before Negrin's and Rorech's second cell phone call, Sherry asked Rorech whether there was any definitive information about the deal structure for the VNU Bond Offering.  Rorech responded that he did not have any definite information yet.[152]

b.      On the morning of July 21, Barnum inquired of Rorech via email whether there was any progress on the holding company issuance.[153]

c.      Even as of the afternoon of July 21, Barnum told others at Blue Mountain that he "remains skeptical" that the sponsors would ultimately agree to do a deal out of VNU N.V. Barnum email at 1:38 PM EDT/6:38 PM GMT on 7/21 (Barnum notes that he took profits in the morning on all the VNU CDS positions because he "remains skeptical" that the sponsors will do a deal out of VNU NV.)

235.    To the extent that Rorech told Negrin anything about the likelihood that the sponsors would accept any recommendation from Deutsche Bank about changing the structure of the VNU Bond Offering during their cell phone calls on July 14 at 8:58am EDT and on July 17 at 9:49am, such "information" could only be based on Rorech's personal opinion and analysis of the benefits of a restructuring and the likelihood that the sponsors would ultimately decide to take advantage of such benefits.

236.    A salesperson's opinion or assessment of the likelihood of a deal happening is just that — an opinion, even if confident or seemingly obvious, but it is *not* inside information.[154]

237.    The recorded evidence confirms that Rorech had no material nonpublic information at the time of his cell phone calls with Negrin.

---

[152]   Defs' Ex. 377: 07/17/2006 Call between Sherry and Rorech at 9:45am EDT.

[153]   Defs' Ex. 243: 7/21/06 Bloomberg between Rorech and Barnum, DBSI 73979

[154]   See Olvany ¶ 52; Barcus Deposition, 3/4/10, 126:04-126:12; 127:15-129:04.

E. **Even If Rorech Had Confidential Or Material Nonpublic Information, Which He Did Not, Rorech Had Nothing To Gain From Sharing Such Information With Negrin**

238.    Rorech and Negrin have had a purely professional working relationship.

239.    Negrin was a customer of Rorech, but Millennium was not one of Rorech's top accounts.

240.    Rorech had no reason to favor Negrin by giving him any confidential information.

241.    Rorech did not obtain any quantifiable or direct financial benefit as a result of Negrin's VNU CDS trades in July and August 2006.

242.    Rorech's compensation, like that of any other salesperson at Deutsche Bank, depended most heavily on the bank's performance and his group's performance, as well as on other factors, including corporate citizenship and the quality of the trades he generated. Salespeople received greater credit for bond trades than CDS trades.[155]

X. **DEUTSCHE BANK DID NOT FIND THAT RORECH OR FEDORCIK BREACHED ANY DUTY TO DEUTSCHE BANK OR MISAPPROPRIATED ANY CONFIDENTIAL INFORMATION**

243.    Deutsche Bank is a registered broker-dealer with the SEC.  **STIPULATED.**

244.    Deutsche Bank has a duty under the securities laws to maintain and to enforce policies designed to prevent the misuse of material nonpublic information by its employees.

245.    Prior to the institution of this lawsuit, Deutsche Bank was aware that both the Financial Services Agency ("FSA") in London and the SEC in the U.S. were investigating possible insider trading in VNU CDS as well as the conduct of Deutsche Bank employees in connection with the VNU Bond Offering.

---

[155]   Martindale Deposition, 1/12/10, 64:14-65:12; 66:04-66:14

246.    Attorneys acting on behalf of Deutsche Bank conducted an internal investigation of its employees' conduct in connection with the VNU Bond Offering, and those attorneys reported to the SEC that they had reviewed all of the hundreds of hours of audio recordings of Deutsche Bank's employees' conversations relating to VNU that were produced to the FSA and to the SEC, including all of the recorded conversations between Rorech and Negrin.

247.    Attorneys for Deutsche Bank specifically reviewed the recorded conversations involving Rorech and others at Deutsche Bank on which the Commission is relying in its claim that Rorech gave Negrin confidential information in breach of his duty to Deutsche Bank.

248.    In early August 2006, Deutsche Bank AG in London received the FSA's initial request regarding an informal inquiry into trading of VNU bonds and derivatives.[156]

249.    In early May 2007, the SEC notified Robert Khuzami — then General Counsel for Deutsche Bank in the U.S. and now the Chief of the SEC's Enforcement Division — that it was beginning an informal inquiry into trading in VNU.[157]

250.    Under Mr. Khuzami's supervision, Deutsche Bank conducted an internal review of the VNU Bond Offering, including a review of the conduct of Fedorcik and Rorech.

