UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                      :
SECURITIES AND EXCHANGE COMMISSION, :                      4325
                                                      :    No. 09-CV-4326 (JGK)
            Plaintiff,                                :
                                                      :
                                                      :
      -against-                                       :
                                                      :
JON-PAUL RORECH and                                   :
RENATO NEGRIN,                                        :
                                                      :
            Defendants.                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## JOINT PRETRIAL ORDER

Pursuant to the Court's Individual Practices, Pretrial Procedures, effective April 2008,

Plaintiff Securities and Exchange Commission and Defendants Jon-Paul Rorech and Renato

Negrin respectfully submit their joint pretrial order.

I.    **TRIAL COUNSEL**

      A.    **Plaintiff Securities and Exchange Commission**

            Richard G. Primoff
            Senior Trial Counsel
            Nancy A. Brown
            Senior Trial Counsel
            Panayiota K. Bougiamas
            Senior Attorney
            Alexander J. Janghorbani
            Senior Attorney
            New York Regional Office
            3 World Financial Center, Suite 400
            New York, NY 10281
            Phone: (212) 336-0148 (Primoff)
                   (212) 336-1023 (Brown)
                   (212) 336-0032 (Bougiamas)
                   (212) 336-0177 (Janghorbani)
            Fax:   (212) 336-1322

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/5/10

B.    **Defendant Jon-Paul Rorech**

Richard Mark Strassberg (RS 5141)
Maryana Zubok (MZ 0625)
Roberto M. Braceras
Goodwin Procter LLP
620 Eighth Avenue
New York, NY  10018-1405
Telephone: 212-813-8800
Fax: 212-355-3333

*and*

Roberto M. Braceras (RB-2470)
Goodwin Procter LLP
Exchange Place
Boston, Massachusetts  02109
Telephone: (617) 570-1000
Facsimile: (617) 523-1231

C.    **Defendant Renato Negrin**

Lawrence Iason  (LI-8996)
Linda Fang (LF-3461)
Morvillo, Abramowitz, Grand,
Iason, Anello & Bohrer, P.C.
565 Fifth Avenue
New York, NY 10017
Telephone: 212-880-9600
Fax: 212-856-9494

II.    **BASIS OF SUBJECT MATTER JURISDICTION**

A.    **Plaintiff's Statement Regarding Subject Matter Jurisdiction**

This Court has subject matter jurisdiction over this proceeding because the Commission

has brought this action under Section 10(b) of the Securities Exchange Act of 1934 which, as

amended by the Commodity Futures Modernization Act of 2000 (the "CFMA"), clarified that

Section 10(b) and all rules previously promulgated by the Commission prohibiting fraud,

manipulation or insider trading, and all judicial precedents previously decided under Section

2

10(b), "shall apply to security-based swap agreements (as defined in section 206B of the Gramm-Leach Bliley Act ("GLBA")) to the same extent as they apply to securities." 15 U.S.C. § 78j, as amended, Pub.L. 106-554, § 1(a)(5), 3 U.S.C. § 303(d)(2).

The Commission has alleged in this action that in July 2006, the Defendants engaged in unlawful insider trading in credit default swaps ("CDS") referencing a bond issued by VNU N.V. Under Section 206B of the GLBA (15 U.S.C. § 78c note), a "security-based swap agreement" is broadly defined to include any swap agreement "of which a material term is based on the price, yield, value or volatility of any security, or any group or index of securities, or any interest therein."

CDS referencing single name corporate entities, such as the VNU CDS at issue in this case, are and were at the time widely used in the market to hedge against a risk of default. A purchase of a CDS contract also is and was perceived as the equivalent to a "synthetic" short of a bond – a speculative trade easier to make by purchasing CDS than by shorting a bond in the cash market. In view of this close relationship between the CDS market and the cash bond market, it is not surprising that the principal, material terms of CDS are explicitly and implicitly based on "the price, yield, value or volatility of any security, or any group or index of securities, or any interest therein." These material provisions include (1) the price of the CDS when bought or sold, (2) the payment and settlement terms that govern the parties' relationships and conduct if a credit event in the reference entity occurs, and (3) the day-to-day valuations necessitated by the counterparties' contract obligations.

In the course of the foregoing conduct, Defendants, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in, or the

3

means or instrumentalities of, interstate commerce, or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

For these reasons, the Commission submits that the VNU CDS at issue is a security-based swap agreement as defined by Section 206B of the GLBA, and that this Court has subject matter jurisdiction over this proceeding.

### B.    Defendants' Statement Regarding Subject Matter Jurisdiction

Defendants contend that the Court lacks subject matter jurisdiction over this action pursuant to section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. The credit default swaps ("CDS") bought and sold by Renato Negrin are not "securities-based swap agreements" under § 206B of the Gramm-Leach-Bliley Act, and thus these transactions are not within the scope of § 10(b) and Rule 10b-5. Commodity Futures Modernization Act § 301(a) (amending the Gramm-Leach-Bliley Act § 206B, set forth in 15 U.S.C. § 78c, Note).

