UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :

SECURITIES AND EXCHANGE COMMISSION,    :
                                             :

                       Plaintiff,      :

                                           :

              v.                       :     09 CV 4329 (JGK)
                                         :

JON-PAUL RORECH and                  :
RENATO NEGRIN,                       :     ECF CASE
                                         :

                    Defendants.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
POST-TRIAL MEMORANDUM OF LAW**

SECURITIES AND EXCHANGE
COMMISSION

Richard G. Primoff
Nancy A. Brown
Panayiota K. Bougiamas
Alexander J. Janghorbani
Attorneys for Plaintiff
New York Regional Office
3 World Financial Center, Room 4300
New York, New York 10281
(212) 336-1048 (Primoff)

# TABLE OF CONTENTS

**Page**

Preliminary Statement………………………………………………………………1

I.  Facts Known to Rorech Before His Offline Conversation with
    Negrin on July 17.................................................................................... 1

II. The VNU Information That Rorech Passed to Negrin
    Substantially Altered the Total Mix of Information That
    Was in the Market on July 17 ...................................................................4

III. Negrin's Trading With Deutsche Bank Does Not Absolve
     Him of Liability................................................................................ 13

IV. The Information That Rorech Tipped to Negrin was
    Confidential, Material and Non-Public and Rorech Had a Duty to
    Maintain that Confidentiality...................................................................15

    A.  The Confidential and Inside Information Policy Prohibited
        Both Disclosures.................................................................................15

    B.  If There Were Evidence that Rorech's Disclosures Were Authorized
        – And There Is None – He Is Still Liable for Misappropriation  ....................17

        1.  The Sponsors Gave No Authorization to Disclose………………………..17

        2.  While Rorech Understood the Limitations of Fedorcik's
            Authorization, He Ignored Them to Further His Own Interests  ................18

    C.  Rorech Violated the Restrictions Imposed by the Restricted List......................21

    CONCLUSION   ............................................................................23

i

**Preliminary Statement**

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this Post-trial Memorandum to address certain discrete issues raised by the Court at the parties' Closing Arguments, as to which the Commission believes a fuller discussion would assist the Court in its assessment of the law as applied to the facts adduced at trial. As to matters not raised at Closing, the Commission respectfully refers the Court to its Pretrial Memorandum of Law, dated March 25, 2010.

**I.      Facts Known to Rorech Before His Offline Conversation with Negrin on July 17**

The Court asked what evidence supports the Commission's view that Rorech told Negrin about Fedorcik's plans to recommend a HoldCo issuance to the Sponsors and the existence of the Blue Mountain indication of interest. Trial Tr. 1877-1885.

As in almost every insider trading case, neither party to the conversations between Rorech and Negrin has testified to their contents. But the Court may use the wealth of circumstantial evidence of what Rorech knew, what Negrin was asking for, what Negrin did after the calls, and what Negrin, at least, does recall about the conversations to infer what Rorech told him. SEC v. Warde, 151 F.3d 42, 47 (2d Cir. 1998) (pattern of contacts with tippee after tipper learns of material nonpublic information and tippee's trading soon after supported conclusion that tipper passed insider information); see 4 Bromberg & Lowenfels on Securities Fraud § 6:548 ("Proof of tipping will often be circumstantial for there will rarely be an objective record or disinterested observer of what was transmitted, and the alleged tipper and tippee will seldom admit that there was a tip."). [1]

---

[1]    See also  SEC v. Suman, No. 07 Civ. 6625 (WHP), 2010 WL 532060, at *10 (S.D.N.Y. Feb. 11, 2010) (inferring that husband passed inside information to wife in telephone conversation made prior to her trades); SEC v. Ginsburg, 362 F.3d 1292, 1299 (11th Cir.

Before his second cell phone call with Negrin at 9:49 am on July 17, three hours before Negrin made the first of his two CDS purchases, Rorech (but not the market) knew:

- <u>Fedorcik's Intention to Recommend the HoldCo Bonds to the Sponsors</u>:  Fedorcik's "game plan" was to "move the sponsors" to "make a new box or . . . issue out of VNU NV" since the guarantee language change would not resolve deliverability;[2]

- <u>The Blue Mountain Anchor Order</u>:  Barnum gave Fedorcik and Rorech an anchor order for $100 million of holding company bonds, and explained in great detail how Deutsche Bank could structure them to appeal to CDS investors interested in purchasing them.  Barnum told Fedorcik what characteristics the bonds would need to have in terms of issuing entity, maturity, call protection, currency and pricing;[3] and

- <u>Fedorcik's Intention to Take Blue Mountain's Order and Suggested Structure to the Sponsors</u>:  Fedorcik took the order from Barnum for the purpose of presenting it to the Sponsors as part of a recommendation to proceed with issuing holding company bonds.  Fedorcik told Barnum -- with Rorech on the line -- that he had "enough now where [he could] talk to the sponsors [about] . . . what works and what does not work."[4]

Even before the first cell phone call with Negrin on July 14, Rorech knew that Fedorcik was actively looking for ways to address the deliverability issue and that the option of changing the guarantee language would not work.[5]  In addition, Rorech had already had an unrecorded conversation with Barnum in which Barnum expressed his interest in purchasing $100 million of holding company bonds, and Rorech had conveyed that information to Fedorcik in an unrecorded

---

2004) ("temporal proximity of a phone conversation between the trader and one with insider knowledge <u>provides</u> a reasonable basis for inferring that the basis of the trader's belief was the inside information").

[2]  PX 50-A (2:19-2:29) and PX 50 (Tr. at DBSI 4357) (07/14/06 at 9:39 am).

[3]  PX 51-A (all) and PX 51 (Tr. at DBSI 4360-72) (07/14/06 at 9:44 am).

[4]  PX 8-A (all) and PX 8 (Tr. at 1) (07/14/06 at 10:03 am).

