UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,                09 Civ. 4329 (JGK)

          - against -                         OPINION AND ORDER

JON-PAUL RORECH AND RENATO NEGRIN,

                    Defendants.
————————————————————————

JOHN G. KOELTL, District Judge:

INTRODUCTION ..................................................3

FINDINGS OF FACT...........................................11
  *I. Background* ........................................... **11**
    A. The Parties Involved ................................. 11
      1. The Defendants.................................... 11
      2. Deutsche Bank Employees........................... 12
      3. Investors......................................... 14
    B. CDSs and Bonds ...................................... 14
    C. The Flow of Information in High Yield Bond Offerings ... 17
  *II. The VNU Bond Offering* ................................ **21**
    A. The Original Bond Issuance .......................... 21
    B. Deliverability Questions Arose ...................... 23
    C. Investors Expressed Interest in Deliverable Bonds ...... 25
    D. The Basis Trade Idea Was Developed .................. 27
    E. Deutsche Bank Worked to Resolve the Deliverability
    Issue ................................................ 29
  *III. The Cellular Phone Calls and Mr. Negrin's VNU CDS*
  *Trades* ................................................. **34**
    A. The Cellular Phone Calls Between Mr. Rorech and Mr.
    Negrin .............................................. 34
    B. Mr. Negrin's VNU CDS Trades ........................ 44
  *IV. Mr. Rorech's Actions as a Deutsche Bank Salesman* ........ **46**
    A. Mr. Rorech's and Others' Efforts to Sell the VNU Bonds . 46
    B. Mr. Rorech's Pitch to Millennium .................... 48
    C. Whether Mr. Rorech Thought He Was Acting Illegally in
    Attempting to Sell the Bonds ......................... 51
  *V. Mr. Negrin's Actions at Millennium* ..................... **56**
    A. Mr. Negrin's Practice of Trading VNU CDSs ............. 57
    B. Mr. Negrin's Reasons for Purchasing the VNU CDSs ....... 58
  *VI. Deutsche Bank's Confidentiality Policies* ............... **60**

*A. Deutsche Bank's Confidentiality Policy, Its Engagement Letter with VNU, and Expected Uses of Indications of Interest* ................................................. 60
*B. Deutsche Bank's Wall-Crossing Procedures* ............... 66
*C. Deutsche Bank's View Whether Their Confidentiality Policies Were Breached* ........................................ 69
*D. VNU on Deutsche Bank's Restricted List* ................. 71
***VII. Information About the VNU Bond Issuance in the Market** .. 74*
***VIII. Facts Relevant to the Court's Jurisdiction** ............ 77*
*A. The Relationship Between VNU Bond Prices and Yields and CDS Prices* ..................................................... 78
*B. The Relationship Between the Value of VNU Bonds and CDS Prices* ..................................................... 83
*C. Section 9.9 of the ISDA Definitions* .................... 85

CONCLUSIONS OF LAW.............................................87
***I. Subject Matter Jurisdiction** ............................... 88*
*A. Statutory Provisions* ................................... 88
*B. The Meaning of "Based On"* ............................ 90
*C. The Price Term of the CDSs Was "Based On" the Price, Yield, and Value of VNU Securities* ........................ 95
*D. Section 9.9 of the ISDA Definitions Was a Material Term of the CDSs and Was "Based On" the Price of Securities* ....... 98
***II. Misappropriation Theory** ................................ 100*
*A. Mr. Rorech's Conduct* ................................. 101
*1. Mr. Rorech Did Not Know that Deutsche Bank Would Recommend that the Sponsors Issue the Holding Company Bonds at the Time of His Calls with Mr. Negrin*................ 102
*2. The Information Mr. Rorech Did Know at the Time of the Calls Was Not Material*................................. 105
*a. Information Regarding the Potential Restructuring* .. 106
*b. Information Regarding Customers' Indications of Interest* ......................................... 108
*3. Sharing the Information Mr. Rorech Did Know Was Not a Breach of His Duty of Confidentiality*.................. 110
*a. Information Regarding the Potential Restructuring* .. 111
*b. Information Regarding Customers' Indications of Interest* ......................................... 112
*B. Mr. Negrin's Conduct* ................................. 114
*C. Scienter* ............................................. 117

CONCLUSION.................................................121

INTRODUCTION

This is a case about alleged insider trading in credit derivatives.  The Securities and Exchange Commission (the "SEC") alleges that the defendants, Jon-Paul Rorech and Renato Negrin, engaged in insider trading in credit-default swaps ("CDSs").

While there are different types of CDSs, the CDSs that are at issue in this case are contracts that provide protection against the credit risk of a particular company.  The seller of a CDS agrees to pay the buyer a specific sum of money, called the notional amount, if a credit event, such as bankruptcy, occurs in the referenced company.  If a credit event occurs, the buyer generally must provide to the seller any of certain debt instruments that are deliverable pursuant to the CDS contract. In exchange for this risk protection from the CDS-seller, the CDS-buyer agrees to make periodic premium payments during the course of the contract.  The CDS-buyer can use the CDS to provide protection, like insurance, against the possibility that the debt instruments the buyer holds will seriously deteriorate in value because of a credit event in the referenced company. The CDS-buyer could also buy the CDS without owning the underlying referenced security, a "naked CDS," in the expectation that it would increase in value based on any one of a number of factors including the likelihood that a credit event will occur in the referenced company.

The CDSs at issue in this case provided for payment if certain credit events occurred at VNU N.V. ("VNU"), a Dutch media holding company. The CDSs referenced a specific VNU security that would have to be delivered in return for the notional amount, although it was possible to deliver certain other securities instead.

In July 2006, Deutsche Bank Securities Inc. ("Deutsche Bank") served as the lead underwriter for a bond offering by two of VNU's subsidiaries. During its efforts to sell the bonds, Deutsche Bank learned that there was demand in the market for bonds issued by the holding company, VNU, rather than by its subsidiaries. This demand existed because the bonds to be issued by VNU's subsidiaries would not be deliverable instruments under the terms of VNU CDSs then in the market. Because VNU was also planning on retiring its then-outstanding deliverable bonds, CDS-holders would be left with only a limited number of bonds that would be deliverable under the CDS contracts. Holders of VNU CDSs, and prospective purchasers, preferred that VNU modify the bond offering to issue at least some bonds at the holding company level.

The SEC alleges that Mr. Rorech, a high-yield bond salesperson at Deutsche Bank, passed confidential information to Mr. Negrin, a portfolio manager for the hedge fund Millennium Partners, L.P. ("Millennium"), regarding plans to modify the VNU

bond offering.  The SEC alleges that Mr. Rorech told Mr. Negrin during two unrecorded cellular telephone calls on July 14 and July 17, 2006, (1) that Deutsche Bank would recommend to VNU's financial sponsors that VNU issue the holding company bonds and (2) that at least one of Mr. Rorech's customers already had placed an order for $100 million of the holding company bonds.

Mr. Negrin bought two VNU CDSs on behalf of Millennium on July 17 and July 18, 2006.  After the July 24, 2006, announcement that VNU's bond offering would be amended to include bonds issued by the holding company, the price of VNU CDSs increased substantially.  Mr. Negrin subsequently sold the VNU CDSs for a profit to Millennium of approximately $1.2 million.

The Court conducted a non-jury trial in this case from April 7, 2010, to April 28, 2010.  Despite the SEC's allegations of the information passed by Mr. Rorech to Mr. Negrin during the two cellular phone calls, there is no evidence of what was actually said on those calls and neither Mr. Rorech nor Mr. Negrin could recall the substance of the calls.  While the SEC attempts to attribute nefarious content to those calls through circumstantial evidence, there is, in fact, no evidence to support this inference and ample evidence that undercuts the SEC's theory that the defendants engaged in insider trading.

First, the SEC produced no evidence that Deutsche Bank had actually decided to recommend that the sponsors issue a holding company tranche at the time of Mr. Rorech's cellular phone calls with Mr. Negrin, and there is no evidence that any such decision was conveyed to Mr. Rorech before the phone calls. Having set forth no evidence that Mr. Rorech either received or shared with Mr. Negrin any allegedly confidential information concerning Deutsche Bank's recommendation, the SEC's allegation of insider trading based on that information fails.

Second, the SEC has failed to prove that either piece of alleged information was material. Immediately after the bond deal was announced, there was widespread discussion in the market regarding investor demand for a restructuring of the VNU bond offering to include deliverable bonds. Even the SEC's own expert, David Barcus, admits that it was publicly known— particularly to sophisticated high yield bond buyers—that, with such strong market demand, Deutsche Bank would be speaking to the sponsors and working with them to try to find a way to issue additional deliverable bonds. Because any information that Mr. Rorech possessed on July 17, 2006, about Deutsche Bank's alleged intention to recommend a holding company issuance was based on information in the market and was completely speculative in any event, any information Mr. Rorech shared with Mr. Negrin cannot be considered material. Likewise, information regarding Mr.

Rorech's customer's indication of interest was not material because the demand for deliverable bonds was known in the market.  The fact that Jeremy Barnum, a portfolio manager at the hedge fund Blue Mountain Capital Management LLC ("Blue Mountain") who placed the initial $100 million indication of interest, subsequently sold VNU CDSs after having actually learned of Deutsche Bank's intent to recommend the holding company tranche and after having placed his own indication of interest is substantial evidence that these two pieces of information were not considered material to reasonable investors in VNU CDSs.

Third, the evidence also confirms that the information that Mr. Rorech could have shared with Mr. Negrin was not confidential and that Mr. Rorech did not breach any duty to Deutsche Bank.  Pursuant to Deutsche Bank's written policy on the use of confidential information, as well as testimony from Deutsche Bank's compliance officer, information is deemed confidential only when there is an expectation or contractual agreement that it will be kept confidential.  The evidence does not show that Mr. Rorech possessed any information about Deutsche Bank's decision to recommend that VNU issue the holding company bonds.  Any information that he did share with Mr. Negrin, therefore, would have been speculative and his own opinion.  If Mr. Rorech shared such information, that would not

amount to a breach of his duty of confidentiality to Deutsche
Bank.  Similarly, Mr. Rorech's customer's indication of interest
in holding company bonds was not confidential, because, among
other things, Mr. Barnum at Blue Mountain, who submitted the
order for holding company bonds, testified unequivocally that he
had no expectation of confidentiality in his proposed order.  To
the contrary, Mr. Barnum, like other customers, expected that
Deutsche Bank would discuss his order with other potential
investors to generate additional demand for a holding company
issuance of bonds.  Because Mr. Barnum had no expectation that
the information would be confidential, Deutsche Bank did not
consider the information confidential and Mr. Rorech did not
breach any duty to Deutsche Bank.

     The actions and testimony of the capital markets officers
who were directly involved in the VNU bond offering—and who were
responsible for determining whether information was
confidential—confirm that neither piece of information was
confidential.  Not only did these individuals openly share the
alleged "inside" information in this case, but they also never
initiated so-called "wall-crossing" procedures for Mr. Rorech
during the marketing period for the VNU bond offering.  "Wall-
crossing" procedures are typically followed if confidential
information is shared with employees, like Mr. Rorech, who work
with the Bank's public customers and clients.  Moreover, other

salespeople at Deutsche Bank, including the head of high yield sales in New York and sales supervisors in London, similarly shared information about a potential holding company issuance and customers' orders, further demonstrating that Deutsche Bank did not view such information to be confidential.

Moreover, Deutsche Bank's actions show that the bank did not view the information as confidential. No one at Deutsche Bank, which did its own internal review of this matter, ever advised Mr. Rorech that he had to change the way he shared information with customers when marketing a high yield bond deal. Instead, Mr. Rorech's supervisors praised him for his work on the VNU bond offering, and Deutsche Bank celebrated the performance of its capital markets professionals in creating a holding company tranche to provide additional demand for the bond offering.

Fourth, deceit—or the unauthorized theft of confidential information—is the cornerstone of the misappropriation theory of insider trading liability, on which the SEC's case relies. United States v. O'Hagan, 521 U.S. 642, 652-55 (1997). The SEC has not established that there was any deception in this case. Mr. Rorech disclosed to his supervisors on the sales desk and in capital markets that he was, in fact, sharing information about the potential holding company issuance with his customers, including Mr. Negrin's hedge fund, Millennium. Mr. Rorech was

never told to stop sharing such information nor cautioned as to its allegedly confidential nature.

Similarly, Mr. Rorech lacked the requisite intent to be held liable for insider trading. Mr. Rorech believed that, in discussing the information about VNU with prospective investors, he was doing his job as a high yield salesperson. This belief comported with both the custom and practice in the industry as well as the actions of capital markets officers and other Deutsche Bank salespeople on the high yield desk, including Mr. Rorech's direct supervisor, Wight Martindale. It is farfetched to think that Mr. Rorech could believe that the very information shared with outsiders by his supervisor and the head of high yield capital markets would somehow not be appropriate for him to share.

The SEC also has failed to present any evidence that Mr. Rorech had any motive to provide "inside" information to Mr. Negrin, who was neither a personal friend nor his most significant account. This is not a case where a securities firm employee receives undisclosed benefits for his "tips." The only benefit Mr. Rorech allegedly received was any increase in compensation that he received from doing his job of selling securities. The SEC did not even present any evidence as to the significance of Mr. Negrin's CDS order on Mr. Rorech's overall compensation. Mr. Negrin's CDS order of a $10 million VNU CDS

from Deutsche Bank appears relatively small compared to the $200 million in VNU bond orders that Mr. Rorech obtained during the same period.  In light of all of the evidence that shows that Mr. Rorech believed his conduct was entirely appropriate, the fact that Mr. Rorech and Mr. Negrin had two cellular phone calls during the marketing period of the VNU bond offering is insufficient to establish scienter.

This is only a summary of the case, which is discussed in greater detail below.  Having heard the testimony of the witnesses, having assessed their credibility, and having reviewed the evidence and the parties' post-trial submissions, the Court makes the following findings of fact and reaches the following conclusions of law.

### FINDINGS OF FACT

#### *I. Background*

*A. The Parties Involved*

*1. The Defendants*

1.    Jon-Paul Rorech began at Deutsche Bank in 2003 at the hedge fund sales desk.  (Trial Transcript ("Tr.") 1169:1-18.)

2.    In about January 2006, Mr. Rorech transferred to the high yield sales group at Deutsche Bank.  (Joint Pretrial Order,

Stipulations or Agreed Statements of Fact or Law ("Stipulated Facts" or "Stipulated Law") ¶ 7.)

3.    After Mr. Rorech transferred to the high yield sales desk, Wight Martindale, the head of the desk, mentored him. Like other salespeople on the desk, Mr. Rorech learned on the job by watching and working with Mr. Martindale and other more experienced salespeople on the desk.  (Tr. 1173:7-1174:8, 1433:25-1434:9.)

4.    In 2006, Renato Negrin was a portfolio manager for Millennium Partners, L.P. ("Millennium"), a New York-based hedge fund.  (Stipulated Facts ¶ 2.)  Mr. Negrin's compensation was based on a percentage of the profits of the portfolio he managed minus certain overhead costs.  (Tr. 126:10-13.)

*2. Deutsche Bank Employees*

5.    In 2006, Wight Martindale was the head of the high yield sales group in New York and Mr. Rorech's direct supervisor.  (Stipulated Facts ¶ 68.)

6.    Christopher Wagner was a salesperson working in the high yield sales group at Deutsche Bank in New York. (Stipulated Facts ¶ 69.)

7.    Andrew Kellerman was a salesperson working in the investment grade sales group at Deutsche Bank in New York. (Stipulated Facts ¶ 70.)

8.   Mark Fedorcik was an investment banker in the high yield capital markets group at Deutsche Bank and was the senior capital markets professional responsible for marketing the VNU bond offering in the United States.  (Stipulated Facts ¶ 65.)

9.   David Ross and Paul Cahalan were investment bankers in the high yield capital markets group at Deutsche Bank, AG in London.  (Stipulated Facts ¶ 67.)

10.  Eve Tournier was the head of credit derivatives trading for Deutsche Bank, AG in London.  (Stipulated Facts ¶ 71.)

11.  John Aylward and Grigore Ciorchina were credit derivatives traders for Deutsche Bank, AG in London. (Stipulated Facts ¶¶ 72-73.)

12.  Sean Hunt was the head of the high yield sales group at Deutsche Bank, AG in London.  (Stipulated Facts ¶ 74.)

13.  Rachel Bobillier was the head of the hedge fund sales group at Deutsche Bank, AG in London.  (Stipulated Facts ¶ 75.)

14.  Vikrant Sawhney was an investment banker in the financial sponsors coverage group at Deutsche Bank and was one of the primary points of contact for the sponsor consortium during the course of the VNU bond offering.  (Stipulated Facts ¶ 66.)

15.  John Eydenberg was an investment banker in the leveraged finance group at Deutsche Bank in New York and was one

of the primary points of contact for the sponsor consortium during the course of the VNU bond offering.  (Tr. 314:10-18, 407:1-4, 472:17-21.)

16.  John Cartaina was a lawyer and a compliance officer at Deutsche Bank in New York in 2006.  (Tr. 698:1-699:1.)

*3. Investors*

17.  Randy Masel was an analyst with Mr. Negrin's credit trading group at Millennium in 2006.  (Stipulated Facts ¶ 76.)

18.  Sean Fahey was a portfolio manager and partner at Claren Road Asset Management LLC ("Claren Road"), a New York-based hedge fund that was one of Mr. Rorech's customers in 2006.  (Tr. 117:11-17, 984:20-985:15.)

19.  Jeremy Barnum was the head of the London office and a portfolio manager for Blue Mountain, a hedge fund that was one of Mr. Rorech's customers in 2006.  (Stipulated Facts ¶ 78.)

20.  Geoffrey Sherry was a portfolio manager for Caxton Associates L.P ("Caxton"), a New York-based hedge fund that was one of Mr. Rorech's customers in 2006.  (Stipulated Facts ¶ 78.)

*B. CDSs and Bonds*

21.  CDSs are bilateral financial contracts in which the CDS-buyer agrees to make periodic, fixed payments to the CDS-seller in exchange for a promise by the CDS-seller to make a fixed payment (the notional amount) to the CDS-buyer if a specified credit event occurs to the company referenced by the

CDS prior to the expiration of the contract.  (Tr. 1553:4-14, 1554:2-23; Defs.' Expert Ex. ("DEX") 1 at ¶ 21.)