251.    Deutsche Bank's attorneys who conducted the internal review and responded to the Commission's document requests were aware of the substance of all of the evidence that the SEC requested and obtained in connection with its investigation of this case, including both the contents of the audio recordings and the fact that Rorech and Negrin had two cell phone calls.

252.    In the face of this knowledge, and after its own internal review, Deutsche Bank did not fire or otherwise discipline either Rorech or Fedorcik.

---

[156]    Defs' Ex. 2: 01/09/2007 Letter from Procter to Fox, DBL 1805-06; Defs' Ex. 273: 08/04/2006 Letter from FSA to Procter, DBL 1765-66.

[157]    Defs' Ex. 17: 05/08/2007 Letter from Khuzami to GC at Deutsche Bank, DBL 1965-1971, at 965-966, 971.

253.     On April 27, 2008, Rorech was placed on heightened supervision.  On May 1, 2008, Fedorcik was placed on heightened supervision.[158]

254.     No other Deutsche Bank employees were placed on heightened supervision in connection with the VNU Bond Offering.[159]

255.     The determination whether to place an employee on heightened supervision is made on a case-by-case basis.  Heightened supervision involves the additional monitoring of an employee's activities.[160]

256.     Rorech was never told to alter his conduct.

257.     Rorech was never told that anything he discussed with customers was confidential, inside, or nonpublic information.

258.     After a period of enhanced review of Rorech's and Fedorcik's conduct, both Rorech and Fedorcik were taken off of heightened supervision by Deutsche Bank.

259.     On September 16, 2008, Mark Fedorcik was promoted to be Global Head of Leveraged Debt Capital Markets, one of the most senior supervisory capital markets positions for all of Deutsche Bank's worldwide operations.

260.     Rorech was removed from heightened supervision status on September 30, 2008.[161]

261.     He remains a valued employee in Deutsche Bank's High Yield Sales group.

262.     The Commission gave Rorech a Wells notice on March 30, 2009.

---

[158]  Defs' Ex. 14: 04/27/2007 Heightened Supervision Memorandum for Jon-Paul Rorech, DBSI 76813; Defs' Ex. 15: 05/01/2007 Heightened Supervision Memorandum for Mark Fedorcik, DBSI 76814.

[159]  DB response to Negrin subpoena dated December 9, 2009, Response to Production Request C.

[160]  Cartaina Deposition, 1/14/10, 46:11-46:17.

[161]  Defs' Ex. 282: 09/20/2008 Memorandum- Cessation of Heightened Supervision Measures for Jon-Paul Rorech, DBSI 76818.

263.     After notice of the Wells, on April 21, 2009, Deutsche Bank placed Rorech on paid administrative leave.[162]

264.     To this day, both Rorech and Fedorcik remain Deutsche Bank employees.

265.     Rorech has always been held in high regard at Deutsche Bank and elsewhere, and during Rorech's nearly two and a half decades in the securities industry, he has never before been the subject of a regulatory or other inquiry, investigation, or lawsuit.

## XI.   NEGRIN'S TRADING IN VNU CDS DOES NOT SUPPORT AN INFERENCE THAT HE WAS TIPPED WITH MATERIAL NONPUBLIC INFORMATION

266.     Renato Negrin has been a market professional for close to two and a half decades, trading securities and more recently, derivatives, for a number of employers, including Salomon Brothers, Smith Barney, and Paine Webber.  His long career was unmarred by any regulatory scrutiny until this case.

### A.     Negrin's VNU CDS Trades Were Consistent with His Trading History

267.     Negrin joined Millennium in March 2003 as a portfolio manager.

268.     Both of the VNU CDS trades at issue in this case were made by Negrin for a Millennium portfolio he managed.  Negrin did not trade any VNU CDS for his personal account.

269.     Pursuant to his employment agreement with Millennium, only a portion of the trading profits Negrin and his group generated for Millennium accrued to Negrin personally.

270.     In particular, Negrin received only 20% of the trading profits from his Millennium portfolio, calculated after deducting administrative expenses for his trading group and salaries for his staff.  Negrin then used a portion of that 20% to pay bonuses to the employees in his group.

---

[162]   Defs' Ex. 282: 09/20/2008 Memorandum- Cessation of Heightened Supervision Measures for Jon-Paul Rorech, DBSI 76818.