### III.    SUMMARY OF CLAIMS AND DEFENSES

#### A.    Plaintiff's Statement

The Commission's Complaint alleges that in July 2006, Defendant Jon-Paul Rorech, a salesman on Deutsche Bank's High Yield bond desk, unlawfully tipped material non-public information regarding a new issuance of securities by Deutsche Bank's client, VNU N.V., to Defendant Renato Negrin, a portfolio manager at Millennium Capital Partners, a New York-based hedge fund. In doing so, Rorech breached duties he owed to Deutsche Bank. Negrin, a longtime customer of Rorech, traded on the information that Rorech provided when he knew or should have known that Rorech had breached his duty to Deutsche Bank by supplying the information to him. The Complaint charges each Defendant with violations of Section 10(b) of

4

the Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder and seeks
disgorgement of all unlawful trading profits, together with prejudgment interest thereon, and
civil penalties pursuant to Section 21A or Section 21(d)(3) of the Exchange Act.

In July 2006, Deutsche Bank was a primary financial advisor to a consortium of financial
sponsors (the "Sponsors") in connection with their leveraged buy-out of VNU N.V., a Dutch
media company, and was lead underwriter of VNU's offering of high yield bonds. When the
offering was first announced, hedge funds that had previously bought VNU CDS immediately
complained that the announced structure (consisting of debt issued not from VNU N.V., but from
its subsidiaries) would leave them with few and short-lived obligations of VNU that could be
delivered into their VNU CDS contracts. With a shortage of deliverable obligations, these hedge
funds feared that the value of their CDS would decline, as the total outstanding amount of
VNU's deliverable bonds shrank.

Deutsche Bank bankers, including the capital markets team assigned to the VNU
offering, immediately went to work exploring options to address the CDS purchasers' concerns.
With the help of the head CDS trader in London, Eve Tournier, the bankers quickly concluded
that they could create a tranche of bonds at the VNU N.V. holding company level that would be
deliverable into the VNU CDS, and which would find a receptive market in those hedge funds
that had already bought VNU CDS protection.

By July 14, 2006, Mark Fedorcik, Deutsche Bank's senior high yield capital markets
professional in New York responsible for the VNU offering, had received an indication of
interest for $100 million in senior discount notes issued by the holding company from one of
Rorech's new clients, Blue Mountain. Rorech had already learned the day before of Blue
Mountain's interest. Fedorcik decided to recommend to the Sponsors that they move $200

5

million of the planned bond offering from Nielsen Finance, a VNU operating subsidiary, to the holding company, VNU NV. Fedorcik told Rorech that he intended to recommend to the Sponsors that they restructure the bond offering to issue this "holdco tranche."

Rorech knew or was reckless in not knowing that if the Sponsors accepted Deutsche Bank's recommendation, the announcement of a holdco tranche would quickly push CDS prices higher, or "wider," as the uncertainty caused by few deliverables would be resolved. Rorech knew or was reckless in not knowing that demand for the holdco tranche expressed by the anchor order from Blue Mountain, and Deutsche Bank's recommendation that the Sponsors issue the new notes would make the issuance, more likely. Rorech also knew or was reckless in not knowing that Negrin and other sales customers would consider this information important in deciding whether to buy VNU CDS.

Rorech knew or was reckless in not knowing that Deutsche Bank policy prohibited him from conveying to third parties material non-public information and confidential information received from Bank customers. Negrin knew or should have known this also. Nonetheless, Rorech told Negrin on July 14, 2006 in an unrecorded cell phone call that Deutsche Bank would recommend the holdco tranche and that at least one customer had already placed an anchor order for $100 million of the bonds. He repeated that information in another unrecorded cell phone call on July 17, 2006. Rorech told Negrin about the recommendation and the anchor order to encourage Negrin to buy VNU CDS because he understood that the holdco tranche would cause CDS to move wider and Negrin could make a substantial profit if he bought CDS before the announcement. Negrin made his first purchase of CDS on July 17, after his second cell phone call with Rorech, and made his second purchase of CDS on July 18.

6

After the Sponsors agreed to issue the holdco tranche, and the restructuring was announced on July 24 to the rest of the market, CDS moved substantially wider that day. Negrin unwound (effectively, sold) his first trade on July 24, 2006, soon after the announcement, and sold his second trade (by assigning it) on August 1, 2006. Negrin's trades earned over $1 million in profit.