[5]  PX 49-A (:05) and PX 49 (Tr. at DBSI 75766) (07/13/06 at 2:03 pm).

conversation.[6]   In the first cell call with Negrin, and in response to Negrin's press for "odds" "probabilit[ies]," "something [he could] hang on to," Rorech likely conveyed whatever he knew on the morning of the 14th with a promise to keep Negrin updated on new developments.[7]

By the time Negrin and Rorech spoke a second time, on the morning of July 17th -- just long enough to move their conversation from a recorded line to their cell phones -- Rorech had the additional, more concrete information that he learned after his first call with Negrin on the 14th, and it is that information that he conveyed to Negrin on the 17th.[8]

The inference of what Rorech conveyed is supported in this case by direct evidence too. Negrin testified that he remembered discussing "reverse inquiry" with Rorech on call on the 17th

---

[6]   We know that the information was passed in unrecorded conversations because recorded calls refer to calls for which no recordings exist or were produced by Deutsche Bank.  E.g., PX 50-A (2:29-2:60) and PX 50 (Tr. at DBSI 4357) (07/14/06 at 9:39 am) (Rorech to Fedorcik: "Yea, and my color is the following . . . with Blue Mountain . . . I think you're going to get the demand. If you created a new box that was senior sub that will be just as high demand as a—you know, what you said yesterday, if you created a whole box being deliverable.  And then out of the Holdco that's a no brainer. You're going to get demand there too.  And again I have an order for 100 there.") (emphasis added); PX 8-A (all) and PX 8 (Tr. at 1) (07/14/06 at 10:03 am) (Rorech to Fedorcik and Barnum: "And Mark, you have his initial interest from yesterday, I mean, I don't know Jeremy if you still feel . . .") (emphasis added);  PX 51-A (:17) and PX 51 (Tr. at DBSI 4360) (07/14/06 at 9:44 am) (Rorech to Fedorcik and Barnum: "So uhm Mark -- Jeremy's the one I've been talking with . . .");  PX 51-A (1:58) and PX 51 (Tr. at DBSI 4361) (07/14/06 at 9:44 am) (Barnum to Fedorcik and Rorech: "JP's probably related a lot of [my views] to you already, so maybe it's more—more efficient in terms of your time . . . if you just shoot me whatever questions you have.").

[7]   In fact, the evidence demonstrates that Rorech was discussing a possible HoldCo issuance with Millennium earlier on the 14th.  Rorech spoke with Masel, Negrin's research analyst, at 8:31 a.m. on July 14.  In that call, Rorech told Masel "well if it doesn't happen there's still always the box to pay themselves a dividend . . . .  All right, and -- as far as probably does it happen?  You make that decision, because --  I know what I think."  Masel responds, "Right, you think it's going to happen," to which Rorech simply laughs.  Masel testified that he understood them to be discussing the HoldCo tranche.  Trial Tr. 213:15-18.

[8]   PX 51-A (all) and PX 51 (Tr. At DBSI 4360-72) (7/14/06 at 9:44 am); PX 8-A (all) and PX 8 (Tr. at 1) (7/14/06 at 10:03 am).  Fedorcik also testified that he spoke with Rorech that Monday morning, after he had spent the weekend discussing the issues with bankers who were discussing the deal directly with the Sponsors.  Trial Tr. 495:6-15; PX 44.

and that his take away from the conversation was that it related to an indication of interest in a "VNU NV level bond."[9]   Additional direct evidence of what they discussed on the 17th appears in their call on the 20th.   There, Rorech told Negrin that "things seem to be . . . going okay with the, uh, structure."[10]   Understanding the reference to "structure" from their prior cell phone calls, Negrin did not ask Rorech what he meant, but merely said "okay, excellent."

## II.    The VNU Information That Rorech Passed to Negrin Substantially Altered the Total Mix of Information That Was in the Market on July 17

Information is material when there is a substantial likelihood that a reasonable investor would find it significant in evaluating whether to buy or sell securities -- that "the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). Information regarding a contemplated transaction that is expected to increase the value of a security is certainly of the type that would be considered by a reasonable investor important with respect to deciding how to invest.  SEC v. Shapiro, 494 F.2d 1301, 1306 (2d Cir. 1974).

As demonstrated by the testimony and contemporaneous telephone conversations of market participants, the two pieces of information that Rorech tipped to Negrin (especially when taken together) substantially altered the "total mix" of information in the market by clarifying Deutsche Bank's preferred solution to the deliverability issue and the market support that was the "necessary condition" (Trial Tr. 835:19) to implementing this preference -- and thereby making the HoldCo tranche likely.

---

[9]    Trial Tr. 136:2-15; 136:20-137:14 (Negrin).

[10]    PX 186-A (0:28) and PX 186 (Tr. at 1) (07/20/06 7:07 am).

On July 17, confusion about deliverability still reigned in the market, with investors actively debating such basic issues as whether the Nielson bonds were even deliverable into VNU CDS and whether, if they were not, the Sponsors would take any action to address deliverability at all.  See DX 79; DX 97; DX 110; DX 131; see Trial Tr. 783:21-784:7 (Barnum); DX 97 at 2 (noting that the CDS concern, driven by European investors, may not be considered, "so European investors may not have much bargaining power.  But who knows, maybe they will manage to sway VNU").

At that point, the holding company tranche was not even a widely-considered possibility.[11]  Significant structural changes -- such as issuing a new tranche of bonds out of a different corporate entity -- are not commonplace.  Trial Tr. 784:1 ("these kind of changes were relatively unusual") (Barnum).  Here the Sponsors and their underwriter-advisors spent months structuring the financing so as to be the cheapest and most optimal for the Sponsor client.  PX 231 at 18-19 (Deutsche Bank's "primary task [was] delivering a bond deal at the most attractive interest rate possible to its issuer client").  As such, it was unusual for the Sponsors and the underwriter to consider discarding their chosen financing structure only a week after launching the deal, especially in response to non-buy-and-hold investors.  Trial Tr. 613:18-614:1 (Barcus); 784:1-7 (Barnum).[12]  Moreover, as late as July 20, the Sponsors were continuing to tell investors

---

[11]   Many sophisticated market participants were oblivious to the HoldCo tranche option until well after Rorech tipped Negrin.  See, e.g., PX 30 at CRD 0116 (on July 20 Merrill Lynch recommended "applying a 100bp deliverability and liquidity impairment premium to 5yr CDS VNU protection"); PX 215 at CRD 0142 (RBS, where Negrin placed his July 17 CDS order, reported as late as July 24 that "[i]t remains unclear as to whether the new Nielsen Finance LLC notes will be deliverable into VNU's CDS").