22.  The price or the "spread" of a CDS is the annual premium that the buyer must pay to the seller.  The price is expressed as a percentage of the notional amount and is denominated in basis points.  One basis point equals .01% of the notional amount.  Therefore, a CDS price of 100 basis points would indicate that the annual premium amount would be 1% of the CDS's notional amount.

23.  The spread of a bond, on the other hand, is the portion of the bond's yield, or amount of expected return, above the risk-free rate of return, which is typically estimated by reference to the London Interbank Offered Rate ("LIBOR").  (Tr. 1558:15-1559:10.)  A bond's price, usually expressed as a dollar value or percentage of the par value of the bond, has an inverse relationship to the bond's spread or yield.  For example, as a bond's price decreases, the bond's spread or yield increases.  (Tr. 1560:6-22.)

24.  The triggering credit events are specified in CDS contracts and often include the referenced company's bankruptcy, its failure to pay an obligation, or its restructuring.  (Tr. 1553:4-14; DEX 1 at ¶ 42.)

25.  Upon the occurrence of a credit event, the CDS-buyer must deliver to the CDS-seller a deliverable obligation under

the contract in order to receive the notional amount at settlement from the CDS-seller.  The obligation actually referenced in a particular CDS contract provides the baseline seniority level for deliverable obligations under that contract. CDS-buyers may return the referenced obligation, or a loan or bond of the same or greater level of seniority.  (Tr. 1557:7-12.)

26.  Although the parties agree upon the types of qualifying deliverable obligations at the commencement of the CDS contract, the exact deliverable obligations are not determined until a credit event occurs.  At such a time, the obligations that will qualify as "deliverable" are determined. (Tr. 1600:15-1601:22.)

27.  The International Swaps and Derivatives Association ("ISDA") facilitates the over-the-counter derivatives market by publishing various protocols, procedures, and base documents that many parties agree to follow in creating CDS contracts, but the use of such protocols is not required.  (Tr. 1555:7-14.)

28.  CDSs are negotiated between the buyer and seller.  In the typical situation, an investment-fund CDS-buyer establishes a prime brokerage relationship with a CDS-seller bank and enters into an ISDA Master Agreement that facilitates over-the-counter trading in a number of derivatives.  Subsequently, the parties enter into a Master Confirmation Agreement that provides general

terms that govern CDS contracts between the parties.  (Tr. 1555:15-1556:14.)

29.  After the Master Confirmation Agreement is in place, the parties can execute individual CDS contracts by negotiating the specific terms of each transaction.  The terms are usually memorialized in Trade Confirmations.  (Tr. 1556:15-1558:14.)

30.  The method of settlement is specified in the Master Confirmation Agreement.  The settlement terms determine what the CDS-buyer must do, upon a credit event, to receive the notional payment.  (Tr. 1553:23-1554:7.)

*C. The Flow of Information in High Yield Bond Offerings*

31.  Many high yield bond offerings are marketed pursuant to SEC Rule 144A under the Securities Act of 1933, 17 C.F.R. § 230.144A, and thus can only be sold to sophisticated institutional customers with more than $100 million in investable assets, also known as Qualified Institutional Buyers ("QIBs").  (Stipulated Facts ¶ 19.)

32.  As Mr. Barnum—a portfolio manager for Blue Mountain— explained, the high yield bond market is "a smaller market, it's a more professional market, it's a more concentrated market, it's a riskier market" than other markets.  (Tr. 760:21-23.)

33.  Marketing a high yield bond offering involves a flow of information among customers, salespeople, the underwriter, and the issuer.  As Mr. Barnum testified, "there is a lot more

discussion about things between issuers and investors and
salespeople and capital markets professionals than there is in
other markets." (Tr. 809:1-9, 1241:19-1242:8; see also, DEX 2 at
¶ 29 ("Thus, effective salespeople are constantly providing
customers with customized investment ideas and market
information and receiving feedback on what kind of investment
products would better meet the customers' needs.  Salespeople
then pass on these continuously flowing bits of information to
traders and capital markets professionals, who use them to price
their various products.  This free flow of information is
regarded as custom and practice in the high yield bond
market.").)

34.  Unlike equity deals, bond deals in the high yield
market are not presented on a "take-it-or-leave-it" basis.  If
investors do not like a deal, they will negotiate with the
salespeople to change the price or the structure.  (Tr. 376:7-
15, 1182:2-15, 1484:4-1485:14; DEX 2 at ¶ 21.)

35.  One of a high-yield-bond salesperson's
responsibilities is to collect feedback from investors.  In the
context of a new bond offering, salespeople bring the feedback
they receive from investors to capital markets professionals.
(Tr. 1242:9-21, 1485:15-1486:5; DEX 2 at ¶¶ 27, 29.)

36.  As the SEC's expert, David Barcus, acknowledged that
"there is a dialogue that takes place" between the investors and

the underwriter in a high yield bond offering, because "[t]he underwriter is seeking information from the buy side of the market to understand what they are thinking about the transaction."  (Tr. 618:3-12.)

37.  Mr. Barcus also agreed that, based on the feedback received from investors, capital markets sometimes would recommend to the sponsor or the issuer that a deal should be restructured.  (Tr. 622:18-22, 623:12-624:21.)

38.  When potential investors suggest that an issuer make changes to the proposed terms of a primary high yield bond offering, the suggestion is called a "reverse inquiry."  Reverse inquiries can include suggested modifications to covenants, pricing, maturity, or structural features of a proposed securities offering.  (Stipulated Facts ¶ 36.)

39.  Reverse inquiries may be submitted by investors to salespeople, who then pass the reverse inquiries on to the capital markets professionals.  Occasionally, investors address these reverse inquiries directly to the capital markets professionals.  The capital markets professionals may relay the suggestion to the other investment bankers responsible for managing the relationship with the issuers, and those bankers, in turn, may discuss the reverse inquiry with the issuer.  (Stipulated Facts ¶ 37.)

40.  It is common in the high yield bond market, when there is a reverse inquiry from a customer, for salespeople to share that idea with other customers in order to determine whether there would be sufficient demand for the proposal suggested in the reverse inquiry.  (Tr. 538:18-25, 637:10-638:24, 1223:25-1224:21; DEX 2 at ¶ 22.)

41.  It also is common for salespeople or capital markets professionals to keep customers apprised of the status of a reverse inquiry and to provide customers with feedback as to the underwriter's possible support for a particular requested change.  (Tr. 539:1-10, 630:13-632:8; DEX 2 at ¶ 23 ("As the Capital Markets professionals are receiving reverse inquiries from the salespeople, it was my experience to receive updates on the progress of the reverse inquiries which may include information about the discussions with sponsors.  This information was also provided to customers by both Capital Markets professionals and other salespeople.").)

42.  The sponsors or the issuers must approve all requests for changes to the proposed terms of the bond offering.  A potential restructuring is not definite until the sponsor approves it.  Indeed, sponsors reject many reverse inquiries for a variety of reasons.  (DEX 2 at ¶ 25; Tr. 377:19-378:5, 539:11-22, 810:1-7.)

20

## II. The VNU Bond Offering

*A. The Original Bond Issuance*

43.    VNU was a public, Dutch media and information company. Its operating subsidiaries included Nielsen, a marketing and media information company best known in the United States for providing viewing and ratings statistics for television shows. (Stipulated Facts ¶ 12.)

44.    On March 8, 2006, VNU announced that it had agreed to be purchased and taken private for €7.5 billion by a consortium of private equity firms consisting of AlpInvest Partners N.V., Blackstone Group L.P., Carlyle Group, Hellman & Friedman LLC, Kohlberg Kravis Roberts & Co. L.P., and Thomas H. Lee Partners, L.P. (the "sponsors").    (Stipulated Facts ¶ 10.)

45.    Deutsche Bank served as a financial advisor to the sponsors in connection with their acquisition of VNU. (Stipulated Facts ¶ 11.)

46.    On July 10, 2006, VNU announced that it would change its capital structure to include $1.67 billion of new bonds issued by VNU's subsidiaries in an offering under SEC Rule 144A, and €4.89 billion of new bank loans and credit facilities. (Stipulated Facts ¶ 13.)

47.    The $1.67 billion of bonds was proposed to be issued in two tranches—senior notes issued by Nielsen Finance LLC and

senior subordinated discount notes issued by Nielsen Finance Co.
(Stipulated Facts ¶ 14.)

48.  Deutsche Bank was the lead underwriter for the VNU
bond offering.  The other underwriters were Citigroup Global
Markets Inc., JP Morgan Securities Inc., ABN AMRO Bank N.V., and
ING Bank N.V.  (Stipulated Facts ¶ 15.)

49.  Deutsche Bank salespeople, especially those in the
high yield sales group in New York, had the primary
responsibility for soliciting orders for the proposed VNU bond
offering.  (Tr. 1496:14-1497:4.)

50.  The VNU bond offering could only be marketed to
Qualified Institutional Buyers.  (Stipulated Facts ¶ 19.)

51.  The financial sponsors, VNU management, and Deutsche
Bank investment bankers organized a three-week international
roadshow to market the bond offering.  The European roadshow
commenced on July 11, 2006, in London, and the United States
roadshow took place from July 17 to July 28, 2006.  (Stipulated
Facts ¶ 21.)

52.  A roadshow consists of meetings that are typically
organized and attended by representatives from the underwriter
and the issuer to educate prospective investors on the issuing
company and the proposed bond offering.  During the roadshow,
investors often ask questions, raise concerns, and discuss
potential changes to the proposed terms of the bond offering

directly with investment bankers and the issuer.  (DEX 2 at ¶ 20; Tr. 618:13-619:13.)

B. *Deliverability Questions Arose*

53.  At the time of the VNU bond offering, VNU CDSs had previously been written and were traded in the market.  The existing VNU CDSs referenced bonds of VNU N.V., the holding company at the top of the corporate pyramid that included the various VNU operating subsidiaries.  (Stipulated Facts ¶ 27.)

54.  As part of its proposed new financing, VNU indicated that it would tender for and retire most of its previously issued, outstanding bonds.  (Stipulated Facts ¶ 29.)

55.  It was understood that existing VNU N.V. 5 5/8% bonds denominated in Great Britain Pounds (the "Sterling Bonds") would remain outstanding.  However, the Sterling Bonds were set to mature in May 2010, and the small outstanding amount of the Sterling Bonds led market participants, including those who had bought VNU CDSs, to conclude that this shortage of outstanding value of deliverable obligations would negatively affect the price of VNU CDSs.  (Tournier Dep. 56:21-58:12; Causer Dep. 23:6-24:20, 26:16-27:11; Pl.'s Ex. ("PX") 142-A; PX 142 at DBL 2116-17; Tr. 771:16-772:15; Defs.' Ex. ("DX") 86.)

56.  As soon as the marketing for the VNU bond offering began, the issue whether the new operating company bonds would

be deliverable into VNU CDSs was debated widely among investors and other market participants.  (DX 57; Tr. 815:12-25.)

57.  Some market participants held the view that, in order for the new operating company bonds to be deliverable into VNU CDSs, they would have to be unconditionally and irrevocably guaranteed by the holding company, VNU.  Because the language in the bond offering's preliminary memorandum indicated that the bonds were guaranteed by VNU, but that the guarantee might fall away in certain circumstances, some market participants believed that the new operating company bonds would not be deliverable into the VNU CDSs.  (DX 57; DX 110.)  Others held the view that the bonds would be deliverable.  (PX 213.)

58.  At one of the first investor presentations, which took place in London on the morning of July 12, 2006, and was attended by financial sponsors, by VNU management, by Deutsche Bank investment bankers, and by market participants, a number of investors raised the question whether the operating company bonds would be deliverable into existing VNU CDSs.  (Stipulated Facts ¶ 31.)

59.  Market participants suggested two options for changing the structure of the VNU bond offering in an effort to solve the deliverability question:  The financial sponsors could (1) change the guarantee language in the offering memorandum for the new bonds so that the bonds would be irrevocably and

unconditionally guaranteed by VNU; or (2) issue a tranche of bonds from the holding company or some other legal entity that would be deliverable into VNU CDSs. (Stipulated Facts ¶ 41.)

*C. Investors Expressed Interest in Deliverable Bonds*

60. From the outset of the marketing period for the VNU bond offering, Deutsche Bank and the financial sponsors heard from a number of public sources about the market's demand for deliverable bonds. (Tr. 304:4-15, 1504:21-1505:2.)

61. The possibility of structural changes to the VNU bond offering, including changing the guarantee language and the potential for issuing a tranche of bonds directly from VNU, was discussed in the marketplace, and was the subject of speculation from July 11 through July 21, 2006. (DX 79; DX 97; DX 109; DX 112; DX 166; DX 199; Tr. 469:2-470:7; PX 108A.)

62. During the first week of the marketing period, Mr. Fedorcik learned through feedback directly from market participants as well as from Mr. Rorech and through reports on questions raised at the roadshow that there was a technical demand in the market for deliverable bonds. (Tr. 295:4-13.)

63. Similarly, Mr. Martindale, Mr. Rorech's direct supervisor, became aware of the deliverability issue through "chatter in the marketplace," research reports, and because "clients were talking about it." (Tr. 1504:25-1505:2.)

64.  In light of the deteriorating conditions in the high yield market in the summer of 2006, and due to the large amount of debt that VNU was planning to assume, Deutsche Bank considered the VNU bond offering to be difficult to market. (Tr. 334:3-17.)

65.  Deutsche Bank's investment bankers understood that the senior subordinated discount note tranche of the new operating company bonds would be especially difficult to sell.  (DX 271; Tr. 387:17-388:20.)

66.  While market prices for VNU CDSs increased following the July 10, 2006, announcement of the bond offering, many market participants held the view that VNU CDSs remained underpriced, in light of the substantial debt burden that the company had announced it was planning to incur, and in light of the fact that the existing VNU CDSs referenced the most junior, and, thus, most risky, part of the company's capital structure. This increased risk drove up the chances that a credit event would occur and that a CDS-buyer would be owed the notional amount. (PX 30; DX 98.)

67.  Because of the relatively low market price for VNU CDSs, upon the announcement of the bond deal, market participants such as Geoffrey Sherry, a portfolio manager at Caxton, a New York-based hedge fund, immediately perceived an opportunity for the financial sponsors to resolve the

deliverability problem by issuing deliverable bonds at the
holding company level.  (DX 361.)  These bonds could be issued
at a lower coupon, and therefore at a lower cost for VNU, than
those contemplated for the operating company bonds.  (DX 361.)

68.  Similarly, on July 12, 2006, Eve Tournier, a trader
for Deutsche Bank in London, discussed the possibility of an
issuance of deliverable bonds to satisfy CDS-investor demand
with David Ross, the senior Deutsche Bank capital markets
professional responsible for marketing the VNU bond offering in
London.  (PX 142A.)

69.  Likewise, Mr. Martindale believed that Deutsche Bank
should address the deliverability issue because, "CDS was
trading way too cheap, just on a fundamental basis, and that if
we could actually issue debt to people that were willing to buy
it based on not the creditworthiness of the company but based on
some synthetic arbitrage, that we should take full advantage of
that because that would be a gift to the issuing client."  (Tr.
1505:3-10.)

D. The Basis Trade Idea Was Developed

70.  At the same time, a number of market participants also
realized that the low VNU CDS prices meant that investors could
potentially profit by executing a basis trade—by buying VNU CDSs
and also buying deliverable bonds.  The basis-trade-buyer would
capture the difference between the relatively high bond spread

and the lower premium amount that had to be paid on the CDS contract, while at the same time enjoying the CDS's protection from the bond's risk.  (Tr. 769:23-771:11.)

71.  Indeed, early in the morning of July 11, 2006, Mr. Sherry explained the deliverability issue to Mr. Rorech, Mr. Sherry's salesperson at Deutsche Bank, and told Mr. Rorech about the basis trade opportunity that would result if deliverable bonds were issued.  (DX 359.)  Mr. Rorech then called Grigore Ciorchina, a trader for Deutsche Bank in London, to discuss VNU. Mr. Ciorchina also expressed his opinion that the basis trade idea made sense.  (DX 528.)

72.  Shortly thereafter on July 11, Mr. Ciorchina sent an email suggesting the basis trade opportunity to a number of Deutsche Bank salesman, including Mr. Rorech.  (DX 40.)

73.  Because a basis trade involves buying both bonds and CDSs, Mr. Rorech believed that the basis trade idea could help generate interest in the bond deal.  (Tr. 1187:3-13, 1192:1-21, 1283:1-9, 1297:2-10, 1357:10-24.)

74.  Mr. Rorech immediately forwarded Mr. Ciorchina's email about the basis trade idea to his customers, including to Renato Negrin and Randy Masel at Millennium, and to Geoffrey Sherry and others at Caxton.  (DX 67; DX 68.)

75.  Mr. Rorech consulted his supervisor, Wight Martindale, and discussed the basis trade idea.  Mr. Rorech asked Mr.

Martindale whether he wanted to discuss it with Mark Fedorcik,
the senior capital markets professional in New York responsible
for the VNU bond offering.  Mr. Rorech then called Mr. Fedorcik
and told him about the deliverability issue and about the
opportunity for the sponsors to issue deliverable bonds that
would be attractive to CDS holders and prospective CDS
purchasers.  (Tr. 1293:9-16, 1503:22-1504:20; DX 368; Stipulated
Facts ¶ 65.)

76.  Other Deutsche Bank salespeople, including Christopher
Wagner, Mark Colm, and John Bertrand, also pitched the basis
trade strategy to their customers.  (Tr. 1444:25-1445:20,
1447:7-10, 1449:7-1450:13, 1451:24-1452:1; DX 84; DX 347; DX
347T; DX 463; DX 463T.)

E. Deutsche Bank Worked to Resolve the Deliverability Issue

77.  The senior investment banking employees working on the
VNU transaction at Deutsche Bank included Mark Fedorcik, Vikrant
Sawhney, and John Eydenberg.  They were the primary points of
contact for the financial sponsors throughout the VNU
transaction and were the investment bankers at Deutsche Bank who
were actively in communications with the sponsors about the
potential structural changes.  (Tr. 407:1-4, 472:17-21.)

78.  The role of capital markets professionals during a new
bond offering is to work with salespeople and with investors to
provide the issuer with accurate information about market demand

and with advice about whether to change the pricing, covenants, and the other structural components of the bond offering so as to achieve the best execution of the deal in light of market conditions. (Stipulated Facts ¶ 40.)

79. During the first week of the VNU bond offering, Mr. Fedorcik and others at Deutsche Bank first explored whether changing the offering memorandum's guarantee language would allow the operating company bonds to be deliverable into VNU CDSs. (DX 85; DX 105.)