271.     As of late 2005, Negrin and those in his group, including Randy Masel and other analysts and traders, had been researching and analyzing VNU, and were familiar with the company and with VNU CDS.[163]

272.     Negrin traded VNU CDS on three other occasions prior to the trades at issue in July 2006, also on behalf of Millennium.  **STIPULATED.**

273.     On November 18, 2005, Negrin purchased €10 million of VNU CDS from UBS AG, at 90 bps.  He subsequently sold a portion of the VNU CDS on December 9, 2005 at 141 bps and a portion on January 5, 2006 at 178 bps.  Millennium realized a profit of €113,397 on the trades.  **STIPULATED.**

1.     On January 12, 2006, Negrin purchased €5 million of VNU CDS from the Royal Bank of Scotland at 222 bps.  Negrin purchased another €5 million of VNU CDS from BNP Paribas on January 31, 2006 at 215 bps.  He sold both VNU CDS to Lehman Brothers on February 21, 2006, at 213 bps, incurring a loss of €27,662 for Millennium.  **STIPULATED.**

274.     On each of these prior occasions, Negrin purchased VNU CDS because of his consistently held belief that VNU's credit risk was too high relative to the spreads on VNU CDS.

275.     When he bought or sold other CDS, Negrin commonly traded in $10 million increments, and he consistently chose to spread out his positions across a number of different counterparties.

276.     The two VNU CDS trades at issue in this case were small relative to the sizes of Negrin's other CDS trades and particularly as compared to the size of his total CDS portfolio.

a.     For instance, on June 13, 2006, Negrin purchased a total of $40 million notional of credit default swaps on Limited Brands, Inc. through four separate $10 million CDS

---

[163]   Masel Deposition, 12/21/09, 176:5-176:23

trades. Additionally, from June 13 to June 15, Negrin purchased $45 million of CDS protection on Pactiv Corporation by way of five CDS transactions with four different counterparties. Similarly, just days after the VNU CDS trades in this case, he purchased $60 million of CDS protection on CBS Corporation through three separate $20 million trades.[164]

> b. In just the months of June and July 2006 alone, Negrin transacted in hundreds of CDS contracts for a total notional value of nearly $8 billion. In that same period, the average notional size of his CDS transactions was in excess of $55 million, some two times the size of the VNU CDS trades in question.[165]

277. The VNU CDS trades at issue did not diverge from Negrin's historical trading patterns. The size of the VNU CDS trades was not out of line with the size of Negrin's other CDS investments at the time.

### B. Negrin Had Many Reasons To Buy VNU CDS on July 17 and July 18

278. Many in the market, including Negrin, held the belief that the price for VNU CDS was likely to increase regardless of whether additional deliverable bonds were issued.

279. Standard & Poor's downgraded the company's debt to "junk status" in May 2006, and, on July 17, further lowered VNU's credit rating.[166] Moody's followed suit on July 18.[167] These credit downgrades reflected the ratings agencies' views that VNU's credit condition was worsening.

280. VNU CDS also seemed like a good buy in July 2006 because the VNU Bond Offering was struggling.

---

[164] Defs' Ex. 328: CDS Trade Chart for Renato Negrin's Group, MLP-SEC 12.14.09 Subp 001404-1912.

[165] Defs' Ex. 328: CDS Trade Chart for Renato Negrin's Group, MLP-SEC 12.14.09 Subp 001404-1912.

[166] Defs' Ex. 26: 07/10/2006 Email from LCDnews to LCDnews, MLP029117-118; Defs' Ex. 150: 07/17/2006 Bloomberg from Pierce to Sherry, et al, CAX05309.

[167] Defs' Ex. 155: 07/18/2006 Email from Rorech to Fahey, et al., CRD005457.

a.      High yield debt market conditions deteriorated during the first week of the VNU roadshow, and it was widely known that it would be difficult to sell the VNU Bond Offering.[168]

b.      The initial pro forma pricing for the VNU Bond Offering set by Deutsche Bank and the Sponsors, as set forth in the preliminary offering memorandum, was 9% for the senior notes issued by Nielsen Finance LLC and 11.5% for the senior subordinated discount notes issued by Nielsen Finance Co.  **STIPULATED.**

c.      On July 27, 2006, Deutsche Bank issued official "price talk" for the new Nielsen bonds, at 9.75% for the senior notes, and at about 12% to 12.25% for the senior subordinated discount notes.  **STIPULATED.**

d.      The new Nielsen bonds ultimately priced at 10% for the senior notes issued in dollars and 9% for the senior notes issued in Euros and 12.5% for the senior subordinated discount notes on August 1, 2006.  **STIPULATED.**

281.    VNU CDS also was perceived to be underpriced relative to prospective pricing of the new Nielsen bonds and bank loans, and the contemporaneous pricing of CDS for comparable companies.