### B.     Defendants' Statement

Defendants Jon-Paul Rorech and Renato Negrin contend that the Commission lacks authority to bring this case because the CDS at issue are not "securities-based swap agreements" as defined in § 206B of the Gramm-Leach-Bliley Act. Commodity Futures Modernization Act § 301(a) (as amending the Gramm-Leach-Bliley Act § 206B, set forth in 15 U.S.C. § 78c, Note). Because the CDS are not "securities-based swap agreements," they are simply not within the scope of the Commission's enforcement power under § 10(b) and Rule 10b-5. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Defendants contend that the material terms of the CDS contracts bought and sold by Mr. Negrin – including the price of the CDS agreements – were not derived from or based on the price, yield, value, or volatility of any security, and, as a result, the contracts were not "securities-based."[1]

Even if the Commission had authority to bring charges in this case, which it does not, Defendants further contend that the Commission's allegations fail, as Defendants did not violate Section 10(b) of the Securities Exchange Act of 1934 or Rule 10b-5 promulgated thereunder.

---

[1] Defendant Rorech previously asserted, in a motion for judgment on the pleadings, that the Commission lacked authority to bring this case, because, in addition to the aforementioned reasons, the VNU CDS at issue referenced foreign bonds, over which the Commission lacks authority. Because the Court ruled on the motion, Defendant Rorech will not be asserting this argument at trial.

Specifically, Defendants contend that there is no evidence supporting any of the fundamental elements of insider trading under § 10(b) and Rule 10b-5.

In particular, Defendants contend that Mr. Rorech was fully authorized to share information regarding the potential restructuring of the VNU bond offering with Mr. Negrin, a prospective bond purchaser. Information regarding the potential restructuring of the VNU bond offering was not confidential, and was openly discussed by Deutsche Bank employees — including Mr. Rorech's direct supervisor, the head of capital markets, and other salespeople — with potential investors outside Deutsche Bank. Moreover, Mr. Rorech could not have provided Mr. Negrin with any of the alleged material nonpublic information concerning the potential restructuring of the VNU bond offering, because, at the time of Mr. Rorech's conversations with Mr. Negrin, such information did not exist. Defendants further contend that Mr. Negrin's trading of VNU CDS, which was consistent with his trading history and supported by reasonable rationales for the purchases, is insufficient to give rise to an inference of insider trading. Defendants also contend that Mr. Rorech and Mr. Negrin did not engage in any deception in connection with the VNU CDS trades, and both lacked the requisite intent.

## IV. NUMBER OF TRIAL DAYS NEEDED, WHETHER JURY IS DEMANDED

### A. Plaintiff's Statement

This case is to be tried before the Court, and not a jury. Plaintiff anticipates that it will need seven days to put on its case in chief. Plaintiff now anticipates the possibility of calling one rebuttal witness, its expert Dr. Chudozie Okongwu, but reserves its right to call any it deems necessary.

### B. Defendants' Statement

8

This case is to be tried without a jury; it is to be tried before the Court as to liability and,
if necessary, as to remedies. Defendants estimate that the trial will require approximately two to
three weeks.

## V.    CONSENT TO TRIAL BEFORE A MAGISTRATE

The parties do not consent to trial by a Magistrate Judge.

## VI.    STIPULATIONS OR AGREED STATEMENTS OF FACT OR LAW

### A.    The parties have stipulated to the following statements of fact:

1.    Jon-Paul Rorech was a salesperson working in the High Yield Sales group at
Deutsche Bank Securities, Inc. ("Deutsche Bank") in New York in 2006.

2.    In 2006, Renato Negrin was a portfolio manager for Millennium Partners, L.P.
("Millennium"), a New York-based hedge fund.

3.    On July 17, 2006, between approximately 12:30 and 1:00 pm EDT, Negrin
purchased a credit default swap with the notional amount of €10,000,000, referencing VNU N.V.
as the reference entity, and listing VNU N.V. May 2010 5 5/8% GBP-denominated bonds as the
reference obligation ("VNU CDS"), at a price of 383 basis points ("bps"), on behalf of a
portfolio Negrin managed for Millennium. Negrin placed the order for this purchase in New
York. On July 24, 2006, Negrin sold this credit default swap to Deutsche Bank at 481 bps, for a
profit of approximately €391,678.

4.    On the morning of July 18, 2006, Negrin purchased a credit default swap with the
notional amount of €10,000,000, referencing VNU N.V. as the reference entity, and listing VNU
N.V. May 2010 5 5/8% GBP-denominated bonds as the reference obligation, at a price of 383
bps from the Royal Bank of Scotland PLC ("RBS"), also on behalf of Millennium. On August 1,
2006, Negrin assigned this credit default swap to Deutsche Bank at 525 bps, for a profit of

9

approximately €555,000.

5.     All of the alleged acts, transactions, and courses of business by Rorech and Negrin relevant to this action occurred in Manhattan, in the Southern District of New York.

6.     In July 2006, Rorech was one of the high yield salespeople at Deutsche Bank in New York responsible for marketing a proposed issuance of high yield bonds by subsidiaries of VNU N.V.

7.     Around January 2006, Rorech transferred to the High Yield Sales group.

8.     The documents comprising the VNU CDS contract Negrin purchased on behalf of Millennium from Deutsche Bank on July 17, 2006 include: 2003 ISDA Credit Derivatives Definitions; September 15, 1997 ISDA Master Agreement between Deutsche Bank AG and Millennium (including Credit Support Annex); and 2003 Master Credit Derivatives Confirmation Agreement between Deutsche Bank AG and Millennium and Transaction Supplement, dated June 11, 2004, and the July 17, 2006 Transaction Supplement.