[12]   Moreover, Deutsche Bank would not lightly consider structural changes.  As left lead, Deutsche Bank had supported the announced structure.  Significant restructuring, therefore, could reflect negatively on its knowledge of the market and ability to "mak[e] the transaction most saleable," key responsibilities of the left lead.  Trial Tr. 309:4-6 (Fedorcik);

at the road show that the structure would not change (Trial Tr. 793:14-794:13 (Barnum)) as were senior members of Deutsche Bank's capital markets and sales teams.  Hunt Dep. 53:2-54:6; PX-108-A (9:58-11:36) and PX 108 (Tr. at 5) (7/18/06 10:01 am EDT/3:01 pm (BST)).

Of course, issuers and underwriters may no more provide material misstatements than they may provide true, but non-public material disclosures selectively to the market.  Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 191 (1994).  The discordant information (both true and false) flowing to different market participants highlights a key issue in this case -- and a flaw in Defendants' argument that the market was aware of Rorech's information (Trial Tr. 1791:9-20 (Strassberg)):  not all market participants had the same insight into Deutsche Bank's or the Sponsor's views on issuing HoldCo bonds.  Some, such as Deephaven, believed (incorrectly) that Deutsche Bank and the Sponsors were not contemplating an issuance.  PX 108-A (9:58-11:36) and PX 108 (Tr. at 5) (7/18/06 10:01 am EDT/3:01 pm (BST)).  Others, who had no special access to an insider, learned what was in the red herring and what was being discussed in the market, and thus knew only that VNU was issuing the operating company bonds and that there was confusion about the impact on CDS.  Those who spoke to Rorech, however, had a unique window into the development of the holding company issuance -- allowing them to purchase CDS at favorable prices.  Trial Tr. 216:25-217:21 (Masel).

Defendants (Trial Tr. at 1794:7-1795:6 (Strassberg)) improperly conflate public knowledge of the problem with private knowledge of the solution (or contemplated solution).  Where general information about a possible corporate event is then in the market, more specific information, especially when it emanates from an insider, may be material because it gives the

---

PX 231 at 10 (Deutsche Bank, as the left lead underwriter, "determin[es] the structure of the transaction").

recipient confidence that the event is more likely to occur than the general information to which everyone is privy.  In United States v. Mylett, 97 F.3d 663, 666 (2d Cir. 1996), for example, the insider confirmed a news report that discussed the possibility that AT&T and NCR might combine and told the tippee that he had conducted a feasibility study related to a possible merger and had been warned by his supervisor not to comment on the article.  The Court had no trouble concluding that the tip had been material:  "At the very least, these non-public facts would make a reasonable investor less likely to believe that nothing would happen.  That by itself would be information with significant market value."  Id. at 666-67; see also Victor Teicher, 1990 WL 29697, at *4 (tipped information that potential suitor had retained prominent law firm to counsel it in possible acquisition could be material even after press report that target might be acquired by suitor because "[i]t is that very fact, which the [tippee] had and the investing public did not, that adds the stuff of reality to the otherwise ephemeral quality of the rumor reported by the Wall Street Journal").

The information that Rorech passed to Negrin was private knowledge of the solution: Negrin got information as to how Deutsche Bank was addressing the issue and which pointed him toward the likelihood that the Sponsors would be receptive.  First, that the left lead underwriter was recommending a change was itself significant for the reasons discussed above: such changes are rare and the left lead is responsible for understanding market demand and structuring the offering.  Trial Tr. 308:5-309:25 (Fedorcik); 783:25-784:1 (Barnum); 1257:16-23 (Olvany testifying that he could not recall any deal involving a supplemental offering memorandum); PX 231 at 10.  Second, the existence of at least $100 million in anchor orders, a "necessary condition" for the holdco tranche (Trial Tr. 835:18-20 (Barnum)), both underpinned and bolstered the significance of Deutsche Bank's recommendation.  Together these pieces of

7

information made it likely that the Sponsors would issue the holding company tranche.  Put another way, the tipped information tended to provide answers to the questions in the market, and was, therefore, material.

It is no answer that certain aspects of the restructuring had not been finalized by July 17. For example, Defendants look to a small number of discussions concerning whether Cayman- and Bermuda-registered hedge funds could invest in a HoldCo tranche for evidence of the immateriality of Deutsche's recommendation.  Trial Tr. 1335:23-1336: 20 (Rorech).  But to be material, information need not be definitive as to outcome; even information that is contingent can be material and "'any fact which in reasonable and objective contemplation might affect the value of the corporation's stock or securities'" is material.  SEC v. Lyon, 605 F. Supp. 2d 531, 541 (S.D.N.Y. 2009) (quoting SEC v. Mayhew, 121 F.3d 44, 52) (2d Cir. 1997) (emphasis in original); see also United States v. Carpenter, 791 F.2d 1024, 1032 n.9 (2d Cir. 1986), aff'd, 484 U.S. 19 (1987) (recognizing materiality of Wall Street Journal columns because of their "undisputed significant market impact").  Thus the Second Circuit has already ruled that an investment bank's recommendation to its client may itself be material when viewed in light of the corporate action taken thereafter.  Castellano v. Young & Rubicam, 257 F.3d 171, 183 (2d Cir. 2001).  In that case, the Court held that Bear Stearn's recommendation to a client that it pursue a leveraged buyout could be material in light of the client's later decision to engage in discussions with a leveraged buyout firm, even if no buyout ultimately occurred.  Id.[13]