80. In exploring the issue internally, Mr. Fedorcik spoke to Eve Tournier in London. During a telephone call on July 13, 2006, Ms. Tournier assured Mr. Fedorcik that providing for an unconditional and irrevocable guarantee would make both the senior and the senior subordinated operating company bonds deliverable under ISDA rules. (PX 48A.)

81. As of July 13, 2006, Mr. Fedorcik was still trying to understand the guarantee language issue. (Tr. 417:21-418:23; DX 105.)

82. Sometime late on July 13 or early on July 14 however, after consulting with Deutsche Bank's legal department, Mr. Fedorcik learned that changing the guarantee language would not solve the deliverability problem. (Stipulated Facts ¶ 42.) In particular, based on the ISDA definitions, an unconditional and

irrevocable guarantee would still not make the senior
subordinated bonds deliverable into VNU CDSs.  (PX 50A.)

83.  Mr. Fedorcik then told Mr. Sawhney and Mr. Eydenberg
that he wanted to "stand down" discussions about the
deliverability issues with the financial sponsors as of the
morning of Friday, July 14, 2006.  (DX 128; Tr. 419:7-421:5.)

84.  Because changing the guarantee language was no longer
deemed a feasible solution, Mr. Fedorcik began to explore the
possibility of issuing a separate tranche of bonds out of the
holding company.

85.  Monday, July 17, 2006, was the first day of the United
States roadshow for the VNU bond offering.  (Tr. 433:16-18.)
Because of the deteriorating market conditions, over the weekend
of July 15 and July 16, 2006, the focus of the discussions
between Deutsche Bank's investment bankers and the financial
sponsors was on whether to launch the senior subordinated
discount tranche of the operating company bonds in the United
States at all, and not on the deliverability issues.  (PX 115;
Tr. 339:3-340:20, 428:18-429:10.)

86.  During the week of July 17, while the United States
roadshows were ongoing, Mr. Fedorcik and others at Deutsche Bank
continued to explore the feasibility of a potential holding
company issuance.

31

87.   On the afternoon of July 17, 2006, Mr. Fedorcik first told Mr. Rorech about his intention to recommend to the sponsors that they issue holding company bonds.  In a telephone conversation at 1:28 p.m., Mr. Fedorcik told Mr. Rorech, "I want to go to the sponsors and kind of tell them, 'here's our recommendation.'"  But before doing so, Mr. Fedorcik said he wanted to talk to Mr. Rorech's customers to "button . . . up" their expressions of interest in purchasing bonds from the holding company.  (PX 54A; DX 380T; Tr. 1323:6-1324:24.)

88.   However, there was still concern around the time of July 19, 2006, that it might not be feasible to issue bonds out of the holding company because hedge funds domiciled in either the Cayman Islands or Bermuda might not be permitted to purchase bonds issued by VNU, a Dutch entity.  (DX 394; PX 59A; DX 392.)

89.   Ultimately, these purchaser restrictions did not pose an obstacle to the holding company issuance.  (Tr. 786:19-787:2.)

90.   The sponsor consortium approved the issuance of bonds by the holding company on Friday, July 21, 2006.  (Stipulated Facts ¶ 43.)

91.   The decision was first communicated to Deutsche Bank by George Taylor at Thomas H. Lee Partners L.P., one of the private equity firms in the sponsor consortium.  Mr. Taylor sent an email to John Eydenberg and Vikrant Sawhney on Friday, July

32

21, 2006, informing the two of the decision.  Mr. Eydenberg and
Mr. Sawhney then forwarded the financial sponsors' approval of
the holding company issuance to Mr. Fedorcik later that evening.
(DX 230; Tr. 470:16-471:20.)

     92.  The financial sponsors, Deutsche Bank's investment
bankers, and their lawyers worked to complete the holding
company issuance over the weekend of July 22 and 23, 2006.  (DX
247.)

     93.  On the morning of Monday, July 24, 2006, Deutsche Bank
announced that the VNU bond offering would be modified to
include a €200 million tranche of bonds issued directly out of
VNU, the holding company, and that the size of the operating
company subordinated tranche would be correspondingly decreased.
(Stipulated Facts ¶ 44.)

     94.  The holding company issuance did not increase the
total debt that was issued by VNU and its subsidiaries.
Deutsche Bank believed the holding company issuance was
beneficial to VNU because it created additional demand for the
bond offering as a whole and also reduced the leverage, or debt,
at the operating company level.  (Tr. 386:11-387:3.)  Moving
some of the proposed senior subordinated discount bonds to the
holding company level also reduced the financial sponsors'
financing costs, because the holding company bonds had a lower

coupon rate (11.125%) than the senior subordinated discount bonds (12.5%).  (DX 325.)

95.  Orders from Mr. Rorech's customers, including those from Blue Mountain, Caxton, and Claren Road, accounted for the majority of the €200 million tranche of VNU holding company bonds.  (DX 325.)

96.  Deutsche Bank was pleased with the outcome of the holding company modification, and with the performance of its employees, including those in capital markets and in high yield sales, in connection with executing the modification to the VNU bond offering.  (Tr. 481:7-14, 1526:24-1527:8.)  The VNU offering was highlighted by Deutsche Bank in an internal case study.  (DX 278.)


**III. The Cellular Phone Calls and Mr. Negrin's VNU CDS Trades**

*A. The Cellular Phone Calls Between Mr. Rorech and Mr. Negrin*

97.  During the marketing period for the VNU bond offering, Mr. Rorech and Mr. Negrin had a number of conversations on recorded telephone lines regarding VNU.  (Stipulated Facts ¶ 51.)

98.  Mr. Rorech and Mr. Negrin also had two cellular phone-to-cellular phone conversations during this period, one on July 14, 2006, at approximately 8:58 a.m. and the other on July 17, 2006, at approximately 9:49 a.m.  (Stipulated Facts ¶ 52.)

99.  The cellular phone call on July 14 occurred shortly after two recorded phone calls that day at approximately 8:37 a.m. and approximately 8:55 a.m.  (Stipulated Facts ¶ 53.)  This cellular phone conversation lasted no more than three minutes. (PX 180.)

100. During a recorded call between Mr. Rorech and Mr. Negrin on July 14, 2006, Mr. Rorech pitched the basis trade idea to Mr. Negrin and stated that VNU CDSs were a good buy because of the possibility that the guarantee language might be changed or that VNU might issue a dividend deal, which would include holding company bonds.  The conversation continued:

| | |
|---|---|
| Negrin: | Right. Well how do we handicap that? How do we get our arms around that? How do we define the odds that we—we, you know—do you know what I mean? |
| Rorech: | Uhm—I think they're very good. |
| Negrin: | Well, how--how are they very—you know, like, give me—give me something to grab onto that they're very good. Do you know what I'm saying? |
| Rorech: | Uhm—yea, yea, uhm--. |
| Negrin: | Okay so usually I—I like to say okay, the probability is X that you know, they're gonna issue out of that box because it's a very tech—you know. |
| Rorech: | I hear what you're saying. |
| Negrin: | (Inaudible). |
| Rorech: | You're listening to my silence right, hang on one second, you're listening to my silence right? |
| Negrin: | Yea. |
| Rorech: | Hang on one second. |
| Negrin: | Yea, okay. I'll call you back. |

(DX 495B.)

101. Background noise captured on the call recording indicates that Mr. Rorech received another call and became distracted shortly before he said to Mr. Negrin, "You're listening to my silence right?"[1]  He then put Mr. Negrin on hold. (Tr. 1114:23-1115:4.)  Mr. Negrin apparently then hung up.

102. Shortly thereafter, Mr. Negrin called Mr. Rorech on his cellular phone.  Mr. Rorech did not answer and, a minute later, he called Mr. Negrin back from his cellular phone.  (PX 179.)

103. At the time of these calls, Mr. Rorech had no definitive information about Deutsche Bank's or Mr. Fedorcik's intent to recommend a holding company issuance.

104. Indeed, the evidence reflects that Mr. Fedorcik and capital markets had not yet reached a decision whether or when to make any such recommendation to the sponsors.  The only recorded conversations that Mr. Rorech had with Mr. Fedorcik prior to the first cellular phone call dealt with the VNU bond offering generally, the market demand for deliverable bonds, and the fact that the demand for deliverable bonds created a potential opportunity to market the VNU bond offering to CDS investors.  (DX 368; DX 368T; DX 367; DX 367T; DX 49A; DX 376T.)

---

[1]     At trial, Mr. Rorech testified that his use of the phrase "you're listening to my silence right?" was "meaningless to [him]." (Tr. 1311:14-1312:2.)

105. At 9:39 a.m. on Friday, July 14, almost a full hour after the first cellular phone call between Mr. Rorech and Mr. Negrin, Mr. Rorech and Mr. Fedorcik had a recorded conversation during which Mr. Fedorcik told Mr. Rorech that the guarantee language could not be changed so as to make the bonds deliverable.  (PX 50A; DX 496T.)

106. In that call, Mr. Fedorcik told Mr. Rorech that they had to go "back to the drawing board" with regard to making the senior subordinated bonds deliverable.  Mr. Fedorcik said that his "game plan" was to "move the sponsors" on the idea of a potential holding company issuance of bonds, but said that it would first be helpful for Mr. Rorech to "get color" on the market demand for a potential holding company issuance.  (PX 50A; DX 496T.)

107. In that context, Mr. Fedorcik asked Mr. Rorech to talk directly with one of Mr. Rorech's customers, Jeremy Barnum of Blue Mountain.  Mr. Barnum had previously given Mr. Rorech an indication of interest for $100 million in holding company bonds.  (PX 50A; DX 496T (Mr. Rorech informing Mr. Fedorcik of Mr. Barnum's order).)  Mr. Fedorcik wanted to assess for himself the strength of Mr. Barnum's interest. (PX 50A; DX 496T.)

108. Mr. Fedorcik and Mr. Rorech called Mr. Barnum on Friday, July 14 at 9:44 a.m.  (PX 51A; DX 497T.)

109. During that call, Mr. Fedorcik talked with Mr. Barnum in detail about how to structure a potential holding company issuance.  Mr. Fedorcik also confirmed with Mr. Barnum that Blue Mountain would be interested in such an issuance.  Mr. Fedorcik told Mr. Barnum that he was planning to speak with the sponsors about their options.  Mr. Fedorcik did not, however, tell Mr. Barnum or Mr. Rorech that he planned to recommend that the sponsors issue from the holding company, or that Deutsche Bank was going to make such a recommendation.  (PX 51A; DX 497T.)

110. Importantly, Mr. Fedorcik testified without contradiction that, as of Friday, July 14 and the weekend of July 15 to July 16, neither he nor others working with the sponsors at Deutsche Bank were in a position to recommend that the sponsors approve a holding company issuance.  He testified that, at that time, he had only decided "that the holding company would be the right option to go explore with the sponsors," but that he did not know whether a holding company issuance "was doable or not" because he still needed to gauge market demand and work through potential legal and tax issues:

> Question: All right.  So let me make sure I understand
> the words that you are using.  When you say
> "to explore," to explore with the sponsors
> whether, in fact, it would make sense to
> ultimately do that.  Is that what you're
> saying what was being discussed perhaps on
> Friday and then over the weekend?

> Fedorcik: Yes.  My recollection was that we didn't
> know if it was doable or not.  We knew that
> this was an option that was available
> potentially to them, structurally made it
> work, but we didn't know if we had the
> interest, if it worked for all the legal tax
> issues, the boxes I just mentioned earlier
> for tax purposes.  But we thought this was
> an option to go explore and then ultimately
> to talk to investors on securing that
> interest.
>
> Question: So fair to say that through that time over
> the weekend, through the Friday and over the
> weekend you were not in a position to
> actually make a more official recommendation
> to the sponsors to actually do that;
> instead, you were in a position to talk to
> them about this is a possibility that might
> work and we're going to explore that.
>
> Fedorcik: That's correct.

(Tr. 424:23-426:10.)

111.  Mr. Fedorcik's testimony and recollection are
corroborated by a July 14 email from Mr. Fedorcik to Mr. Sawhney
and Mr. Eydenberg, which stated that, given the problems with
changing the guarantee language, they needed to understand the
issues better before making any recommendation to the sponsors:

> Cds issue still not resolved- not clear if you
> can ever deliver sr sub notes into a cds
> contract.
> May be back to holdco.
> Let's stand down on any discussions until we get
> a full understanding of how the CDS contracts
> work.

(DX 128.)

112. This was likewise reflected in a conversation between Mr. Fedorcik and Mr. Martindale on July 14, in which Mr. Fedorcik told Mr. Martindale that they had determined that they were unable to change the guarantee language to make the senior subordinated Nielsen bonds irrevocably guaranteed, and that they may go back to exploring a potential holding company issuance or create another box.  (DX 524; DX 524T.)

113. On Monday, July 17 at 9:45 a.m., Mr. Rorech spoke to Mr. Sherry about the VNU bond offering and the potential for a structural change.  During that call, Mr. Rorech told Mr. Sherry that nothing definitive had been decided with regard to the deal structure.  Mr. Rorech also told Mr. Sherry what his supervisor, Wight Martindale, thought might happen with the deal, but he did not mention hearing anything from Mr. Fedorcik or anyone else in capital markets:

> Sherry:   What's going on with VNU? Is there going to be any definitive deal structure at some point?
>
> Rorech:   Yeah, we don't have anything yet, but, you know, that's the tone. I think as of now, Wight thinks that they're going to do like an issue out of the holdco box, initial out of the holdco box.

(PX 131A; DX 377T.)

114. Mr. Rorech's call with Mr. Sherry on the morning of July 17 indicates that (i) he did not have any specific information as to Mr. Fedorcik's intent to recommend a holding

40

company tranche at that time; however, (ii) his supervisor believed that the sponsors were "going to do like an issue out of the holdco." (PX 131A; DX 377T.)

115. The cellular phone call between Mr. Rorech and Mr. Negrin on Monday, July 17 occurred at 9:49 a.m., and followed a recorded phone call between Mr. Rorech and Mr. Negrin placed at the same time. (Stipulated Facts ¶ 52; PX 98A.)

116. On the recorded call, Mr. Rorech and Mr. Negrin had the following conversation, in relevant part:

> Negrin:   I wanted to talk a little bit more about the other situation.
> Rorech:   Yes
> Negrin:   You know, ahh . . . so, I'll call--
> Rorech:   VNU
> Negrin:   Yes . . . ahh . . .
> Rorech:   You're going to call my cell?
> Negrin:   Yeah . . .
> Rorech:   Alright, guy.
> Negrin:   Bye.
> Rorech:   Alright, bye.

(PX 98-A; DX 378T.)

117. Mr. Negrin then placed a call from his cellular phone to Mr. Rorech's cellular phone and they spoke for four minutes. (PX 180.)

118. Neither Mr. Negrin nor Mr. Rorech recalls the substance of their cellular phone conversations. (Tr. 133:13-15, 136:2-6, 1108:21-23, 1111:16-18.) The only evidence as to what was discussed is Mr. Negrin's previous recollection of the phrase "reverse inquiry" with regard to the July 17 call, and

his understanding that "reverse inquiry" refers to an indication of interest placed by a customer. (Tr. 136:2-137:14.)

119. There is no evidence that Mr. Rorech spoke with Mr. Fedorcik between the time of their call with Mr. Barnum on Friday, July 14, and the time of the second cellular phone call on Monday, July 17.

120. There is also no evidence that Mr. Rorech and Mr. Fedorcik had any in-person conversation on the morning of July 17, prior to the second cellular phone call between Mr. Rorech and Mr. Negrin.

121. In fact, the first instance in which the evidence shows that Mr. Rorech spoke with Mr. Fedorcik after their July 14 call with Mr. Barnum was on the afternoon of July 17 at 1:28 p.m., nearly four hours after Mr. Rorech's second cellular phone call with Mr. Negrin. (PX 54A; DX 380T.)

122. It was during this call on July 17 that, for the first time, Mr. Fedorcik conveyed to Mr. Rorech his intent to recommend that the sponsors issue a holding company tranche, although, even Mr. Fedorcik's intent to recommend the deal was contingent on securing the interest of investors:

> Fedorcik: I want to go to the sponsors and kind of tell them, 'here's our recommendation.'
>
> Rorech:　Yep.
>
> Fedorcik: They kind of know that by coming, something's at the holdco.
>
> Rorech:　Right.

> Fedorcik: They already know that. I've talked to a couple of other guys, and other guys have given me similar feedback from Jeremy. This other guy gave me an order similar to Jeremy. I just want to make sure what I represent, I know. Because here's what I want to do: I want to go to the sponsors and say, 'look, 200-250 million,' I want to come out kind of next week on Monday and sort of say we're adding a HoldCo tranche.
>
> Rorech:   Right.
>
> Fedorcik: And it's ten year deal, non-call five, you know, just like we talked about with Jeremy.
>
> Rorech:   Yep.

(PX 54A; DX 380T; see also Tr. 1324:7-10 ("Q: Is this the first time that you heard or learned of Mr. Fedorcik's intention to recommend to the sponsors a holding company tranche? Rorech: As far as I know, yes.").)

123. The substance and tone of this conversation makes clear that this was the first time that Mr. Fedorcik shared his plans to make a recommendation to the sponsors that they issue the holding company tranche.

124. Mr. Fedorcik's goal—the fact that he "want[ed]" to recommend a holding company tranche to the sponsors—is not the same thing as a decision by Deutsche Bank to recommend a holding company issuance. The decision to recommend a holding company issuance was not up to Mr. Fedorcik alone; other Deutsche Bank investment bankers, including John Eydenberg and Vikrant Sawhney, were involved in that decision. (See Tr. 407:5-10.)

125. There is no evidence that this idea had been approved by Mr. Sawhney or Mr. Eydenberg as of July 17, 2006.

126. Further, even this plan by Mr. Fedorcik was conditional on assessing customer demand.  Mr. Fedorcik wanted to call Mr. Rorech's clients to assess their interest before discussing the potential recommendation with the other Deutsche Bank bankers and the sponsors.  (See, e.g., PX 55A; DX 379T; DX 381; DX 381T.)

127. Mr. Rorech could not have provided Mr. Negrin with information that Deutsche Bank's investment bankers had decided to recommend to the financial sponsors that they issue holding company bonds at the time of either cellular phone call, because that decision had not yet been made by Deutsche Bank.

128. After their second cellular phone call, Mr. Rorech and Mr. Negrin did not speak again about the VNU bond offering until July 20, 2006, after Mr. Negrin had bought the VNU CDSs at issue in this case.  (See PX 186A; DX 402.)