282.    Some market participants, including Negrin, believed that the market price of the VNU CDS during the marketing period for the VNU Bond Offering indicated that the market's view was that the financial sponsors would do something to address the deliverability demands made by investors.[169]

---

[168]  Fedorcik SEC Investigative Testimony, 2/4/09, 332; Defs' Ex. 209: 07/21/2006 Email from High Yield Trading Desk at Goldman Sachs to Eckerson, CRD 007332.

[169]  Defs' Ex. 97: 07/13/2006 Reuters Article; Defs' Ex. 55: 07/11/06 Bloomberg from Knapp, MLP002439-002442; Defs' Ex. 96: 07/12/06 Bloomberg from Hu to Epstein and Hornblass, MLP 002281-002282; Defs' Ex. 245: 07/21/2006 Email from Barclays Capital, MLP 005159-63; Defs' Ex. 92: 07/12/2006 Bloomberg between Burch and Logue, BM 0000042; Expert Report of John J. Olvany ¶ 45 ("Based on my experience in the credit

C.      **All of the VNU CDS Trades Involved Deutsche Bank**

283.    Negrin engaged in no deception in his buying or selling VNU CDS.

284.    Indeed, the first of Negrin's VNU CDS trades, he purchased from Deutsche Bank.

285.    And he sold both of his VNU CDS through Deutsche Bank.

## XII.   THE COURT LACKS JURISDICTION OVER THE CREDIT DEFAULT SWAPS AT ISSUE

A.      **Overview Of Credit Default Swap Agreements**

286.    A credit default swap is a fixed-duration, bilateral financial contract in which a protection buyer (the buyer of the CDS) agrees to make periodic, fixed payments (the "spread") to a protection seller (the seller of the CDS) in exchange for a promise by the protection seller to make a fixed payment ("notional" amount) if a specified credit event occurs with regard to the reference entity prior to the expiration of the contract.

287.    Examples of a credit event that trigger payment obligations for the CDS seller include bankruptcy and failure to pay outstanding debt obligations.

288.    The reference entity is the company upon which the contract is written.

289.    A CDS contract can be viewed as "insurance" against the credit risk of the reference entity.  The fixed payments made by the CDS buyer to the CDS seller are based on market participants' views of the credit risk of the reference entity and, in particular, the perceived likelihood, at the time the CDS is purchased, that a credit event will occur.

290.    The parties to a credit default swap agree to a Master Confirmation Agreement setting forth the default terms that govern the specific credit default swap contracts that the parties may enter.

---

markets, and in particular with CDS, I believe that that the movement in the CDS price during the road show was consistent with the market's anticipation that additional bonds could be deliverable into VNU CDS.").

291.    The Master Confirmation Agreement incorporates by reference the standardized definitions and terms found in the 2003 International Swaps and Derivatives Association ("ISDA") Credit Derivatives Definitions and in the May 2003 Supplement to the 2003 ISDA Credit Derivatives Definitions (collectively, the "2003 ISDA Definitions").

292.    The parties to a credit default swap agreement also agree to a number of transaction-specific terms, generally memorialized in the Trade Confirmation.  The Trade Confirmation identifies the reference entity or obligation, the notional amount, the expiration date of the contract, the spread, the frequency of spread payments, and the triggering credit events — in essence, the subject matter of each credit default swap contract.  The terms of the Trade Confirmation constitute the "material terms" of the CDS contracts.

293.    All of these transaction-specific terms are defined in the 2003 ISDA Definitions.

294.    The notional amount is the fixed amount paid by the protection seller in case of a credit event.

295.    The periodic payment is the fixed amount paid by the protection buyer for the protection. This payment is quoted in basis points and calculated by multiplying the spread by the notional amount.  The periodic payment is also referred to as the "premium," "spread," or "price" of the CDS contract.[170]

296.    The spread or price of a CDS contract is determined by an arms-length negotiation between two willing parties — *i.e.*, the price of a CDS agreement is based on the CDS market.

297.    The parties to a credit default swap also agree upon the method of settlement — whether the contract will be settled physically or by cash.  The settlement terms are specified in

---

[170] Defs' Ex. 299: 2003 ISDA Credit Derivatives Definitions.

the Master Agreement.  These terms determine what the protection buyer must do, upon a credit event, to receive the notional payment for the CDS.