9.     The documents comprising the VNU CDS contract Negrin purchased on behalf of Millennium from RBS on July 18, 2006 include: 2003 ISDA Credit Derivatives Definitions; October 5, 2004 ISDA Master Agreement between RBS and Millennium (including Credit Support Annex and Exhibits/Schedules); and May 12, 2005 Master Credit Derivatives Confirmation Agreement between RBS and Millennium and Transaction Supplement, and the July 18, 2006 Transaction Supplement.

12.     VNU N.V. ("VNU") was a public Dutch media and information company. Its operating subsidiaries included Nielsen, a marketing and media information company best known in the U.S. for providing viewing and ratings statistics for television shows.

10.     On March 8, 2006, VNU announced that it had agreed to be purchased and taken

10

private for €7.5 billion by a consortium of private equity firms consisting of AlpInvest Partners N.V., Blackstone Group L.P., Carlyle Group, Hellman & Friedman LLC, Kohlberg Kravis Roberts & Co. L.P., and Thomas H. Lee Partners, L.P ("sponsor consortium" or "Sponsors").

11.    Deutsche Bank served as a financial advisor to the sponsor consortium in connection with its acquisition of VNU.

12.    Shortly after the acquisition, VNU's common and preferred stocks were delisted from the Amsterdam Euronext exchange, and VNU was converted from a public to a private company.

13.    On July 10, 2006, VNU announced that it would offer $1.67 billion of new bonds issued by VNU's subsidiaries in an offering under Rule 144A of the Securities Exchange Act of 1934 ("VNU Bond Offering"), and €4.89 billion of new bank loans and credit facilities ("bank debt").

14.    The $1.67 billion of bonds was proposed to be issued in two tranches, by Nielsen Finance LLC and Nielsen Finance Co. (the "new Nielsen bonds"), and consisting of senior notes and senior subordinated discount notes.

15.    Deutsche Bank was the lead underwriter for the VNU Bond Offering. The other underwriters were Citigroup Global Markets Inc. ("Citigroup"), JP Morgan Securities Inc., ABN AMRO Bank N.V., and ING Bank N.V.

16.    Citigroup was the lead underwriter on the bank debt portion of VNU's new financing.

17.    In light of the challenging conditions in the high yield market in the summer of 2006, and the size of the VNU Bond Offering, the deal was difficult to market successfully.

11

18.    Deutsche Bank and the sponsor consortium understood that the senior subordinated discount note tranche of the new Nielsen bonds would be especially difficult to sell.

19.    The VNU Bond Offering was made pursuant Rule 144A, and thus could only be marketed to sophisticated institutional customers with over $100 million in investable assets, also known as Qualified Institutional Buyers.

20.    As lead underwriter, Deutsche Bank had primary responsibility for marketing the VNU Bond Offering.

21.    The Sponsors, VNU management, and Deutsche Bank investment bankers organized a three-week international roadshow process to market the VNU Bond Offering. The European roadshow commenced on July 11, 2006 in London, and the U.S. roadshow ran from July 17 through July 28, 2006.

22.    Books closed for the VNU Bond Offering at approximately 5:00pm EDT on July 31, 2006, at which point no more orders could be placed. The bonds for the VNU Bond Offering were officially priced and allocated to investors on August 1, 2006.

23.    The initial pro forma pricing for the VNU Bond Offering set by Deutsche Bank and the Sponsors, as set forth in the preliminary offering memorandum, was 9% for the senior notes issued by Nielsen Finance LLC and 11.5% for the senior subordinated discount notes issued by Nielsen Finance Co.

24.    On July 27, 2006, Deutsche Bank issued official "price talk" for the new Nielsen bonds, at 9.75% for the senior notes, and at about 12% to 12.25% for the senior subordinated discount notes.

25.    The new Nielsen bonds ultimately priced at 10% for the senior notes issued in dollars and 9% for the senior notes issued in Euros and 12.5% for the senior subordinated

12

discount notes on August 1, 2006.

26. Shortly after the VNU Bond Offering was announced by Deutsche Bank on July 10, 2006, Deutsche Bank sent the preliminary offering memorandum (sometimes referred to as the "Red Herring" or "Red") setting forth the proposed terms of the VNU Bond Offering to prospective bond purchasers, including Millennium, on July 11, 2006.

27. Long before the VNU Bond Offering was announced, credit default swap contracts had been written to reference VNU N.V. ("VNU CDS"). At the time of the VNU Bond Offering, VNU credit default swaps were traded in the market.

28. The VNU CDS trades that Negrin executed with Deutsche Bank were executed through the London derivatives trading desks for Deutsche Bank.

29. As part of its proposed new financing, VNU indicated that it would tender for and retire most of its previously issued and then-outstanding bonds – about €1.095 billion in total.