---

[13]  Castellano is just the most recent in a long line of cases in the merger context that have recognized that information about initial steps in the process -- even where no merger occurs -- can be material if they alter the total mix available because news of preliminary discussions or of the identity of potential targets may affect the value of the corporation's securities.  E.g., United States v. Materia, 745 F.2d 197, 199 (2d Cir. 1984) (upholding conviction of misappropriator of merger target identity information, noting that "even a hint of an upcoming tender offer may send the price of the target company's stock soaring");

In addition, discussions of restructurings, including the issuance of new securities, can be material, even where they are subject to uncertainties beyond the control of the issuer or underwriter. In <u>SEC v. Downe</u>, No. 92 Civ. 4092 (PKL), 1993 WL 22126 (S.D.N.Y. Jan. 26, 1993) the Court rejected the defendant tipper's argument that the company's considerations of various restructuring plans were immaterial as a matter of law. The Court held that defendant's tips of the various proposals to restructure that the company was considering, including a recapitalization plan that involved the potential issuance of new debt, were not too inchoate to be considered material. <u>Id.</u> at *9. Nor did the fact that some of the restructuring plans were contingent on factors beyond defendant's control, or that the company ultimately rejected the plans, render the information about the company's considerations of those plans immaterial. <u>Id.</u> at *9-10.

Thus, issues that arose on the 19th and 20th relating to the potential purchasers' domiciles does not lessen the materiality of the HoldCo tranche information. In any event, Defendants' argument misses the import of the information at issue: Deutsche Bank was pushing a restructuring to make new VNU bonds deliverable into the CDS. While there may have been discussions about which entity could issue the deliverable bonds – the ultimate holding company or an intermediate one – there is no evidence of any uncertainty that *deliverable* bonds would be recommended and issued.

A "major factor" in determining whether information is material "is the importance attached to it by those who knew about it." <u>SEC v. Mayhew</u>, 121 F.3d 44, 52 (2d Cir. 1997).

---

<u>United States v. Victor Teicher & Co., L.P.</u>, No. 88 CR 796 (CSH), 1990 WL 29697, at *4 (S.D.N.Y. 1990) (tip that potential acquirer had retained prominent law firm in connection with possible acquisition could be material even where merger did not ultimately occur because of antitrust obstacles), <u>aff'd</u>, 987 F.2d 112 (2d Cir. 1993); <u>SEC v. Maio</u>, 51 F.3d 623, 637 (7th Cir. 1995) (preliminary merger discussions were material).

On this record, there is ample evidence that those who knew what Rorech knew considered it material.

Rorech's tippees thought the information sufficiently significant that they traded on it. On July 17 at 1:39 pm, Rorech and Fedorcik spoke with Geoffrey Sherry, a portfolio manager at Caxton, and relayed to him the same two pieces of information that Negrin received earlier that morning. DX 381 (2:19-2:40; 4:18-5:16; 5:28-5:34) and DX 381T (Tr. at 2-4). Sherry testified that receiving this information made the likelihood of a HoldCo offering "more concrete." Trial Tr. 525:12-16 (Sherry). In response Sherry stopped discussing VNU with his Caxton colleagues (Trial Tr. 531:10-19); and he traded VNU CDS only with Deutsche Bank because "they were the people that [he] had been speaking to about this potential transaction" and "[t]hey had the same information" about VNU. Trial Tr. 534:4-535:1 (Sherry). Most tellingly, however, Sherry bought €10,000,000 of VNU CDS the next day, July 18. PX 137; Trial Tr. 532:24-535:6 (Sherry).

Sean Fahey purchased VNU CDS on even less specific information from Rorech. On the morning of July 18, Rorech told Fahey to "expect structural changes" to clarify the deliverability issue and to "think about the iterations of how you can do that." PX 36-A (3:12-end) and PX 36 (Tr. at 3) (7/18/06 8:27 am). This (even without the "concrete" facts Rorech gave the others, including Negrin) was enough. Less than 30 minutes later Fahey purchased 5 million in VNU CDS. PX 34, DX 153, and Plaintiff's Post-Trial Proposed Findings of Fact and Conclusions of Law at ¶ 7, 116.

Negrin of course also believed the information to be material. By July 18, Negrin purchased € 20 million in VNU CDS, twice the size of any other VNU CDS purchase he had ever made. Plaintiff's Post-Trial Proposed Findings of Fact and Conclusions of Law at ¶ 95.

Negrin placed significance on the information Rorech gave him precisely because it came from Rorech, a representative of the left lead underwriter (Trial Tr. 145:14-146:4 (Negrin)), who thus had factual information about structural changes "distinct from rumors." (Trial Tr. 145:5-145:13 (Negrin)).

Jeremy Barnum, who provided the initial $100 million anchor order to Fedorcik and Rorech on July 13, also understood the two pieces of information to be significant. As he testified (once he came to trust the veracity of what he was being told):

> I think that in the hypothetical where Deutsche Bank had showed up to the issuer and said, Hey, you should do this, and the issuer had said, Oh, you know, well, do you have orders? And Deutsche Bank said, Oh, no, we didn't bother to get any orders, then the issuer probably told them to go away. So in that sense, the existence of the orders certainly was a necessary condition for the issuer to even consider the change.

Trial Tr. at 835:13-20; see also Trial Tr. at 803:3-803:9 ("I think that at the very least the fact that Mr. Rorech was consistently saying that the deal was going to happen with such high conviction . . . did contribute to my sort of snapping out of my blinded state and considering the consequences of the alternate state of the world actually coming to pass").