B. Mr. Negrin's VNU CDS Trades

129. Approximately three hours after the second cellular phone conversation on July 17, Mr. Negrin placed an order to buy €10 million of VNU CDS from Deutsche Bank on Millennium's behalf.  The trade was executed by John Aylward, a Deutsche Bank credit derivatives trader in London, at approximately 12:40 p.m. New York time on July 17, 2006.  (Stipulated Facts ¶ 57.)

130. The price of the CDS was 383 basis points, to be paid every three months by Millennium. The CDS referenced a 5 5/8% VNU bond that matured in May 2010. The reference entity for the CDS was VNU. The credit events included bankruptcy, failure to pay, and restructuring. The CDS terminated on September 20, 2011. (DX 148.)

131. Mr. Negrin purchased another €10 million of VNU CDS from the Royal Bank of Scotland on July 18, 2006, at the same price and including the same terms as his CDS purchased from Deutsche Bank. (Stipulated Facts ¶ 58; DX 161.)

132. After the announcement of the holding company issuance on July 24, Mr. Negrin sold the €10 million VNU CDS he purchased from Deutsche Bank back to Deutsche Bank at a price of 481 basis points. This sale resulted in a profit of approximately €391,678 for Millennium. (Stipulated Facts ¶ 3.)

133. On the morning of August 1, 2006, Mr. Negrin placed an order to sell to Deutsche Bank the €10 million VNU CDS that he had purchased from the Royal Bank of Scotland. The trade took place as a novation, in which Millennium assigned its interest as the protection buyer to Deutsche Bank, at a price of 525 basis points. This transaction yielded a profit of approximately €555,000 for Millennium. (Stipulated Facts ¶ 4.)

### IV. Mr. Rorech's Actions as a Deutsche Bank Salesman

*A. Mr. Rorech's and Others' Efforts to Sell the VNU Bonds*

134. The market consensus during the time of the marketing of the VNU bond offering was that VNU CDSs were inexpensive and that their price was expected to increase. (DX 98; PX 30; Tr. 237:7-13, 399:22-400:14, 1511:25-1512:9.)

135. Because of this pricing discrepancy, on the morning of July 11, 2006, Grigore Ciorchina suggested to Mr. Rorech and others that there was an opportunity for investors to execute a basis trade by buying VNU CDS and buying the new Nielsen bonds. (DX 40.) The same morning, Mr. Sherry told Mr. Rorech that the pricing dynamic and CDS-buyers' demand created an opportunity for the financial sponsors to issue a dividend deal. A dividend deal is a bond issuance, typically from a holding company, that is used to pay financial sponsors a dividend. (DX 361, Tr. 208:15-18, 1274:4-24.)

136. That same day, after talking to Mr. Martindale, Mr. Rorech told Mr. Fedorcik about the basis trade idea, and suggested that the deliverability issue created the opportunity for an issuance of deliverable bonds. (DX 368; Tr. 1292:11-1293:2.) Mr. Fedorcik thought the basis trade idea was a good one. (DX 511.)

137. Mr. Rorech then proceeded to pitch the basis trade idea to a number of his clients he thought would be interested

in executing a basis trade, including Millennium. (Tr. 1111:19-1112:5.)

138. Mr. Rorech also discussed with a number of his clients the idea that the VNU CDS was a good buy because of the possibility of a future dividend deal from VNU. (Tr. 1187:3-19; DX 369; DX 493; DX 495B.)

139. Market participants know that dividend deals, generally involving issuances from a holding company, are always possible in leveraged buyouts. (Tr. 393:11-394:11.) Further, because of the prevalence of dividend deals at the time, there were discussions in the market about the possibility of a future VNU dividend deal while the VNU bonds were being marketed. (DX 42; DX 109; Tr. 561:3-20, 822:15-823:15, 1509:13-20.)

140. Mr. Martindale discussed the possibility of a dividend deal or an issuance out of the holding company with his customers. (DX 506.) A number of other Deutsche Bank salespeople in New York, including Christopher Wagner, Mark Colm, and John Bertrand, also pitched basis trades and discussed the possibilities of a dividend deal or other issuance of deliverable bonds in their conversations with customers. (DX 509; DX 508; DX 463; DX 346; DX 513.)

141. Mr. Rorech believed that the basis trade idea was likely to create more demand for the overall VNU bond offering. He believed that by getting his customers involved in VNU CDSs,

he was increasing the pool of likely buyers for VNU bonds.  Mr. Rorech continued to pitch the basis trade throughout the marketing period, even when the price of VNU CDSs increased, because he believed there was still a profitable basis trade opportunity.  (Tr. 1144:3-13, 1283:10-1285:8.)

142. Two of Mr. Rorech's hedge fund customers, Blue Mountain and Claren Road, ultimately executed basis trades, and bought both VNU CDSs and VNU bonds.  (Tr. 808:11-23; DX 153; DX 325.)

B. Mr. Rorech's Pitch to Millennium

143. Millennium was a Qualified Institutional Buyer in 2006 and was a potential investor in the VNU bond offering. (Stipulated Facts ¶ 49.)

144. Mr. Negrin, on behalf of Millennium, had purchased bonds from Mr. Rorech at Deutsche Bank prior to July 2006. (Stipulated Facts ¶ 50.)

145. Mr. Negrin was a frequent purchaser of bonds generally, and conducted hundreds of bond transactions in June and July 2006 alone, buying and selling bonds worth many hundreds of millions of dollars.  (DX 527.)

146. Mr. Rorech first spoke to Randy Masel, a research analyst in Mr. Negrin's group at Millennium, about the VNU bond offering on the morning of July 11, 2006, when Mr. Rorech told Mr. Masel of the basis trade idea.  (Tr. 201:4-11; PX 84A.)

147. Mr. Rorech spoke to Mr. Negrin about the upcoming VNU bond offering for the first time on the morning of July 13, 2006. Mr. Negrin said that he would be involved in the VNU deal. (DX 374.)

148. On the morning of July 14, 2006, Mr. Rorech pitched the basis trade idea to Mr. Masel, encouraging him to buy the operating company bonds and VNU CDSs for "100 basis points pick up on the pro forma rate of the new bonds." Mr. Masel said he agreed with Mr. Rorech and said that he had spoken to Mr. Negrin about the idea, but encouraged Mr. Rorech to talk to Mr. Negrin as well about the trade because Mr. Negrin was not yet convinced. (DX 493.)

149. A few minutes later, Mr. Rorech called Mr. Negrin and pitched the basis trade. They spoke about the proposed structure of the VNU bond offering, and Mr. Rorech opined that VNU CDSs were a good buy because VNU could irrevocably guarantee the operating company bonds or could issue a dividend deal from the holding company. Mr. Rorech told Mr. Negrin that he thought the odds were good that the deliverability concerns would be addressed. (DX 495B.) This was followed by Mr. Rorech and Mr. Negrin's first cellular phone call.

150. Mr. Rorech and Mr. Negrin spoke numerous times about VNU during the marketing period, including their cellular phone call on July 17. (Stipulated Facts ¶¶ 51-52.)

151. Mr. Negrin purchased €10 million of VNU CDS from
Deutsche Bank approximately three hours following his cellular
phone conversation with Mr. Rorech on July 17. (Stipulated
Facts ¶ 57.) Mr. Negrin purchased another €10 million of VNU
CDS from the Royal Bank of Scotland on July 18, 2006.
(Stipulated Facts ¶ 58.)

152. On the morning of July 24, after the announcement of
the holding company issuance, Mr. Rorech and Mr. Negrin spoke a
number of times. During the calls, Mr. Rorech inquired whether
Mr. Negrin wanted to place an order for the VNU bonds. (PX
178A; PX 189A.)

153. On one call on July 24, after Mr. Rorech provided Mr.
Negrin with a bid/ask quote for VNU CDS at 495/515 basis points
(PX 191), Mr. Negrin expressed his thanks to Mr. Rorech for
recommending the VNU CDS trade, in light of the trade turning
out to be profitable. Mr. Negrin said, "Great call. That's all
I have to f___ing say." Mr. Rorech asked whether they would "go
out soon or what?" and Mr. Negrin replied, "Yeah, I'm going to
have to take you out." Mr. Negrin told Mr. Rorech that he owned
€20 million of VNU CDSs, which Mr. Rorech called a "nice little
kiss." (PX 189A; Tr. 152:20-24.)

154. Later that morning, when Mr. Rorech was giving Mr.
Fedorcik a summary of the orders from Claren Road, Blue
Mountain, and Caxton for holding company bonds, Mr. Negrin

called, at which point Mr. Rorech asked Mr. Fedorcik to hold by saying "I may have something from Millennium. Hang on a second, okay?" (DX 415.)

155. Although Mr. Negrin did not place an order for any holding company bonds on July 24, Mr. Rorech spoke to Mr. Negrin and Mr. Masel a number of times over the course of the week of July 24 about the VNU bond offering.

156. As of July 27, 2006, Mr. Negrin indicated that he and Mr. Masel were still undecided as to whether to participate in the bond offering. (PX 234A.)

157. Mr. Rorech kept Mr. Negrin and Mr. Masel apprised of covenant updates, and continued to pitch the basis trade idea in order to persuade Millennium to buy either the holding or operating company bonds until the afternoon of July 31, when the deal closed. (DX 485; PX 234A; DX 490; DX 491.) Millennium ultimately did not purchase any VNU bonds.

*C. Whether Mr. Rorech Thought He Was Acting Illegally in Attempting to Sell the Bonds*

158. As of July 2006, Mr. Rorech was relatively new to the high yield sales group, having transferred from the hedge fund sales group just a few months earlier. (Tr. 1169:24-1170:1.) Mr. Rorech was transferred to high yield in part to try to incorporate derivative trading strategies into the high yield sales group's marketing practices. (Tr. 985:16-986:8.)

159. Mr. Rorech was not provided with formal training on how to market high yield bond deals. Rather, he learned directly from his supervisor, other senior high yield salespeople, and capital markets professionals. (Tr. 1482:2-10.)

160. Mr. Rorech kept his supervisors, including Mr. Martindale and Mr. Fedorcik, apprised of the fact that he was speaking with his customers about a potential issuance of deliverable bonds. (Tr. 1321:4-15, 1532:3-6.) In particular, Mr. Rorech told Mr. Fedorcik that he was speaking to protection holders like Millennium, and Mr. Fedorcik was aware that Mr. Rorech had demand from other customers for deliverable bonds in addition to the indications of interest from Caxton and Blue Mountain. (PX 57A; DX 406; DX 418.)

161. Mr. Rorech participated in a number of calls during which those senior to him, namely Mr. Fedorcik and Mr. Martindale, provided potential investors with information about possible structural changes in the VNU bond offering. (PX 51A; PX 8A; PX 55A; DX 381; DX 386.)

162. Mr. Martindale and Mr. Fedorcik openly discussed the possibility of a holding company issuance with customers. (DX 524; DX 522; Tr. 1515:10-23.)

163. Mr. Fedorcik never told Mr. Rorech that he could not discuss potential structural changes with customers.  (Tr. 1046:11-19.)

164. Other Deutsche Bank employees were also discussing with customers during this period the possibility of structural changes in the VNU bond offering—either through a change in the guarantee language or through an issuance of deliverable bonds:

a.    Eve Tournier and Grigore Ciorchina spoke to Jeff Burch, a portfolio manager at Blue Mountain, on July 12, 2006. Ms. Tournier told Mr. Burch that she and Mr. Ciorchina had raised with capital markets the possibility of amending the VNU bond offering to include a tranche of holding company bonds, but that the sponsors and capital markets professionals were not receptive to the idea.  (DX 429.)

b.    On July 12, 2006, Sean Hunt, the head of high yield sales in London, told a number of clients about the demand for deliverable bonds from CDS investors and about the likelihood that something could be done to resolve the issue.  (DX 431; DX 433; DX 434.)

c.    On the morning of July 18, 2006, Mr. Fedorcik spoke with Andrew Kellerman, a salesperson in the Investment Grade Sales group at Deutsche Bank in New York, and with individuals from Merrill Lynch Principal Finance, one of Mr. Kellerman's customers, about reverse inquiries that Deutsche Bank received

from other investors, and about the fact that Mr. Fedorcik had introduced the possibility of a holding company issuance to the financial sponsors. (DX 482; DX 483.)

     d.   On July 19, Sean Hunt told Elyssa Johnson at the Citadel hedge fund that Deutsche Bank had received reverse inquiries from customers who wanted to change the structure of the VNU bond offering to include a tranche of holding company bonds. (DX 502.)

165. Mr. Rorech himself discussed the holding company bond issuance with other customers and on recorded telephone lines:

     a.   On July 17, Mr. Rorech responded to Mr. Sherry's question as to whether the holding company issuance was likely to happen by saying, "we don't have anything yet, but that's the tone." Mr. Rorech also told Mr. Sherry that one of his accounts put in an indication of interest for €100 million of any holding company issuance. (PX 131A.)

     b.   On July 18, Mr. Rorech told Mr. Fahey that an issuance of deliverable bonds was likely because he had €150 million worth of indications of interest for such an issuance. (PX 38A.)

     c.   On July 18, Mr. Rorech called Alex Koundourakis, a childhood friend and trader at the hedge fund Gracie Capital, and whispered to Mr. Koundourakis that he was "structuring the deal." This call occurred after the charged conduct in this

case, and after Mr. Fedorcik informed Mr. Rorech of his plan to recommend the holding company deal to the sponsors.  Neither Mr. Koundourakis nor his hedge fund, Gracie Capital, purchased VNU CDSs.  (PX 184A; PX 184T; see PX 230.)  Mr. Rorech testified that there was no reason for him to whisper to Mr. Koundourakis—on a line he knew to be recorded—about the VNU deal, which he was freely discussing with his other accounts.  Mr. Rorech testified that he was bragging to a friend about his role on the deal, which he did not want his colleagues on the high yield desk to hear.  (Tr. 1095:10-22.)

d.    On July 19, Mr. Rorech told Mr. Fahey about other customers' indications of interest for the holding company issuance, and that he thought there would likely be an issuance of a couple hundred million euros of bonds from the holding company.  (DX 390.)

e.    On July 21, Mr. Rorech told Mr. Barnum that a holding company issuance was likely and that in the words of Mark Fedorcik, "it seems all clear."  (PX 10A.)

166. Mr. Rorech believed that he was authorized and permitted to discuss possible structural changes with potential VNU bond buyers in order to attempt to generate additional customer interest in the bond issuance.  (Tr. 1069:20-1070:15.)

167. The SEC refers to portions of other conversations for the proposition that Mr. Rorech knew the information he was

discussing was confidential or that Mr. Rorech did not want to speak openly about the VNU deal.  (See, e.g., PX 54A; PX 71A.) These snippets do not undermine the overwhelming evidence that Mr. Rorech and others at Deutsche Bank did not view the information as confidential and thus talked about it openly on recorded lines.

### V. Mr. Negrin's Actions at Millennium

168. Mr. Negrin joined Millennium in 2003.  In 2006, he led a credit trading group of approximately four to seven professionals.  (Tr. 170:4-18.)

169. Approximately 20% of the trading profits Mr. Negrin and his group generated for Millennium accrued to Mr. Negrin personally.  (Tr. 126:7-13.)

170. Both of the VNU CDS trades at issue in this case were made by Mr. Negrin for a Millennium portfolio that he managed. Mr. Negrin did not trade any VNU CDSs for any personal account.

171. Mr. Negrin and Mr. Rorech have a purely professional relationship; they are not friends.  (Tr. 172:3-8.)

172. Mr. Negrin was not one of Mr. Rorech's most important customers and Mr. Rorech was not one of the most important salespeople to Mr. Negrin.  (Tr. 171:9-172:2.)

*A. Mr. Negrin's Practice of Trading VNU CDSs*

173. Prior to July 2006, Mr. Negrin and Mr. Masel had researched and traded VNU CDSs, and were familiar with the company. (Tr. 233:4-7, Tr. 234:9-235:4; DX 287; DX 289.)

174. Mr. Negrin, on behalf of Millennium, traded VNU CDSs prior to the trades at issue in July 2006 (Stipulated Facts ¶ 62):

     a.    On November 18, 2005, Mr. Negrin purchased €10 million worth of VNU CDS from UBS AG, at a price of 90 basis points. He subsequently sold a portion of the VNU CDS on December 9, 2005, at 141 basis points and a portion on January 5, 2006, at 178 basis points. Millennium realized a profit of €113,397 on the trades. (Stipulated Facts ¶ 63.)

     b.    On January 12, 2006, Mr. Negrin purchased €5 million of VNU CDS from the Royal Bank of Scotland at 222 basis points. Mr. Negrin purchased another €5 million of VNU CDS from BNP Paribas on January 31, 2006, at 215 basis points. He sold both VNU CDS to Lehman Brothers on February 21, 2006, at 213 basis points, incurring a loss of €27,662 for Millennium. (Stipulated Facts ¶ 64.)

175. The two VNU CDS trades at issue in this case were small relative to the sizes of Mr. Negrin's other CDS trades and particularly as compared to the size of his total CDS portfolio:

a.    In June and July 2006, Negrin regularly purchased CDSs with notional values ranging from $50 million to $250 million.  (DX 328.)

b.    On June 13, 2006, Negrin purchased a total of $40 million of CDSs in Limited Brands, Inc., through four separate $10 million CDS trades, from HSBC, Morgan Stanley, Deutsche Bank, and Goldman Sachs.  (DX 328; Tr. 176:18-177:6, 177:10-12.) Additionally, from June 13 to June 15, Mr. Negrin purchased $45 million of CDS protection in Pactiv Corporation by way of five CDS transactions with four different counterparties.  (DX 328; Tr. 177:7-9, 177:13-178:5.)  Similarly, on July 21, 2006, Mr. Negrin purchased $60 million of CDS protection in CBS Corporation through three separate $20 million trades with Citigroup, UBS, and Goldman Sachs.  (DX 328; Tr. 180:6-25.)

176. The VNU CDS trades at issue in this case did not diverge from Negrin's historical trading patterns.  The size of the VNU CDS trades was not inconsistent with the size of Negrin's other CDS investments at the time.

*B. Mr. Negrin's Reasons for Purchasing the VNU CDSs*

177. Mr. Negrin, as a result of his experience in the finance industry, assumed that because salespeople were on the public side of an investment bank's "wall," any information they had was public.  (Tr. 185:15-18.)