298.    Where, as here, the CDS contract requires physical settlement, the protection buyer must settle the contract upon a credit event by delivering to the protection seller a qualifying credit obligation that is guaranteed, assumed, or issued by the reference entity.  Upon receiving the deliverable obligations, the CDS seller pays the buyer the notional amount of the contract.

299.    The parties also determine the characteristics of the deliverable obligations for the swaps, as set forth in the Master Confirmation Agreement.  Deliverable obligations may include loans, credit facilities or bonds.

300.    Although the parties agree upon the *types* of qualifying deliverable obligations at the commencement of the CDS contract, the exact deliverable obligations are not determined until — and unless — a credit event occurs.  At such time, the determination of which obligation will qualify as "deliverable" is determined in accordance with ISDA procedures.  Typically, loans, credit facilities, and bonds may qualify as deliverable obligations.

301.    Because the specific deliverable obligations are determined only after the occurrence of a credit event based on the obligations existing at the time of the credit event, the parties cannot identify, at the inception of a CDS contract, the full universe of obligations that may be deliverable into the CDS contract.

302.    The purpose of the reference obligation listed in a CDS contract is to set the seniority level of the obligation that may ultimately be delivered by the CDS buyer to the CDS seller to receive the notional payment, upon the occurrence of a credit event.

**B.**     **None Of The Material Terms Of The VNU Credit Default Swap Agreements Contained An Express Reference To The Price, Yield, Value, Or Volatility Of Any Security Or Group Or Index Of Securities.**

303.     The parties to the VNU CDS contracts at issue agreed that the contracts would expire on September 10, 2011, had notional amounts of €10 million each, and had a spread of 383 basis points per annum, to be paid every 3 months by Millennium, the CDS buyer, to Deutsche Bank and Royal Bank of Scotland, the CDS sellers.  The reference entity for the contracts was VNU.

304.     The notional amounts of each of the VNU CDS — €10 million — were negotiated between the parties.  This €10 million notional amount merely represents the amount that Deutsche Bank and Royal Bank of Scotland agreed to pay to Millennium upon the occurrence of a credit event.  This term was not based on the price, yield, value, or volatility of any security or group or index of securities.

305.     The triggering credit events for these CDS agreements were "bankruptcy," "failure to pay," and "restructuring."

306.     Under the two VNU CDS contracts purchased by Millennium, a bankruptcy or a restructuring or default on any of VNU's outstanding debt — including outstanding loans — would constitute a credit event and would trigger the credit protection sellers' obligations to pay, even if there was no default on the bond referenced in the CDS contract

307.     The VNU CDS contracts referenced a 5 5/8% VNU bond maturing in May 2010 ("VNU Reference Obligation").  Thus, upon a credit event, Millennium would need to deliver to Deutsche Bank and Royal Bank of Scotland either a VNU loan or a bond of equal or greater seniority to the VNU Reference Obligation to settle the contracts and to obtain the full notional payments.

308.     Ultimately, a committee formed pursuant to ISDA guidelines would determine which obligations would qualify as deliverable.  The settlement terms did not make reference to the price, yield, value, or volatility of any qualifying loan or bond that could be delivered to the CDS seller to settle the contract.

309.     There are some credit default swaps which premise the protection seller's payment obligations upon the occurrence of a qualifying credit event *along with* a significant price deterioration of the referenced security.[171]  But the VNU CDS contracts at issue in this case do not contain such a price deterioration term; they require only the occurrence of the specified credit event.

310.     The price term specified in the VNU CDS contracts at issue was based on an arms-length agreement and was not derived from or based on the price, yield, value, or volatility of the VNU 5.625% bond that served as the Reference Obligation or *any other* security or group or index of securities.[172]

311.     As with the other material terms of the VNU CDS agreements, the spread or "price" of the CDS agreement was also negotiated by the parties, based on what the protection buyer was willing to pay and the protection sellers were willing to accept, in light of the parties' respective perceptions of VNU's credit risk and its likelihood of bankruptcy or default.  The price of VNU CDS is not based on the price, yield, value, or volatility of any bond or any other security.

---

[171]   J.P. Morgan & RiskMetrics Group, <u>The J.P. Morgan Guide to Credit Derivatives</u>, at 14 (December 2003), <u>available at</u> http://www.investinginbonds.com/assets/files/Intro_to_Credit_Derivatives.pdf (last visited February 24, 2009).

[172]   Okongwu Deposition, 3/5/10, 32:16-34:07.