30. Because the language of the preliminary offering memorandum indicated that the guarantee from VNU N.V. for the new Nielsen bonds could fall away in certain instances, some investors believed that the new Nielsen bonds – as they were originally contemplated to be issued as indicated in the preliminary offering memorandum – would not be deliverable.

31. At one of the very first investor presentations in London on the morning of July 11 or 12, 2006 – a presentation attended by representatives from the Sponsors, VNU management and Deutsche Bank – a number of investors raised the question of whether the VNU Bond Offering would be deliverable into existing VNU CDS. At that presentation,, investors sought to persuade the Sponsors to change the guarantee language so that some of the new Nielsen bonds would be deliverable.

13

32.    In addition to the guarantee language change, another potential way to resolve the deliverability problem was to change the structure of the VNU Bond Offering to include a tranche of bonds issued directly by VNU N.V., the holding company and the reference entity for the VNU CDS.

33.    The CDS premium quoted and traded at in the market subsequent to the issuance of the preliminary offering memorandum was perceived by market participants to be lower than would be expected.

34.    During the marketing period for the VNU Bond Offering, certain investors and market professionals at Deutsche Bank perceived an opportunity for VNU and the Sponsors to issue a tranche of bonds directly out of the holding company – VNU – in an attempt to satisfy the market's demand for what they perceived to be qualifying deliverable bonds.

35.    Additionally, during the first week of the marketing period, a number of investors asked salespeople and capital market professionals at Deutsche Bank whether the Sponsors would consider issuing bonds out of the holding company.

36.    When potential investors suggest that an issuer offer particular securities for sale or suggest that an issuer make changes to an announced securities offering, the suggestion is called a "reverse inquiry." Reverse inquiries can include suggested modifications to covenants, pricing, maturity, or structural features of a proposed securities offering.

37.    Reverse inquiries may be submitted by investors to salespeople, who may then pass the reverse inquiries on to the investment bank's capital markets professionals. Occasionally, investors address these reverse inquiries directly to the capital markets professionals. The capital markets professionals may relay the suggestion to the other

14

investment bankers at the bank responsible for managing the relationship with the issuers who then may discuss the reverse inquiry with the issuer.

38.    The ultimate decision whether to agree to any investor-proposed structural change is made by the issuer.

39.    In the case of the VNU Bond Offering, the ultimate decision whether to agree to the investor-proposed structural changes was made by the Sponsors.          DR

40.    The role of capital markets professionals during a new bond offering is to work closely with salespeople and with investors to provide the issuer with accurate information about market demand and with advice about whether to change the pricing, covenants, and structural components of the bond offering so as to achieve the best execution and results for the issuer in light of market conditions

41.    Market participants suggested two options for changing the structure of the Bond Offering in an effort to solve the deliverability problem and make the offering more attractive: the Sponsors could (1) change the guarantee language in the offering memorandum for the new Nielsen bonds so that the bonds would be unconditionally guaranteed by VNU N.V.; or (2) issue a tranche of bonds from the holding company or some other legal entity that would be deliverable into VNU CDS.

42.    Sometime late on July 13 or early on July 14, after consulting with Deutsche Bank's legal department, Fedorcik discovered that changing the guarantee language for the new Nielsen bonds would not solve the deliverability problem.

43.    The sponsor consortium approved the issuance of bonds out of VNU N.V. on the afternoon of Friday, July 21, 2006.

44.    On the morning of July 24, 2006, Deutsche Bank announced via Bloomberg that a

15

€200 million tranche of bonds issued directly out of VNU, the holding company, would be added to the VNU Bond Offering, and that the size of the Nielsen senior subordinated discount tranche of bonds being offered would be correspondingly decreased.

45.    The market price of VNU CDS increased on July 24, 2006.

46.    The new VNU holding company bonds priced at 11.125% on August 1, 2006.

47.    Deutsche Bank, like many multi-service financial institutions, has both a public side and a private side. The public side includes the bank's sales, trading and research employees, whereas the private side includes the bank's investment banking employees, including capital markets. The public side primarily interacts with other public market participants including investors, while the private side primarily interacts with issuers and financial sponsors.

48.    VNU CDS was traded throughout the two weeks leading up to July 24, 2006 when the holding company issuance was announced.

49.    Millennium was a Qualified Institutional Buyer in 2006 and was a potential investor in the VNU Bond Offering.

50.    Negrin, on behalf of Millennium, had purchased bonds from Deutsche Bank through Rorech prior to July 2006.

51.    During the marketing period of the VNU Bond Offering, Rorech and Negrin had a number of conversations on Deutsche Bank's recorded telephone line regarding VNU .

52.    Rorech and Negrin also had two cell phone-to-cell phone conversations during this period, one on July 14 at about 8:58am EDT and the other on July 17 at about 9:49am EDT.

53.    The cell phone call on July 14 occurred shortly after two recorded phone calls on July 14, 2006 at about 8:37am EDT and about 8:55am EDT.