Although Barnum sold VNU CDS on July 18 and on the morning of July 21, Barnum was the first to concede that he was not acting as a reasonable investor when he did so. Rather, for his own subjective reasons, Barnum did not believe Rorech and Fedorcik were telling him the truth. Barnum acknowledged that in this period he had been "in a frame of mind that was unusually skeptical . . . or cynical even", his trading pattern was "particularly confused and erratic," and "a personal issue for [him]." Trial Tr. 811:3-5, 832:2-3 (Barnum). His refusal to believe Fedorcik on July 17 "may have been part of my somewhat exaggerated skepticism at the time," (Trial Tr. 827:9-10 (Barnum)), one likely fed by the conflicting information he received from David Ross at Deutsche Bank London ((DX 448 (0:48-1:35), DX 448T (Tr. at 1) (7/12/06,

11:57 am (BST)); Trial Tr. 784:12-16 (Barnum)) and the Sponsors.  Trial Tr. 793:14-795:2

(Barnum).[14]

Once Barnum realized on July 21 that Rorech and Fedorcik had, in fact, been giving him

accurate information all along, he immediately bought €10 million of  VNU CDS.  PX 6 at

BM0000294 ("I took profit on all the VNU short as I remain skeptical that the sponsors will

bother to do a deal out of the holdco.  However, at the end of the day, it was looking more

probable so I bought back 10 million of protection."); see also Trial Tr. 802:20-803:9 (Barnum);

Trial Tr. 832:7-10 ("Q.  But you'll agree, won't you, Mr. Barnum that in hindsight, the

confidence that was being expressed to you by Mr. Fedorcik and Mr. Rorech turned out to be

true, isn't that right?  A.  In hindsight, it certainly did turn out to be true") (Barnum).

Deutsche Bank personnel working on the transaction also believed that the VNU

Information was significant compared to what was in the market.  For example, Eve Tournier,

the head of the Deutsche Bank desk responsible for trading VNU bonds and CDS, believed

herself "tainted" by her preliminary conversation with Ross and Cahalan on July 12, and

refrained from trading in VNU CDS -- merely because she now knew Deutsche Bank was

"thinking about" a Holdco tranche.  PX 142-A (11:23-end) and PX 142 (DBL 2120) (7/12/06 at

5:14 am EDT/10:14 am BST); Tournier Dep. at 103:12-25.

Fedorcik, Ross, and Cahalan each understood that news of Deutsche Bank discussing a

restructuring (much less recommending a restructuring, with anchor orders in support) would

---

[14]    The test of a reasonable investor requires an objective, not a subjective inquiry.  Isquith for
and on Behalf of Isquith v. Middle South Utilities, Inc., 847 F.2d 186, 208 (5th Cir. 1988)
("reasonable investor test is appropriate because adequacy of disclosure, like materiality,
only can be judged against an objective standard of investor behavior.") (quoting Durning v.
First Boston Corp., 815 F.2d 1265, 1268 n.4 (9th Cir. 1987); SEC v. Hoover, 903 F. Supp.
1135, 1140 (S.D. Tex. 1995).  In this respect, Barnum's early skepticism does not defeat a
finding of materiality because in selling CDS, he was not acting reasonably by his own
admission.

add to the information available in the market and would impact CDS prices.  See Cahalan Dep. at 78:20-79:2 ("A. [I]f you do have a new security or a change of structure you've got to be very careful with it until it's baked and that you announce it . . . because, you know, people could be using this information and potentially putting on trades around it.); Ross Dep. at 76:13-17 ("you don't want to sort of overpromise something . . . that's price sensitive information"); PX 53-A (8:44) and PX 53 (Tr. at 1251) (7/17/06 10:28 am EDT/3:28 BST) (Fedorcik asks Ross and Cahalan whether Tournier is "over the wall" before speaking with her about a HoldCo tranche on July 17; Trial Tr. 320:8-321:16 (Fedorcik indicating that his practice was to limit investor contact to avoid potential disruption of the deal).  Rorech himself understood that Deutsche Bank's push for a HoldCo offering combined with the anchor orders "makes a holdco tranche more likely."  Trial Tr. 1078:23-25 (Rorech).

Defendants' contention that Deutsche Bank Capital Markets was only concerned about disclosure of the Sponsors' final approval to issue Holdco bonds is not, therefore, supported by the record.

Negrin and Rorech's other tippees understood that Rorech's information was significant because it clarified the confusion in the market and made a holding company tranche more likely.  In sum, it added to the "total mix" of information in the marketplace by making it likely that the HoldCo tranche would issue, or, put another way, by making a reasonable investor less likely to believe that "nothing" would happen.  Mylett, 97 F.3d at 667.

III.    **Negrin's Trading With Deutsche Bank Does Not Absolve Him of Liability**

That Negrin purchased half of his CDS position from Deutsche Bank and assigned some of it back to Deutsche Bank (at a profit for Negrin) does not negate the deceptive nature of his trading.

See Trial Tr. 1867:19-1868:12 (the Court).  Negrin's "disclosure" was insufficient because it was not timely nor full disclosure that he was in possession of material nonpublic information.

In United States v. O'Hagan, 521 U.S. 642 (1997), the Court set out the nature and timing of the disclosure that would be necessary to remove the deceptive taint from a trade on inside information.  There, the defendant had misappropriated information from his law firm about a client's merger plans.  Id. at 647.  While the defendant had made no disclosure to anyone prior to his trades, the Court noted that "full disclosure forecloses liability under the misappropriation theory . . . .  Because the deception essential to the misappropriation theory involves feigning fidelity to the source of information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation."  Id. at 655 (emphasis added).  Therefore, what O'Hagan requires (and what is lacking here) is both full and pre-trading disclosure.  See SEC v. Rocklage, 470 F.3d 1, 12-14 (1st Cir. 2006).

First, Negrin made no full and pre-trading disclosure to the source of his information, Deutsche Bank, prior to buying or selling his CDS.   There is no evidence that Negrin told anyone at Deutsche Bank, except perhaps Rorech, that he was trading on material nonpublic information supplied by one of its employees; therefore, the deception remained unabated.  As far as Deutsche Bank knew, Rorech remained a loyal employee and had breached no duty.