178. During the period in which he discussed VNU with Mr. Rorech, Mr. Negrin remained interested in buying VNU bonds. (Tr. 184:9-18.) Mr. Masel also spoke to Mr. Rorech because he, too, was evaluating whether Millennium should participate in the VNU bond offering. (Tr. 235:21-236:7.)

179. Mr. Negrin does not recall why he bought VNU CDSs in July 2006. However, he testified that based on a review of the facts surrounding VNU's July 2006 bond offering, he likely bought the VNU CDSs because he believed that the price of the VNU CDSs was low relative to the high risk of the debt the CDSs referenced and because he believed the company would solve the deliverability issue and provide deliverable obligations to the market. (Tr. 123:1-19.)

180. These views were shared by many in the market in July 2006. (Tr. 237:7-13, 398:9-400:14; DX 98; DX 110; DEX 108.)

181. In July 2006, many market participants, including Mr. Masel, believed that the price of VNU CDS was likely to increase regardless of whether the deliverability issue was resolved. (Tr. 236:15-237:13, 813:10-13; DX 41; PX 30.)

182. Indeed, Mr. Masel believed that VNU CDSs were a good buy and, while he cannot recall whether he recommended them to Mr. Negrin, he testified that his usual practice was to recommend good trades to Mr. Negrin. (Tr. 236:8-14; see also DX 493.) Furthermore, on July 18, 2006, Mr. Masel told Eddie

Oppedisano, a research analyst at the hedge fund Sigma Capital, that he and Mr. Negrin bought VNU CDSs not because of the likelihood that a holding company tranche would be issued, but based on their view that the CDSs were underpriced relative to the expected price of the new operating company bonds. (DX 166; Tr. 218:6-8, 239:3-10, 241:22-242:24.)

### VI. Deutsche Bank's Confidentiality Policies

*A. Deutsche Bank's Confidentiality Policy, Its Engagement Letter with VNU, and Expected Uses of Indications of Interest*

183. Deutsche Bank's Confidential and Inside Information policy defines "confidential information" as "information provided by or obtained from a third party with the expectation or contractual agreement that it will remain confidential." Deutsche Bank's policy permits employees to use confidential information for the "business purpose" for which it was communicated and to disclose information to anyone who has a "legitimate need to know the information." (DX 285 at 4.)

184. John Cartaina—a lawyer and a compliance officer at Deutsche Bank—confirmed that information is not "confidential" under the Bank's policy unless there is an "expectation or contractual agreement that we keep it confidential." (Tr. 716:02-8.)

185. Here, there was no expectation on the part of the sponsors—Deutsche Bank's issuer client—to keep information regarding the VNU bond offering confidential from prospective purchasers such as Millennium.

186. Deutsche Bank's Engagement Letter with the sponsors explicitly authorized Deutsche Bank employees to disclose information regarding the potential VNU bond offering, including a potential restructuring, to prospective buyers. Indeed, the Engagement Letter expressly provides that even nonpublic information can be disclosed "to purchasers or prospective purchasers of Securities in connection with an Offering of such Securities, to the extent appropriate in the context of such Offering . . . ." (DX 301 at 7.)

187. It is undisputed that Millennium was a prospective purchaser and, therefore, came within the purview of the Engagement Letter. (Stipulated Facts ¶ 49.)

188. This express grant of authority to discuss information related to the VNU bond offering, including potential structural changes, meant that there was no expectation or agreement that such information be kept confidential.

189. In fact, the sponsors and Deutsche Bank had the expectation that information would be shared with prospective customers to sell the bond deal. Not only is this expectation clear from the language of the Engagement Letter, but, as the

testimony confirmed, sharing information about potential structural changes in a bond offering—including information related to a potential recommendation related to such changes—is consistent with the custom and practice of marketing a high yield bond deal.  (Tr. 444:23-446:7, 539:1-10, 1242:13-1243:8, 1516:16-1518:10.)

190. It is also consistent with the custom and practice in the high yield bond industry for customers' indications of interest in placing an order, especially so-called "anchor orders" that allow a deal to take place, such as that placed by Mr. Barnum, to be shared with other potential investors during the process of marketing a new issuance.  (Tr. 541:1-9, 830:15-20, 1243:22-1244:23, 1500:10-21, 1501:14-23.)

191. Mr. Barnum testified specifically that he did not view his indication of interest in the VNU holding company bonds to be confidential.  (Tr. 830:15-20.)  Rather, he expected that his order would be used as the so-called "anchor order" to obtain other orders:

> The Court:  But you spoke to Mr. Fedorcik, and Mr.
> Fedorcik said he was putting together an
> interest of hundreds of millions of
> dollars; he was talking to you about
> $100,000,000.  Did you have any
> expectation that when he went to the next
> person that he was trying to put together
> the deal with, he would not be talking, at
> least in general terms, in the same way
> about what he was putting together?

```
Barnum:       No. If anything, it's the contrary. . . .
              I thought I was the so-called anchor
              orderer.  So the narrative in my head was
              I was the anchor orderer.  I did this
              thing.  They were going to use that order
              to build the rest of the book with a few
              other guys. . . . But in fact, what I was
              trying to achieve very specifically was
              for the company to agree to do this.  And
              for them to do that, it was going to take
              more than [$]100,000,000.  So what I was
              hoping to do was jump-start the process
              and sort of my definition that meant that
              my order was going to contribute to that.
```

(Tr. 833:11-834:12.)

192. Mr. Fedorcik believed it was appropriate to share his thoughts on recommending a holding company tranche to the sponsors with potential investors in order to obtain feedback on the potential issuance for the sponsors.  Mr. Fedorcik also believed it would be appropriate for a salesperson to do the same.  (Tr. 383:6-17, 433:19-434:13.)

193. Mr. Fedorcik's practice, in the course of exploring potential structural changes to a publicly announced bond offering, was to explore the viability of the possible change with a few investors.  He preferred not to broadcast the possibility of the change to the whole market prior to the change's announcement because he did not want to raise investors' expectations in the event that the change did not happen.  (Tr. 319:25-321:16.)

194. Both Mr. Fedorcik and Mr. Ross, the two senior capital market professionals at Deutsche Bank responsible for marketing the VNU bond offering, expressly asked various salespeople to discuss the possibility of a holding company issuance with their customers in order to obtain market feedback and to gauge investor interest in the change.

195. On July 14, Mr. Fedorcik asked Mr. Rorech to get "color," that is, to assess investor demand, for a potential holding company issuance. (DX 462.)

196. On July 12, Mr. Ross asked Sean Hunt, the head of the high yield sales group at Deutsche Bank in London, to see if customers had any interest in deliverable bonds. (DX 445.)

197. Similarly, on July 20, Mr. Ross asked Rachel Bobillier, the head of the hedge fund sales group at Deutsche Bank in London, to raise the potential holding company tranche issuance with CQS, a hedge fund that Ross thought likely traded in VNU CDS. (DX 460.)

198. Furthermore, Mr. Fedorcik spoke, with Mr. Rorech on the line, to Jeremy Barnum, the head of Blue Mountain's London office, about the possibility of a holding company issuance, and about Mr. Fedorcik's plans to speak to the financial sponsors and about other customers' interest in deliverable bonds. (PX 51A; PX 8A; DX 335; PX 55A.)  Mr. Fedorcik provided the same

information to Geoffrey Sherry at Caxton, also while Mr. Rorech was on the line.  (DX 381.)

199. Mr. Fedorcik believed that the information discussed on these calls was not confidential.  (Tr. 427:1-10.)

200. Capital markets professionals like Mr. Fedorcik relied on salespeople like Mr. Rorech to know their customers' needs and to bring customers who might be interested in deliverable bonds to capital markets' attention.  (Tr. 1046:11-19.)  Mr. Rorech believed that in order to provide this information to Mr. Fedorcik, he was authorized to discuss the possibility of a potential holding company issuance with his customers in order to ascertain if any of his customers were interested.  (Tr. 1069:20-1070:15.)

201. Mr. Rorech spoke with several customers he believed might be interested in a basis trade, that is, purchasing both VNU CDSs and deliverable bonds, including Blue Mountain, Caxton, Claren Road, Millennium, and Gracie Capital.  (Tr. 1333:17-1334:7.)

202. Some of these investors gave indications of interest for holding company bonds only after being provided with information about the transaction by Mr. Fedorcik and Mr. Rorech:

a.  For example, on the afternoon of July 17, Mr. Fedorcik told Geoffrey Sherry that he was trying to gauge

investor demand for a holding company tranche before going to the sponsors with a proposal.  Mr. Sherry had not expressed any interest in or given an order for deliverable bonds prior to this recorded conversation.  (Tr. 1370:6-1371:17.)  After being told about the possibility of a holding company issuance, however, Mr. Sherry gave an indication of interest of €50 million of VNU bonds.  (DX 381.)

   b.   On July 18, 2006, Mr. Rorech discussed with Sean Fahey, a portfolio manager at Claren Road, the possibility that bonds would be issued out of the VNU holding company.  After receiving this information, Mr. Fahey and Bill Green, an analyst at Claren Road, indicated that they may be interested in the potential holding company bonds.  (PX 38A.)  Later, Claren Road put in a €15 million order for deliverable bonds.  (DX 325.)

*B. Deutsche Bank's Wall-Crossing Procedures*

   203. According to Deutsche Bank's Confidentiality Policy, Deutsche Bank maintains a separation between its public side and its private side.  (DX 285.)  The public side includes the bank's sales, trading, and research employees, and the private side includes the bank's investment banking employees.  The public side primarily interacts with other public market participants including investors, while the private side primarily interacts with issuers and financial sponsors. (Stipulated Facts ¶ 47.)

204. Deutsche Bank has a "wall" in place to prevent nonpublic information possessed by private-side employees from reaching employees on the public side. (DX 285.)

205. Members of Deutsche Bank's sales force, including high yield salespeople, are on the public side of the wall. (Tr. 725:2-4.)

206. Deutsche Bank's capital markets professionals, including Mr. Fedorcik, are often thought of as straddling the wall, working on both the public and private sides of the bank. (Tr. 1179:4-11.)

207. Capital markets professionals control the flow of information from the private side of the bank to their sales and trading colleagues on the public side of the bank and to potential investors. As a result, capital markets professionals are responsible for determining whether and when it is appropriate to share information with public-side employees and with investors in the course of marketing bond issuances. (Tr. 300:3-21, 378:9-14, 664:10-20.)

208. Pursuant to Deutsche Bank's policy, private-side employees, such as investment bankers, are required to initiate a set of formalized "wall-crossing" procedures before providing any material nonpublic information to public-side employees. (DX 285.) These procedures require the private-side employees to notify Deutsche Bank's compliance department and to notify

the public-side, "wall-crossed" employee's supervisor to obtain approval for the wall-crossing.  Upon obtaining approval, the public-side employee is then notified in writing that he or she has been wall-crossed, and a record of the wall-crossing is kept by compliance employees.  All of these steps are to be completed before a public-side employee is provided with any material nonpublic information by a private-side employee.  (Tr. 725:20-727:8.)

209. Salespeople are not provided with, nor do they have access to, material nonpublic information about Deutsche Bank's investment banking issuer clients in the ordinary course of business.  (Tr. 725:5-10.)

210. Salespeople are infrequently wall-crossed or provided with material nonpublic information.  This is especially so during the marketing period for a new issuance, because a wall-crossed salesperson would be prevented from speaking to that person's clients about an issuance on which the salesperson was wall-crossed.  (Tr. 727:22-728:4, 728:19-25, 1234:6-14, 1491:7-13.)

211. Neither Mr. Rorech nor any other Deutsche Bank sales or trading employee was wall-crossed during the period of July 7, 2006, through August 8, 2006, in connection with the VNU bond offering.  (Tr. 726:23-727:1, 736:7-18; DX 317; DX 319; PX 22.)

212. In fact, Mr. Fedorcik testified that he personally did not initiate any wall-crossing procedures in connection with the VNU bond offering, because he did not believe that he was in possession of any material nonpublic information that could not be shared with salespeople or customers:

> Question: Now, Mr. Fedorcik, is it fair to say that you didn't initiate any wall-crossing procedures with respect to VNU? Correct?
>
> Fedorcik: That's correct.
>
> Question: And that's because you didn't believe that during the course of the events involved with the marketing of the deal, from the time the marketing began in July 11th of 2006 until the decision was made by the sponsors to make a change on the 21st of July, 2006, that you were in possession of confidential information that was being shared with any salesman?
>
> Fedorcik: That's correct.
>
> Question: And likewise, you didn't believe you were in possession of confidential information that you were sharing with any customer, right?
>
> Fedorcik: That's correct.

(Tr. 379:7-21.)

*C. Deutsche Bank's View Whether Their Confidentiality Policies Were Breached*

213. Deutsche Bank is a registered broker-dealer with the Securities and Exchange Commission. As a result of being so registered, Deutsche Bank has a statutory duty to maintain and

to enforce policies designed to comply with the securities laws. (Tr. 721:12-19.)

214. Prior to the institution of this lawsuit, Deutsche Bank was aware that both the Financial Services Agency, which regulates the financial services industry in the United Kingdom, and the SEC, were investigating the conduct of Deutsche Bank employees in connection with the VNU bond offering. (Tr. 489:4-14; DX 277.)

215. Attorneys acting on behalf of Deutsche Bank conducted an internal investigation of its employees' conduct in connection with the VNU bond offering. Attorneys for Deutsche Bank and Deutsche Bank's compliance personnel interviewed Mr. Fedorcik and Mr. Rorech about the VNU transaction. (Tr. 489:4-491:3, 492:17-23, 1358:22-1360:2.)

216. Deutsche Bank's attorneys who conducted the internal review and responded to the SEC's requests for documents were aware of the evidence that the SEC requested and obtained in connection with this case, including the contents of the audio recordings that were produced and the fact that Mr. Rorech and Mr. Negrin had two cellular phone calls. (DX 277.)

217. In the face of this knowledge, and after its own internal review, neither Mr. Rorech nor Mr. Fedorcik was ever told by their supervisors, by compliance, or by other Deutsche

Bank officials to alter their conduct in sharing information with clients.  (Tr. 482:22-484:10, 1363:24-1364:2, 1528:19-22.)

218. Following Deutsche Bank's internal investigation, Mr. Fedorcik was promoted twice.  He was first promoted to global head of high yield capital markets, and subsequently to global head of leveraged debt capital markets.  Today, in that capacity, Mr. Fedorcik oversees a group of approximately 100 capital markets professionals for Deutsche Bank worldwide.  (Tr. 493:9-494:14.)

219. After the SEC issued a Wells notice to Mr. Rorech in 2009, Deutsche Bank placed Mr. Rorech on paid administrative leave.  (Tr. 1364:12-17.)  Mr. Rorech remains a Deutsche Bank employee.  (Tr. 1364:18-19.)

*D. VNU on Deutsche Bank's Restricted List*

220. VNU was on Deutsche Bank's internal "restricted list" from March 2006 through August 2006.  (DX 316; Tr. 735:3-13, 738:24-739:2.)

221. VNU was placed on Deutsche Bank's restricted list during the course of the leveraged buyout of VNU and the VNU bond offering in order to prevent conflicts of interest between Deutsche Bank and its issuer client.  (Tr. 722:3-723:3.)  The restrictions prevented individual trading by Deutsche Bank employees and prevented Deutsche Bank from building proprietary positions in VNU securities and derivatives.  (DX 530.)

222. The restricted list governs how the Bank could trade VNU securities and derivatives.  VNU's presence on the restricted list is not relevant to whether information about VNU was confidential, or whether Deutsche Bank possessed material nonpublic information about VNU.

223. Deutsche Bank's Confidential and Inside Information Policy states that the restricted list is "based on federal securities laws, regulatory rules, and/or Firm policy."  (DX 285 at 8.)

224. Mr. Cartaina testified that an issuer can be placed on the restricted list for a variety of different reasons.  He also stated that, in the context of a leveraged buyout transaction where Deutsche Bank was advising the acquirer, one of the reasons an issuer might be on the restricted list would be to avoid Deutsche Bank taking a proprietary position in the issuer and creating a potential conflict of interest with its client. (Tr. 721:20-722:16.)

225. In addition, there are different types of restrictions that Deutsche Bank imposed.  Mr. Martindale noted that in some circumstances, salespeople are allowed to solicit trades, but traders are restricted from trading.  (Tr. 1496:11-13.)

226. During most of the marketing period for the VNU bond offering, members of Deutsche Bank's high yield sales group in New York, including Mr. Rorech and Mr. Martindale, did not

believe that they were restricted from speaking to their customers about VNU securities or VNU CDSs. (Tr. 1023:2-12, 1497:24-1499:20.) Indeed, Mr. Martindale did not think it was possible to market the VNU bond offering without being able to discuss the preexisting VNU securities or derivatives. (Tr. 1497:7-23, 1499:24-1500:7.)

227. On July 17, 2006, at 10:36 a.m., Mr. Rorech explicitly asked Mr. Aylward "are you still trading VNU? Allowed to trade it?" Mr. Aylward replied that he was. (PX 181A; PX 181T.)

228. Throughout the relevant time period between July 11 and July 24, 2006, Deutsche Bank traders sent runs on VNU to the salespeople. John Olvany, the defendants' industry expert in the high yield market, testified that his experience at Morgan Stanley was that "[i]f I received a trader run, I would not imagine that we were restricted in the company." If the salespeople were restricted from soliciting, then "the trader would not be sending out any runs." (Tr. 1231:16-25.)

229. Mr. Martindale testified that there was a great deal of confusion surrounding VNU's presence on the restricted list during this time: "So because there were three different traders and it was coming out of London, which is a different time zone, there was indeed some confusion about if we were restricted in the existing securities, that being the CDS and the euro and Sterling bonds for a period of time, as I recall

during the marketing." (Tr. 1498:4-22.)  Mr. Martindale

testified that Deutsche Bank salespeople were always able to

talk to customers about getting orders for the new deal, but

were restricted for a couple of days from trading in the

existing capital structure.  (Tr. 1499:4-1500:7.)

230. A number of Deutsche Bank high yield salespeople,

including Mr. Martindale, recommended to their customers to buy

VNU CDS throughout the marketing period.  (DX 346; DX 347; DX

506; DX 512; Tr. 1447:21-1448:19.)

231. Deutsche Bank represents that it did not take

proprietary positions in VNU CDSs during the period that VNU was

on its restricted list and all trading in VNU CDSs was within

Deutsche Bank's restricted policy.  (DX 530.)

### VII. Information About the VNU Bond Issuance in the Market

232. VNU's financial sponsors heard about the

deliverability issue and investor demands for potential

structural changes first-hand during the roadshow presentations.