312.     Even the SEC's expert, Dr. Chudozie Okongwu, agreed that *no* causal relationship exists between VNU CDS and VNU bonds.[173]

313.     Indeed, the price of the VNU CDS simply cannot be dependent on, or derived from, the Reference Obligation since VNU CDS can trade even if the Reference Obligation no longer exists.

314.     For example, at the time that the parties to the VNU CDS contracts entered into their agreements, there was a mismatch in maturities of the CDS agreement and the VNU 5.625% bond that served as the Reference Obligation.  The VNU CDS contracts were five-year contracts, terminating on September 20, 2011, but the reference obligation — the 5.625% VNU bond — was scheduled to mature in 2010.  As such, the parties to the VNU CDS agreements contemplated that their 5-year CDS contracts would continue to exist after the reference bond expired, demonstrating that there could be no dependency between the price (or any other material term) of the CDS agreements and the price, yield, value, or volatility of any security.

315.     Moreover, the VNU 5.625% bond that served as the Reference Obligation for the VNU CDS contracts were fully redeemed in June 2009.  Despite the fact that the VNU 5.625% ceased to exist nine months ago, the VNU CDS that have the VNU 5.625% bonds as their reference security continue to trade and be priced today, confirming that VNU CDS cannot be based on the price, yield, value or volatility of any security.

316.     VNU CDS contracts can continue to trade and be priced in the market because the price of such contracts depends on the credit risk of the *reference entity* — or the company referenced in the CDS contract (*i.e.*, VNU N.V.).   In other words, if market participants believed

---

[173]    Okongwu Deposition, 3/5/10, 245:11-245:18; <u>see also</u>  123:03-125:06.

that VNU was likely to declare bankruptcy, then CDS will trade at a higher price or a wider

spread, regardless of the price or spread of any other security.

  **C.**  <u>**No Other Aspect Of The VNU CDS Contracts Is Based On The Price, Yield,**</u>
    <u>**Value, Or Volatility Of Any Security Or Group Or Index Of Securities.**</u>

  317.  CDS prices can be determined without ever using a pricing model.  Pricing

models may be used to help a market participant decide if the market price for a CDS contract is

over or undervalued, but such models do not set or determine the market price for a CDS

contract.  A survey of VNU CDS bid and ask quotes reveals that there is a range of quotes that

would not exist if CDS prices were determined through the use of a theoretical pricing model.

  318.  No pricing model was actually used by Millennium, Deutsche Bank, or Royal

Bank of Scotland to arrive at the spreads or prices for the VNU CDS at issue in this case.

  319.  Even if a pricing model were used to estimate whether an actual VNU CDS

market price was under- or over-valued, the recovery rate input used was not based on the actual

price, yield, value, or volatility of any security or group or index of securities.

  320.  The *actual* recovery rate cannot be known until a credit event occurs and all

qualifying deliverable obligations have been determined and valued in accordance with ISDA

procedures.  Until such time, only an *assumed* rate can be used as an input in certain theoretical

pricing models to estimate the potential combined value of all qualifying deliverable obligations.

  321.  VNU CDS contracts were bought and sold in the secondary market, but the prices

for which such contracts were bought and sold were based on CDS market prices — not the

prices, yield, value, or volatility of any security.

  322.  For example, when Deutsche Bank and Millennium agreed to unwind the VNU

CDS contract, the payout amount was calculated through the use of the Market Quotation

method, as required by the Early Termination provision of the ISDA Master Agreement.  The

Market Quotation method uses actual price quotes obtained from CDS dealers to determine the current market price for the CDS and then uses the market price to determine the payment amount.  The use of theoretical pricing models is not permitted under the Market Quotation method.

323.    Furthermore, the Credit Support Annex is a default provision that is not a specifically-negotiated term for any particular CDS contract that the parties might enter.  It is, therefore, not a material or essential term to the VNU CDS agreements in this case.

324.    Moreover, even if the Credit Support Annex was deemed to be a material term of the CDS contract, it is not based on the price, yield, value, or volatility of any security.  The collateral posting requirements specified in the Credit Support Annex are based on changes in CDS _market_ prices, not changes in the price of any security.  Changes in CDS prices are calculated through the use of quotations obtained from CDS dealers in the market.  Thus, the terms of Credit Support Annex are not dependent on the price, yield, value, or volatility of any security or any group or index of securities.

325.    The VNU CDS were not "securities-based swap agreements" and thus outside the purview of Section 10(b) of the Exchange Act.

326.    Therefore, the Court lacks subject matter jurisdiction over this action.