16

54.    Negrin called Rorech's cell phone from his cell phone at about 8:57am EDT on July 14, 2006, but did not reach him. Rorech then called Negrin's cell phone back from his cell phone at about 8:58am.

55.    On the morning of July 17, 2006, Negrin called Rorech on the recorded line at approximately 9:49am EDT.

56.    Following this call, Rorech and Negrin had a cell phone-to-cell phone conversation at approximately 9:49am EDT.

57.    Approximately three hours after the cell phone conversation on July 17, Negrin placed an order to buy €10 million of VNU CDS from Deutsche Bank for Millennium. The trade was executed by John Aylward, a Deutsche Bank credit derivatives trader in London, at approximately 12:40pm EDT on July 17 at a spread of 383 bps.

58.    Negrin purchased another €10 million of VNU CDS from the Royal Bank of Scotland on July 18, 2006, also at a spread of 383 bps.

59.    After Deutsche Bank announced the change in the structure of the VNU Bond Offering on July 24, 2006, Negrin sold the €10 million VNU CDS he purchased from Deutsche Bank on July 17 back to Deutsche Bank at a spread of 481 bps.

60.    On the morning of August 1, 2006, Negrin placed an order to sell the €10 million of VNU CDS that Millennium had purchased from the Royal Bank of Scotland with Deutsche Bank. The trade resulted in a novation in which Millennium assigned its interest as the protection buyer in that VNU CDS to Deutsche Bank, at a spread of 525 bps.

61.    Deutsche Bank is a registered broker-dealer with the SEC.

62.    Negrin traded VNU CDS on three other occasions prior to the trades at issue in July 2006, also on behalf of Millennium.

17

63.    On November 18, 2005, Negrin purchased €10 million of VNU CDS from UBS AG, at 90 bps. He subsequently sold a portion of the VNU CDS on December 9, 2005 at 141 bps and a portion on January 5, 2006 at 178 bps. Millennium realized a profit of €113,397 on the trades.

64.    On January 12, 2006, Negrin purchased €5 million of VNU CDS from the Royal Bank of Scotland at 222 bps. Negrin purchased another €5 million of VNU CDS from BNP Paribas on January 31, 2006 at 215 bps. He sold both VNU CDS to Lehman Brothers on February 21, 2006, at 213 bps, incurring a loss of €27,662 for Millennium.

65.    Mark Fedorcik was an investment banker in the High Yield Capital Markets group at Deutsche Bank Securities, Inc. in New York in 2006. He was the senior capital markets professional responsible for marketing the VNU Bond Offering in the U.S.

66.    Vikrant Sawhney was an investment banker in the Financial Sponsors coverage group at Deutsche Bank Securities, Inc. in New York in 2006. He was one of the primary points of contact for the sponsor consortium during the course of the VNU leveraged buyout and the VNU debt offering.

67.    David Ross and Paul Cahalan were investment bankers in the High Yield Capital Markets group at Deutsche Bank AG, London Branch in London in 2006.

68.    Wight Martindale was a salesperson in, and was also the head of, the High Yield Sales group at Deutsche Bank Securities, Inc. in New York in 2006. Martindale was Jon-Paul Rorech's direct supervisor.

69.    Christopher Wagner was a salesperson working in the High Yield Sales group at Deutsche Bank Securities, Inc. in New York in 2006.

70.    Andrew Kellerman was a salesperson working in the Investment Grade Sales

group at Deutsche Bank Securities, Inc. in New York in 2006.

71.    Eve Tournier was a credit derivatives trader in London for Deutsche Bank AG, London Branch in 2006. She was the head of the credit derivatives trading desk in London, and supervised John Aylward and Grigore Ciorchina.

72.    John Aylward was a credit derivatives trader in London for Deutsche Bank AG, London Branch in 2006.

73.    Grigore Ciorchina was a credit derivatives trader in London for Deutsche Bank AG, London Branch in 2006.

74.    Sean Hunt was a salesperson in, and the head of, the High Yield Sales group at Deutsche Bank AG in London in 2006.

75.    Rachel Bobillier was a salesperson in, and the head of, the Hedge Fund Sales group at Deutsche Bank AG in London in 2006.

76.    Randy Masel was an analyst with Negrin's credit trading group at Millennium Partners, L.P. in 2006.

77.    Sean Fahey was a portfolio manager and partner at Claren Road Asset Management LLC ("Claren Road"), a New York-based hedge fund in 2006. Claren Road was one of Rorech's customers.

78.    Jeremy Barnum was the head of the London office and a portfolio manager for Blue Mountain Capital Management LLC ("Blue Mountain"), a hedge fund in 2006. Blue Mountain was one of Rorech's customers. Rorech provided sales coverage in the U.S. to Blue Mountain.

79.    Geoffrey Sherry was a portfolio manager for Caxton Associates L.P ("Caxton"), a New York-based hedge fund in 2006. Caxton was one of Rorech's customers.