Second, full disclosure must precede trading rather than occur simultaneously with or after trading.  O'Hagan, 521 U.S. at 655 (explaining that there would be no liability "if the fiduciary discloses to the source that he plans to trade on the nonpublic information") (emphasis added);  Rocklage, 470 F.3d at 12 ("[T]he Court in O'Hagan seemed to contemplate that any liability-avoiding disclosure would come before the defendant engaged in the deceptive activity.") (emphasis in original);  accord United States v. Falcone, 257 F.3d 226, 232 n.3 (2d

14

Cir. 2001) ("[I]f the fiduciary discloses to the information source his or her <u>intent to trade</u> based on the information, there is no fraud . . .) (emphasis added).  Here, not only was Negrin's disclosure wholly inadequate, it happened simultaneously with trading rather than prior to it. [15]

<u>Finally</u>, Negrin's own testimony refutes his argument.  By his own admission, Negrin did not (as did Sherry) pick Deutsche Bank to execute his CDS trades because of any desire to trade with the source of his information;  Negrin testified that he based his choice of trading partners on "a combination of who has the best market and who helps [him] in executing the trade and gives [him] color on the trade, depending upon information that [he gets] from different salespeople."  Trial Tr. at 176:7-15 (Negrin).

## IV. The Information That Rorech Tipped to Negrin was Confidential, Material and Non-Public and Rorech Had a Duty to Maintain that Confidentiality

Rorech was bound by Deutsche Bank's Confidential and Inside Information Policy (DX 285) and was aware of its terms.  Trial Tr. 984:3-19 (Rorech).  In passing the information to Negrin about Blue Mountain's order and Deutsche Bank's intention to recommend the HoldCo tranche to the Sponsors, Rorech breached that policy.

### A. The Confidential and Inside Information Policy Prohibited Both Disclosures

<u>First</u>, both the order and recommendation information constitute "Confidential Information" under the Policy which employees were instructed not to disclose to anyone without a "legitimate business need to" know.  DX 285 at DBSI 98822.   The order constituted "customer information" (<u>id.</u>) which Deutsche Bank's representative testified was covered under the Policy, even when transmitted by the customer without an explicit request for confidentiality.

---

[15]     In addition, Negrin appears to argue that disclosure to DBSI was also made by his July 24 sale and August 1 assignment of CDS to DBSI.  Because the conduct at issue is Negrin's purchases on July 17 and July 18, any actions taken by Negrin after the purchases cannot possibly constitute disclosure, even if one were convinced that merely placing a trade constitutes disclosure.

Trial Tr. at 729:13-730:2 (Cartaina).  Plaintiff's expert, David Barcus, echoed that view, noting

that when the customer order is delivered in connection with a reverse inquiry for an

unannounced new issue, it is confidential and should not be used by salesmen in speaking to

other accounts.  Trial Tr. at 614:615:3 (Barcus).  In that situation, the order information takes on

a special, confidential quality because it communicates more than simply the existence of

customer interest;  it indicates the likelihood that the issuance of a proposed and as-yet

undisclosed tranche will actually happen.  Causer Dep. at 48:8-17; accord Trial Tr. at 614:14-

615:3 (Barcus).

      Deutsche Bank's recommendation to its Sponsor clients was also "Confidential

Information" under the Policy.  The Policy defines "proprietary information" as confidential.

DX 285 at DBSI 98822.  To the extent that Defendants read the policy to limit "proprietary

information" to proprietary information that was provided by or obtained from a third party with

the expectation or contractual agreement that it will remain confidential, their reading makes no

sense, as proprietary information is by definition information that no third party delivers.

      Second, both the order and recommendation information constitute "Inside  Information"

under the Policy which employees were prohibited from disclosing or using as a basis for

recommending the purchase or sale of a security under any circumstance.  DX 285 at DBSI

98823.  The Policy defines "Inside Information" as "information about an issuer or its

security(ies) that is material and non-public."  Id.  The Policy also explicitly designates "Plans to

issue or redeem securities" as Inside Information.  Trial Tr. 1251:14-16 (Olvany).  Thus, if the

recommendation and order information are material, nonpublic information, Rorech breached

Deutsche Bank's policies in disclosing it.

Rorech's argument that Fedorcik (and to a lesser extent, Martindale) authorized his disclosure to Negrin is unavailing.  The Policy permits disclosure of Confidential Information only after "consultation with Compliance or Legal."  DX 285 at DBSI 98822.  And there is no provision for the authorized disclosure of Inside Information under the Policy; an employee may consult with Compliance or Legal "to assist in making [a] determination" as to "whether information they have is inside information," but no Deutsche Bank employee may permit the dissemination of Inside Information.  Id. at 98823.

**B.**    **If There Were Evidence that Rorech's Disclosures Were Authorized – And There Is None – He Is Still Liable for Misappropriation**

1.    **The Sponsors Gave No Authorization to Disclose.**

If Defendants still argue that the Engagement Letter constitutes VNU's authorization to disclose all information associated with its offering, they should not.  Under Deutsche Bank's own Policy, the issuer has no power to define what material, non-public, or even confidential, information a Deutsche Bank employee may divulge, particularly information like that here that belongs not to the Sponsors, but to Blue Mountain and Deutsche Bank itself.  Trial Tr. 678:4-12 (Barcus).  But even if the Sponsors could do so, they plainly did not authorize the disclosures as evidenced by the Preliminary Offering Memorandum's explicit disclaimer of any such authorization:

> You should base your decision to invest in the notes solely on information contained in this offering memorandum.  Neither we nor the initial purchasers [the underwriters] have authorized anyone to provide you with any different information.

PX 62 (VNU Preliminary Offering Memorandum at 3.)  Of course, there was no mention of a HoldCo tranche in the Preliminary Offering Memorandum.