(DX 110; Ross Dep. 114:7-17.)

233. The fact that potential investors had interest in

deliverable bonds was "obvious to everyone who was participating

in the market."  (Tr. 829:10-830:2, 834:19-21; DX 97; DX 110.)

234. During the time of the VNU bond offering, it was

widely known in the market that Deutsche Bank was working with

the financial sponsors to resolve the deliverability issues. (Tr. 396:21-397:13, 640:2-16; DX 44; Ross Dep. 124:8-125:4.)

235. Despite this knowledge, and after speaking with Mr. Rorech on July 19, 2006, and learning that the potential holding company issuance was "moving in the right direction," Mr. Barnum sold VNU CDSs.  Mr. Barnum sold the CDSs before the holding company tranche was announced on July 24, 2006, and the price of VNU CDSs increased. (DX 394; Tr. 785:18-20, 789:17-790:16.)

236. Further, Mr. Barnum testified that the fact that there were outstanding orders for deliverable bonds would not have affected his thinking in deciding whether to buy VNU CDSs.  (Tr. 830:8-11.)

237. No investor who received information about the potential structural changes, including information about other customers' indications of interest and about Deutsche Bank's discussions with the financial sponsors, was asked to sign a confidentiality agreement restricting the potential investor's ability to trade in VNU CDSs or securities.  Nor was any investor who received information about potential structural changes asked to keep the information confidential.

238. Sophisticated institutional investors, who are the participants in the high yield bond market, understand that discussions about reverse inquiries and potential structural changes are tentative and uncertain until the final decision as

to whether to implement the changes is made by the issuer.  (Tr. 536:14-20, 760:19-761:5, 377:20-378:1, 539:11-16, 810:1-7.) Market participants know that it is common for reverse inquiries, even those that seem like great ideas, to be rejected by issuers.  (Tr. 378:2-5, 539:17-22.)

239. In the case of the VNU bond offering, the final decision whether to agree to the investor-proposed structural changes was made by the financial sponsors.  (Stipulated Facts ¶ 39.)  The fact that the final decision was to be made by a group of highly-sophisticated private equity sponsors in the VNU case was viewed by some investors as increasing the uncertainties involved in the negotiation process for structural changes in the VNU bond offering.  (Tr. 783:21-784:12.)

240. The SEC relies on Ms. Tournier's statement that she became "tainted" and restricted from trading merely "from her discussions about [possible] recommendations" to argue that information about the restructuring was confidential and not available in the market.

241. However, Ms. Tournier's testimony reveals that her belief that she was "tainted" was not grounded in Deutsche Bank's Confidentiality Policy.  Rather, as she explained, her view was based on her personal opinion that she should not trade because of her conversations with others in capital markets. (Tournier Dep. 105:9-16, 182:10-15.)

242. The SEC also focuses on the fact that, during one of Mr. Fedorcik's calls with Mr. Ross, he asked Mr. Ross whether Ms. Tournier was "restricted" before Ms. Tournier joined the call. (PX 53A; PX 53T.) However, Mr. Fedorcik explained that he asked this question merely because he wanted to know what Ms. Tournier's status was as a precautionary measure and not because he planned necessarily to share any confidential, material nonpublic information with her. (Tr. 346:19- 347:14.) Indeed, Mr. Fedorcik testified that he had no confidential information in his possession with respect to the potential holding company tranche that could not be shared with a public side employee such as Ms. Tournier.

243. Notably, Mr. Ross testified that Ms. Tournier was restricted out of an abundance of caution, in case he ended up sharing confidential, material nonpublic information with her in light of her position as an expert in derivatives. But, as he explained, Mr. Ross did not believe that Ms. Tournier ever received material nonpublic information. (See Ross Dep. 165:11-20, 169:22-170:9.)


### VIII. Facts Relevant to the Court's Jurisdiction

244. CDSs that reference single corporate entities are viewed by market participants as synthetic bond positions in those entities, with the purchase of CDS protection being the

equivalent of shorting a corporate bond, and the selling of protection being the equivalent of buying a bond. (Tr. 118:19-119:15 (Mr. Negrin discussing using CDSs to short bonds); Tournier Dep. 15:17-16:17 (explaining that buying a CDS has same effect as taking a short position in a bond); DEX 36 at 2 ("[D]efault swaps helped investors create outright short and long/short positions much more easily than by using bonds and the repo markets.").)

*A. The Relationship Between VNU Bond Prices and Yields and CDS Prices*

245. The price, or the spread, of a CDS is the annual premium that the buyer must pay to the seller, expressed in basis points.

246. The spread of a bond, on the other hand, is the portion of the bond's yield, or amount of expected return, above the risk-free rate of return. A bond's price, usually expressed as a dollar value or percentage of the par value of the bond, has an inverse relationship to the bond's spread or yield. For example, as a bond's price decreases, the bond's spread or yield increases. (Tr. 1560:6-22.)

247. Mr. Negrin and Mr. Rorech each testified to, or discussed contemporaneously with the VNU CDS transactions at issue in this case, the fact that CDS prices were based on the spread or yield, and therefore, inversely, on the price, of VNU

bonds:

a. At his deposition, Mr. Negrin testified that if the coupon rate of the new VNU bonds was going to increase, that would be a "piece for the puzzle" in his determination of what the price of the VNU CDSs should be. (Tr. 128:5-130:12; see also PX 175.)

b. Mr. Negrin also testified that during a recorded phone call with Mr. Rorech on July 24, 2006, after discussing the expected pricing of the new VNU bonds, including the new holding company bonds, Mr. Negrin asked Mr. Rorech to give his opinion on what the VNU CDS price should be based on the expected spread of the VNU bonds. Mr. Rorech then calculated the expected price of VNU CDSs based on the expected spread of the VNU bonds. (Tr. 149:21-151:22; PX 178.)

c. During a recorded telephone conversation on July 31, 2006, Mr. Rorech and Mr. Negrin again calculated the proper price for VNU CDSs based on the expected spread of the new VNU bonds. (DX 490T.)

248. This understanding was widely shared by fact witnesses who were market participants and by the market more widely. These witnesses and market participants testified or demonstrated in contemporaneous communications that they understood that CDS prices were based on the price, spread, or yield of deliverable bonds. For example:

79

a. Mr. Sherry, in discussing a blast email from a trader at Citigroup dated July 13, 2006, which noted that the existing VNU bonds that served as the VNU CDSs' reference obligation were always going to be "cheapest to deliver" under the CDS contract, acknowledged that the "cheapest to deliver" bond is in theory reflected in the price of a CDS. (Tr. 564:16-565:13.) The email Mr. Sherry discussed noted that the five-year VNU CDS price is "still determined by a sub bond." (DX 115.)

b. Mr. Sherry also discussed his own email of July 11, 2006, in which he stated that VNU CDSs would go higher as the new bonds' pricing "becomes clear." (Tr. 565:14-566:5; DX 42.)

c. Mr. Masel testified as to his recollection of why the VNU CDS price increased after Mr. Negrin bought the CDSs in July 2006: "I think the interest rates on the bond deal were probably higher and the ratings lower than maybe anticipated or they were pretty low. So that had an influence on the CDS spreads. And I think the other thing that had influence was this HoldCo bond deal." (Tr. 216:20-217:21.)

d. At her deposition, Ms. Tournier testified that "in general, if there's no corporate action, the bonds and the CDS would tend to move in tandem," and that the price of a CDS and the price of the issuer's bonds would be "sometimes, but not always" "correlated." (Tournier Dep. 11:16-12:9.) She

explained that "in general, if a credit improves, [the bond] price would go up and its spreads would tighten," but that "each security . . . may have its own events that drive the price." (Tournier Dep. 11:20-12:4.)

e. In discussing the new operating company bond deal that was just announced, on July 11, 2006, Mr. Wagner and Mr. Fedorcik discussed the relationship between the price of VNU CDSs and the expected yield of the VNU bonds.  Mr. Wagner said, "CDS contracts should therefore take the pricing from the new bonds."  (DX 511T.)

f. Mr. Fedorcik testified that at the time of the bond offering announcement, he believed VNU CDSs should be priced higher because "these three other tranches of debt—the bank debt, the senior unsecureds, the senior subordinated notes—were all going to price at much wider levels."  (Tr. 399:24-400:2.)

249. Contemporaneous analyst reports reflect that market participants in general understood that the price of VNU CDSs was based on the price of VNU bonds, and most closely based on the reference obligation of the VNU CDSs in the market.  (See PX 213 ("CDS contracts should therefore take their pricing from the new bonds. We note that even if the tender process for the existing VNU bonds is not completely successful, the new Nielsen bonds would still be deliverable.  CDS will then be priced from

whichever bonds are the cheapest to deliver."); PX 216 ("At current 5-year CDS levels (mid price is 475 basis points) we believe spreads could continue to widen to 550+ basis points, particularly if the VNU NV notes are priced on the higher end of the 10 to 11% coupon range. Again, 10% would imply a 5-year spread of +495 basis points; 11% would imply +595 basis points.").)

250. The relationship between CDS prices and the price or yield of bonds has been demonstrated theoretically and empirically. (PX 232 at ¶¶ 23-60; Tr. 872:12-874:24.)

251. A statistical analysis of the available data on VNU bonds and CDSs referencing VNU bonds demonstrates that the relationship between VNU bond spreads and VNU CDS spreads is consistent with the relationship predicted by academic theory and found in empirical academic papers. The data evidence a long-term equilibrium relationship between VNU CDS spreads and bond spreads, because valid statistical analysis demonstrates that the two spreads are cointegrated. This means that any fluctuation between the two spreads returns to a stable equilibrium value, which, in the context of comparing VNU bond spreads and CDS spreads, means a statistically stable, constant basis. Cointegration also implies that the observed high degree of correlation between VNU CDS and bond spreads is not spurious. Finally, further statistical analysis reveals that

both VNU CDS and bond spreads contribute to price discovery of each other.  (PX 232 at ¶¶ 61-93; Tr. 878:23-880:1, 881:15-884:11, 885:24-886:17, 887:9-889:25, 891:10-894:18, 896:24-902:2.)

252. This view of CDS prices as based on the spread or value of the referenced entity's bonds was also shared by market analysts outside of the context of the VNU offering.  (See DEX 36 at 12 ("Conceptually, the CDS premium should equate to spread over LIBOR for the issuer's floating rate note trading at par, and represents the compensation for the default risk.").)

B. The Relationship Between the Value of VNU Bonds and CDS Prices

253. The "value" of a bond or group of bonds is calculated by multiplying the notional amount of the outstanding bonds by their price.  (Tr. 1637:15-1638:1.)

254. The value of VNU bonds that were deliverable into VNU CDSs increased when VNU issued the holding company tranche of bonds in July 2006.

255. Mr. Negrin testified that part of the bet he made in purchasing the VNU CDSs was that the issuance of the holding company bonds would cause the price of the VNU CDSs to increase. (Tr. 147:3-148:14.)

256. He also testified that part of the reason he bought the VNU CDSs was that the fact that the price of the CDSs increased

slightly before he bought it, showed him that the market believed the deliverability issue would be resolved: "The price moving itself gave me a signal that that's what was going to happen." (Tr. 123:18-19.)

257. On July 24, 2006, Mr. Rorech discussed with Mr. Negrin the fact that the announcement of the issuance of the additional holding company bonds, and the accompanying increase in value of deliverable VNU bonds, would cause an increase in the price of the VNU CDSs. (PX 188.)

258. Other witnesses and market participants agreed that the value of the VNU holding company bonds would affect the price of the VNU CDSs. In a discussion among Mr. Fedorcik, Mr. Ross, and Ms. Tournier on July 17, 2006, Mr. Ross told Mr. Fedorcik to be "extremely careful" when speaking to investors, because if Mr. Fedorcik went out "right now and [had] a conversation with a guy . . . the CDS [would] . . . blow way out immediately because . . . if you say, for instance, I'm going to do this trade at 11, you know, 600 over, and the CDS is at 375, I mean that's going to sort of immediately – CDS should blow out, right?" (PX 53-A; PX 53 at DBL 1242-42, 1246.)

259. An email that a Citigroup employee sent to his clients on July 13, 2006, offered the view that VNU CDSs should "trade even wider" if additional deliverable bonds were issued by VNU. (DX 98.)

260. A Merrill Lynch report dated July 20, 2006, noted that its evaluation of the target price of VNU CDSs was "impaired" by 100 basis points because of "deliverability and liquidity issues," an impairment that could be rectified by an issuance of deliverable bonds. (PX 30.)

*C. Section 9.9 of the ISDA Definitions*

261. In completing the purchase of the two VNU CDSs at issue in this case, Mr. Negrin, on behalf of Millennium, and Deutsche Bank and RBS, the CDS-sellers, memorialized a number of transaction-specific terms in two Trade Confirmations. The Trade Confirmations identified the reference entity or obligation, the notional amount, the expiration date of the CDS, the price of the premium, the frequency of premium payments, and the triggering credit events. (Tr. 1556:15-1558:14; DX 148; DX 161.)

262. The parties agreed that the VNU CDS contracts were to be physically settled, that is, the CDS-buyer would actually deliver a deliverable obligation to the CDS-seller upon settlement. (PX 227; PX 229.)

263. The CDS sales at issue were governed by Master Confirmation Agreements that incorporated by reference the standardized definitions and terms found in the 2003 ISDA Credit Derivatives Definitions and the May 2003 Supplement to the 2003

Definitions (collectively, the "ISDA Definitions").  (PX 227; PX 229; PX 224.)

264. Section 9.9 of the ISDA Definitions allows for the CDS-seller to invoke an option to settle the CDS in cash under certain circumstances.  This provision is triggered in the event that a CDS-buyer fails to physically provide to the CDS-seller a deliverable obligation under the contracts within the specified time after a credit event.  (Tr. 1633:1-20.)

265. Section 9.9 allows the CDS-seller to "buy-in" to bonds not delivered by buying deliverable obligations and then deducting the price of the undelivered obligations from the final settlement payment owed by the CDS-seller to the CDS-buyer.

266. Dr. Andrew B. Miller, who holds a Ph.D. in economics and testified as the defendants' expert on financial economics, indicated in his expert report that the "key terms of the VNU-related CDSs are primarily those specified in the Confirmation Agreements as supplemented by the Transaction Supplements and the supporting ISDA documentation."  (DEX 1 ¶ 33.)

267. Dr. Miller also testified that "settlement terms," including Section 9.9, are among the "key terms" in a CDS contract, but he clarified that he used "key terms" to mean terms he wanted to examine in analyzing the CDS contracts for purposes of this case.  (Tr. 1631:21-1633:9.)

CONCLUSIONS OF LAW

1.    The single claim in this case alleges insider trading in CDSs in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  (Stipulated Law ¶ 1.)  The SEC brings this action under the misappropriation theory of insider trading.  (Stipulated Law ¶ 2.)

2.    To prevail, the SEC first must prove by a preponderance of the evidence that the Court has subject matter jurisdiction over this action.

3.    To establish liability as to Mr. Rorech, the SEC must prove that Mr. Rorech, in connection with the purchase or sale of a security or "securities-based swap agreement," misappropriated material nonpublic information in breach of a fiduciary duty to Deutsche Bank, and that Mr. Rorech acted with scienter.  See United States v. Falcone, 257 F.3d 226, 232 (2d Cir. 2001) (citing United States v. O'Hagan, 521 U.S. 642, 652 (1997)); United States v. Chestman, 947 F.2d 551, 566 (2d Cir. 1991) (in banc); see also Aaron v. SEC, 446 U.S. 680, 691 (1980) (finding that scienter is a necessary element of every section 10(b) and Rule 10b-5 claim).  (Stipulated Law ¶ 3.)

4.    To establish liability as to Mr. Negrin, the SEC must first prove that Mr. Rorech is liable.  The SEC must also prove that Mr. Negrin knew that Mr. Rorech provided him with material

nonpublic information in breach of a fiduciary duty to Deutsche Bank, and that Mr. Negrin purchased VNU CDSs while in possession of that material nonpublic information.  See Falcone, 257 F.2d at 234; Chestman, 947 F.2d at 571.

5.    The SEC bears the burden of proof and must prove every element of its claim by a preponderance of the evidence.  Herman & MacLean v. Huddleston, 459 U.S. 375, 389-91 (1983); SEC v. Willis, 825 F. Supp. 617, 622 (S.D.N.Y. 1993).


### I. Subject Matter Jurisdiction

*A. Statutory Provisions*

6.    In 2000, Congress passed the Commodity Futures Modernization Act ("CFMA"), Pub. L. No. 106-554, 114 Stat. 2763 (2000), which amended section 10(b) to extend the rules promulgated by the SEC under that section to prohibit fraud, manipulation, and insider trading, and judicial precedents decided under section 10(b), to "securities-based swap agreement[s] (as defined in section 206B of the Gramm-Leach-Bliley Act)."

7.    Section 206B of the Gramm-Leach-Bliley Act, in turn, defines a "security-based swap agreement" as "a swap agreement (as defined in section 206A . . .) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein."

Gramm-Leach-Bliley Act, Pub. L. No. 106-102, § 206B, 113 Stat.
1138 (1999) (set out as a note under 15 U.S.C. § 78c).
(Stipulated Law ¶ 8.)

   8.   A "non-security-based swap agreement" is defined by
the Gramm-Leach-Bliley Act as "any swap agreement (as defined in
section 206A) that is not a security-based swap agreement (as
defined in section 206B)."  Gramm-Leach-Bliley Act § 206C (set
out as a note under 15 U.S.C. § 78c).

   9.   A "swap agreement" is defined in section 206A of the
Gramm-Leach-Bliley Act as

         any agreement, contract, or transaction
         . . . the material terms of which (other
         than price and quantity) are subject to
         individual negotiation, and that . . . (2)
         provides . . . for the exchange . . . of one
         or more payments based on the value or level
         of one or more interest or other rates,
         currencies, commodities, securities,
         instruments of indebtedness, indices,
         quantitative measures, or other financial or
         economic interests or property of any kind
         . . . including any such agreement,
         contract, or transaction commonly known as
         an interest rate swap, including a rate
         floor, rate cap, rate collar, cross-currency
         rate swap, basis swap, currency swap, equity
         index swap, equity swap, debt index swap,
         debt swap, credit spread, credit default
         swap, credit swap, weather swap, or
         commodity swap.

Gramm-Leach-Bliley Act § 206A (set out as a note under
15 U.S.C. § 78c).