80.     George Taylor was a managing director at Thomas H. Lee Partners, L.P., one of the private equity firms in the sponsor consortium, in 2006.

81.     Robert Reid was a managing director at the Blackstone Group L.P., one of the private equity firms in the sponsor consortium, in 2006.

82.     Simon Brown and Alex Navab were partners at Kohlberg Kravis Roberts & Co. L.P., one of the private equity firms in the sponsor consortium, in 2006.

**B.     The parties have stipulated to the following statements of law:**

1.     The single claim in this case alleges insider trading of credit default swaps in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.



2.     The Commission brings this action under the misappropriation theory of liability.

3.     To establish liability for Jon-Paul Rorech, the Commission must prove that Rorech, in connection with the purchase or sale of a security or security-based swap agreement, misappropriated material non-public information in breach of a fiduciary duty to Deutsche Bank, and that Rorech acted with scienter. United States v. Falcone, 257 F.3d 226, 232 (2d Cir. 2001) (quoting United States v. O'Hagan, 521 U.S. 642, 652 (1997)); United States v. Chestman, 947 F.2d 551, 566 (2d Cir. 1991) (en banc); see Aaron v. SEC, 446 U.S. 680, 691 (1980) (scienter is necessary element of every section 10(b) and Rule 10b-5 claim).

4.     The Commission bears the burden of proof and must prove every element of its claim by a preponderance of the evidence. Herman & MacLean v. Huddleston, 459 U.S. 375, 389-91 (1983); SEC v. Willis, 825 F. Supp. 617, 622 (S.D.N.Y. 1993). Proof of the elements may be by circumstantial evidence. United States v. McDermott, 245 F.3d 133, 139 (2d Cir. 2001).

5.      Federal courts have limited jurisdiction and must always, as a threshold matter,

ensure themselves that subject matter jurisdiction exists. Morrison v. Nat'l Australia Bank Ltd.,

547 F.3d 167, 170 (2d Cir. 2008). The Commission bears the burden of establishing subject

matter jurisdiction by a preponderance of the evidence. Id.

6.      The Commission's enforcement authority is limited to that which is granted by

Congress. Etuk v. Slattery, 936 F.2d 1433, 1443 (2d Cir. 1991); Killip v. Office of Pers. Mgmt.,

991 F.2d 1564, 1570 (Fed. Cir. 1993).

7.      Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides,

in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the
> use of any means or instrumentality of interstate commerce or of
> the mails ... (b) [t]o use or employ, in connection with the
> purchase or sale of ... any securities-based swap agreement (as
> defined in section 206B of the Gramm-Leach-Bliley Act), any
> manipulative or deceptive device or contrivance in contravention
> of such rules and regulations as the Commission may prescribe as
> necessary or appropriate in the public interest or for the protection
> of investors.
>
> Rules promulgated under subsection (b) that prohibit fraud,
> manipulation, or insider trading (but not rules imposing or
> specifying reporting or recordkeeping requirements, procedures, or
> standards as prophylactic measures against fraud, manipulation, or
> insider trading), and judicial precedents decided under subsection
> (b) and rules promulgated thereunder that prohibit fraud,
> manipulation, or insider trading, shall apply to security-based swap
> agreements (as defined in section 206B of the Gramm-Leach-
> Bliley Act) to the same extent as they apply to securities.

8.      A "security-based swap agreement" is "a swap agreement (as defined in section

206A [of the Gramm-Leach-Bliley Act]) of which a material term is based on the price, yield,

value, or volatility of any security or any group or index of securities, or any interest therein."

Commodity Futures Modernization Act § 301(a) (as amending the Gramm-Leach-Bliley Act

§ 206B, set forth in 15 U.S.C. § 78c, Note).

## VII.    WITNESSES

The parties' potential trial witnesses are as follows:

### A.    Plaintiff's Statement Regarding Testimony by Witnesses

In addition to the witnesses below, Plaintiff may also call to testify, in person at trial,

some or all of the witnesses identified on Defendants' witness list.  In the event that any of the

witnesses below are unavailable to testify in person at trial, the Defendants reserve the right to

designate portions of their deposition testimony for use at trial.  Plaintiff also reserves the right to

call at trial additional witnesses as may be required to establish foundation and/or authenticity for

certain exhibits.

| | | |
|---|---|---|
| 1. | Mark Fedorcik – in person |
| 2. | Jon-Paul Rorech – in person |
| 3. | Renato Negrin – in person |
| 4. | Randy Masel – in person |
| 5. | Jeremy Barnum – in person |
| 6. | Sean Fahey – in person |
| 7. | Geoffrey Sherry – in person |
| 8. | John Cartaina – in person |
| 9. | Vikrant Sawhney – in person |
| 10. | Wight Martindale – in person |
| 11. | Paul Cahalan – by deposition |
| 12. | Paul Causer – by deposition |

22

13.      Eve Tournier – by deposition

14.      David Ross – by deposition

15.      Sean Hunt – by deposition

16.      Chudozi Okongwu – in person

17.      David Barcus – in person

## B.    Defendants' Statement Regarding Testimony By Witnesses

In addition to the witnesses below, the Defendants may also call to testify, in person at trial, some or all of the witnesses identified on the Plaintiff's witness list. In the event that any of the witnesses listed below are unavailable to testify in person at trial, the Defendants reserve the right to designate portions of their deposition testimony for use at trial.