    2.    **While Rorech Understood the Limitations of Fedorcik's Authorization, He Ignored Them to Further His Own Interests**

Even assuming for the sake of argument that Rorech's disclosures could somehow be sanctioned by Fedorcik (and they could not have been),[16] Rorech still misappropriated the information when he disclosed it to Negrin -- a disclosure Rorech knew Fedorcik had not authorized and a disclosure that served no interest of Deutsche Bank.[17]

A misappropriator may violate the securities laws even if he does nothing wrong to obtain the information he tips;  all that is required is that he convert the information once he has it to his own use.  "A fiduciary who '[pretends] loyalty to the principal while secretly converting the principal's information for personal gain', . . . 'dupes' or defrauds the principal." O'Hagan, 521 U.S. at 653-54 (citations omitted).  Thus, a misappropriator may obtain the information

---

[16]    Neither Section 10(b) nor Rule 10b-5 makes any allowance for the disclosure of material nonpublic information in the course of soliciting reverse inquiry.  As Paul Causer testified, Fedorcik's disclosure of the likelihood of a HoldCo tranche to any public side employee or investor should have been preceded by a confidentiality agreement between the recipients and the Bank. (Causer Dep. 10:8-11:6.)  As Barcus testified, per market practice, an underwriter should elicit this type of information in an unannounced deal like the HoldCo tranche, without disclosing to potential buyers who the issuer was.  Trial Tr. 634:4-23; 638:6-13; 639:5-640:1 (Barcus).  Alternatively, an underwriter can enter into a confidentiality agreement with a prospective buyer, merely limiting their ability to trade in the non-public information conferred.  PX 231 at 17.  But none of this provides an answer for Rorech's conduct: Rorech deliberately refused to abide by the limitations Fedorcik set for himself and others for the purposes of accomplishing the VNU deal.

[17]    Indeed, Rorech's duty to keep material, nonpublic information confidential arises from his employment relationship with DBSI, and does not depend on the existence of any confidentiality agreement or policy.  See United States v. Chestman, 947 F.2d 551, 566 (2d Cir. 1991) (holding that the duty arises from the relationship of the tipper to the source and noting precedent finding the requisite duty in employer/employee contexts); United States v. Newman, 664 F.2d 12, 17 (2d Cir. 1981); SEC v. Falbo, 14 F. Supp. 2d 508, 523 (S.D.N.Y. 1998) (contractor owed duty not to reveal any information he obtained during his work for employer even where no agreement to maintain confidentiality existed);  see also Restatement (Second) of Agency § 395 ("Unless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency").

legitimately, but if he uses it for his own purposes instead of his principal's, he has misappropriated it.  E.g., United States v. Carpenter, 791 F.2d 1024 (2d Cir. 1986), aff'd, 484 U.S. 19 (1987), (tipper was the author of the material nonpublic information he improperly tipped to others); SEC v. Materia, 745 F.2d 197 (2d Cir. 1984) (proof reader learned of the targets of tender offers in the regular course of his job at a financial printer and improperly traded on it); SEC v. Singer, 786 F. Supp. 1158 (S.D.N.Y. 1992) (client's voluntarily provision of information to lawyer did not absolve him of duty to refrain from trading on it.); United States v. Willis, 778 F. Supp. 205 (S.D.N.Y. 1991) (psychiatrist who learned of material nonpublic information from patient through therapy sessions improperly traded on it).

Here, Rorech took the information that Fedorcik (and Barnum) gave him and used it for an unauthorized purpose.  Fedorcik testified that he wanted to contain the information about Deutsche Bank's efforts to bring a HoldCo tranche to those who had placed reverse inquiry for HoldCo bonds so as not to hurt momentum on the OpCo deal. Trial Tr. 326:8-321:16.  Rorech knew that Fedorcik wanted to keep the information contained to those two or three investors who provided indications of interest for the HoldCo bonds. PX 100-A (July 13 call with Jeff Burch of Blue Mountain).

Rorech ignored Fedorcik's limited authorization when he tipped his inside information to Negrin and his other accounts, and he did so to advance his own agenda, not Deutsche Bank's.  Rorech's agenda was that of all tippers:  to confer on his tippees the opportunity to buy something (here, CDS) low and sell high once the news was announced and the rest of the market reacted to it.[18]  As Ross and Cahalan understood, rising CDS spreads hurt the VNU bond

---

[18]    Rorech's claim that he disclosed the possibility of a HoldCo tranche to pitch a sale of OpCo bonds as part of a basis trade does nothing to excuse his unauthorized disclosures.  To pitch a basis trade, Rorech had no need to tell anyone about the HoldCo issuance.  Indeed, even

deal by raising the prices at which the OpCo bonds could be sold and potentially dampening market enthusiasm for that issue.  Ross Dep. 101:4-102:25; PX 47-A (13:38) and PX 47 (Tr. at DBL 1114).  Therefore, Rorech's disclosures were not in the Bank's or the Bank's client's interests.

At no time did Rorech seek or obtain Fedorcik's (or more properly, the Compliance Department's) authorization to spread the word about a possible HoldCo tranche outside the circle of two Fedorcik had identified.  Indeed, Rorech hid those disclosures from Fedorcik:  He falsely assured Fedorcik that he had told Millennium that he had no idea whether a HoldCo tranche would issue. (PX 57-A (0:47-1:12) and PX 57 (Tr. at DBSI 75771).)[19]  He refused to take or deliver Claren Road's reverse inquiry to Fedorcik because doing so would have revealed that he was doing what he knew he should not:  "I can't be getting this info [the news about the HoldCo tranche] out there yet." PX 38-A (0:15-1:40) and PX 38 (Tr. at 1-2).  Indeed, in all of the calls Rorech had with his non-reverse inquiry investors -- Koundourakis at Gracie Capital (PX 184-A and PX 184 (Tr. at 1) (whispering "I'm structuring the deal" and "I'll call you later on the outside"), Wilner at PIMCO (PX 185-A (4:17) and PX 185 (Tr. at 3) ("Nothing is public, nothing is out there yet, you know what I mean?")), even Kellerman (PX 71-A and PX 71 (Tr. at

---

before the idea of the HoldCo tranche was first floated, Rorech was trying to interest accounts in a basis trade.  Trial Tr. at 1273:6-13; 1276:19-24; 1278:8-1279:3; 1282:3-23.  In any event, with respect to Millennium, Rorech's intention to sell them a basis trade is simply implausible because, as Masel testified, Millennium did not engage in basis trades (Trial Tr. 201:3-23), a fact Rorech undoubtedly knew from his long relationship with Negrin and familiarity with his trading strategies.  Trial Tr. 984:20-985:15 (Rorech).