*B. The Meaning of "Based On"*

10.   The SEC argues that section 10(b) and Rule 10b-5's proscription of insider trading applies to the CDSs sold in this case because, among other reasons, the price term (or spread) of the two CDSs was based on the price, yield, value, or volatility of VNU bonds.

11.   The defendants respond that the price of the two CDSs may have been related to the price, yield, value, or volatility of VNU bonds, but argue that the price of the CDSs was not "based on" those characteristics of the bonds.   The defendants argue that "based on" should be interpreted to require a direct, or exclusive dependence, and that, in this case, the price of the VNU CDSs was negotiated between the buyer and seller and was affected by many factors, including the strength of the overall economy and the market's assessment of the referenced company's credit risk.

12.   The defendants contend that the Court should determine whether the material terms of the CDSs were "based on" the price, yield, value, or volatility of the bonds by looking solely at the terms of the CDSs contracts.   They argue that because the price of the CDSs is stated in basis points and does not explicitly refer to the price or value of any security, the

price of the CDSs could not be "based on" the price, yield, value, or volatility of the VNU bonds.

13.  The Court is not aware of any case that has addressed the question whether CDS agreements that reference a corporate debt security are "security-based swap agreements" for purposes of 15 U.S.C. § 78j, as amended by the CFMA.

14.  Because the Gramm-Leach-Bliley Act does not itself define "based on," "the ordinary meaning of the words chosen by Congress provides the starting point for interpreting the statute." Cuomo v. Clearing House Ass'n, L.L.C., 129 S.Ct. 2710, 2723 (2009).

15.  Webster's Third New International Dictionary 180 (1993) states that the verb "base" or "based," sometimes used with "on or upon," means "to use as a base or basis for."  The noun "base," in turn, is defined as "the fundamental part of something" or a "basic principle."  Id.  "[B]asis" is defined as "the principle component of anything" or a "fundamental ingredient."  Id.

16.  The plain meaning of "based on," therefore, does not imply an exclusive relationship, as the defendants urge. Rather, it means to use as the fundamental part or ingredient of, or principal component of, something.

17. It is possible that "based on" can have different meanings, depending on the context in which the phrase is used. In deciding whether a consumer was subjected to an adverse action "based in whole or in part on any information contained in a consumer report" for purposes of the Fair Credit Reporting Act, 15 U.S.C. § 1681m(a), the Supreme Court stated that "'based on' indicates a but-for causal relationship and thus a necessary logical condition." Safeco Ins. Co. v. Burr, 551 U.S. 47, 63 (2007).

18. However, there is no reason to believe that this interpretation of "based on" applies to all statutory uses of the phrase. Indeed, in other contexts, courts have interpreted "based on" to mean something closer to its dictionary definition. See, e.g., Environmental Defense v. EPA, 369 F.3d 193, 203-05 (2d Cir. 2004) (interpreting "based on photochemical grid modeling" in the Clean Air Act to mean "'having as the foundation' or 'arising from'"); McDaniel v. Chevron Corp., 203 F.3d 1099, 1111-12 (9th Cir. 2000) (noting that courts interpret "based upon" to mean "arising from" and to refer to a "starting point" or "foundation"); United States v. Becton Dickinson & Co., 21 F.3d 1339, 1348 (4th Cir. 1994) (finding that a qui tam action is "based upon" a public disclosure when the allegations are "actually derived" from the disclosure rather than an independent source).

19.   In this case, the context in which the phrase "based on" is used in section 206B of the Gramm-Leach-Bliley Act, and the statutory scheme as a whole, support the conclusion that "based on" in that statute does not require a necessary dependence or exclusive relationship.

20.   The Gramm-Leach-Bliley Act broadly defines "swap agreement" to include not only CDSs, but also, among other things, interest rate swaps, currency swaps, and weather swaps— items which clearly are not "security-based swap agreement[s]" for purposes of applying section 10b and Rule 10b-5's anti-fraud provisions.  See School District of Erie v. J.P. Morgan Chase Bank, No. 08 Civ. 7688, 2009 WL 234128, at *1 (S.D.N.Y. Jan. 30, 2009) (finding that interest rate swap agreement was not security-based swap agreement); St. Matthew's Baptist Church v. Wachovia Bank Nat'l Ass'n, No. 04 Civ. 4540, 2005 WL 1199045, at *12-13 (D.N.J. May 18, 2005) (finding that swap agreement based on LIBOR was not security-based).

21.   The fact that Congress extended section 10(b) and Rule 10b-5's anti-fraud rules to "security-based swap agreement[s]," and not other "swap agreement[s]" that clearly are not based on securities, appears to bring CDSs like those in this case into the heartland of the swap agreements Congress intended to govern under section 10(b) and Rule 10b-5.  The defendants in this case

allegedly exchanged inside information regarding securities that
affected the price of CDSs that were based on those securities.
It is no surprise that Congress intended to extend the anti-
fraud provisions that would prohibit sharing inside information
in connection with trading those securities to also prohibit
insider trading in transactions involving the CDSs themselves.

22.  The legislative history of the CFMA supports the view
that Congress intended to extend section 10(b) and Rule 10b-5's
protections to CDSs such as those at issue in this case.

23.  At the time of its passage, it was noted that the
CFMA's amendment to section 10(b) would allow "current and
future anti-fraud rules [to] apply to swap agreements to the
same extent as they do to securities." Thus, the Act would
"enhance protection for investors and for the financial markets,
and will permit the SEC to respond as necessary to developments
in these markets." 147 Cong. Rec. S11946-01 (daily ed. Jan. 2,
2001) (statement of Sen. Sarbanes). The relevant legislative
history prior to its passage is consistent. Administration
officials and congressional members expressed support for making
it clear that the SEC's traditional anti-fraud and insider
trading enforcement authority applied to novel financial
instruments. See The Commodity Futures Modernization Act of
2000: Hearing on S. 2697 Before the Senate Committee on

Agriculture, Nutrition, and Forestry and the Senate Committee on

Banking, Housing and Urban Affairs, 106th Cong. 4 (2000)

(statement of Sen. Gramm) ("We need the SEC in all areas to

exercise its authority on anti-fraud and insider trading."); id.

at 20 (statements of Sen. Sarbanes and Federal Reserve Chairman

Greenspan, expressing agreement that "we should focus on insider

trading, fraud, manipulation, and make sure that any possibility

for those practices to take place is precluded under the

regulatory scheme").

24.    The defendants' interpretation of "based on," as

requiring a direct, explicit relationship that must be spelled

out in the text of a CDS contract, would allow traders to escape

the ambit of section 10(b) and Rule 10b-5 through clever

drafting.  Under the defendants' view, as long as CDSs' material

terms did not make actual reference to the price or value of

securities, the CDSs would not be "security-based," no matter

how closely tied to securities their material terms actually

were.

*C. The Price Term of the CDSs Was "Based On" the Price, Yield,*

*and Value of VNU Securities*

25.    While it is possible that not all CDSs are "based on"

securities, the jurisdictional issue in this case is whether the

material terms of the particular VNU CDSs purchased by Mr.

Negrin were based on the price, yield, value, or volatility of securities.

26.   While Mr. Negrin may have considered other factors in determining the price at which he was willing to purchase VNU CDSs, it is clear from the evidence in this case that a fundamental part of his decision was the spread or yield (or, inversely, the price) of deliverable VNU bonds and the value of deliverable VNU bonds.

27.   Mr. Negrin's deposition testimony and his recorded conversations with Mr. Rorech reveal that the spread of deliverable VNU bonds was central to his decision to buy VNU CDSs.   Mr. Negrin and Mr. Rorech twice discussed and calculated the target price of VNU CDSs based on the expected spread of the VNU holding company bonds.   (Findings of Fact ¶ 247.)

28.   Moreover, the value of deliverable VNU bonds served as a fundamental part of Mr. Negrin's evaluation of the target price of the VNU CDSs.   Mr. Negrin was keenly interested in the odds of VNU issuing a holding company tranche of bonds and repeatedly discussed the issue with Mr. Rorech.   Mr. Negrin and Mr. Rorech also discussed the fact that the price of the VNU CDSs would increase if the value of deliverable bonds increased. (Findings of Fact ¶ 257.)

29.  The importance of the price, yield, and value of VNU bonds to Mr. Negrin in determining whether to purchase VNU CDSs is unsurprising in light of the evidence from other market participants that the price, yield, and value of VNU's bonds was critical to the price of the VNU CDSs.  Many market participants, including investors such as Mr. Masel and Mr. Sherry, and investment bank professionals at Deutsche Bank and other institutions, were focused on the price, yield, and value of deliverable VNU bonds in evaluating the price of VNU CDSs in July 2006.

30.  Moreover, apart from the VNU transaction, the evidence suggests that market analysts and experts considered CDS prices in general to be based on the price, yield, or value of the referenced entity's bonds.

31.  The fact that bond spreads and CDS prices can move in opposite directions on a daily basis (DEX 1 at ¶ 70), and the fact that CDSs can continue to be priced and traded even after their reference obligations have matured (DEX 1 at ¶ 94), is not dispositive of the question whether the material terms of the VNU CDSs actually purchased by Mr. Negrin in this case were based on the price, yield, value, or volatility of VNU bonds.

*D. Section 9.9 of the ISDA Definitions Was a Material Term of
the CDSs and Was "Based On" the Price of Securities*

32.   In addition, the SEC argues that a material term of
the VNU CDSs was based on the price of a security because
Section 9.9 of the ISDA Credit Derivatives Definitions, a term
incorporated in the CDSs through the Master Confirmation
Agreements, was based on the price of VNU securities.

33.   Section 9.9 allows CDS counterparties to deduct the
price of the reference entity's securities from the amount owed
to the CDS-buyer if a triggering credit event occurs and the
CDS-buyer fails to deliver the covered securities.  Because the
provision explicitly relies on the price of deliverable VNU
obligations as the basis for calculating the cash settlement
terms of the CDS, the provision is "based on" the price of a
security for the purposes of section 206B of the Gramm-Leach-
Bliley Act.  (See Tr. 1636:10-1337:4.)

34.   The question remains whether Section 9.9 is a
"material term" of the CDSs for the purposes of the Gramm-Leach-
Bliley Act.

35.   The material terms of a contract are those terms that
must be sufficiently definite to allow the contract to be
enforceable.  Examples of material terms include subject matter,
price, payment terms, quantity, timing, compensation, and

duration.  See, e.g., Local 917, Int'l Bhd. of Teamsters v.
N.L.R.B., 577 F.3d 70, 74 (2d Cir. 2009) (citing 17A Am.Jur.2d
Contracts § 190 (2004)); Sevel Argentina, S.A. v. Gen. Motors
Corp., 46 F. Supp. 2d 261, 269 (S.D.N.Y. 1999); Rosenthal v.
Nat'l Produce Co., 573 A.2d 365, 370 (D.C. 1990).

36.  In this case, Section 9.9, together with the
contracts' physical settlement provisions, provided the terms on
which the VNU CDSs were to be settled if a credit event
occurred.  The CDS-sellers' agreement to pay the CDS-buyer the
notional amount at settlement upon the occurrence of a credit
event was plainly part of, if not all of, the consideration for
which the CDS-buyer agreed to make the premium payments.

37.  If Millennium actually held the referenced VNU bond
when a credit event occurred, it could deliver the bond for the
notional amount.  But the actual value of the settlement would
depend on the value of the bond surrendered.  The greater the
value of the bond, the less valuable the exchange would be for
Millennium.  If Millennium did not deliver the bond, then
Section 9.9 would be used to determine the amount of money that
the CDS-seller would have to pay Millennium and that would be
calculated based on the notional amount minus the price of the
VNU bond that could be acquired in the marketplace.

38.  Therefore, the terms of that settlement were central to the VNU CDSs and are material terms without which the contracts would be unenforceable.

39.  Moreover, the defendants' financial economics expert testified that the settlement terms, including Section 9.9, were part of the "key terms" in the CDS contracts.

40.  For all of the reasons stated above, the material terms of the VNU CDS contracts were based on the price, yield, value, or volatility of VNU's securities.  Therefore, the CDSs at issue in this case are security-based swap agreements for the purposes of section 206B of the Gramm-Leach-Bliley Act and are subject to section 10(b)'s antifraud provisions and the rules promulgated, and judicial precedents decided, thereunder.

## II. Misappropriation Theory

41.  Under the misappropriation theory, an individual violates section 10(b) and Rule 10b-5 "when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." O'Hagan, 521 U.S. at 652.

42.  One engages in "misappropriation" for purposes of insider trading laws when he engages in "conduct constituting secreting, stealing, [or] purloining . . . [of] material non-

public information in breach of an employer-imposed fiduciary
duty of confidentiality." United States v. Carpenter, 791 F.2d
1024, 1031 (2d Cir. 1986), aff'd, 484 U.S. 19 (1987).

43.    Therefore, to establish that the defendants are liable
for insider trading under the misappropriation theory, the SEC
must prove that the information at issue was both material and
nonpublic.  See SEC v. Lyon, 605 F. Supp. 2d 531, 541 (S.D.N.Y.
2009).  The SEC must also show that Mr. Rorech breached a duty
of confidentiality in sharing the information—"the cornerstone
of a misappropriation liability case." Id. at 542.  Finally,
the SEC must prove that the defendants acted with scienter.
Aaron, 446 U.S. at 691.

*A. Mr. Rorech's Conduct*

44.    There is no evidence of what was actually said on the
cellular phone calls between Mr. Rorech and Mr. Negrin on July
14, 2006, and July 17, 2006.  The SEC asks the Court to draw the
inference that Mr. Rorech shared inside information with Mr.
Negrin from circumstantial evidence.  However, that evidence
does not support the conclusion that Mr. Rorech or Mr. Negrin
violated insider trading laws.

*1. Mr. Rorech Did Not Know that Deutsche Bank Would Recommend that the Sponsors Issue the Holding Company Bonds at the Time of His Calls with Mr. Negrin*

45.   It is self-evident that insider trading liability cannot be premised on the disclosure of information that did not exist at the time of the allegedly illegal activity.  See SEC v. Gonzalez de Castilla, 184 F. Supp. 2d 365, 376-77 (S.D.N.Y. 2002) (granting summary judgment for defendants where the alleged insider information "could not have been known at the time of the attacked [stock] purchases as it did not, as a matter of uncontroverted fact, exist at that time"); SEC v. Truong, 98 F. Supp. 2d 1086, 1102 (N.D. Cal. 2000) ("A tippee cannot be liable, of course, where the SEC fails to show that the alleged tipper possessed inside information.").

46.   The SEC alleges that Mr. Rorech improperly shared with Mr. Negrin information regarding Deutsche Bank's intention to recommend that the sponsors issue holding company bonds during a cellular phone call on July 14 and, again, on another cellular phone call on July 17.  (Joint Pretrial Order, Plaintiff's Summary of Claims at 6.)

47.   At the time of the cellular phone calls on July 14 at 8:58 a.m. and July 17 at 9:49 a.m., Mr. Rorech did not possess any information about Deutsche Bank's recommendation because

Deutsche Bank had not yet made any decision to recommend that the financial sponsors issue the holding company bonds.

48.  Even if Deutsche Bank or Mr. Fedorcik had decided to recommend the holding company deal to the sponsors as of the morning of July 17, Mr. Fedorcik had not yet told Mr. Rorech of his or the bank's intention to do so.  (See Findings of Fact ¶ 87.)

49.  Mr. Fedorcik did not share his intention to recommend a holding company issuance to the sponsors with Mr. Rorech until nearly four hours after the second cellular phone call, at 1:28 p.m. on July 17, and even then his tentative recommendation was conditional on investor demand for a holding company tranche of bonds.  Thus, Mr. Rorech did not, and could not, possess this information at the time that he and Mr. Negrin spoke.

50.  Deutsche Bank, consistent with the standard practice in the industry, had a wall in place to control the flow of information between its investment banking and sales and trading businesses.  Rorech was never wall-crossed in connection with the VNU bond offering, and there is no evidence that Deutsche Bank's wall was breached or failed to function during the marketing for the VNU bond offering.

51.  The fact that Mr. Rorech was a Deutsche Bank employee, and that he may have spoken with Mr. Fedorcik (or merely had the opportunity to do so) does not mean that Mr. Rorech actually

possessed information about Mr. Fedorcik's plans prior to the
recorded telephone conversation between Mr. Rorech and Mr.
Fedorcik at approximately 1:28 p.m. on July 17, 2006.  Potential
"access" to material nonpublic information, without more, is
insufficient to prove that Mr. Rorech actually possessed any
such information.  See Truong, 98 F. Supp. 2d at 1097-99
(finding that the fact that an employee worked in an office with
open cubicles and had "routine interactions with senior
management" who knew of the company's negative financial
condition did not create a triable issue of fact that the
employee possessed information); see also SEC v. Anton, No. 06
Civ. 2274, 2009 WL 1109324, at *7-8 (E.D. Pa. Apr. 23, 2009)
(finding that the fact that insider was aware that increasing
loss reserves was a "strong possibility" but was not involved in
internal discussions on the issue was insufficient to establish
that insider possessed the information).

52.  In short, because the alleged material nonpublic
information about Deutsche Bank's recommendation did not exist
at the time of the cellular phone calls, there could have been
no insider trading based on that information.  See SEC v.
Hoover, 903 F. Supp. 1135, 1143 (S.D. Tex. 1995) ("A defendant's
liability for insider trading can be based only on material non-
public information known at the time of the trade, not on
information learned later.").

*2. The Information Mr. Rorech Did Know at the Time of the
Calls Was Not Material*

53.  For purposes of the securities laws, information is
deemed "material" if there is "a substantial likelihood that the
disclosure of the omitted fact would have been viewed by the
reasonable investor as having significantly altered the 'total
mix' of [available] information."  Basic, Inc. v. Levinson, 485
U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway,
Inc., 426 U.S. 438, 449 (1976)).  With respect to "contingent or
speculative" information, "materiality will depend at any given
time upon a balancing of both indicated probability that the
event will occur and the anticipated magnitude of the event in
light of the totality of the company activity."  Basic, 485 U.S.
at 238 (citing SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849
(2d Cir. 1968)) (internal quotation marks omitted).

54.  A generalized confirmation of an event that is "fairly
obvious" to every market participant who was knowledgeable about
the company or the particular instrument at issue is not
material information.  See, e.g., SEC v. Monarch Fund, 608 F.2d
938, 942 (2d Cir. 1979) (generalized tips that do not divulge
the specific terms of an impending but not yet publicly
announced securities offering, where no specific terms or dates
or names of participants was divulged, "lack[] the basic

elements of specificity" to be considered material for purposes
of insider trading laws); Anton, 2009 WL 1109324, at *8
(quoting SEC v. Bausch & Lomb, Inc., 565 F.2d 8, 15 (2d Cir.
1977)) (alleged tip that company was increasing its loss
reserves, without any specific information as to the extent of
the reserves, was not material where the likelihood that
reserves would be increased was subject of analyst speculation
in research reports).