1. Jeremy Barnum – in person

2. John Cartaina – in person

3. Sean Fahey – in person

4. Mark Fedorcik – in person

5. Sean Hunt – by deposition

6. Andrew Kellerman – in person

7. Wight Martindale – in person

8. Andrew Miller – in person

9. Renato Negrin – in person

10. John Olvany – in person

11. Jon-Paul Rorech – in person

12. David Ross – by deposition

13. Vikrant Sawhney – in person

14. Geoffrey Sherry – in person

23

15. Christopher Wagner – in person

## VIII.  DESIGNATED PORTIONS OF DEPOSITION TESTIMONY WITH OBJECTIONS; AND COUNTER- DESIGNATIONS WITH OBJECTIONS:

### A.  Plaintiff's Statement

Plaintiff expects that Eve Tournier, David Ross, Paul Cahalan, Sean Hunt and Paul Causer will be unavailable to testify at trial, and Plaintiff will seek to present designated portions of their deposition testimony for its case in chief. For that reason, Plaintiff's designations of Ms. Tournier, Mr. Ross, Mr. Cahalan, Mr. Hunt and Mr. Causer are included as Appendix A hereto, which also includes (1) Defendants' objections thereto; (2) Defendants' Counter-Designations; and (3) Plaintiff's objections to Defendants' Counter-Designations.

### B.  Defendants' Statement

Defendants expect that Sean Hunt and David Ross will be unavailable to testify at trial, and will seek to present designated portions of their deposition testimony for their case in chief. For that reason, Defendants' designations of Mr. Ross and Mr. Hunt are included in Appendix A hereto, which also includes Plaintiff's objections thereto.

## IX.  EXHIBIT LIST

### A.  Plaintiff

Attached hereto as Appendix B is Plaintiff's (1) Trial Exhibit List; and (2) Trial Expert Exhibit List, designating exhibits it intends to offer as evidence in its case in chief. Pursuant to the Court's Individual Rules of Practice, one star indicates exhibits to which no party objects on grounds of authenticity, and two stars indicate exhibits to which no party objects on any ground.

### B.  Defendants

24

Attached hereto as Appendix C is Defendants' (1) Trial Exhibit List; and (2) Trial Expert

Exhibit List, designating exhibits they intend to offer as evidence in their case in chief. Pursuant

to the Court's Individual Rules of Practice, one star indicates exhibits to which no party objects

on grounds of authenticity, and two stars indicate exhibits to which no party objects on any

ground.

Dated: New York, NY
       March 19, 2010


                                SECURITIES AND EXCHANGE
                                COMMISSION


                                By: _____
                                    Richard G. Primoff
                                    Nancy A. Brown
                                    Panayiota K. Bougiamas
                                    Alexander J. Janghorbani
                                New York Regional Office
                                3 World Financial Center, Suite 400
                                New York, NY 10281
                                Phone: (212) 336-0148 (Primoff)
                                       (212) 336-1023 (Brown)
                                       (212) 336-0032 (Bougiamas)
                                       (212) 336-0177 (Janghorbani)
                                Fax:   (212) 336-1322

*Plaintiff*

GOODWIN PROCTER, LLP

By: _____

Richard Mark Strassberg
Maryana Zubok
Roberto M. Braceras
620 Eighth Avenue
New York, NY 10018-1405
Telephone: 212-813-8859
Fax: 212-355-3333
        *Counsel for Defendant Rorech*

MORVILLO, ABRAMOWITZ, GRAND,
IASON, ANELLO & BOHRER, P.C.

By: _____

Lawrence Iason
Linda Fang
565 Fifth Avenue
New York, NY 10017
Telephone: 212-880-9620
Fax: 212-856-9494
        *Counsel for Defendant Negrin*

So Ordered:


_____
U.S.D.J.

26

GOODWIN PROCTER, LLP

By:    _____
      Richard Mark Strassberg
      Maryana Zubok
      Roberto M. Braceras
620 Eighth Avenue
New York, NY  10018-1405
Telephone: 212-813-8859
Fax: 212-355-3333
      *Counsel for Defendant Rorech*

MORVILLO, ABRAMOWITZ, GRAND,
IASON, ANELLO & BOHRER, P.C.

By:    _____
      Lawrence Iason
      Linda Fang
565 Fifth Avenue
New York, NY 10017
Telephone: 212-880-9620
Fax: 212-856-9494
      *Counsel for Defendant Negrin*

So Ordered:

_____
U.S.D.J.

7/2/10

26