[19]  At that point, Rorech likely grew concerned that Fedorcik might find out about Millennium's CDS purchases and question Rorech about what he had told them about HoldCo.  Fedorcik was clearly concerned about accounts taking CDS positions, not to participate in the HoldCo tranche, but rather to benefit from the rise in price that would result from the announcement.  PX 150.

1) ("I'll come over. I've gotta do it offline.") -- Rorech demonstrates that he knew he should not be sharing this information.[20]

### C. Rorech Violated the Restrictions Imposed by the Restricted List.

If it were somehow possible that the information Rorech told Negrin was both material nonpublic information subject to Rule 10b-5's proscriptions and yet not subject to Deutsche Bank's Confidential and Inside Information Policy restrictions, Rorech still misappropriated it by disclosing it to Negrin in solicitation of a trade that he was barred from soliciting by Deutsche Bank's restricted list. Deutsche Bank put VNU on its Restricted List where it remained throughout the month of July 2006. PX 22; Trial Tr. 712:2-16. While VNU was on that list, all Deutsche Bank employees were prohibited from soliciting trades in existing VNU securities and derivatives. Trial Tr. at 705:8-9; 706:23-25; 713:7-8 (Cartaina).

Rorech intentionally or recklessly violated Deutsche Bank's prohibition on soliciting VNU CDS trades from Millennium. Although he recognized that he should have checked the Restricted List, Rorech testified that he did not. Trial Tr. at 996:7-997:3 (Rorech). Nonetheless, Rorech knew about the restriction. On July 12, Rorech knew he was restricted. PX 174. Again on July 17, 2006, John Aylward, Deutsche Bank's VNU CDS trader, told Rorech that he was restricted to passive market making in VNU CDS. (PX 181-A (2:45-end) and PX 181 (Tr. at 2-3.)) Not three hours later, and without checking with Compliance, Rorech forwarded the order

---

[20] Equally telling is the difference in the specificity of the information Rorech provided Claren Road between his first call with them on July 18th (PX 36-A (3:12-end) and PX 36 (Tr. at 3) (in which Rorech offers the vague "expect structural changes")) and his third call, after Eckerson offered him an order for HoldCo bonds (PX 38-A (0:15-1:40) and PX 38 (Tr. at 1-2) (in which Rorech detailed the size of the existing orders and tells Fahey and Eckerson that the bankers "want to get the deal done").

he had solicited from Negrin to Aylward for execution without disclosing that he had solicited the trade.  Trial Tr. at 1028:25-1029:4.[21]

In contrast to Rorech's reaction to the news Aylward delivered, his fellow salesman, Chris Wagner, *did* call Compliance when he questioned what the trader told him about his restriction.  DX 521 (:41)(07/12/06 at 10:54 am) and DX 521T (Tr. at 1). [22]

When Wagner did so, he learned that salesmen were prohibited from soliciting VNU CDS trades.  While he testified that he understood the restriction to permit talking to accounts about purchasing CDS (Trial Tr. 1475:2-5), he is not heard on any later calls soliciting trades in CDS.  See DX 526 (7/14/06 at 12:06 pm) and DX 526(B)T, DX 337 (7/19/06 at 11:54 am) and DX 337T, DX 338 (7/19/06 at 1:56 pm) and DX 338T.   In fact, in the call in which he relates his conversation with Compliance, he tells his customer that if he wants to put on anymore CDS, he will have to go elsewhere for a quote.  DX 521 (:41) and DX 521T (Tr. at 1).  Nor is Martindale heard soliciting CDS trades in any of his calls with customers.  DX 336 (7/17/06 at 10:28 am) and DX 336T; DX 341 (7/20/06 at 12:54 pm) and DX 341T; DX 522 (7/13/06 at 11:44 am) and DX 522T; DX 524 (7/14/06 at 9:31 am) and DX 524T; DX 525 (7/14/06 at 9:58 am) and DX 525T.

---

[21]    Rorech maintains that despite what Aylward told him, he believed that Aylward was permitted to accept solicited orders because the trade runs he saw did not carry a legend to that effect.  Trial Tr. 1012:7-14.  But his explanation is not entitled to any credence.  There is simply no evidence that between the time Aylward told him of the restriction and the time Rorech forwarded Negrin's trade, Rorech saw any trade run at all.

[22]    This section addresses the Court's question at Trial Tr. 1914:21-1915:8.

## Conclusion

Based on the foregoing evidence and law, and on the evidence adduced at trial, the

Commission respectfully requests that the Court hold Defendants Rorech and Negrin liable for

violations of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5

promulgated thereunder, and issue an Order permanently enjoining them from future violations

of those provisions, requiring them to disgorge their unlawful gains, and imposing civil penalties

against each under Section 21A or 21(d)(3) of the Securities and Exchange Act.

Dated: New York, New York
        May 7, 2010

<div style="margin-left:40%">

SECURITIES AND EXCHANGE
COMMISSION

By:    _____/S/_____
       Richard G. Primoff
       Nancy A. Brown
       Panayiota K. Bougiamas
       Alexander J. Janghorbani
       Attorneys for Plaintiff
       New York Regional Office
       3 World Financial Center, Room 400
       New York, New York 10281-1022
       Telephone (212) 336-0148 (Primoff)
       primoffr@sec.gov

</div>