    *a. Information Regarding the Potential Restructuring*

55.  Even if Mr. Rorech had shared his opinions with Mr.
Negrin as to the likelihood of a holding company issuance or
provided Mr. Negrin with general information about the potential
deal, such information does not constitute material inside
information.  See Anton, 2009 WL 1109324, at *7-8 (finding that
information about possible increased loss reserves without any
specifics was not material); In re Allaire Corp. Sec. Litig.,
224 F. Supp. 2d 319, 333 (D. Mass. 2002) ("vaguely optimistic
language" by corporation not material nonpublic information).

56.  Information that Deutsche Bank's investment bankers
were advising the sponsors on the deliverability issues in
general, and that the sponsors were likely to address the
investor demand for deliverable bonds was widely discussed in
the marketplace in July 2006.  In this context, Mr. Rorech's
opinion, or even knowledge, that Deutsche Bank was working on a

solution to solve the deliverability problem was not

sufficiently different from the information that was available

in the marketplace to be material.

57. Moreover, any information that Mr. Rorech allegedly

shared with Mr. Negrin regarding Deutsche Bank's intention to

recommend a holding company issuance was speculative information

that does not rise to the level of materiality. First, there is

no evidence that Deutsche Bank made, or that Mr. Rorech was

informed of, any decision to recommend the holding company deal

to the sponsors by the time of his cellular phone calls with Mr.

Negrin. Second, the ultimate decision as to whether or not to

actually issue a holding company tranche was up to the financial

sponsors, not Deutsche Bank. Indeed, even if Deutsche Bank

recommended a holding company issuance, the sponsors' approval

was far from guaranteed. Issuers regularly decline structural

changes proposed by investors in high-yield bond offerings.

Furthermore, there were additional issues discussed in the

market that made a holding company issuance less likely

notwithstanding a recommendation from Deutsche Bank, including

tax and jurisdictional concerns. Given the inherently

speculative nature of any information that Mr. Rorech possessed

at the time of the cellular phone calls, the SEC has failed to

prove by a preponderance of the credible evidence that the

information was material. See Glazer v. Formica Corp., 964 F.2d

149, 155 (2d Cir. 1992) (finding that mere fact that some discussion has occurred on matters that may not eventuate is not necessarily material).

> *b. Information Regarding Customers' Indications of Interest*

58.  Nor was the fact that a customer had given an indication of interest for $100 million of holding company bonds material information.  This information was not materially different from the information in the market that there was substantial investor demand for deliverable bonds.

59.  Information about investor interest in, and demand for, deliverable bonds was widely discussed in the market.  In fact, Mr. Barnum testified that because there was such strong demand, market participants expected that indications of interest or orders for deliverable bonds would be submitted to the underwriter, such that information about his particular indication of interest was expected and not different from the information in the market.

60.  In addition, Ms. Tournier had assessed as early as July 12, based solely on publicly available information, that there was quantifiable demand in the market for deliverable bonds in the amount of €100-150 million, or more than $200 million.

61.  As a result of the public knowledge of demand for deliverable bonds, Blue Mountain's indication of interest in $100 million of potential holding company bonds was not sufficiently different from the general discussions in the marketplace at the time to be deemed material.  See Monarch Fund, 608 F.2d at 942-43 (finding that generalized information from insider about upcoming financing that was consistent with market rumors was not material nonpublic information).

62.  Furthermore, where there is a question of whether certain information is material, courts often look to the actions of those who were privy to the information in determining materiality.  See Basic, 485 U.S. at 241 n.18 ("[T]rading (and profit making) by insiders can serve as an indication of materiality . . . .") (emphasis omitted); Texas Gulf Sulphur, 401 F.2d at 851 (noting that a "major factor in determining whether [discovery of mineral ore] was a material fact" was "the importance attached to the drilling results by those who knew about it"); Rothberg v. Rosenbloom, 771 F.2d 818, 821 (3d Cir. 1985) ("The best proof of the materiality of that information is that the . . . experienced investors, found it to be sufficiently material . . . to purchase [the] stock.").

63.  Here, the evidence does not establish that the information about Deutsche Bank's recommendation and an indication of interest for holding company bonds was material

information.  Indeed, after learning of Mr. Fedorcik's likely recommendation and after placing his own indication of interest, Mr. Barnum sold VNU CDSs.  This demonstrates that the information in question was not viewed by reasonable investors as having "significantly altered the 'total mix' of [available] information."  Basic, 485 U.S. at 231-32.

64.  Under these circumstances, Mr. Rorech's opinion about a recommendation and information about an indication of interest was not material information.  Bausch & Lomb, Inc., 565 F.2d 8, 17 (2d Cir. 1977) (finding that fact of company's negative sales was "common knowledge" and thus was not material nonpublic information); Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976, 987-88 (S.D.N.Y. 1989) (finding that company's own view that it was likely to be target of takeover was not material nonpublic information where there was widespread speculation in the market that company was a likely takeover candidate).

*3. Sharing the Information Mr. Rorech Did Know Was Not a Breach of His Duty of Confidentiality*

65.  Furthermore, Mr. Rorech did not breach his duty of confidentiality to Deutsche Bank either by sharing his opinion regarding whether Deutsche Bank would recommend that the

sponsors issue the holding company bonds or by sharing his customer's indication of interest.

66. One engages in "misappropriation" for purposes of insider trading laws when he engages in "conduct constituting secreting, stealing, or purloining . . . [of] material non-public information in breach of an employer-imposed fiduciary duty of confidentiality." Carpenter, 791 F.2d at 1031.

67. There cannot be liability under section 10(b) and Rule 10b-5 unless the owner of the information that was allegedly misappropriated expected the information to remain confidential. See O'Hagan, 521 U.S. at 647 (emphasizing that both Grand Met and Dorsey & Whitney, O'Hagan's employer, "took precautions to protect the confidentiality of Grand Met's tender offer plans"); Dirks v. SEC, 463 U.S. 646, 655 n.14 (1983) (in order for a fiduciary duty to be imposed on a temporary insider tipper, "the corporation must expect [him] to keep the disclosed nonpublic information confidential, and the relationship [between the corporation and the tipper] at least must imply such a duty").

   *a. Information Regarding the Potential Restructuring*

68. Deutsche Bank had no expectation that Mr. Rorech's personal opinions or general information concerning the restructuring of the VNU bond offering would be kept confidential. Indeed, it was consistent with the custom and practice in the high yield bond market for Mr. Rorech, a

salesperson, to share his ideas and opinions with Mr. Negrin, a prospective purchaser of the bonds.

69.  Furthermore, the non-confidential status of the information Mr. Rorech possessed is confirmed by the fact that Deutsche Bank took no steps to ensure the confidentiality of the information.  Pursuant to Deutsche Bank policy, capital markets officers, who are responsible for controlling the flow of confidential information from the private side of the Bank to the public side, cannot share confidential information with any public-side employee, including a salesperson, unless that individual is first "wall-crossed."  The capital markets officers who worked on the VNU bond offering openly shared information about the potential restructuring of the deal, including considerations of recommending a potential holding company issuance, with Mr. Rorech and other salespeople without ever instituting "wall-crossing" procedures.

> b. *Information Regarding Customers' Indications of Interest*

70.  In addition, sharing information about other investors' indications of interest or orders for deliverable bonds could not have breached a duty of confidentiality to Deutsche Bank because the information was not "confidential information" under Deutsche Bank's policy and Deutsche Bank did

not consider the information to be confidential.  The investors

who provided the indications of interest or orders did not

expect that the information would be kept confidential; on the

contrary, they anticipated that that their indications of

interest or orders would be shared with others in the

marketplace.  (Tr. 540:10-541:9 (Mr. Sherry testifying that

customarily investors did not expect their indications of

interest to be confidential).)  In fact, Mr. Barnum specifically

said that he did not think that his order was confidential and

that he wanted it to be used by Deutsche Bank to anchor the

deal.  (Tr. 830:15-20, 833:11-834:12.)

    71.  In any event, it was permissible under Deutsche Bank's

policy to share information about the indications of interest

with other potential investors in order to build market interest

for the potential structural change.

    72.  The wholesale absence of any expectation of

confidentiality or breach of a duty of confidentiality is fatal

to the SEC's claim.  See Dirks, 463 U.S. at 665 (finding no

insider trading liability where "[t]here was no expectation by

[the analyst's] sources that he would keep their information in

confidence.  Nor did [the analyst] misappropriate or illegally

obtain the information"); see also O'Hagan, 521 U.S. at 663

(emphasizing the absence of any expectation of confidentiality

in _Dirks_ in contrast to the clear theft of secret information by O'Hagan).

_B. Mr. Negrin's Conduct_

73.   The SEC has not established the content of the cellular phone calls between Mr. Rorech and Mr. Negrin or that Mr. Negrin traded while in the possession of material nonpublic information.  For all of the reasons explained above, the SEC has failed to prove by a preponderance of the credible evidence that Mr. Rorech possessed or conveyed to Mr. Negrin any material nonpublic information in breach of any duty of confidentiality Mr. Rorech had to Deutsche Bank.  Therefore, Mr. Negrin could not have traded on such non-existent information.

74.   The SEC asks the Court to infer that Mr. Rorech must have conveyed prohibited information to Mr. Negrin based on the existence of the cellular telephone calls and on Mr. Negrin's subsequent trades.  These facts alone do not support the inference that Mr. Negrin traded while in possession of material nonpublic information.  See _SEC v. Goldinger_, No. 95-56092, 1997 WL 21221, *1-2 (9th Cir. Jan. 14, 1997) (affirming summary judgment for defendant where defendant spoke with insider who had information about a merger, engaged in substantial trading accounting for 7% of the total market volume of the stock immediately thereafter, and commented to others that he "owe[d]" the insider "for this one").

75.  Mr. Negrin's VNU CDS trades were consistent with his past investment practices and trading history.  Any inference of insider trading that might arise from Mr. Rorech and Mr. Negrin's cellular phone calls followed by Negrin's VNU CDS trades is negated in light of Mr. Negrin's similar practices in the past.  See Freeman v. Decio, 584 F.2d 186, 197 & n.44 (7th Cir. 1978) (district court correctly determined that inference of insider trading created from an insider's sale of stock just prior to a negative corporate announcement was "nullified" in light of similar past trading patterns and reasonable explanations for the sales); SEC v. Heartland Advisors, Inc., No. 03 Civ. 1427, 2006 WL 2547090, at *1-4 (E.D. Wisc. Aug. 31, 2006) (facts that defendant portfolio manager had lunch with insider who had negative information about security just before defendant liquidated all of his holdings in that security did not support finding that he must have been tipped at the lunch where defendant had sold the same security in similar quantities in the two years prior to the trades in question and had plausible, uncontroverted reasons for the challenged sales); SEC v. Moran, 922 F. Supp. 867, 893 (S.D.N.Y. 1996) (defendant's history of purchasing large quantities of similar stocks weighed against finding of insider trading).

76.  Furthermore, "trading is suspicious only when it is dramatically out of line with prior trading practices at times

115

calculated to maximize the personal benefit from undisclosed inside information." In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999). Here, Mr. Negrin had purchased VNU CDS previously on several occasions, and his particular trades on July 17 and 18 were consistent with the sizes of his other CDS trades at the time, and were immaterial relative to the size of his overall CDS portfolio.

77. Mr. Negrin also provided reasonable explanations for purchasing the VNU CDS on July 17 and July 18, because he believed that VNU CDS was underpriced in light of the substantial leverage that the company was going to be incurring. His testimony on this point is corroborated by the testimony of Mr. Masel and the various Bloomberg messages and research reports that were circulating in the market at the time. See Freeman, 584 F.2d at 197 & n.44 (finding no inference of wrongdoing where, among other reasons, defendant had reasonable explanations for the sales); Moran, 922 F. Supp. at 893 (citing to defendant's innocent explanations for his stock purchases in finding that no insider trading occurred).

78. Nor do Mr. Negrin's statements in his July 24, 2006, call with Mr. Rorech thanking Mr. Rorech for suggesting the VNU CDS trade significantly support the SEC's claim of insider trading. There is no question that Mr. Rorech urged Mr. Negrin to engage in a basis trade that included purchasing the VNU CDSs

116

as well as bonds that Deutsche Bank was attempting to sell.  Mr.

Rorech repeatedly attempted to get Mr. Negrin to purchase the

bonds, but Mr. Negrin purchased only the VNU CDSs.  That turned

out to be a profitable trade for Millennium, but it does not

indicate that the VNU CDS trade was based on material nonpublic

information.  Mr. Rorech urged the same basis trade to other

customers in recorded telephone calls.  The fact that Mr. Negrin

expressed appreciation for Mr. Rorech's recommendation is not

surprising, nor does it indicate that Mr. Negrin made his

purchase based on material nonpublic information.  See

Goldinger, 1997 WL 21221, at *1-2 (affirming summary judgment

for defendant; defendant's statement following his heavy trading

in a stock that he "owe[d]" the insider did not create triable

issue of fact).

79.  Under the circumstances, the trades and the cellular

telephone calls do not give rise to any inference that Mr.

Negrin received material nonpublic information from Mr. Rorech.

*C. Scienter*

80.  Scienter is a necessary element of every section 10(b)

and Rule 10b-5 claim.  Aaron, 446 U.S. at 691.  Scienter

encompasses "a mental state embracing intent to deceive,

manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S.

185, 193 n.12 (1976).

81.  The SEC has failed to prove by a preponderance of the credible evidence that Mr. Rorech, a relative newcomer to the high yield sales group, intended to deceive, manipulate, or defraud by sharing the allegedly "inside" information.  Mr. Rorech heard his direct supervisor and the head of capital markets share the same information with customers.  Indeed, Mr. Rorech participated in calls where Mr. Fedorcik, the head of capital markets and the source of the alleged "inside" information, provided customers with the same information that the SEC claims that Mr. Rorech shared with Mr. Negrin.  (PX 55A: DX 381T.)

82.  Here, the requisite mental state cannot be established merely by pointing to the two cellular phone calls.  Any negative inference that the SEC attempts to draw from the calls is undermined by the fact that Mr. Rorech also disclosed the same allegedly material nonpublic information to other customers on recorded lines.

83.  Moreover, on July 17, Mr. Rorech and Mr. Negrin spoke openly on recorded lines about the fact that they were going to speak on their cellular phones.  (PX 98A.)  If, as the SEC claims, they spoke on cellular phones so as to avoid detection of their conversation, Mr. Rorech and Mr. Negrin would not have first created a record of the cellular phone call by speaking about it on the recorded line.

84.   In addition, the SEC cannot point to any reason for Mr. Rorech to give Mr. Negrin special treatment by providing him with inside information.  Mr. Rorech and Mr. Negrin had a purely professional working relationship; they were not friends.  See Anton, 2009 WL 1109324, at *1 n.3, *9 (alleged tipper and tippee's exclusively professional relationship—lacking any social component—made it unlikely that tipper had any motive to give the tippee material nonpublic information).  Moreover, the SEC has failed to establish that Mr. Rorech obtained any quantifiable or direct financial benefit as a result of Mr. Negrin's VNU CDS trades in July and August 2006.  Indeed, Mr. Negrin's $10 million CDS purchase from Deutsche Bank was small relative to the more than $200 million in VNU bonds that Mr. Rorech sold during the same time.  Further, any benefit Mr. Rorech may have received from any sales he generated would have helped him only because those sales were known to Deutsche Bank, his employer, and benefited the employer.

85.  This is in stark contrast to the typical insider trading case.  See, e.g., United States v. Larrabee, 240 F.3d 18, 22-23 (1st Cir. 2001) (facts that tipper and tippee and their families had close personal ties, tippee-trader gave substantial monetary gifts to tipper's children and paid for their tuitions, and tippee's unusually large and well-timed

stock purchases supported inference that insider trading occurred).

86.  There is also no evidence that Mr. Negrin knew that any information Mr. Rorech gave him was, in fact, material nonpublic information obtained in breach of Mr. Rorech's duty of confidentiality to Deutsche Bank.  As explained above, the information that Mr. Rorech provided in the cellular telephone calls was not, in fact, prohibited information.  Moreover, Mr. Negrin did not act as though the information was possibly prohibited.  He made his first purchase of VNU CDSs from Deutsche Bank, and he sold or assigned both of the VNU CDSs at issue to Deutsche Bank.  There was no effort to hide the transactions from Deutsche Bank.

87.  Deception is also an essential element of all claims brought pursuant to the misappropriation theory of section 10(b) and Rule 10b-5 liability.  O'Hagan, 521 U.S. at 654 ("Deception through nondisclosure is central to the [misappropriation] theory of liability . . . .").

88.  The SEC cannot establish that Mr. Negrin or Mr. Rorech engaged in any deception.  Mr. Rorech kept his direct supervisor and the head of U.S. capital markets apprised of the fact that he was speaking with his customers about a potential holding company issuance.  Mr. Rorech discussed the possibility of a

holding company issuance with his customers in order to persuade them to buy bonds, and not for a "self-serving" purpose.  Cf. O'Hagan, 521 U.S. at 652 (it is the "fiduciary's undisclosed self-serving use of a principal's information . . . in breach of a duty of loyalty and confidentiality" that provides the requisite "deception" to justify liability under Rule 10b-5).

89.  There also was nothing deceptive about Mr. Negrin's VNU CDS trades.  As explained above, he made no effort to conceal his trading in VNU CDS from Deutsche Bank or from Mr. Rorech, but rather openly traded with Deutsche Bank.  See id. at 655 ("Because the deception essential to the misappropriation theory involves feigning fidelity to the source of the information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation.").

90.  The wholesale lack of any deceptive conduct in this case by Mr. Negrin or Mr. Rorech underscores that the SEC has failed to establish the necessary elements of its section 10(b) and Rule 10b-5 claim against the defendants.

CONCLUSION

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rules 52(a) and 65 of the Federal Rules of Civil Procedure.  For the reasons explained above, the

defendants are entitled to a Judgment **dismissing** the plaintiff's complaint.  The Clerk is directed to enter Judgment in favor of the defendants and closing this case.

SO ORDERED.

Dated:     New York, New York
           June 24, 2010

                                        John G. Koeltl
                                  United States District Judge